UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -     x

UNITED STATES OF AMERICA          :

  - v. -                                          :

                                                (S10) 98 Cr. 1023 (LAK)

AHMED KHALFAN GHAILANI          :

            Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - -     x


# GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION FOR AN ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT GRANT A TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION PRECLUDING THE DEPARTMENT OF DEFENSE FROM SEVERING THE ATTORNEY-CLIENT RELATIONSHIP BETWEEN THE DEFENDANT AND COLONEL JEFFREY P. COLWELL AND MAJOR RICHARD B. REITER


PREET BHARARA
United States Attorney
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA          :

  - v. -                          :

AHMED KHALFAN GHAILANI           :          (S10) 98 Cr. 1023 (LAK)

         Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION FOR AN ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT GRANT A TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION PRECLUDING THE DEPARTMENT OF DEFENSE FROM SEVERING THE ATTORNEY-CLIENT RELATIONSHIP BETWEEN THE DEFENDANT AND COLONEL JEFFREY P. COLWELL AND MAJOR RICHARD B. REITER

The Government respectfully submits this Memorandum of Law in response to Defendant's Motion for an Order to Show Cause Why the Court Should Not Grant a Temporary Restraining Order and Permanent Injunction Precluding the Department Of Defense from Severing the Attorney-Client Relationship Between the Defendant and Colonel Jeffrey P. Colwell and Major Richard B. Reiter ("Motion"). As set forth below, the Motion should be denied.

First, Mr. Ghailani simply has no Sixth Amendment or substantive due process right to an appointed legal team of his choice. As the Second Circuit has observed, "there is no constitutional right to continuity of appointed counsel." *United States v. Parker*, 469 F.3d 57, 61 (2d Cir. 2006). Further, as the Supreme Court has stated, "[t]he right of counsel of choice does not extend to defendants who require that counsel be appointed for them." *United States v.*

1

*Gonzalez-Lopez*, 548 U.S. 148, 151 (2006). Equally important, in an affirmation accompanying Mr. Ghailani's motion, his lead civilian lawyer states that the motion does not reflect on his own ability to represent Mr. Ghailani effectively or communicate with him. Thus, by the lead lawyer's own account, his client is receiving effective civilian representation in this case.

Second, the military judge advocates general ("JAGs") who represented Mr. Ghailani in the past, Colonel Colwell and Major Reiter, do not have a professional responsibility to accept Court appointment to represent Mr. Ghailani in this case. These military defense counsel's obligations to represent Mr. Ghailani ended when the military commission case at Guantanamo Bay ended. For the sake of a smooth transition to representation by his new civilian defense counsel, Colonel Colwell's and Major Reiter's Navy, Marine and Air Force commanders permitted them to assist civilian counsel in this case for an initial period of four months, and are considering whether to extend it for a short period longer. The Department of Defense views that accommodation as more than reasonable and fair in this exceptional situation.

Third, the Motion before the Court seeks to direct the assignment of particular military personnel to serve as defense counsel in this civilian criminal case. The United States respectfully submits that such an order exceeds this Court's authority. The circumstances under which a JAG may represent a party in a judicial forum are prescribed in a number of statutes with a reasonable degree of specificity. They include (i) the representation of an accused in a courts martial or military commission, (ii) the representation of an accused in civilian court in an appeal from a courts martial or military commission case, and (iii) the representation of the United States in a civil or criminal case in civilian court. In some circumstances, JAGs may also provide advice to servicemembers and their dependents in legal assistance matters. There is no statutory

provision authorizing JAGs to represent a non-servicemember in a civilian criminal case. And, various provisions of Title 10 make clear that individual assignment of a JAG is always at the discretion of the Judge Advocate General of each military service. That decision by the armed forces is entitled to great deference.[1]

## FACTS

On August 28, 2008, Marine Corps Colonel J.P. Colwell and Air Force Major Richard B. Reiter were assigned to defend Ahmed Ghailani before a military commission at Guantanamo Bay, Cuba, pursuant to the Military Commissions Act of 2006, 10 U.S.C. § 948k (2006). In that military commission proceeding, Mr. Ghailani was charged with offenses against the laws of war arising from alleged involvement in the 1998 bombing of the U.S. embassy in Tanzania.

The military charges against the defendant were withdrawn and dismissed in May 2009. In June 2009, before trial commenced in the military commission, Mr. Ghailani was transferred from Department of Defense custody at Guantanamo Bay to Department of Justice

---

[1] The Court should not and need not compel a particular assignment here. Colonel Colwell's and Major Reiter's commanders have determined, now that Mr. Ghailani's military commission case has ended, that these officers provide for a smooth transition to civilian counsel in the civilian case, and move on to other cases and duties. One fact worth noting is that, for the past nine months, military commissions cases have been stayed at Guantanamo pursuant to the President's Executive Order 13492, thus permitting Colonel Colwell and Major Reiter some time to work with Mr. Ghailani's new civilian counsel in the civilian case; that dynamic is very likely about to change as the suspension of military commissions soon winds down.

To be sure, the statements from Colonel Colwell and Major Reiter to this Court in support of this motion reflect the selfless dedication to duty that we expect of our U.S. military. However, equally essential to the military is that it is up to their commanders, not the individual officers personally, their client, or, respectfully, this Court, to consider, determine and assign their military mission.

3

custody to face the charges in Indictment No. 98 Cr. 123. That Indictment charges Mr. Ghailani

and others (who were previously convicted of those charges following trial in 2001) with federal

criminal offenses stemming from their alleged involvement in both the 1998 embassy bombings

in Tanzania and Kenya. On June 9, Mr. Ghailani was arraigned in this Court and, on June 16,

2009, attorneys Gregory Cooper and Peter Quijano were appointed pursuant to the Criminal

Justice Act ("CJA"), 18 U.S.C. § 3600A, as Mr. Ghailani's counsel in this criminal case.

Colonel Colwell and Major Reiter requested permission from their superior

officers to join in the representation of Mr. Ghailani in the civilian criminal case in New York.

On June 16, 2009, Jeh C. Johnson,[2] General Counsel of the Department of Defense, met with the

Judge Advocates General of the Army, Navy and Air Force, along with the Staff Judge Advocate

to the Commandant of the Marine Corps, to consider this request. Following the meeting, the

General Counsel issued written guidance in response to the request reflecting the unanimous

view of all the military services. Mr. Johnson noted that the case to which Colonel Colwell and

Major Reiter had been assigned to represent Mr. Ghailani — the proceeding before the military

commission — was over, and that a new assignment of Colonel Colwell and Major Reiter to

represent Mr. Ghailani in a criminal case in an Article III court would "take them outside the

normal realm of accountability for our U.S. military and our JAGs." Def. Ex. E at pp. 3.

However, sensitive to the need to provide for a smooth transition between Mr. Ghailani's military

counsel in the commission case and civilian counsel in the civilian case, Mr. Johnson's guidance

stated:

---

[2] As has been disclosed previously by the Court, Mr. Johnson and the District Judge in
the federal criminal case, Judge Kaplan, were once law partners.

4

> Colonel Colwell and Major Reiter should be permitted to advise and assist Mr.
> Ghailani and his new civilian defense counsel in the above-referenced case, as a
> matter of transition and to facilitate the new attorney client relationship, consistent
> with their professional obligations to Mr. Ghailani, for a period of up to four (4)
> months from today. This period may be extended by me upon good cause shown
> with the concurrence of the [The Judge Advocate General (TJAG)] concerned.

Def. Ex. E (emphasis added). In that same guidance, Colonel Colwell and Major Reiter were

advised not to file an appearance with this Court or allow themselves to be appointed as Mr.

Ghailani's counsel by this Court.

On July 1 and August 13, 2009, Mr. Cooper wrote Mr. Johnson to urge that he

reconsider the Department of Defense's position. Mr. Cooper requested that Colonel Colwell and

Major Reiter be authorized to "be full members of the team" and not serve in a mere transition

role. *See* Def. Exs. F and G at pp. 1. On July 6, Mr. Ghailani himself wrote to Mr. Johnson and

requested that Colonel Caldwell and Major Reiter be allowed to represent him. *See* Def. Ex. H.

On September 1, 2009, Mr. Johnson responded to Mr. Cooper that the four-month transition

period did not expire until October 19, 2009, and stated:

> If at that time you believe you need the continued assistance of Colonel Colwell
> and Major Reiter for an additional period, as a matter of transition, I urge you to
> write me then. In that application, it would be helpful if, without invading
> privileges, you could provide a specific and detailed account of what counsel has
> done to date and why they are needed for an additional period.

Def Ex. K. Rather than submit a request for renewal, on October 7, 2009, defense counsel

moved for a temporary restraining order and injunction requiring the Department of Defense to

appoint Colonel Colwell and Major Reiter as defense counsel in this case.

On October 23, 2009, Mr. Johnson, the Judge Advocates General of the Navy and

5

Air Force, along with the Staff Judge Advocate to the Commandant of the Marine Corps, met directly with Colonel Colwell and Major Reiter to consider whether to permit them more time to assist Mr. Ghailani and his civilian counsel in the case. Colonel Colwell made it plain that both he and Major Reiter were not interested in simply assisting the team as a matter of transition; they sought to be appointed as Mr. Ghailani's defense counsel for the duration of the case. Though Ghailani's civilian counsel has not requested it, Colonel Colwell's and Major Reiter's commanders are considering whether to permit them some limited and final additional to time to assist the defense team, again as a matter of transition. As of this writing, no determination has been made.

## DISCUSSION

Whether Colonel Colwell's and Major Reiter's commanders permit them to continue to assist Mr. Ghailani's defense team as a matter of transition, the United States respectfully objects to and opposes the defendant's extraordinary motion to compel the U.S. military to make available two of its own servicemembers to represent a defendant charged with federal criminal violations in an Article III court who already has appointed counsel under the CJA.

As described below, the defendant's request for relief presents issues that are nonjusticiable and raise serious separation of powers concerns.[3]  Even if this Court had

---

[3] The defendant appears to have styled his application as an ancillary civil action against the Secretary of Defense, without the commencement of a separate civil action. For reasons described below, it is unnecessary to determine whether ancillary jurisdiction is appropriate because the defendant's motion presents issues that are nonjusticiable and would thus fail in any event.

If the Court were to consider the question of its ancillary jurisdiction in this criminal case to entertain an application for civil relief against the Secretary of Defense, however, such

jurisdiction, however, a "preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Grand River Enters. Six Nations v. Pryor*, No. 02-CV-5068 (JFK), 2006 WL 1517603, at *16 (S.D.N.Y. May 31, 2006) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985)). In order to prevail on a motion for a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (*quoting Merkos L'Inyonei Chinuch, Inc. v. Ostar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)). For all of the reasons set forth herein, the defendant does not meet this burden, and his motion should be

---

jurisdiction cannot be assumed. By its terms, the jurisdictional provision invoked by the defendant, 28 U.S.C. § 1331, provides original jurisdiction in the district courts only over "*civil* actions arising under the Constitution, laws, or treaties of the United States" (emphasis added), and thus has no applicability in the context of a criminal prosecution. Moreover, any attempt to exercise ancillary subject matter jurisdiction to initiate such a civil proceeding in the underlying criminal case — to which the Secretary of Defense is not a party — would be inappropriate. *See Stein v. KPMG, LLP*, 486 F.3d 753 (2d Cir. 2007) (holding that district court acted "well outside its subject matter jurisdiction" by opening a civil docket and then exercising ancillary jurisdiction over contract claims against a non-party in a criminal prosecution of former employees of the non-party). As the Second Circuit in *Stein* made clear, any exercise of ancillary jurisdiction must be "consistent with the limited jurisdiction of federal courts" and that "the assertion of ancillary jurisdiction over matters that are otherwise outside the jurisdiction conferred by the Constitution and the Congress can be justified only by compelling needs arising in the exercise of jurisdiction that is conferred." *Id.* at 761. As discussed more fully below, however, the military's determination that the defendant's military counsel should be reassigned to other duties now that his military commission case has ended is nonjusticiable. Plainly, the "requisite compelling circumstances," *see id.* at 761, are absent when such a fundamental military issue is sought to be litigated as an ancillary matter by a party — here, the criminal defendant, Mr. Ghailani — who, at best, has an indirect interest in the relationship between Colonel Colwell and Major Reiter and their military superiors and is already represented by properly appointed civilian counsel for these proceedings. Thus the defendant's motion fails, whether for lack of ancillary jurisdiction over non-parties or the principles described below.

7

denied.

I.    **Defendant Has No Constitutional Right to Have Colonel Colwell and Major Reiter Appointed to Represent Him In This Case**

    A.    **The Fifth Amendment and Substantive Due Process**

Although the defendant's motion is couched in Fifth Amendment terms, the guarantee of substantive due process is inapplicable here. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal citations omitted). The Sixth Amendment guarantee to effective assistance of counsel should therefore guide the decision on the matter at hand. *See United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (applying Sixth Amendment analysis to choice of counsel issue).[4] Further, the defendant cannot demonstrate the sort of behavior necessary to trigger substantive due process concerns. "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense"; a "cognizable level of executive abuse of

---

    [4] To the extent that defense relies upon *Stein* to support a Fifth Amendment argument, that case makes plain the distinction between Fifth Amendment constraints applicable to pre-indictment Government conduct and the Sixth Amendment right to effective assistance of counsel free of unjustifiable government interference, addressed below, that attains post-indictment. *Stein*, 541 F.3d at 153, n12. However, the defense does not complain that the Government interfered with Mr. Ghailani's attorney-client relationship pre-indictment but, on the contrary, complain that the meaningful relationship that developed between Mr. Ghailani and military defense counsel must continue post-indictment to sustain his Fifth Amendment right to fairness in the criminal process. The latter contention is unsupported by this or other authority. *Id.*

power [is] that which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal citations omitted). And where there is no authority for military counsel to be assigned to serve as counsel for a defendant in a civilian criminal proceeding, it cannot be said that the failure to make such an assignment is "egregious." This is particularly true here, where the military already has as a discretionary matter authorized military counsel to assist the defendant's CJA-appointed counsel during a months-long transition period.

**B.    The Sixth Amendment**

The defendant asserts that Colonel Colwell and Major Reiter established a good working attorney-client relationship with him during the life of the military commissions case. However, the military commission case has been dismissed, Mr. Ghailani faces federal criminal charges in this Court, and he accordingly has been assigned civilian defense counsel qualified for such an appointment, pursuant to the CJA, 18 U.S.C. § 3006A, and this Court's Plan for implementing the CJA, *see* U.S. Dist. Ct. for the S.D.N.Y., Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act (Dec. 10, 2008) ("CJA Plan"). Thus, although styled as a request to continue the representation of his military counsel, the defendant's motion ignores the fact that his military counsel have never represented him in these proceedings. The question before this Court is not one of maintaining continuity of counsel; it is whether to order the intervention of military personnel as counsel contrary to the decisions of their superior officers.

In short, despite the proper appointment of his counsel, Mr. Ghailani ultimately requests that Colonel Colwell and Major Reiter also be appointed as his counsel in this case. But his desire for certain counsel does not rise to the level of a Sixth Amendment right. At the

9

outset, his request for, in essence, four appointed counsel is contrary to this Court's CJA Plan. *See* CJA Plan VII.C.4 (allowing for the appointment of two counsel "[i]n an extremely difficult case"). Moreover, it is axiomatic that an indigent defendant does not have the right to appointed counsel of his choice - even to maintain continuity of counsel. For example, the Second Circuit has held unambiguously that "[t]here is no constitutional right to continuity of appointed counsel." *United States v. Parker*, 469. F.3d 57, 61 (2d Cir. 2006) (*citing Morris v. Slappy*, 461 U.S. 1, 11-13 (1983) (noting that there is no right to a "meaningful attorney-client relationship")); *see also United States v. Simpson*, 227 Fed. Appx. 41, 42 (2d Cir. 2007) (citing cases and affirming the limits on choice of counsel). This is consistent with precedent in other courts. *See United States v. Burns*, 990 F.2d 1426, 1437 (4th Cir. 1993) ("Although an indigent defendant has an absolute right to have counsel appointed to represent him, the Sixth Amendment does not guarantee representation by a lawyer in whom the defendant reposes special confidence or with whom the defendant is able to establish a 'meaningful relationship.' Therefore, a defendant's disappointment with appointed counsel can undermine his conviction only if counsel's performance fell below an objective standard of reasonableness under all the circumstances and if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'") (internal citations omitted).

Mr. Ghailani primarily relies on *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). *Gonzalez-Lopez*, however, is inapposite. There, the Supreme Court specifically noted that, "[t]he right to counsel of choice does not extend to defendants who require counsel be *appointed* for them. Nor may a defendant insist on representation by a person who is not a member of the bar . . ." 548 US at 151 (emphasis added and internal citations omitted). Indeed,

courts consistently have held that an indigent defendant does not have the constitutional right to appointed counsel of his choice. *See Caplin v. Drysdale, Chartered v. U.S.*, 491 U.S. 617, 626 (1989) ("Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of ... counsel.'") (citation omitted). Neither Colonel Colwell nor Major Reiter is available for hire or appointment under the Court's CJA Plan, nor may the services of either be lawfully obtained absent express permission from their superiors, as discussed below.

There is simply no Sixth Amendment right to a government-supported appointed defense team of choice, or to appointed counsel with whom the defendant may enjoy a good relationship. For this reason, the defendant has not demonstrated any likelihood of success in his request seeking this Court's extraordinary intervention. His motion to appoint counsel outside the provisions of the CJA Plan should therefore be denied.

## II.    Colonel Colwell and Major Reiter Do Not Have a Professional Responsibility To Represent Mr. Ghailani In This Court

As a matter of professional responsibility, Colonel Colwell and Major Reiter have no continuing obligation, now that the military commission case is over, to also represent Mr. Ghailani before this Court. As with any criminal defense lawyer, Colonel Colwell and Major Reiter's obligation to represent the accused ended when the case before the military commission was withdrawn. *See, e.g.*, 22 N.Y.C.R.R. 606.5 (1st Dep't) (noting that a criminal lawyer's obligation to represent a client generally ends when the case ends); *see also United States v. Parker*, No. 00-CR-0053A, 2004 WL 2095684 (W.D.N.Y. Sept. 14, 2004) (applying New York

11

State ethical obligations as required by the New York Federal court's local rules). The lawyer's obligation to participate in the case is to the client and the particular court which appointed him or her counsel in the case. Once the case ends in a particular tribunal, the lawyer's duty to the tribunal ends. The only other duty is to the client, and there is no legal support for the proposition that a lawyer has a professional obligation to represent the client in a new but related case.

Where an attorney makes an appearance in a case and later withdraws, the attorney has an obligation to ensure a smooth transition to successor counsel and avoid foreseeable prejudice to the client. *See* New York Rules of Professional Conduct, Rule 1.16(e) (eff. Apr. 1, 2009) (formerly DR 2-110); Air Force Rules of Professional Conduct and Standards of Civility, Rule 1.16(d) (17 Aug. 2005); Army Regulation 27-26, Rule of Professional Conduct for Lawyers, Rule 1.16 (1 May 1992); Navy JAG Instruction 5803.1c (9 Nov. 04). In keeping with the spirit of this rule, Colonel Colwell and Major Reiter were permitted to serve in a transition role for the past four months, even though they were never Mr. Ghailani's counsel in this case.

## III.    The Defendant's Request to Have this Court Assign Military Personnel to Particular Duties Raises Grave Separation of Powers Concerns and is Nonjusticiable

Mr. Ghailani requests this Court's extraordinary intervention to compel the military to provide Colonel Colwell and Major Reiter as his counsel in this case, over the objection of the military. Specifically, both officers' commanders in the senior military leadership of the Navy, Air Force and Marine Corps have determined that they are not available for appointment as defense counsel in this case. Thus, Ghailani seeks to have the Court

effectively direct that these two military officers be detailed to his case, contrary to the

determination of their military commanders, without regard to the normal array of considerations

that go in to the assignment by a military commander to a specific mission.

   The Judge Advocate General of each military service has the express statutory

authority and responsibility to assign and direct the duties to be performed by JAGs under their

supervision. *See* 10 U.S.C. § 806(a); 10 U.S.C. § 3037(c)(2) (Army); 10 U.S.C. § 5148(d)(2)

(Navy and Marine Corps); 10 U.S.C. § 8037(c)(2) (Air Force).  In addition, there are specific

circumstances, contemplated and prescribed by statute, under which JAGs may represent a client

in a judicial forum - none of which are met here.  The Uniform Code of Military Justice provides

that JAGs are available to serve as defense counsel in courts-martial pursuant to Article 27(a)(1)

of the Uniform Code of Military Justice (10 U.S.C. § 827(a)(1)), and the Military Commissions

Act (10 U.S.C. § 948k) provides for JAGs to serve as defense counsel for the accused before

military commissions.  In both instances, the JAG may serve as defense counsel in a criminal

case, but within the context of a military court.  Beyond that, there are a limited number of

statutorily prescribed circumstances in which JAGs may be permitted to appear in Article III

courts.  These circumstances include: (1) representation of the United States in civil and criminal

trials, pursuant to Article 6(d)(1) of the Uniform Code of Military Justice (10 U.S.C. § 806(d)(1)

and 10 U.S.C. § 973(b)(2)(B));  (2) where JAGs serve as appellate counsel in connection with the

review of court-martial cases, pursuant to Article 70(e) of the UCMJ (10 U.S.C. § 870(e)); (3) in

conjunction with an initial proceeding under the Military Extraterritorial Jurisdiction Act (18

U.S.C. §§ 3265(c)(1) and (2)); (4) on behalf of servicemembers and their dependents on legal

assistance matters (pursuant to 10 U.S.C. § 1044(c)); and (5) where JAGs assigned as appellate

counsel for those tried by military commission may appear in the United States Court of Appeals for the District of Columbia Circuit and the Supreme Court, on appeal from the Court of Military Commission Review (pursuant to 10 U.S.C. § 950h). There is no express statutory provision for what the defendant seeks here: JAGs to be appointed as criminal defense attorneys in an Article III court to defend an individual charged with offenses against Title 18 of the U.S. Code.

Even if there were express statutory authority for a JAG to represent a criminal defendant in a federal civilian court, given the nature of the military, the Judge Advocate General of each service always retains the general authority under 10 U.S.C. § 806(a) to assign and reassign a specific JAG to duties within their respective service. In this instance, both Colonel Colwell's and Major Reiter's superior officers in the Marines and the Air Force have determined not to permit these JAGs to be assigned and appointed as defense counsel to Ghailani in this civilian criminal case. *See* Decl. of Colonel Roberta Moro, USAF, ("Moro Decl."), Oct. 25, 2009 (Exhibit A); and Decl. of Major Hanorah E. Tyer-Witek, USMC, ("Tyer-Witek Decl."), Oct. 25, 2009 (Exhibit B).

The defendant seeks nothing less than an order from this Court compelling the military to assign its personnel to defend him in this forum and ignores the serious constitution issues his request raises. Such an order would entail the diversion of military personnel away from their intended duties, to the detriment of the armed services. *See* Moro Decl. ¶ 5 (noting that military commission assignments cause vacancies elsewhere in critical supervisory positions); ¶ 7 (describing factors the military takes into account in making personnel assignments); ¶¶ 8-9 (noting the detrimental impact of allowing military counsel to continue representation of defendant). The Constitution, however, vests in the President alone the power

14

to be the "Commander in Chief of the Army and Navy of the United States," U.S. Const. art. II, § 2; *see DeCosta v. Laird*, 471 F.2d 1146, 1154 (2d Cir. 1973); *Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C. Cir. 2006). As the Supreme Court has observed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). It is the President's "exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring). Courts therefore exercise particular care not to intrude into the Executive Branch's control over military matters. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991). This is because, as noted, the Constitution makes a "specific textual commitment of decision-making responsibility in the area of military operations in a theatre of war to the President, as Commander in Chief." "It is-and must-be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means." *Overseas Media Corp. v. McNamara*, 385 F.2d 308, 314 (D.C. Cir. 1967); *see also Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997) (noting that "[t]he Constitution emphatically confers authority over the military upon the executive and legislative branches of government" and that "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions").

Accordingly, it is well-settled that military decisions are nonjusticiable and courts generally must defer to actions of military officials, particularly personnel decisions. *See Orloff*

15

*v. Willoughby*, 345 U.S. 83 (1953) (refusing to undertake review of Army's commissioning and assignment decision regarding physician draftee who refused to take loyalty oath). "Deference by the courts to military-related judgments by Congress and the Executive is deeply recurrent in Supreme Court case law and repeatedly has been the basis for rejections to a variety of challenges to Congressional and Executive decisions in the military domain." *Able v. United States*, 155 F.3d 628, 633 (2d Cir. 1998); *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ( "[I]t is the primary business of armies and navies to fight or be ready to fight wars…[t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress and with the President"). As the Court explained in *Orloff*, "[J]udges are not given the task of running the Army. . . [o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to interfere in judicial matters." 345 U.S. at 93-94; *see also Falk v. Secretary of the Army*, 870 F.2d 941, 945 (2d Cir. 1989) (holding deference to military judgment "significantly reduces the ordinary scope of review"). The Court has recognized that with respect to military decisions the "lack of competence on the part of the courts is marked." *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981); *see Aktepe*, 105 F.3d at 1403-04.

The Second Circuit has likewise observed that "[t]he Supreme Court has repeatedly counseled that '[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between [junior] military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the Military establishment.'" *Dibble v. Fenimore*, 339 F.3d 120, 125 (2d Cir. 2003) (*quoting Chappell*, 462 U.S. 296, 300 (1983)). The rule of nonjusticiability

16

of purely discretionary decisions by military officials which are within their valid jurisdiction

extends to situations where injunctive relief is sought. *See Jones v. New York State Division of*

*Military and Naval Affairs*, 166 F.3d 45, 55 (2d Cir. 1999) (holding exhaustion of administrative

remedies prerequisite to pursuit of equitable relief, but noting applicability of justicability

analysis to request for an injunction to require convention of Flying Evaluation Board). The

issuance of an injunction halting facially-valid military assignment orders constitutes

unwarranted judicial interference in military affairs. *See Cortright v. Resor*, 447 F.2d 245,

254-55 (2d Cir. 1971), cert. denied, 405 U.S. 965 (1972) (reversing injunction halting

reassignment orders for soldier who claimed First Amendment violations relating to his protest

of Vietnam War).

      The military has determined that the defendant's military commission counsel are

to be reassigned now that the military commission proceedings has been dismissed. *See*

Tyer-Witek Decl. ¶¶ 2-3; Moro Decl. ¶¶ 5, 8-9. The issue of a military assignment, by

definition, takes into account uniquely military matters ill-suited for judicial resolution. Indeed,

this Court has already recognized that the assignment of Colonel Colwell and Major Reiter to

this case is necessarily a matter for the Department of Defense to determine.[5] As set forth in the

---

     [5] On June 16, the Court made these remarks: "Now, so far as Colonel Colwell and his colleague are concerned, I have been informed that under military regulations, they cannot represent you in this court without the permission of their superior officers in the Department of defense;" "Assuming the military allows them to go forward . . ."; "So I gather from all of that that you stand by your application to withdraw your appearance and that your application to be appointed CJA counsel is contingent upon my not allowing Colonel Colwell and his colleague to be part of the defense team, or alternatively, the Defense Department taking that question away from me by denying the permission; is that right?"; and "I am going to appoint his counsel and if he wishes two military lawyers that he has identified to be involved and if the Defense Department allows them to be involved, . . ." Transcript at pp. 6, 7, 14 , 21. On July 2, the Court stated: "Well, look, I think I can guess the competing demands on the decision maker or makers

17

accompanying declarations of Colonel Moro and Major Tyer-Witek, in assigning JAGs, the

Judge Advocate General and their designees must consider: (1) mission prioritization in

absorbing vacancies; (2) the need for Guard and Reserve presence in the field; (3)

career-rounding assignment opportunities, especially as the officer approaches senior grades; (4)

high-tempo and out-of-cycle deployment taskings for Iraq, Afghanistan, and other deployed

locations; and (5) increased leadership value of the officer based upon promotion. *See* Moro

Decl. ¶ 2; Tyer-Witek Decl. ¶ 7. To be sure, both Colonel Colwell and Major Reiter, in their

submissions to this Court, reflect the selfless commitment to duty the military expects of all

officers. Regardless of their personal views of any career impact they may or may not face based

upon continued representation of Mr. Ghailani in federal court, it is their military commanders

who are charged with determining the best interests of their military departments, operational

requirements, and the officers' career progression and future utility for the good of the national

defense. These considerations and consequent decisions, uniquely military in nature, are within

the sound discretion of their respective service chains of command and may not be

second-guessed by this Court. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex

subtle, and professional decisions as to the composition, training, equipping, and control of a

military force are essentially professional military judgments, subject always to civilian control

of the Legislative and Executive Branches."); *accord Chappell*, 462 U.S. at 305 (stating "'courts

are ill-equipped to determine the impact upon discipline that any particular intrusion upon

military authority might have.'" (emphasis removed) (quoting Chief Justice Earl Warren, The

_____

at the Defense Department with respect to the participation of Major Reiter and Colonel Colwell,
and that is their judgment." Transcript at p. 27.

18

Bill of Rights and the Military, 37 N.Y.U.L. Rev. 181, 187 (1962)); *see also Orloff*, 345 U.S. at 94.

In sum, an order directing the U.S. military to take specific and judicially-determined steps to provide its personnel to augment Mr. Ghailani's CJA-appointed counsel, despite the military's determination that such assignment would not be in the national interest, would be flatly inconsistent with these well-recognized separation-of-powers principles. For these reasons the defendant's motion should be denied.

**IV.    Defendant Has Failed to Show Irreparable Harm In the Absence of an Injunction**

Defendant has failed to demonstrate irreparable harm. The Second Circuit has held that while it is true that impairment of a constitutional right "can undoubtedly constitute irreparable injury," it is "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable v. Bloomberg*, 118 F.3d 917, 924 (2d Cir. 1997).

Here, Mr. Ghailani is more than adequately represented by Messrs. Cooper and Quijano, even if military counsel do not continue in their transition role or serve as appointed counsel before this Court. In fact, Mr. Cooper himself attests to the effective assistance of counsel Mr. Ghailani would be provided regardless of Colonel Colwell's and Major Reiter's status: "This statement is not a reflection on my ability to communicate with Mr. Ghailani or effectively defend him." Affirmation of Mr. Gregory Cooper, para. 17, lines 5 and 6. This acknowledgement by Ghailani's lead civilian counsel ought to be fatal to any claim that a temporary restraining order and permanent injunction are necessary to cure a Constitutional

violation. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984); *Able v. United States*, 847 F.

Supp. 1038, 1043 (E.D.N.Y. 1994) (citing *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992)).

   Indeed, in balancing the harms, as this Court must, *MyWebGrocer, LLC*, 375 F.3d

at 192, it is apparent that the defendant has not met his burden.  The defendant seeks this Court's

unwarranted interference in decisions concerning the assignment of military personnel and,

indeed, his motion amounts to a request that this Court countermand decisions made by military

counsels' superior officers.  Such an order would be harmful to the military in this case. *See, e.g.*,

Moro Decl. ¶ 5 (noting that continued assignment of military counsel deprives the service of

personnel requiring litigation experience); *see also id.* ¶ 9 (describing harm to career of military

counsel from prolonged assignment).  And, for all the reasons described above, it would be

harmful to the Government generally because matters of military tactical deployment and

personnel assignment are properly resolved by the political branches, rather than the Court.

## Conclusion

For the reasons stated above, the Motion should be denied.


Dated: New York, New York
      October 26, 2009

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney
                                Attorney for the Respondent

By:       _Ross Morrison / mc_____

                                Ross E. Morrison
                                Assistant United States Attorney
                                86 Chambers Street, 3rd Floor
                                New York, New York 10007
                                Tel: (212) 637-2691

Robert E. Easton
Director
Office of Litigation Counsel
Department of Defense
      -Of Counsel-

Exhibit A

UNITED STATES OF AMERICA )
                                   )
vs.                                   )
                                   )
AHMED KHALFAN GHAILANI )
                                   )

DECLARATION OF

COLONEL ROBERTA MORO

UNITED STATES AIR FORCE

I, Colonel Roberta Moro, United States Air Force, being first duly sworn upon oath, hereby state the following:

1. I am the director of the Professional Development Directorate, Office of The Judge Advocate General (TJAG), United States Air Force.

2. The Professional Development Directorate ("JAX") is responsible for implementing and managing all phases of the JAG Corps' officer professional development by directing various personnel programs for TJAG. These programs include recruiting, accessions, professional education, personnel manpower, deployment sourcing, and assignments. JAX is responsible for making assignment recommendations to TJAG and implementing the assignment decisions of TJAG, who is the approval authority for all judge advocate assignments.

3. In preparing this declaration, I have worked primarily from my own personal experience and work with active duty officers. Additionally, as to those issues which impact Air Reserve Component Officers, I have consulted Colonel Mitchel Neurock. Colonel Neurock is the Air Reserve Component Advisor to The Judge Advocate General. In this capacity, he provides senior-level advice to The Judge Advocate General on all matters concerning the Air Force Reserve and Air National Guard programs.

4.. The Air Force is responsible for filling 34 judge advocate positions in the Office of Military Commissions (OMC); including 15 for the Prosecution Office, 16 for the Defense Office, 2 for the Convening Authority's Office, and 1 for the Judiciary's Office. These are the Air Force's share of current requirements. The judge advocates filling these positions are a mixture of active duty and Air Reserve Component (ARC) officers (Reservists and Guardsmen).

5. Assignment to OMC is generally for two to three years. The nature of the mission at OMC necessitates the assignment of experienced counsel with an extensive background in military justice. In order to staff OMC, the Air Force reassigned experienced active duty counsel from positions throughout the Air Force. These reassignments have caused many positions to remain vacant for long periods of time. These vacancies include critical Senior Counsel positions (prosecution and defense), typically filled by our more experienced litigators. Senior Counsel try our more challenging courts-martial and provide mentorship for junior counsel throughout the Air Force, a necessary management

and leadership tool for the force development of the Air Force JAG Corps. Consequently, if military counsel are tasked above and beyond our OMC requirements, we may not be able to fill key billets requiring litigation experience.

6. The detail of ARC members to OMC deprives the active duty offices to which the Reservists were attached and the Guard units to which the Guardsmen were assigned of their services. Extended or unanticipated OMC duty will impact our ability to fill key billets in this arena as well. This, necessarily, can have an adverse impact on operational support requirements.

7. In making all these decisions, ARC and active duty alike, we take into account such matters as: (1) the mission priority of the various billets involved; (2) the individual career path and progression of the officer involved; and (3) manpower requirements for other mission obligations. These considerations are compounded because we face a significant number of deployment requirements for Iraq, Afghanistan, and other deployed service locations around the world.

8. Generally, assignment to OMC is considered career-enhancing given the mission of the OMC to try complex, high-visibility cases. A tasking to represent a client in United States District Court could similarly be considered career enhancing. However, if a judge advocate works only one case, especially for a long period of time, it can make for a one-dimensional performance report (annual written appraisal for officers considered by promotion boards) which may have a negative impact when considered for promotion. In some cases, as in the case of a more senior reservist, long-term defense work for a single client necessarily diminishes opportunities for the broad-based leadership experience expected for promotion to colonel in the competitive legal career field.

9. Major Reiter was selected for promotion to lieutenant colonel in this year's promotion board, and is scheduled to assume the higher grade in May 2010, given the current promotion sequence. Tentatively, he will meet his promotion board for colonel in October 2014. Although this 2014 date may seem like a long time off, it is actually a relatively narrow window in which to take meaningful positions of increasing leadership. While Major Reiter heads a satellite OMC defense office and supervises other attorneys and support personnel, an extended stay in an office with such a limited nature of practice could have an effect on his opportunity for further promotion -- not because of the work itself, but because of the time spent away from the mainstream of JAG practice and the lack of opportunity to assume greater leadership positions. As to his OMC assignment, Major Reiter started active duty at OMC as of May 31, 2008, with orders slated to extend through March 1, 2010.

10. The Judge Advocate General has determined he will not make Major Reiter available to defend clients in United States District Court.

I have read the foregoing declaration, know the contents thereof, and declare under penalty of perjury of the laws of the United States that it is true and correct.

DATED this 22nd day of October, 2009.

_Roberta Moro_

Roberta Moro, Colonel, USAF
Director, Professional Development Directorate
Office of The Judge Advocate General (TJAG), United States Air Force.
1420 Air Force Pentagon, Rm 5D116
Washington DC 20330-1420

Exhibit B

UNITED STATES OF AMERICA   )

)   DECLARATION OF

vs.   )

)   MAJOR HANORAH E. TYER-WITEK

AHMED KHALFAN GHAILANI   )

)   U.S. MARINE CORPS

_____)

I, MAJOR HANORAH E. TYER-WITEK, U.S. MARINE CORPS, being first duly sworn upon oath, hereby say:

1.  I am the Head, Judge Advocate Support Branch, Judge Advocate Division, Headquarters Marine Corps.  I am the occupational field sponsor for judge advocates in the Marine Corps.

2.  The Deputy Commandant for Manpower and Reserve Affairs, Manpower Management Officer Assignments (MMOA) section makes assignments based on the following priorities (listed in order of precedence):
A. Needs of the Marine Corps;
B. MOS/Billet variety—command versus staff tour;
C. Availability of the individual;
D. Overseas control date (OCD);
E. Seniority; and
F. Individual Preference.
The normal minimum prescribed tour of duty in the Fleet Marine Force in the Continental United States is 36 months.

3.  Col Jeffery P. Colwell, U.S. Marine Corps is a judge advocate in the U.S. Marine Corps.  His current assignment as a defense counsel for the Office of Military Commissions began in 2008. He began his tour as a Lieutenant Colonel and has subsequently been promoted.  His billet is designed for a Lieutenant Colonel, which makes him eligible to move during the summer of 2010 into a billet commensurate with his new grade of Colonel.  His current assignment allows him to represent assigned clients pending charges before the military commissions.  His assignment does not allow him to represent these same clients in alternate forums once their cases pending before a commission are dismissed, withdrawn or otherwise concluded in the commissions' process.

     I have read the foregoing declaration, know the contents thereof, and

     declare under penalty of perjury of the laws of the United States that it is

     true and correct.

     DATED this 22nd day of October, 2009.

Hanorah E. Tyer-Witek, Major, USMC
Head, Judge Advocate Support Branch
Judge Advocate Division
Headquarters Marine Corps
Phone: (703) 693-8161
hanorah.tyer-witek@usmc.mil