UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,


       -against-                                S10 98 Crim. 1023 (LAK)


AHMED KHALFAN GHAILANI,

                           Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION

Appearances:

         David Raskin
         Michael E. Farbiarz
         Ross E. Morrison
         Assistant United States Attorneys
         PREET BHARARA
         UNITED STATES ATTORNEY

         David Brash
         Robert E. Easton
         Director
         Office of Litigation Counsel
         DEPARTMENT OF DEFENSE

         Gregory E. Cooper, Esq.
         Peter Enrique Quijano, Esq.
         Michael K. Bachrach, Esq.
         *Attorneys for Defendant*


LEWIS A. KAPLAN, *District Judge.*

        Ahmed Khalfan Ghailani, an alleged member of Al Qaeda, was indicted in this Court

in 1998 and charged with conspiring with Usama Bin Laden and others to kill Americans abroad by,

among other means, bombing the United States Embassies in Nairobi, Kenya, and Dar es Salaam,

2

Tanzania.  An arrest warrant promptly issued.  Some years later, Ghailani was captured abroad by a foreign state and turned over to the Central Intelligence Agency ("CIA").  Rather than execute the outstanding arrest warrant, the executive branch held Ghailani in CIA custody.  Much later, he was transferred to secure facilities at the United States naval base at Guantanamo Bay, Cuba, where he remained until he was turned over to civilian authorities and presented pursuant to the warrant earlier this year.  He now stands charged with, among other crimes, conspiring to kill Americans both here and abroad including by bombing the East African embassies.

While Ghailani was at Guantanamo, he was charged before a military commission with one of the embassy bombings.  Two military officers, members of Marine and Air Force Judge Advocate General Corps, were assigned as his defense counsel.  Although the military commission proceeding was aborted, Ghailani now seeks an injunction barring the Secretary of Defense from reassigning those officers to other duties and requiring that he permit them to participate fully in Ghailani's defense in this Court.  He argues that his constitutional rights to due process of law and to the effective assistance of counsel would be violated absent the full participation of these military counsel.

*Facts*

A.    *The Indictments*

Ghailani first was indicted by a grand jury in this Court on December 16, 1998.  The indictment, the third superseding indictment in this case, charged the existence of a broad ranging conspiracy by Usama Bin Laden and others, including Ghailani, to wage a campaign of terror against

3

the United States.[1]   Among the alleged means and methods of the conspiracy were (a) killing Americans abroad and (b) the bombing of the United States Embassies in Nairobi and Dar es Salaam.[2] Ghailani was charged with participation in the conspiracy and with substantive offenses.

The indictment in this case has been superseded many times since December 1998. Ghailani now is charged in the tenth superseding indictment, which was returned on March 12, 2001.[3] Unlike the third superseding indictment, the tenth alleges that the conspiracy in which he participated included among its objects the killing of Americans *both* in the United States and abroad.[4]  He faces additional conspiracy and substantive charges under the current indictment,[5] but  the broad outline of his alleged involvement in the conspiracy remains largely the same as in previous instruments.

B.    *Ghailani's Capture and Detention*

This Court issued a warrant for Ghailani's arrest on the day he first was charged.[6]  The warrant was not promptly executed, presumably because he could not be found.

On July 24, 2004, Ghailani was taken into Pakistani custody.  He was transferred to

---

[1]    Third superseding indictment  [DI 31] ¶¶ 1-9.

[2]    *Id.* ¶ 9.

[3]    DI 550.

[4]    The charged conspiracy was enlarged to include the killing of Americans here as well as abroad in the sixth superseding indictment [DI 73], filed June 16, 1999.

[5]    Ghailani is now charged with the alleged bombing and murders in Nairobi as well as Dar es Salaam.  Tenth superseding indictment [DI 550] ¶¶ 33, 41.

[6]    Docket entry following DI 31.

4

exclusive United States control and then held and interrogated outside of the United States by the CIA as part of a secret intelligence-gathering program.[7]  In September 2006, President Bush ordered that Ghailani and several other "high value detainees" be transferred to the U.S. naval base at Guantanamo Bay,[8] where he was held in military custody for approximately 32 months.

C.      *The Military Commission Prosecution at Guantanamo*

In March 2008, Ghailani was charged before a military commission at Guantanamo with offenses related to the 1998 embassy bombing in Dar es Salaam.  A month later, Lieutenant Colonel Michael Acuff, United States Army Reserve, was assigned to represent him in that proceeding.  Some time later, Ghailani requested new counsel in consequence of which Lieutenant Colonel Acuff was reassigned in August 2008.  Soon thereafter, the Chief Defense Counsel of the Office of Military Commissions assigned Lieutenant Colonel Jeffrey P. Colwell, United States Marine Corps, and Major Richard B. Reiter, United States Air Force, to represent him.[9]

By all accounts, Colonel Colwell and Major Reiter established good working relationships with the defendant.  At his October 22, 2008 arraignment before the military commission, Ghailani requested that a civilian attorney, Scott Fenstermaker, Esq., be allowed to join the defense team, but he indicated also that he wanted Colonel Colwell's and Major Reiter's representation to continue.  Colonel Colwell and Major Reiter spent considerable time and effort

---

[7]         Def. Ex. A ¶ 6.

[8]         *Id.* ¶ 7.

[9]         Def. Ex. B.

5

preparing for Ghailani's defense before the military commission, including several trips to meet with the defendant at Guantanamo.

D.    *Ghailani's Transfer to the Criminal Justice System and His Subsequent Representation in this Court*

After taking office in January 2009, President Obama suspended the military commissions and, on May 21, 2009, announced that Ghailani would be transferred to this Court for prosecution. Immediately thereafter both Ghailani and his military counsel formally requested that Colonel Colwell and Major Reiter be permitted to represent the defendant in this forum.[10] These requests ultimately were denied save that Colonel Colwell and Major Reiter were given permission to remain involved with the defense until October 19, 2009 so that they might effectively "transition" the case to Ghailani's appointed civilian counsel.[11]

E.    *The Present Motion*

On October 7, 2009, the defense moved by order to show cause for a temporary restraining order and permanent injunction enjoining the reassignment of Colonel Colwell and Major Reiter at the conclusion of the transition period on October 19, 2009.[12] Ghailani claims that such a reassignment would violate his Fifth Amendment right to due process of law and his Sixth Amendment right to the effective assistance of counsel.

---

[10]    *See* Def. Ex. C, May 22, 2009; Def. Ex. D, May 26, 2009.

[11]    Def. Ex. E, June 19, 2009.

[12]    The October 19, 2009, deadline has been extended pending the determination of this motion.

It is important to note the precise manner in which the application is framed.  The papers bear the caption of this criminal case followed by an additional caption styled *Ahmed Khalfan Ghailani, Petitioner, against Robert M. Gates, Secretary of Defense, Respondent.*  They seek an injunction against the Secretary of Defense.  Ghailani, however, has filed no such civil action.

*Discussion*

This is a criminal prosecution to which the Secretary of Defense is not a party.  Thus, by styling the application as one for an injunction against the Secretary, the defense has raised a number of preliminary questions, including whether the Court could and should grant relief against the Secretary in this case, assuming *arguendo* that relief otherwise were warranted.  The Defense Department and the United States Attorney's Office ("USAO"), moreover, have met the defense on this ground.[13]  But the application must be viewed from another perspective as well.

In essence, the defendant claims that the United States government, the word "government" here used to refer to the United States as a whole rather than in the more limited sense used in criminal cases, where it typically refers to the USAO and the Department of Justice, threatens to act in a manner that would violate his Fifth and Sixth Amendment rights in this criminal case.[14]  There appears to be little doubt that "[i]f . . . a Sixth Amendment violation is the result of ongoing government conduct, the district court . . . may order the cessation of such conduct" in the context of

---

[13]     Indeed, the Assistant United States Attorney assigned to the motion is from the Civil Division, and counsel for the Defense Department also has appeared.

[14]     *See* Transcript, Oct. 28, 2009, at 12-15.

a criminal case.[15]  There is no doubt at all that a completed violation of Fifth or Sixth Amendment rights may warrant dismissal of an indictment.[16]  Accordingly, the Court will consider both the specific application for an injunction against the Secretary of Defense and the more general assertion that relief is warranted against the United States as part of this criminal prosecution.

I.      *Jurisdiction Over and Justiciability of the Motion for an Injunction Against the Secretary*

      A.      *The Standard for Injunctive Relief*

"A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the requested relief is denied."[17]  The standard for a permanent injunction is the same except that the applicant must prevail, as distinguished from establishing some likelihood of success, on the merits.[18]  In order to prevail here, then, Ghailani first must establish that the Court has jurisdiction – power – to grant relief against the Secretary if relief were warranted and that prudential considerations would permit the exercise of any such power.  I begin with those

---

15

      *Stein v. KPMG, LLP*, 486 F.3d 753, 763 (2d Cir. 2007).

16

      *Id.* at 762-63 (dismissal of an indictment for Fifth and Sixth Amendment violations "always . . . available"); *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (affirming dismissal of indictment for Sixth Amendment violations).

17

      *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 152-53 (2d Cir. 2007) (emphasis in original).

18

      *See, e.g.*, *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (citing *Amoco Prod'n Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n.12 (1987)).

8

questions.[19]  The further issue whether the reassignment of Colonel Colwell and Major Reiter would violate Ghailani's  constitutional rights is common to his claims against the Secretary and for relief against the government, meaning here the prosecution, and therefore is treated separately below.


B.    *Subject Matter Jurisdiction*

"Federal district courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."[20]

Jurisdiction in this case is invoked under Section 3231 of the Criminal Code,[21] which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  In seeking to obtain an injunction against the Secretary, Ghailani seeks relief that is beyond the scope of that statute.  The question therefore arises whether jurisdiction may be grounded in the doctrine of ancillary jurisdiction or elsewhere.

The doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some

---

[19]

*See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 101-02 (1998) (rejecting "hypothetical jurisdiction" doctrine, which assumed the existence of jurisdiction and decided the merits instead); *Powell v. McCormack,* 395 U.S. 486 (1969) (deciding subject matter jurisdiction, then justiciability, before considering merits); *Nixon v. United States,* 506 U.S. 224, 226 (1993) ("[B]efore we reach the merits . . . we must decide whether it is 'justiciable,' that is whether it is a claim that may be resolved by the courts."); *see also ProShipLine, Inc. v. Aspen Infrastructures, Inc.,* ___ F.3d ___, 2009 WL 3380611, at *5 n.7 (2d Cir. Oct. 22, 2009) (in light of *Steel Co.,* deciding jurisdiction before affirming on the merits).  *But cf. Professional Traders Fund, LLC v. Prairie Oil & Gas, Inc.,* 521 F. Supp. 2d 313, 314-15 (S.D.N.Y. 2007).

[20]

*Kokkonen v. Guardian Life Ins. Co. of Amer.,* 511 U.S. 375, 377 (1994).

[21]

18 U.S.C. § 3231.

9

matters (otherwise beyond their competence) that are incidental to other matters properly before them,"[22] essentially allowing federal courts to "assert[] otherwise nonexistent federal jurisdiction."[23] "At its heart, ancillary jurisdiction is aimed at enabling a court to administer 'justice within the scope of its jurisdiction.' . . . Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to 'effectively dispose of the principal case, nor do complete justice . . . .'"[24] But "[t]he boundaries of ancillary jurisdiction are not easily defined and the cases addressing it are hardly a model of clarity,[25] particularly in criminal cases.[26] Specifically, the Supreme Court has instructed that exercise of ancillary jurisdiction may be appropriate in two circumstances: "(1) to permit disposition of claims that are, in varying respects and degrees, factually interdependent by a single court, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."[27]

　　　　In the criminal context, district courts most often have exercised ancillary jurisdiction in order to settle state law contract disputes over attorneys' fees related to their ongoing criminal

---

[22] *Kokkonen*, 511 U.S. at 378.

[23] *Id.* at 396-97.

[24] *Garcia v. Teitler*, 443 F.3d 202, 208 (2d Cir. 2006) (citation omitted).

[25] *Id.*

[26] The Judicial Improvement Act of 1990 merged and codified ancillary and pendent jurisdiction doctrine for civil cases. *See* 28 U.S.C. § 1367. It left ancillary jurisdiction undisturbed as it relates to criminal cases. *Garcia,* 443 F.3d at 207.

[27] *Kokkonen*, 511 U.S. at 379-80.

proceedings.[28]   However, in *Stein v. KPMG, LLP*,[29] its most recent statement on this subject, the Second Circuit held improper the district court's exercise of ancillary jurisdiction in a criminal case over a state law contract claim against a non-party for payment of defense costs.[30]   It explained that "when a non-party to the primary proceeding is sought to be joined as a defendant in the ancillary proceeding, the need for the ancillary proceeding and the efficiencies provided by it must be both sufficiently great to outweigh the prejudice to the non-party and to be consistent with the limited jurisdiction of federal courts."[31]   Its holding therefore rested on its conclusions that (1) KPMG, as a non-party to the criminal proceedings, would have been prejudiced significantly by being subjected to ancillary jurisdiction,[32] (2) the claim over which ancillary jurisdiction was exercised involved state law contract "matters that [we]re otherwise outside the jurisdiction conferred by the Constitution and the Congress,"[33] and (3) the exercise of ancillary jurisdiction would not necessarily have remedied the constitutional concerns that motivated it and there in any case were other remedies for any

---

[28]    *See Stein v. KPMG, LLP*, 486 F.3d 753, 760 (2d Cir. 2007).

[29]    *Id.*

[30]    *Id.* at 760-64.

[31]    *Id.* at 760-61.

[32]    *Id.* at 761-62 ("An ancillary proceeding may subject the non-party to what may be a different forum and different procedural or even substantive rules than would normally be involved in disposing of the claims at issue. . . . In the present matter, the prejudice to KPMG is clear . . . .").

[33]    *Id.* at 761.  *See also Kokkonen*, 511 U.S. at 382 (concluding that exercise of ancillary jurisdiction was inappropriate because "the [ancillary] suit involves a claim for breach of a contract . . . . Absent [previous court action retaining jurisdiction], enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction.").

constitutional violations.[34]   This case, however, is significantly different.

Ghailani's claim, in contrast to that against KPMG in *Stein,* is not a state law contract matter over which the federal courts otherwise would lack subject matter jurisdiction.  Ghailani contends that the Secretary intends to act in a manner that would violate his rights under the U.S. Constitution.   That claim arises under the federal Constitution.  It would come within the federal question jurisdiction of the district courts conferred by Section 1331 of the Judicial Code[35] and within the waiver of sovereign immunity contained in Section 10(a) of the Administrative Procedure Act[36] if it were brought as a free-standing civil action.  Thus, the exercise of ancillary jurisdiction would not involve this Court in state law matters that otherwise would be beyond its cognizance.  Nor would it prejudice the Secretary by "subject[ing him] to what may be a different forum and different procedural or even substantive rules than would normally be involved in disposing of the claims at issue."[37]

To be sure, there is one pertinent similarity between *Stein* and this case: there is at least one other remedy for any violation by the Secretary of Ghailani's constitutional rights – dismissal of the indictment.  But that, in the Court's view, is not sufficient to deprive it of ancillary jurisdiction to determine Ghailani's claim.  There is an overwhelming public interest in the determination of the

---

[34]
     *Stein*, 486 F.3d at 761-63.

[35]
     28 U.S.C. § 1331.

[36]
     5 U.S.C. § 702.

[37]
     *See Stein,* 486 F.3d at 761-62.

     Nor does the Secretary contend that he was not properly served with process, that he could not be subjected to the personal jurisdiction of the Court, or that any other procedural irregularity in the manner by which Ghailani has asserted the claim against the Secretary preclude relief.

charges against Ghailani on the merits without unnecessarily risking the possibility that any conviction, if that were the outcome, would have to be overturned on a basis that could have been avoided by a ruling prior to trial. Given the lack of any prejudice to the Secretary from determining the matter now and the fact that the claim against him raises purely federal questions that could be heard now in a civil suit in federal court, this Court concludes that the balance of considerations decidedly favors the exercise of ancillary jurisdiction to decide the merits of Ghailani's contentions.

C.    *Justiciability*

The fact that the Court has jurisdiction to decide the claim against the Secretary does not necessarily mean that it should do so. There are both constitutional and prudential limitations on the exercise of federal judicial power, commonly referred to under the rubric of justiciability.[38]  In deciding whether a case is justiciable, courts must consider whether it is of a sort that courts can decide competently as well as whether they ought to do so in light of the constitutional balance of powers.[39]

The Constitution explicitly vests Congress and the executive with control over military affairs.[40]  In an oft-quoted passage, the Supreme Court remarked:

---

[38]
        *See Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("Justiciability is itself a concept of uncertain meaning and scope. Its reach is illustrated by the various grounds upon which questions sought to be adjudicated in federal courts have been held not to be justiciable.").

[39]
        15 JAMES WM. MOORE, ET. AL., MOORE'S FEDERAL PRACTICE § 101.01 (3d ed. 2009).

[40]
        *See* U.S. CONST. art. I, § 8 (granting Congress power "[t]o raise and support Armies," "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces"); *id.* art. II, § 2 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States.").

> "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence.  The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . .  The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability."[41]

Courts therefore have shown great deference to the political branches regarding military decisions, both at the threshold justiciability stage and when deciding the merits of justiciable cases.[42]  "The rule of non-justiciability of discretionary military decisions," however, "is not absolute."[43]  Courts consistently have held justiciable certain types of claims against the military: service members' challenges under the Administrative Procedure Act to final decisions by Boards for the Correction of Military Records,[44] claims that a military official acted beyond his or her powers[45] or that a decision was "so arbitrary and irrational that it cannot stand,"[46] allegations that the military violated

---

[41]

    *Gilligan v. Morgan*, 413 U.S. 1, 10-11 (1973).

[42]

    *See, e.g.*, *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 377-78 (2008) (according deference, in merits analysis, to military officials' professional judgments regarding necessity of training exercises); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society."); *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) (holding discrimination claim by officer against military to be nonjusticiable because denial of commission was properly within military discretion); *Kurlan v. Callaway*, 510 F.2d 274, 280 (2d Cir. 1974) ("[F]ederal courts will not normally review purely discretionary decisions by military officials which are within their valid jurisdiction.").

[43]

    *Jones v. New York State Division of Military and Naval Affairs*, 166 F.3d 45, 52 (2d Cir. 1999).

[44]

    *Clinton v. Goldsmith*, 526 U.S. 529, 539 (1999).

[45]

    *Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976).

[46]

    *Kurlan v. Callaway*, 510 F.2d 274, 280 (1974).

14

Congressional rules or internal military regulations,[47] and constitutional challenges to military regulations.[48]  With respect to each of these categories the Supreme Court has determined or, at times, simply assumed[49] that the particular question presented was subject to judicial review notwithstanding the general textual commitment of military matters to the political branches.  Ghailani's claim, however, does not fit neatly into any of these categories, so the Court must look to more general justiciability standards.

The justiciability of a particular claim involving separation of powers concerns turns on two distinct but closely related inquiries.[50]  First, as a general matter, a court must decide "whether the claim presented and the relief sought are of the type which admit of judicial resolution."[51]  If so, the court then must ask "whether the structure of the Federal Government renders the issue presented a 'political question' – that is, a question which is not justiciable in federal court because of the separation of powers provided by the Constitution."[52]

---

[47]
    *See, e.g.*, *Winter*, 129 S.Ct. at 372-75 (assuming without discussion Court's authority to review Navy's alleged violation of three environmental protection acts passed by Congress); *Jones*, 166 F.3d at 52 ("Among the exceptions [to non-justiciability] we have recognized is where the military has failed to follow its own mandatory regulations in a manner substantially prejudicing a service member.").

[48]
    *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 507-10 (1986) (reviewing, under deferential standard, Air Force regulation prohibiting service members from wearing yarmulkes); *Able v. United States*, 155 F.3d 628, 632 (2d Cir. 1998) (reviewing, under deferential standard, military's "don't-ask-don't-tell policy" regarding gay and lesbian service members).

[49]
    *See, e.g.*, *Goldman*, 475 U.S. at 507; *Able*, 155 F.3d at 632.

[50]
    *Powell v. McCormack*, 395 U.S. 486, 516-17 (1969).

[51]
    *Id.*

[52]
    *Id.*

### 1.    General Justiciability

In answering the first question, courts must decide whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded."[53]

Here, the defendant asserts that reassignment of Colonel Colwell and Major Reiter to other duties would violate his Fifth and Sixth Amendment rights.  He asks the Court to enjoin the Defense Department from taking this action.[54]  Determining whether a person's constitutional rights have been violated and fashioning appropriate relief is a core, traditional function of American courts.[55]  There is no suggestion that deciding this question would be beyond the institutional competence of the judiciary.  Moreover, to whatever extent the government's argument relies on the asserted impropriety of injunctive relief, the Court notes that injunctive relief is only one potentially available remedy should it determine that Ghailani's constitutional rights would be violated by the intended government action.[56]  Accordingly, Ghailani's claim "admit[s] of judicial resolution."[57]  The

---

[53]

*Baker v. Carr*, 369 U.S. 186, 198 (1962).

[54]

Def. Br. 1.

[55]

*See Nixon v. Fitzgerald*, 457 U.S. 731, 783 (1982) (referring to "[c]ourts' traditional function of enforcing federally guaranteed rights").

[56]

No one remedy is appropriate for all Sixth Amendment violations.  *United States v. Morrison*, 449 U.S. 361, 364 (1981) ("Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.").  In fashioning remedies, courts must "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 365.

criteria for general justiciability are satisfied.

2.      *The Political Question Doctrine*

The second justiciability inquiry concerns the constitutional separation of powers.  It requires courts to define the proper scope of judicial authority in relation to the other government branches.[58]

As far back as *Marbury v. Madison*,[59] the Supreme Court recognized a narrow class of claims, the resolution of which is best left to the politically accountable branches of the federal government.[60]  This widely recognized but ill-defined doctrine received its clearest and most systematic treatment in *Baker v. Carr*,[61] where the Supreme Court sketched its contours by describing six of the most common characteristics of political questions:

---

[57]   If this Court were to find both that defendant's constitutional rights would be violated by the intended government action and that enjoining military duty orders would be an inappropriate remedy, it nevertheless could provide relief.  *See, e.g., United States v. Stein*, 541 F.3d 130 (affirming dismissal of indictment for Sixth Amendment violation).

[58]   *Powell*, 395 U.S. at 516.

[59]   *See Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question  is primarily a function of the separation of powers.").

[60]   5 U.S. (1 Cranch) 137 (1803).

[61]   *Id.* at 165-66 ("[T]he President is [constitutionally] invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character . . . . [These decisions] respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.").

369 U.S. 186 (1962).  Both the Supreme Court and the Second Circuit continue to utilize *Baker*'s framework for identifying political questions.  *See, e.g., Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004); *Connecticut v. Amer. Elec. Power Co., Inc.*, 582 F.3d 309, 321-32 (2d Cir. 2009).

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."[62]

The Court cautioned, however, that "the doctrine of which we treat is one of 'political questions,' not one of 'political cases.'"[63]  The mere fact that a case may have political overtones or consequences does not make it nonjusticiable.  Rather, the court must engage in a "discriminating inquiry into the precise facts and posture of the particular case."[64]  "Whether a case or controversy . . . lies beyond judicial cognizance can only be determined by 'a discriminating analysis of the particular question posed,' including a consideration of 'the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action.'"[65]

Each *Baker* factor contemplates a different potential constitutional or prudential problem that could be created were a court to adjudicate the "issue" or "question" in the case.  Before addressing these factors, then, this Court must define with specificity the issue presented.[66]

---

[62] *Id.* at 217.

[63] *Id.*

[64] *Id.*

[65] *Lamont v. Woods*, 948 F.2d 825, 832 (2d Cir. 1991) (quoting *Baker*, 379 U.S. at 211-12).

[66] Justiciability in military cases has sometimes turned on careful parsing of the issue at stake. *See, e.g.*, *Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996) ("Stehney has not asked for a

Both the government and the defense have spent considerable energy disputing the scope of the Court's authority to review and enjoin the Defense Department's reassignment of Colonel Colwell and Major Reiter.  This focus, however, confuses the central question presented by Ghailani's application with the specific form of relief requested.  The precise issue before this Court is not the Secretary's authority to order reassignment or even the appropriateness of this discretionary personnel decision in this instance.  It is, instead, the question whether the *effect* of this decision would infringe upon the defendant's constitutional rights.  In deciding that issue, the Court need not review the Secretary's discretionary decision or his reasoning.  It need determine only whether that decision would violate the defendant's Fifth or Sixth Amendment rights.  Having precisely characterized the issue in this manner, the Court now proceeds to the *Baker* factors to determine whether it constitutes a political question.

Most political question cases involving claims against the military have turned on a combination of the first and second *Baker* factors[67] – whether there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department"[68] and whether there are "judicially discoverable and manageable standards" for its resolution. The Second Circuit, moreover,

---

review of the merits of NSA's [security clearance] revocation decision.  Rather she asserts NSA violated her constitutional and regulatory rights in revoking her clearance.  Therefore, we cannot agree with the district court that the political question doctrine precludes review of her claims."); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1512 (D.C. Cir. 1984) ("[P]laintiffs do not seek to adjudicate the lawfulness of the United States military presence abroad.  Instead, they seek adjudication of the narrow issue whether the United States defendants may run military exercises throughout the plaintiff's private pastures when their land has not been lawfully expropriated. . . . This is a paradigmatic issue for resolution by the Judiciary.").

[67]    See discussion, *infra*, of *Gilligan v. Morgan*, 413 U.S. 1 (1973), *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir.1973), and *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir. 1973).

[68]    *Baker*, 369 U.S. at 217.

repeatedly has recognized the first factor as the "dominant consideration in any political question inquiry" because a textual commitment strongly indicates that the matter falls outside the scope of judicial power.[69]  The first and second factors are not entirely separate, however, as "[t]he lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."[70]

The Constitution explicitly commits control and maintenance of the military to Congress and the executive.[71]  Pursuant to this commitment, Congress has delegated significant rulemaking and decisionmaking authority to military agencies and officials.[72]  Whether or not a case involving military action turns on a political question, however, depends upon a more nuanced analysis as to whether the specific issue presented, as distinguished from military affairs generally, has been committed to a political branch.

In the 1970s, the Second Circuit confronted a series of legal challenges to military campaigns in southeast Asia.  The different results in those cases demonstrate both the importance of properly defining the issue and the significance of the second *Baker* factor in political question

---

[69]

*Connecticut v. Amer. Elec. Power Co., Inc.*, 582 F.3d 309, 324 (2d Cir. 2009) (quoting *Lamont v. Woods*, 948 F.2d 825, 831 (2d Cir. 1991)).

[70]

*Nixon v. United States*, 506 U.S. 224, 228-29 (1993).

[71]

U.S. CONST. art. I, § 8 (granting Congress power "[t]o raise and support Armies," "[t]o provide and mantain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces"); *id.* art. II, § 2 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States.").

[72]

In particular, Congress has delegated to the Judge Advocate General of each military service express authority to use his or her discretion in assigning individual judge advocates to particular duties.  *See* 10 U.S.C. § 806(a).

analysis.

In *Orlando v. Laird*,[73] the Second Circuit held that the question whether the Vietnam war had been authorized by Congress and therefore was constitutional was justiciable. In so doing, it relied upon the fact that Article I, Section 8, of the Constitution, which gives to Congress the power to declare war, provided a judicially discoverable and manageable standard for deciding the war's constitutionality.[74] In the same opinion, however, the Circuit concluded that the "constitutional propriety of the means by which Congress has chosen to ratify" the military action was a political question because it was "one of policy, committed to the discretion of Congress . . . and there are no intelligible and objectively manageable standards by which to judge such actions."[75]

By contrast, the Second Circuit held nonjusticiable two other challenges to military conduct that would have required the court to determine whether particular military actions constituted continuations of a Congressionally authorized war or "escalations" that required new Congressional authorization. In *DaCosta v. Laird*,[76] it concluded that President Nixon's decision, made without new Congressional authorization, to mine North Vietnam harbors was nonjusticiable.[77] Not only were such tactical decisions exclusively committed to the president as commander-in-chief, but the court held

---

[73] 443 F.2d 1039 (2d Cir. 1971).

[74] *Id.* at 1042-43 ("[T]he constitutional delegation of the war-declaring power to the Congress contains a discoverable and manageable standard imposing on the Congress a duty of mutual participation in the prosecution of war. Judicial scrutiny of that duty, therefore, is not foreclosed by the political question doctrine.").

[75] *Id.* at 1043.

[76] 471 F.2d 1146 (2d Cir. 1973).

[77] *Id.* at 1146-47.

also that judicial review of that decision would require factual investigations and political policy determinations for which courts were ill-equipped.[78]  Likewise, in *Holtzman v. Schlesinger*,[79] the Circuit held that it lacked both constitutional authority and the factfinding capacity to review the legality of military bombings in Cambodia.[80]

Ghalani's application is comparable to *Orlando* and quite different from *DaCosta* and *Holtzman*.  This motion requires only that this Court apply the Fifth and Sixth Amendments to determine the constitutionality of the Secretary's intended action much as *Orlando* required nothing more than the application of Article I, Section 8, to determine whether the president's action constituted the making of war without the requisite Congressional authority.  The question presented is simply whether the severance of the professional relationships between Colonel Colwell and Major Reiter with Ghailani would be a constitutional violation.  Its resolution  requires a purely legal determination for which the courts are particularly well-suited.  Unlike *DaCosta* and *Holtzman*, it would not involve a determination of a matter textually committed to another branch or fact finding endeavors for which courts are ill equipped.

---

[78]
  *Id.* at 1155 ("Judges, deficient in military knowledge, lacking vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action, cannot reasonably or appropriately determine whether a specific military operation constitutes an 'escalation' of the war or is merely a new tactical approach within a continuing strategic plan.").

[79]
  484 F.2d 1307 (2d Cir. 1973).

[80]
  *Id.* at 1308-12 ("These are precisely the questions of fact involving military and diplomatic expertise not vested in the judiciary . . . .  We are not privy to the information supplied to the Executive by his professional military and diplomatic advisers, and even if we were, we are hardly competent to evaluate it.").

This view is consistent also with *Gilligan v. Morgan*,[81] another case that involved a civilian challenge to military policies and conduct that was held to present a political question. There, in the wake of the shootings at Kent State University, students sought "a judicial evaluation of the appropriateness of the 'training, weaponry and orders' of the Ohio National Guard."[82] The Court's justiciability analysis first concluded that "there [was no] relief a District Court could appropriately fashion." "The [declaratory and injunctive] relief sought by respondents, requiring initial judicial review and continuing surveillance by a federal court over the training, weaponry, and orders of the Guard, would . . . embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government."[83] Furthermore, the Court noted that discretionary choices regarding "evolving methods of training, equipping, and controlling military forces" were best left to military professionals.[84] Accordingly, the Court held the claim to be nonjusticiable based on a combination of factors: "[t]he advisory nature of the judicial declaration sought," the fact that "the questions to be resolved on remand are subjects committed expressly to the political branches," "uncertaint[y] as to whether a live controversy still exists," and "the infirmity of the posture of

---

[81]

    413 U.S. 1 (1973).

[82]

    *Id.* at 5. As narrowed by the Court of Appeals, the specific question asked: "Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?" *Id.* at 4.

[83]

    *Id.* at 5, 7.

[84]

    *Id.* at 8 ("It would be inappropriate for a district judge to undertake this responsibility in the unlikely event that he possessed requisite technical competence to do so.").

respondents as to standing."[85]  It noted, however, that "we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel...."[86]

Unlike cases that courts have found to turn on political questions, this motion does not ask this Court to "review" a military decision or otherwise act beyond its constitutionally prescribed role and institutional competence.  It need not insert itself into the military's decisionmaking hierarchy, second-guessing discretionary decisions as in *Gilligan*.  Nor is it asked to discover or evaluate, as a factual matter, the bases on which the Judge Advocates General of their respective military branches have decided to reassign Colonel Colwell and Major Reiter.  The motion instead asks only that it decide the legal effect that these military decisions would have on the defendant, a function to which it is well-suited.  Furthermore, unlike the situation in *Gilligan,* appropriate relief could be fashioned in this case.

These considerations suggest that the particular question at issue in this case is committed to the judiciary rather than the political branches.[87]  The mere fact that the controversy involves military personnel decisions does not render it a nonjusticiable political question under the

---

[85]     *Id.* at 10.

[86]     *Id.* at 11-12.

[87]     *See Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) ("[W]e have noted in a similar context . . . that '[t]he department to whom this issue is "constitutionally committed" is none other than our own - the judiciary.'" (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991))).

first two *Baker* factors.[88]

  *Baker*'s other four factors are easily dispatched.  Factors four through six "appear to be relevant only if judicial resolution of the question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests."[89]  "The greater the scope of a military decision and the more far-reaching its effects, the more it assumes the aspects of a political determination, which, in and of itself, is not subject to judicial second-guessing."[90]

  Here, the Court's review of the effect of the Secretary's decision would be quite narrow.  Adjudication of the motion would judge the constitutional effect, not the wisdom, of the decision to reassign Colonel Colwell and Major Reiter.  Such judicial action would not require an initial policy determination, nor would it necessarily contradict or be incompatible with the military's reassignment of these officers.  Colonel Colwell and Major Reiter's superior officers presumably balanced a variety of military needs and interests in making their staffing decisions.  The Court, however, need only determine the constitutional effect of those decisions, an inquiry which would implicate different facts and concerns and imply no disrespect for the staffing decision made by a coordinate political branch.  The fact that adjudication of the defendant's rights might prove

---

[88]

  *See Hanson v. Wyatt*, 552 F.3d 1148, 1161 (10th Cir. 2008) ("*Gilligan* does not support the position that all cases involving military personnel decisions are nonjusticiable.  Judicial resolution of a single personnel decision by interpreting a promulgated regulation is a far cry from a court's 'establish[ing] standards for the training, kind of weapons and scope and kind of orders to control the actions of the National Guard.'" (quoting *Gilligan*, 413 U.S. at 6)); *cf. Kadic,* 70 F.3d at 249 ("[J]udges should not reflexively invoke [political question doctrine] to avoid difficult and somewhat sensitive decisions in the context of human rights.").

[89]

  *Kadic*, 70 F.3d at 249.

[90]

  *Chicago & Southern Air Lines. Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

inconvenient for a coordinate department is not the sort of constitutionally cognizable "disrespect" the political question doctrine seeks to prevent.[91]

The Secretary and the USAO rely, in support of a contrary conclusion, upon cases involving intramilitary immunity. This line of authority, which began with *Feres v. United States*[92] and has been followed by a series of Supreme Court and Second Circuit cases, has restricted the types of suits that service members may bring against the military,[93] including in some instances suits challenging personnel decisions.[94]

The intramilitary immunity cases do not go as far as the government would have them. At least some suits by service members for equitable relief "designed to halt or prevent . . .

---

[91]

*Cf. United States v. Munoz-Flores*, 495 U.S. 385, 390-91 (1990) ("The Government may be right that a judicial finding that Congress has passed an unconstitutional law might in some sense be said to entail a 'lack of respect' for Congress' judgment. But disrespect, in the sense the Government uses the term, cannot be sufficient to create a political question.").

[92]

340 U.S. 135, 146 (1950) (holding that members of armed forces may not sue government for injuries that "arise out of or are in the course of activity incident to service").

[93]

For a description of this progression, see *Dibble v. Fenimore*, 339 F.3d 120, 125 (2d Cir. 2003).

[94]

The most categorical – and frequently quoted – judicial pronouncements asserting that military actions are nonjusticiable come from the intramilitary immunity line of cases. *See, e.g.*, *Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers . . . ."); *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953) ("[J]udges are not given the task of running the Army. . . . Orderly government requires that the judiciary be . . . scrupulous not to interfere with legitimate Army matters . . . . [W]e have found no case where this Court has assumed to revise duty orders as to one lawfully in the service."); *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969) ("Our recent decisions make clear that purely discretionary decisions by military officials which are within their valid jurisdiction will not be reviewed by this court.").

26

constitutional violation[s] rather than [to recover] money damages"[95] are permissible.[96] But this ultimately is beside the point.

The intramilitary immunity doctrine most frequently has been justified by three considerations specific to the intramilitary context: (1) military life and discipline necessitate greater restrictions on individual rights,[97] (2) intramilitary suits may detrimentally affect military discipline in light of the "peculiar and special relationship of the soldier to his superiors,"[98] and (3) an internal military justice system is available to redress service members' grievances.[99] But Ghailani is not a

---

[95]

    *Id.* at 683.

[96]

    The circuits are split as to exactly which intramilitary suits for injunctive relief courts may hear. The Fifth, Seventh, Eighth, Ninth, and D.C. Circuits "allow[] equitable challenges to personnel decisions only when they constitute facial challenges to the constitutionality of military regulations, and not in cases of discrete individualized actions." *Dibble v. Fenimore*, 339 F.3d 120, 126 (2d Cir. 2003). The First, Third, and Tenth Circuits entertain challenges of both types. *Id.* The Second Circuit took the former approach in at least one recent case because it concluded that resolving the constitutional challenge would require a court to discover and judge the motivations behind a particular military staffing decision. *Id.* at 128. Even were the intramilitary cases applicable here, Ghailani's motion would be distinguishable in this respect, since a legal determination as to Ghailani's rights does not require invasive inquiry into the reasons for the military's decision.

[97]

    *See Parker v. Levy*, 417 U.S. 733, 751 (1974) ("While members of the military community enjoy many of the same rights . . . as members of the civilian community, within the military community there is simply not the same autonomy as there is in the larger civilian community."); *Orloff*, 345 U.S. at 94 ("The military constitutes a specialized community governed by a separate discipline from that of the civilian."); *Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971) (justifying refusal to review transfer order that allegedly violated soldier's First Amendment rights by stating that "the Army has a large scope in striking a proper balance between servicemen's assertions of the right of protest and the maintenance of the effectiveness of military units").

[98]

    *United States v. Brown*, 348 U.S. 110, 112 (1954).

[99]

    *See Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 54 (2d Cir. 1999) ("Consistent with our view that civilian courts must avoid unnecessary interference with [the military], we hold that [military] members must exhaust administrative remedies before

member of the armed forces.  Considerations of military life and discipline are not relevant to his situation, and he has no remedies within the military justice system and no further practical avenue for relief within its administrative structure.  In consequence, the intramilitary immunity cases – although both the intramilitary immunity and political question doctrines stem from similar structural and policy concerns, and courts understandably and frequently have transplanted language and reasoning from one doctrinal line to the other – are not compelling here.  The issue tendered by Ghailani's motion is not a political question.

*   *   *

In the last analysis, Ghailani asks this Court to decide only the constitutional effect of the Secretary's intended action, not the propriety or wisdom of his decision to act in that manner. Defining and protecting constitutional rights is a core function of the judiciary and one that this Court cannot and should not abdicate.  Accordingly, the Court holds that Ghailani's motion for relief against the Secretary of Defense is justiciable.  As his rights to relief against the Secretary and against the government, meaning here the prosecution, are coextensive, I treat the issue as one.

III.     Ghailani's Constitutional Claims

A.     The Due Process Claim

Ghailani asserts that his relationship with Colonel Colwell and Major Reiter is unique. He was rendered involuntarily into CIA custody and placed in a secret interrogation program that, in

bringing a federal challenge based on the military's failure to follow its own regulations."). *See also* 10 U.S.C. § 938 (establishing recourse for any service member who believes himself to have been wronged by commanding officer); *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969) (noting that right to review order or decision within military establishment "is essential in any organization which is inevitably hierarchical and hence particularly subject to those prejudices or arbitrary decisions which are part of man's psychological fabric.").

Ghailani's words, "created a situation where it is highly likely that [he] would have difficulty forming a productive attorney-client relationship with his attorneys."[100]  When he was moved to Guantanamo and charged before a military commission, Colonel Colwell and Major Reiter were assigned to him by the military.  Notwithstanding what he suggests were near-insurmountable difficulties created by the U.S. government, he came to trust these officers to a degree that perhaps could not be equaled with new counsel.[101]  The president then suspended the military commissions and elected to prosecute him in this Court whereupon the Secretary has determined to deprive him of assistance of these valued lawyers.  This, he argues, is egregiously unfair and would deprive him of due process of law.

The Fifth Amendment guarantees criminal defendants "fundamental fairness" throughout the criminal process.[102]  Nevertheless, "[w]here a particular [constitutional] Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing [a] claim[].'"[103]

---

[100]

Def. Br. 17.

[101]

The defense argues that Ghailani was subject to rigorous interrogation techniques while in CIA custody and severe detention conditions at Guantanamo that frequently lead to post-traumatic stress disorder, paranoia and suspiciousness.  *See* Def. Br. 18-20; Def. Ex. A, Newell Decl. 3-9; Def. Ex. L, Rosenfeld Decl. 2.  It has submitted a declaration of a clinical psychologist that opines that the level of trust reposed by Ghailani in Colonel Colwell and Major Reiter is "quite remarkable" in the circumstances and raises the possibility that he would be unable to trust new counsel to a comparable degree.  Rosenfeld Decl., *passim*.

[102]

*United States v. Stein*, 435 F. Supp. 2d 330, 356-61 (S.D.N.Y. 2006) (explaining "right to fairness in the criminal process"); *see also United States v. Stein*, 541 F.3d 130, 153 n.12 (2d Cir. 2008) ("[T]he pre-indictment conduct is separately constrained by the Fifth Amendment.").

[103]

*Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citations omitted); *see also Strickland v. Washington*, 466 U.S. 668, 684-85 (1984) ("The Constitution guarantees a fair trial through the

The Sixth Amendment attaches upon indictment and thereafter guarantees the right to effective assistance of counsel.[104]   The government conduct at issue in this case – the Defense Department's reassignment of Colonel Colwell and Major Reiter – is occurring post-indictment and therefore is properly governed by the Sixth rather than the Fifth Amendment.  The defense's reliance on *United States v. Stein*[105] for a contrary view therefore is misplaced.  Indeed, the Court's due process analysis there concerned pre-indictment government conduct.[106]  Accordingly, Ghailani's claim rises or falls on the Sixth Amendment.[107]

B.    *The Sixth Amendment Right to Counsel Claim*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall

---

Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause.").

[104]

*See Rothgery v. Gillespie County, Tex.*, 128 S. Ct. 2578, 2583 (2008) ("The Sixth Amendment right . . . 'does not attach until a prosecution is commenced.'  We have . . . pegged commencement to '"the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."'") (citations omitted).

[105]

435 F. Supp. 2d 330 (S.D.N.Y. 2006).

[106]

*Id.* at 362-65 (describing pre-indictment government actions that violated defendants' due process rights); *see also Stein*, 541 F.3d at 148 n.9.

[107]

Even if I were free to consider defendant's due process claim under a substantive due process rubric, the executive conduct at issue is not so egregious, even assuming the truth of defendant's factual submission, as to constitute a violation.  Among other things, there has been no sufficient showing that Ghailani is unable to form a productive attorney-client relationship with anyone other than Colonel Colwell and Major Reiter.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.").

enjoy the right . . . to have the Assistance of Counsel for his defense."[108]  For a criminal defendant who can pay for representation, this encompasses the right to choose his or her own legal counsel.[109] Indigent defendants like Ghailani also are entitled "to assistance of counsel, by appointment if necessary, in a trial for any serious crime."[110]  However, "[t]he right to *counsel of choice* does not extend to defendants who require counsel to be appointed for them."[111]   "The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."[112]

In large part, this reflects the Supreme Court's interpretation of the Sixth Amendment as fundamentally more concerned with fostering an effective adversarial system than with ensuring satisfying attorney-client relationships.[113]  Indeed, the Court specifically has "reject[ed] the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."[114]

---

[108]    U.S. CONST. amend. VI.

[109]    *Wheat v. United States*, 486 U.S. 153, 158-59 (1988) (recognizing Sixth Amendment right to choose own counsel, but noting that this right is "circumscribed in several respects").

[110]    *Id.* (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)); *see also Johnson v. Zerbst*, 304 U.S. 458 (1938) (first recognizing the right in federal proceedings).

[111]    *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (emphasis added).

[112]    *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989).

[113]    *Wheat*, 486 U.S. at 159 ("[T]he essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (citations omitted)).

[114]    *Morris v. Slappy*, 461 U.S. 1, 14 (1983).

In the same vein, the Second Circuit has held that "there is no constitutional right to continuity of appointed counsel."[115]   Indeed, the Criminal Justice Act provides that a court "in the interests of justice" may "substitute one appointed counsel for another at any stage of the proceeding."[116]

Defense counsel correctly note that the military justice system does recognize a qualified right to continuity of counsel[117] which, if it applied here, might require a showing of good cause for the reassignment of these officers.  But the more generous protection of the right to counsel afforded in the military justice system is grounded in the Uniform Code of Military Justice and military regulations, not the Sixth Amendment.[118]  Accordingly, the military analogy lends no support to Ghailani's argument.  He is entitled to, and is receiving, representation of appointed counsel at public expense.  He is not entitled to choose particular government-paid counsel – military or civilian – and he does not have a right to the continued services of previously appointed counsel.[119]

---

[115]

*United States v. Parker*, 469 F.3d 57, 61 (2d Cir. 2006).

[116]

18 U.S.C. § 3006A(c).

[117]

*See, e.g., United States v. Spriggs*, 52 M.J. 235, 239-40 (2006) ("Our Court has been vigilant in protecting the relationship between a servicemember and his or her military counsel. . . . A servicemember may not be deprived of the services of his detailed military defense counsel . . . simply because of a routine change in the military attorney's assignment or duty station." (citations omitted)).

[118]

*Id.* at 237-38 ("Congress has provided members of the armed forces facing trial by general or special court martial with counsel rights broader than those available to their civilian counterparts. . . . These rights reflect the unique nature of military life . . . .").

[119]

This would be true even if the Court found, which it does not, that the current civilian proceeding represented a continuation of the military commission case, rather than a new prosecution, such that Colonel Colwell and Major Reiter were considered "appointed" to the case.  Even in that instance, the defendant would have no federal constitutional right to continuity of counsel, and the Court would still have the authority to substitute new counsel "in the interests of justice."  *See* 18 U.S.C. § 3006A(c).

*Conclusion*

Colonel Colwell and Major Reiter have performed a service to their country as well as to their client by their steadfast devotion to his cause.  Their professionalism in seeking to remain in the case is admirable.  The Secretary's decision to reassign them, however, does not violate Ghailani's rights.

The defendant's motion [DI 791], whether treated solely as one for preliminary and permanent injunctive relief against the Secretary of Defense or as one to dismiss the indictment or for other relief, based on the alleged violation by the United States of his Fifth and Sixth Amendment rights is denied.  The foregoing constitute my findings of fact and conclusions of law.

SO ORDERED.

Dated:        November 18, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)