# ~~TOP SECRET~~

FILED WITH THE
COURT SECURITY OFFICER
CSO: _m001350_
DATE: ___11/14/08___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

    v.

Hage, et al., includ.
AHMED KHALFAN GHAILANI,

            Defendant.
-------------------------------------------------------X

98 CR. 1023 (LAK)

DECLARATION
IN SUPPORT OF MOTION

Colonel Jeffrey P. Colwell, United States Marine Corps, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalties of perjury:

The statements of fact in this declaration are based upon personal knowledge gained from my personal involvement in this case. All matters upon which your deponent lacks personal knowledge are asserted herein upon information and belief.

1. I am a colonel in the United States Marine Corps with over 22 years of active duty service. I have served as a judge advocate (attorney) in the Marine Corps for the last 15 of those 22 years. I am licensed to practice law in the Commonwealth of Massachusetts. In August of 2008, I was appointed as Mr. Ghailani's detailed military defense counsel in his military commission case at Guantanamo Bay, Cuba.

2. In October 2008, through the discovery process, the prosecution in Mr. Ghailani's military commission case provided us with a compact disk which included materials commonly referred to as the "referral binder." The referral binder consisted of materials that were reviewed by the Convening Authority prior to her referral decision in this case. In civilian terms a "referral" is similar to binding a case over for trial and it is also at this point that a decision whether or not to seek the death penalty is made. The referral binder materials consisted primarily of portions of the FBI investigation into the East Africa

# ~~TOP SECRET~~

bombings including many FD-302 forms memorializing interviews of witnesses by the FBI.

3.  In February 2009, our defense team scheduled a trip to Tanzania for the time period of April 17-30, 2009 for the purposes of attempting to locate and interview relevant witnesses gleaned from the discovery materials provided to us, as well as to meet with Mr. Ghailani's family in Zanzibar.

4.  On March 20, 2009, I contacted the lead prosecutor in our military commission case (Mr. Phil Viti), via email, requesting to be put in touch with the lead FBI case agents in order to ascertain updated contact information (address, telephone, and/or business address) for many of the witnesses identified in the FD-302's included in the referral binder discovery materials provided to us. Most of the information provided to us in discovery was almost ten years old.

5.  In a response dated March 23, 2009, the lead prosecutor declined to put me in touch with the FBI case agents and indicated that if I needed to contact the FBI agents in any way, I should do so through him. He also declined to provide any updated contact information for the requested witnesses.

6.  On March 25, 2009, I notified the prosecution, via email, that our team would shortly be traveling to Tanzania for the purpose of investigating and evaluating our case. I once again requested updated contact information for 12 specified witnesses; included in this list were: ███████████████████████████████ ████████████ On the same day, the prosecution declined to provide the requested information.

2

7. Upon information and belief, based upon discussions with Colonel Peter Masciola (the Chief Defense Counsel, Office of Military Commissions), on March 27, 2009, my immediate supervisor, Colonel Peter Masciola was approached by his counter part, Colonel Lawrence Morris (the then-Chief Prosecutor, Office of Military Commissions). Colonel Morris expressed concerns to Colonel Masciola regarding our planned trip to Tanzania, and its possible impact on the government's investigation. Colonel Masciola suggested to Colonel Morris that he could speak with me about his concerns some time the following week when both offices (defense and prosecution) were scheduled to attend a joint training session. I attended the training; however, Colonel Morris did not. Accordingly I did not speak with him.

8. On April 1, 2009, we filed a Motion to Compel Discovery (D-006) requesting, in part, that the military judge compel the prosecution to provide us with updated contact information for the requested witnesses.

9. Upon information and belief, based upon discussions with Colonel Peter Masciola (the Chief Defense Counsel, Office of Military Commissions), on April 7, 2009, the day before the prosecution's response to our motion to compel discovery (D-006) was due, Colonel Morris again contacted Colonel Masciola regarding our planned trip to Tanzania. During this conversation Colonel Morris suggested that if we could delay our trip for a month or more that possibly the FBI might be able to help us contact some of the witnesses at a later point. Colonel Morris also mentioned that with the uncertainty of the Commission system at the time, our trip could be rendered unnecessary. This conversation was relayed to me by Colonel Masciola and I was instructed to contact the

assigned prosecutors to discuss the possibility of postponing the trip for the reasons discussed above. I was in Guantanamo Bay, Cuba at the time.

10. I immediately attempted to telephone each of the prosecutors as well as Colonel Morris by telephone, but I was unable reach any of them. I followed these telephonic attempts with an email that included the following:

> The message that we have received through Col Masciola via Col Morris was that you all were desirous of us postponing our trip to Africa for at least a month. It was relayed, that if we delayed our trip that possibly the FBI might be willing to facilitate our locating/speaking with many of the witnesses. Quite candidly we find this suggestion a bit disingenuous - particularly, when only two weeks ago you informed us that we were not permitted to speak to the FBI agents, and further informed us that we were not entitled to being provided updated contact information for these witnesses. Further, despite an order from the military judge that discovery would continue in Mr. Ghailani's case during this "pause", no additional discovery has been provided to date. We propose that if you really do want us to cancel our trip to Africa that the government should simply put this case to rest and dismiss all charges with prejudice.

11. On April 15, 2009, I submitted a request to the Convening Authority for advance approval of $1000 of funding in order to reimburse, if necessary, several of these witnesses we sought to interview for lost work time and/or transportation expenses incurred in order to meet with us. We noticed from the discovery materials provided to us that the FBI had compensated many of them for lost wages when they interviewed them ten years ago. (Attachments A and B).

12. On April 16, 2009, the Convening Authority's representative, via email, denied our request for advance funding indicating that there was no fiscal authority to pay a witness for lost wages. We were informed however, that if a witness needed to travel for an interview, he or she could be reimbursed for his or her travel expenses. (Attachment C).

13. On April 16, 2009, the military judge denied our motion (D-006) to compel witness contact information. (Attachment D).

14. Upon information and belief, based upon conversations with various witnesses as well as personal observations, sometime prior to April 17, 2009, Special Agents█████████ and ███████████of the FBI traveled to Dar es Salaam, Tanzania and began attempting to make contact with the witnesses that we had asked the prosecution for updated contact information on. Special Agents ████████████enlisted the assistance of██████████ █████████████████████████████ to contact the witnesses, set up meetings with the witnesses, and to serve as a Swahili interpreter during these meetings. Agents ██████████████ were checked-in to the same hotel as our defense team when we arrived in Tanzania.

15. Upon information and belief, based upon our defense team's interview with ██████████ ██████on or about April 17, 2009, Special Agents ████████████ along with███ ██████flew to the island of Pemba which is located off the coast of Tanzania to meet with █████████████████████ This meeting had been arranged a few days prior by ██████████ Special Agents ████████████ had previously interviewed ████████████ as early as January 1999 and had met with him multiple times since. Their most recent meeting (prior to April 17, 2009) was a bit more than a year prior at which Agents ████████████ told Teacher that Ahmed Ghailani's case was getting ready for trial and that they hoped that he would be a witness in the case. ████████was told that soon the agents would bring "their attorneys" who would help guide ██████through his testimony.

5

16. Upon information and belief, based upon our defense team's interview with ███████ ███████ the April 17, 2009, meeting consisted of a 5 to 10 minute walk down the street where ███████ was informed by Agents ███████████ that Ahmed Ghailani's attorneys would soon be coming to see him. ███████ was informed that it was up to him to decide whether or not to talk to these attorneys. When recounting this meeting to us in person when we met him on April 26, 2009, ███████ indicated that while the FBI agents told him that it was his choice, it was clear from the circumstances of the meeting and the way in which they spoke to him that the FBI did not want him to talk to the Defense.

17. On April 20, 2009, after arriving in Tanzania, our defense team received a country and security brief from ███████████████████ Embassy of the United States, Dar es Salaam, Tanzania. We inquired about using the Embassy's Foreign Service National (FSN) investigator to facilitate locating witnesses. ███████ indicated that he had also thought about this, but ran into a "landmine" when he inquired about the idea with higher headquarters. Accordingly, ███████ indicated that he could not provide investigatory assistance to us. ███████ revealed that the Embassy was "caught in the middle" because of the Defense and FBI's presence in Dar es Salaam at the same time. ███████ indicated that he had received guidance not to share information with us and that we were essentially on our own; his hands were tied.

18. On April 22, 2009, we had arranged a meeting with ███████████ at his attorney's office in Dar es Salaam. When the Defense team arrived at the attorney's office, Special Agents ███████████ and ███████ were already present in the office lobby claiming that they also had a meeting scheduled with ████ ███████ did meet with us, but only for approximately an hour, and declined to meet with us any further or

6

answer a majority of our questions. ▮▮▮▮▮ was insistent that we should compensate him for his time; something that we were unable to do.

19. Upon information and belief, based upon a meeting with ▮▮▮▮▮▮▮▮ and his attorneys, on April 22, 2009, Special Agents ▮▮▮▮▮▮▮▮ met briefly with ▮▮▮▮▮▮▮▮▮▮ in the conference room of the ▮▮▮▮▮ ▮▮▮▮▮▮▮ Tanzania. This meeting was preceded by the agents first contacting ▮▮▮▮ and requesting to meet him at his home in Zanzibar. Thereafter, ▮▮ ▮▮ contacted ▮▮▮▮ and ordered him to appear at a Dar es Salaam police station. ▮▮▮▮ then contacted his attorneys about these requests. ▮▮▮▮▮ attorneys then contacted ▮▮▮▮▮ and told him that if they wanted to meet with ▮▮▮▮ they should come to their law offices.

20. Upon information and belief, based upon a meeting with ▮▮▮▮▮▮▮▮ and his attorneys, at the April 22, 2009 meeting, Special Agents ▮▮▮▮▮▮▮▮ showed up and said that they just wanted to say "hi." Special Agent ▮▮▮ then informed ▮▮▮▮ that "we brought you a gift" and threw a Zanzibar tee-shirt across the table towards ▮▮▮▮ Agents ▮▮▮▮▮▮ then departed the conference room.

21. Upon information and belief, based upon a meeting with ▮▮▮▮▮▮▮▮ and his attorneys as well as press accounts, ▮▮▮▮ spent approximately 5 ½ years in United States custody detained at Bagram, Afghanistan until his release in the summer of 2008. During the tail end of his detention at Bagram, ▮▮▮▮ was interrogated by Special Agents ▮▮▮▮▮▮▮

22. On April 23, 2009, our Defense team set up a meeting with ▮▮▮▮ and his attorneys in the conference room of the ▮▮▮▮▮▮▮▮▮▮▮▮ Tanzania.

7

23. Upon information and belief, based upon a meeting with █████████████ and his attorneys, ███████ refused to answer a majority of our questions based primarily on his encounter with the FBI on the day prior and his past experiences with these agents.

24. We were only able to locate 4 of the 13 witnesses that we had sought to locate during our trip to Tanzania. Only one of them, ██████ was fully cooperative with us. The others indicated that they had already talked to the FBI on multiple occasions and did not want to talk any further.

Dated: Arlington, Virginia
    November 12, 2009

*Jeffrey P. Colwell*
Jeffrey P. Colwell
Colonel, United States Marine Corps

Attachments:

A. Defense Request for Appropriation of Services of April 15, 2009 (without attachments)
B. Government Response to Defense Request for Appropriation of Services of April 15, 2009
C. Convening Authority's Denial of appropriations of April 16, 2009
D. D-006 – Military Judge's Ruling on Defense Motion to Compel Discovery of April 16, 2009

# ATTACHMENT (A)



**DEPARTMENT OF DEFENSE**
**OFFICE OF THE CHIEF DEFENSE COUNSEL**
**OFFICE OF MILITARY COMMISSIONS**
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600

15 April 2009

MEMORANDUM FOR THE CONVENING AUTHORITY AND THE DIRECTOR OF
OPERATIONS, PLANNING, AND DEVELOPMENT

SUBJECT: Request for Appropriations for Services - *United States v. Ahmed Khalfan Ghailani*

1. The Defense in the above named case has previously been approved for a trip to Tanzania and Kenya in support of our defense of Mr. Ghailani before military commissions. The purpose of this trip is to investigate and evaluate our case and to meet with and interview potential witnesses in order to adequately prepare our case for trial. We will be seeking to locate and contact many of the individuals who provided statements to the FBI which were included in the referral binder materials that were provided to us by the prosecution in October 2008. In conjunction with, and in support of the mission of this trip, the Defense respectfully requests advance approval for $1000 of funding in order to reimburse, if necessary, several of these witnesses for lost work time and/or transportation expenses incurred in order to meet with us. **As the Defense is scheduled to travel from 17-30 April 2009 – immediate response to this request is respectfully requested** (justification for the timing of this request is provided below).

2. In P-001, the military judge granted the prosecution's 23 January 2009 request for a continuance in part, ruling that no further in-court sessions would be held until 22 May 2009. However, the military judge ordered pre-trial processing and pre-trial discovery in this case to continue. *See,* Attachment A. Since the approval of this continuance, the prosecution has provided no additional discovery to the Defense.

3. On 25 March 2009, the Defense specifically requested that the prosecution provide us with the most recent contact information (last known address, telephone number, and place of employment) for thirteen specified witnesses that we are desirous of locating in Tanzania and Kenya. On the same day, the prosecution denied this request. *See,* Attachment B. On 1 April 2008, the Defense filed a motion with the military judge to compel the prosecution to provide the requested witness contact information (D-006). This motion remains pending with the military judge to date.

4. In the meantime, in early March 2009, the Defense contacted a civilian attorney in Tanzania, ███████████████████ represented ████████████████ who was tried in Tanzania for charges of conspiracy to commit murder relative to the bombing of the U.S. Embassy in Dar es Salaam. ████████ was eventually acquitted of all charges in 2004. *See,* Attachment C. A majority of the witnesses that the Defense desires to locate and interview were witnesses in ███ ████ trial. On 15 April 2008, ████████ indicated, via email, a willingness to facilitate meeting with his former client ████████ and potentially assisting us locate other witnesses, however to do so, he expects compensation for his time at a billable rate of $150/hour. *See,* Attachment D. I spoke with ████████ on the telephone shortly after receiving his email. ████ ████ indicated that the FBI had contacted him yesterday (14 April 2008) also seeking to meet with ████████ and that he had demanded to be similarly compensated for his time from them.

5. The Defense has no independent source of funding for services expenses such as these; however, the Defense is privy to the fact that law enforcement agencies, such as the FBI and OSI, routinely incur similar expenses. The materials provided to the Defense in the referral binder make many references to the fact that various witnesses were compensated for lost work time and/or travel expense. We merely seek comparable accommodations. If approved, the Defense will submit a written summary and/or receipts of expenses incurred with our travel claim. We welcome the opportunity to discuss this request with each of you in person. I may be contacted at: (703) 588-0105 or Jeffrey.colwell@osd.mil.

Respectfully submitted,

By:

LTCOL J\(\emptyset\). COLWELL, USMC
MAJ R.B. REITER, USAFR
*Detailed Defense Counsels for*
*Ahmed Khalfan Ghailani*
Office of the Chief Defense Counsel
Office of Military Commissions
1600 Defense Pentagon, Room 3B688
Washington, DC 20301

Attachments:
    A. Military Judge's Order on Government Continuance Request
    B. 25 March 2009 Request to and Response from Prosecution re: witness contact info
    C. Excerpts from Record of Trial ICO Republic v. ███████
    D. Emails with ███████ of 15 Apr 09

2

# ATTACHMENT (B)



**OFFICE OF THE
CHIEF PROSECUTOR**

# DEPARTMENT OF DEFENSE
### OFFICE OF MILITARY COMMISSIONS
### 1600 DEFENSE PENTAGON
### WASHINGTON, DC 20301-1600

15 April 2009

MEMORANDUM FOR THE CONVENING AUTHORITY

SUBJECT: Government Response to Defense Request for Appropriations for Services - *United States v. Ahmed Khalfan Ghailani.*

1. The Government opposes the Defense Request for Appropriations for Services that the Defense submitted on 15 April 2009. The Government asserts that the requested funds will be used to pay for what amounts to be a bribe of a local attorney to gain access to a potential witness. This is a cooperation fee and the Federal Government does not pay these sorts of expenses.

2. In its request, the Defense states: "...the Defense respectfully requests advance approval for $1000 of funding in order to reimburse, if necessary, several of these witnesses for lost work time and/or transportation expenses incurred in order to meet with us." The justification the Defense uses for the request, however, reveals that the money will not be used to compensate the witness for either lost work or transportation costs. Rather, it will be used to gain access and information from potential witnesses. Paragraph 4 of the request indicates that the money will be used to reimburse a witness' *attorney* for "his (the attorney's) willingness to facilitate meeting with his former client, and potentially assisting us locate other witnesses, however to do so, he expects compensation for his time at a billable rate of $150/hour." Discussions with witnesses should be free and voluntary and should not be dependent upon the interviewer having to pay a broker to obtain access to these witnesses.

3. In support of its request, the Defense correctly states that the same witness' attorney recently made a similar demand to the FBI. What the Defense fails to mention is the fact that the FBI refused to accept the condition. The FBI does NOT routinely incur such expenses. As a matter of policy, witnesses may speak to the FBI in the presence of the witness' attorney, but the cost of the attorney's presence is solely the witness' responsibility.

4. Please contact John McAdams at (703) 556-5271 or Jeffrey Jones at (703) 556-5279 if there are any questions regarding this memorandum.

Felice John Viti
Prosecutor

John McAdams
Prosecutor

Jeffrey B. Jones
Prosecutor



Printed on Recycled Paper

# ATTACHMENT (C)

| | |
|---|---|
| **From:** | ████████████████████████████████ |
| **To:** | Colwell, Jeffrey LtCol OSD OMC Defense; |
| | ████████████████████████████; |
| **cc:** | Reiter, Richard Maj OSD OMC Defense; |
| | ███████████████████████; |
| | ████████████████████████████; |
| | ██████████████████████████████; |

**Subject:** RE: US v. Ghailani: Request for appropriations for services (U)

**Date:** Thursday, April 16, 2009 4:32:47 PM

---

~~UNCLASSIFIED~~

Lt. Col. Colwell:

We have completed our research on the matters you raised. Thank you for the very complete answers to the questions we raised earlier in the day.

The government has no ability or obligation to pay for the services of ████ ████████ If ████████████wishes to have counsel present when he speaks to you, that is at his expense, not the government's. There is also no authority to pay ████████as an intermediary to facilitate your interviews.

You have asked to be advanced $1,000 to pay witnesses for their travel expenses, and to reimburse them for lost wages. If you know of the witnesses' names/locations at this time, OMC can prepare Invitational Travel Orders (ITO's) authorizing them to travel from their homes to your location in Tanzania. If you don't know their names/locations at this time, the ITO's can be prepared after the fact. There is no way to issue you an advance for these payments, but we are checking to see if you can take a $1000 advance against your government travel card.

If you choose to reimburse witnesses yourself for travel, you should have the witness provide you with documentation supporting their claim for transportation expenses. They will also need to provide you with some type of government issued identification number (passport, driver's license, or similar document) to prove their identity and you will need to copy that document for the claim. Then, they must fill out a travel voucher (DD 1351) and sign it. When you return to the USA, the voucher should be filed with the OMC DTS section [3]████████████████████████, and they can code the voucher so that the EFT payment is paid to your account instead of to the witness. Properly documented travel expenses and any authorized per diem for meals will be paid.

There is no authority to pay for lost wages. We followed up with your  contact and obtained information on FBI policy regarding this.

TWH

Thomas W. Hartmann
Brigadier General, United States Air Force
Director of Operations, Planning and Development
Office of Military Commissions
Office of the Convening Authority
1600 Defense Pentagon (3B652)
Washington D.C. 20301

CAUTION: Information contained in this message may be protected by the attorney/client privilege, attorney work product, deliberative process or other privileges. Do not distribute further without approval from the Office of the Convening Authority for Military Commissions.

-----Original Message-----
From: Colwell, Jeffrey LtCol OSD OMC Defense
Sent: Thursday, April 16, 2009 2:47 PM
To: Hartmann, Thomas BG OSD OMC Convening Authority;

Defense
Subject: RE: US v. Ghailani: Request for appropriations for services (U)

UNCLASSIFIED

General / 

This information took longer than we hoped to acquire for you. A member of my church is fairly high up in  organization. I was able to track him down at training in New Jersey on his lunch hour. He relayed that  uses contingency funds to compensate witnesses for time etc. These same funds

are used to compensate cooperating witnesses (snitches) and to pay out rewards. ███████ is the █ Financial Manager. I am told he is the "expert" on these issue. I have not been able to raise him, but have left him voicemails and alerted him of the issue that he may be contacted about. His contact information is below.

███████, Director, █ ███████ Financial Management
Com: ████████████
DSN: ████████████
E-mail: ████████████

Additionally, ███████████ is the instruction that applies for use of these funds. This instruction is █ ███████████ and is held internally by █ ███████████ Accordingly, we do not have a copy of it or access to it.

I know you appreciate the timing here sir, but wanted to let you know that we do still have some time. We depart CONUS tomorrow evening, but with travel and delay enroute, we will not get to "work" until Monday in Tanzania (they are 7 hours ahead). We have our fingers crossed that our blackberries will work enroute and we will be able to maintain some connectivity. Additionally, █ ███████, cc'd above, is one of our paralegals who will remain as our eyes and ears back here in Rosslyn.

Again sir, thank you for your time and consideration of this request.

Very Respectfully,
LtCol Jeff Colwell

LtCol J.P. Colwell, U.S. Marine Corps
Office of Military Commissions
Office of the Chief Defense Counsel
1600 Defense Pentagon, ███████
Washington, D.C. 20301
(703) 588-0105
Bberry: (571) 309-4288
Jeffrey.Colwell@osd.mil
SIPR: jeffrey.colwell@osd.smil.mil

-----Original Message-----
From: Colwell, Jeffrey LtCol OSD OMC Defense
Sent: Thursday, April 16, 2009 9:53 AM
To: Hartmann, Thomas BG OSD OMC Convening Authority; ███████████

████████ ███████  ████████████████████

Defense
Subject: RE: US v. Ghailani: Request for appropriations for services ~~(U)~~

~~UNCLASSIFIED~~

General:

Addressing your questions in the order asked:

1) Procedures used by FBI: Sir, we do not specifically know their
procedures/guidelines. We requested, through the prosecution, to be put in
touch with the FBI, and were told no (see attached email). However, as we
mention in paragraph 5 of our request for funding, there are multiple
instances documented throughout the referral binder where the FBI
compensated witnesses for lost wages, travel expenses, or provided a meal:

     a. Bates 10012-REF-00000441: ██████████████ - "given a
meal"
     b. Bates 591 (same reference as above): ██████████ - "paid
10,000 for lost wages for the day of 11/19/98"
     c. Bates 600: ████████████ - "paid $10,000 TSH, an amount
equivalent to the wages he lost for participating in the interview."
     d. Bates 732: ████████████ - "paid 1500 TSH for his services"
(locating witness and serving as translator)
     e. Bates 808: ████████████ - "provided $1400 Tanzanian
Schillings for transportation expenses."
     f. Bates 824: ████████████ - "paid ten thousand TSH for
missed wages"
     g. Bates 831: ████████████ - "paid $10,000 TSH, an amount
equivalent to the wages he lost for participating in this interview."
     h. Bates 836: ████████████ - "provided a meal" (albeit an
MRE!)
     i. Bates 852: ████████ - "paid 5,000 (Tsh) for lost wages."
     j. Bates 863: ████████ - "paid 10,000 (TSH) for lost wages on
both 11/18/98 and 11/20/98."
     k. Bates 867: ██████████ - "furnished with $500 Tanzanian
Shillings for transportation."

l. Bates 870: ████████ - "paid ten thousand Tanzanian schillings for missed wages."

m. Bates 877: ████████████ - "provided with 5,000 (Tsh) for transportation expenses.

2) Procedures used by ██ (and other DoD investigative agencies):

a. Part of this knowledge comes simply through word of mouth from my Marine Corps judge advocate colleagues who have deployed to either Iraq and Afghanistan. As you know, judge advocates are routinely involved in investigations of alleged LOW violations, deaths/injury to Marines, and deaths/injuries to civilians. My colleagues (I have not deployed to either theater) have shared that ██ regularly paid money to cooperating witnesses to compensate them for their time, lost wages, and transportation costs.

b. The Ghailani team has an ██████████████ investigator detailed to it (which partially addresses your third question General). He has deployed to Afghanistan. He describes ██ routinely paying out money to witnesses (IED strikes, and other counter-Intel investigations) for their time, lost wages, transportation etc. Additionally, it is standard practice CONUS/OCONUS to pay informants for information.

c. We have not talked to ██████ on this. However our investigator has put in some calls to ██ as have I. If I am able to get you a POC, I will do so as soon as I can sir.

3) Do we have an investigator assigned to our case? Yes sir. As mentioned above, we have an ████████████████████ detailed to our case.

4) Efforts to locate witnesses on our own: Our investigator has been provided all of the discovery we have received, todate, which relevant for these purposes consists of the materials provided in the referral binder. We have attempted to get put in touch with the FBI agents assigned to this case, but that request was denied by the prosecution. Our investigator has made liaison with the Defense Attaché at the US Embassy in Tanzania and sought their assistance, or foreign national support, to facilitate locating witnesses. While they have not said "no", they indicated that it would be unlikely that they will be able to provide us any kind of dedicated assets for the duration we'd need. We are meeting with them on Monday when we arrive in Dar es Salaam. As we tried to articulate in our request, ██████ is an attorney in Tanzania who is intimately familiar with the embassy bombing case, as he represented ████████████ an individual who was tried (and acquitted) for similar offenses in Tanzania. ████████ is currently the ██████████████████████ A majority of the witnesses that we hope to

locate during our trip testified in ▓▓▓▓▓▓▓ case - accordingly, while a significant time period has elapsed since the trial, ▓▓▓▓▓▓ has interviewed many of these witnesses more recently than the FBI statements that have been provided to us in the referral materials.
Further, ▓▓▓▓▓ client ▓▓▓▓▓▓▓ knows many of these witnesses personally.

5) General, we also ask you to consider a few other elements:

    a. The Defense has been entirely open here and showed our cards to the government. We informed them of our planned travel plans well in advance to allow them to provide us the means to facilitate the mission of this trip. We learned yesterday that the FBI is on the ground now seeking to re-interview the very same witnesses that we are looking for. While it may be one big coincidence, we can't help but think our informing the prosecution of our trip caused them to send the FBI back out in a rush.

    b. We also ask you to consider the fact that the limited discovery that we have been provided, to date, is over ten years old. Further, we will be traveling into a Third World Country. It is one thing for you and I to give a few hours of our day up, but it is an entirely different thing for a citizen of one of the poorest nations in the world to do so. The prosecution filed a persuasive response to our request yesterday categorizing the funding requested as "a bribe." We emphatically disagree with this characterization. We are not buying testimony - in fact, we believe a majority of these witnesses may possess information adverse to our client - nevertheless we have an ethical obligation to interview these witnesses so that we may intelligently advise and represent our client. We are merely asking for the means, in the appropriate situation, to compensate an individual for their time away from work. As demonstrated above, the FBI and other law enforcement bodies do exactly the same thing. The prosecution has suggested we are attempting to hire a broker, but the prosecution uses a broker to locate witnesses in every single case - they are called the FBI/▓▓▓▓▓▓CID etc.

    c. I chastised the prosecution yesterday about the fact that this is not a motion - but if you need legal authority to sink your teeth in, we ask you to consider the following:

        i) MCA sec. 949j(a)'s requirement that "defense counsel in a military commission under this chapter shall have a reasonable opportunity to obtain witnesses and other evidence as provided in regulations prescribed by the Secretary of Defense."

        ii) Military practice under the UCMJ Article 46, upon which

the MCA is loosely based, provides the accused "shall have equal opportunity to obtain witnesses and other evidence"

       iii) Common Article 3's requirement of "a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people."

       iv) The concept of "Equality of Arms" generally recognized in International Criminal Procedure. See e.g. International Criminal Practice, 3d ed., Jones & Powles p. 590 (sec. 8.5.73 et seq.)

We hope that we have adequately addressed the issues that you needed developed and are available to discuss with you and your staff.

Very Respectfully,
LtCol Jeff Colwell

LtCol J.P. Colwell, U.S. Marine Corps
Office of Military Commissions
Office of the Chief Defense Counsel
1600 Defense Pentagon, 2, 3 ▮▮▮▮▮▮
Washington, D.C. 20301
(703) 588-0105
Bberry: (571) 309-4288
Jeffrey.Colwell@osd.mil
SIPR: jeffrey.colwell@osd.smil.mil


-----Original Message-----
From: Hartmann, Thomas BG OSD OMC Convening Authority
Sent: Thursday, April 16, 2009 7:32 AM
To: Colwell, Jeffrey LtCol OSD OMC Defense; ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: RE: US v. Ghailani: Request for appropriations for services ~~(U)~~

~~UNCLASSIFIED~~

Jeff: You can copy 3 ▮▮▮▮▮ and me.

TWH

Thomas W. Hartmann

Brigadier General, United States Air Force Director of Operations, Planning and Development Office of Military Commissions Office of the Convening Authority 1600 Defense Pentagon  Washington D.C. 20301

CAUTION:  Information contained in this message may be protected by the attorney/client privilege, attorney work product, deliberative process or other privileges.  Do not distribute further without approval from the Office of the Convening Authority for Military Commissions.

-----Original Message-----
From: Colwell, Jeffrey LtCol OSD OMC Defense
Sent: Thursday, April 16, 2009 7:21 AM
To: Hartmann, Thomas BG OSD OMC Convening Authority
Cc: Reiter, Richard Maj OSD OMC Defense
Subject: Re: US v. Ghailani: Request for appropriations for services (U)

General:

Thank you for your response and consideration of our request.  We will assemble the information you have requested and send to you this morning.

I am a bit hesitant to clog everyone's in-box w/ unnecessary information. Should we send the requested info directly to you sir, or members of you staff?

V/R
LtCol Jeff Colwell

----- Original Message -----
From: Hartmann, Thomas BG OSD OMC Convening Authority
To: Colwell, Jeffrey LtCol OSD OMC Defense;



Sent: Thu Apr 16 06:51:41 2009
Subject: RE: US v. Ghailani:  Request for appropriations for services (U)

~~UNCLASSIFIED~~

Lt Col Colwell:  We are looking into this.  Can you identify the procedure that you say the FBI and [2] use, as referenced on page 2 of your memo.  Can you provide us with a contact, particularly in the [2]  Also, can you explain whether you have an investigator assigned to your case and what efforts that investigator has undertaken to find the referenced witnesses?

Thank you.  We are trying to work within your schedule, so rapid responses will be helpful.

TWH


Thomas W. Hartmann
Brigadier General, United States Air Force Director of Operations, Planning and Development Office of Military Commissions Office of the Convening Authority 1600 Defense Pentagon [2, 3] Washington D.C.  20301


CAUTION:  Information contained in this message may be protected by the attorney/client privilege, attorney work product, deliberative process or other privileges.  Do not distribute further without approval from the Office of the Convening Authority for Military Commissions.


-----Original Message-----
From: Colwell, Jeffrey LtCol OSD OMC Defense
Sent: Wednesday, April 15, 2009 1:03 PM
To:



Subject: US v. Ghailani: Request for appropriations for services (U)
Importance: High

UNCLASSIFIED

Ladies and Gentlemen:

I am detailed counsel ico U.S. v Ghailani. Please find that attached request for funding relative to our approved trip to Tanzania upon which we depart on 17 April 2009. I recognize the timing of this request is less than ideal, however, the need for this funding only arose this morning. As we are scheduled to depart on Friday, the Defense respectfully requests a response as soon as possible. I am available to discuss if you so desire.

Very Respectfully,
LtCol J.P. Colwell, U.S. Marine Corps
Office of Military Commissions
Office of the Chief Defense Counsel
1600 Defense Pentagon, 2, 3
Washington, D.C. 20301
(703) 588-0105
Bberry: (571) 309-4288
Jeffrey.Colwell@osd.mil
SIPR: jeffrey.colwell@osd.smil.mil

<<...>>

# ATTACHMENT (D)

|                                        |                                                       |
| -------------------------------------- | ----------------------------------------------------- |
| **UNITED STATES OF AMERICA**           | **RULING ON D-006, DEFENSE**<br>**MOTION to Compel Discovery** |
| v.                                     |                                                       |
| **AHMED KHALFAN GHAILANI**<br>a/k/a "Fupi", "Haytham",<br>"Abubakar Khaflan Ahmed",<br>"Sharif Omar" | 16 April 2009 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1. <u>Procedural History</u>. On 27 March 2009, the Defense moved this Commission to issue an Order Compelling Discovery of certain matters from the Government. The Government responded in a timely manner to the Defense's motion on 8 April 2009. Thereafter, the Defense filed supplemental pleadings with the Commission on 13 April 2009. An R.M.C. 802 session was conducted on 13 April where this motion was further discussed. Neither party requested oral argument.

2. <u>Issue</u>. The Defense seeks an order from this Commission compelling the Government to produce current contact/ address information in their possession for certain named witnesses. The government has declined to provide this information. In the alternative, the Defense seeks dismissal of all charges and specifications now pending against the accused.

3. <u>Facts</u>.

   a. As part of pre-trial discovery, the Government provided a binder containing information relative to the referral process in the subject case. Included within the referral binder were the statements recorded in 1998 of at least eleven witnesses.

   b. On 20 March 2009 the Defense requested, via electronic mail, contact information for witnesses whose statements were disclosed in the referral binder. The Government declined to provide contact information as requested. Thereafter, on 25 March 2009, the Defense provided via electronic means, a list outlining specific names in concert with their prior request for contact information. The Government declined to provide contact information for the thirteen (13) named witnesses.

c. On 17 April 2009 a Defense team will travel to Kenya and Tanzania for pre-trial preparation over a two week period.

d. The statements of the various persons interviewed by United States and local police officials provide either telephone numbers, home addresses, business names and addresses, local police official who participated in the interview process. the name of the police station where interviews took place, identity and address of relative or telephone contacts of neighbors, post office boxes, neighborhoods/districts of residence and in some cases, directions to homes or businesses. Some statements provided more identifying information than others. The new report extract provides little amplifying information.

e. All statements considered under this motion were taken in 1998 in Tanzania.

4. Discussion.

a. Commissions in general are *sui generis* both in their form, procedure and substance. While it is accurate that the Commissions have adopted many principles common to trials by courts-martial, the overall charter of Military Commissions is one calculated and designed to provide the greatest degree of due process and justice consistent with supervening national security concerns, when applicable. Accordingly, Commissions must not only be fair and just, the Commission process must be perceived as such by all participants and those who view the application of justice via the Commission process. Accordingly, within this framework, precedent of military and federal circuits must be considered on the merits of the issues then presented. Oft times, those considerations mandate a melding of military and federal law.

b. In federal practice, discovery in criminal litigation is, in many respects, vastly different from that experienced in a military court. The Government correctly reveals the determination of the Supreme Court from Weatherford v Bursey that "there is no general constitutional right to discovery in a criminal case, and Brady did not create one". See also, Pennsylvania v Ritchie, 480 U.S. 39; 107 S. Ct. 989; 94 L. Ed. 2d 40 (1987). However, as it applies to discovery in a military

2

jurisdiction, the superior military court in <u>United States</u>
<u>v. Killebrew</u>, 9 M.J. 154, 159 (C.M.A. 1980) stated,

> "Military law has long been more liberal than its
> civilian counterpart in disclosing the government's
> case to the accused and in granting discovery rights.
> For example, the names of prospective witnesses are
> listed on a charge sheet, which is served on the
> accused; in civil courts the names of prosecution
> witnesses often remain undisclosed."

c. The model for R.M.C. 701 extends from its military
counterpart, R.C.M. 701 and its statutory basis, Article
46, U.C.M.J. The analysis of R.C.M. 701 provides
additional guidance and illustration of the discovery
rights which should be afforded in a military criminal
court context. In this Commission's opinion, this analysis
from the Manual for Courts-martial is persuasive authority.
The rationale expressed therein demonstrates that the
discovery rights in military trials should be interpreted
more liberally than its federal counterpart (found in
Federal Rules of Criminal Procedure 16)[1]. It is not
unreasonable to conclude that a hybrid between federal
practice and military criminal practice has been created.
Accordingly, an accused enjoys greater and more liberal
discovery rights at Military Commissions than a defendant
indicted in a federal district court.

d. However, the analysis of the particular question
presented here cannot conclude on this note. The question
begged by the current controversy is whether the Government
should be compelled to provide discovery in the form of
updated contact information for certain persons interviewed
in a foreign country over a decade ago. Moreover, the
question is formed - has the Defense demonstrated by a
preponderance that they are entitled to the relief
requested. In brief, the answer to the latter question is
in the negative.

e. The defense has not demonstrated that they have
been denied access or "unreasonably impeded" by the
Government's failure or denial to provide current contact
information of certain individuals who were interviewed by

---

[1] I note that many portions of R.C.M. 701 are taken directly from Fed. R. Crim. Proc 16.

3

police officials over a decade ago[2]. The Defense has offered no evidence that the statements in their present form will prevent them from contacting and interviewing any person on their requested list. Additionally, there is no assertion that the Government has taken any action calculated to prevent the Defense from successfully conducting their own investigation. In fact, it appears that the Convening Authority has approved $60,000 for the Defense to conduct investigations in East Africa.

f. However, while the Defense has failed to carry their burden on this specific point at this time, future motions of the same nature may have different results. In addition to fundamental notions of justice, economy, efficiency, effectiveness, and productivity of the judicial process are at stake. While this Commission is sensitive to proceeding with all due dispatch with discovery and other pre-trial requirements, the government's failure to provide even basic discovery will compound and exacerbate the smooth and forthright administration of this Commission[3].

5. Ruling. The Defense Motion to Compel Discovery in the form of updated contact information of various named witnesses is denied.

16 April 2009
Date

B. W. MacKenzie
Military Judge

---

[2] The Government has neither confirmed nor denied that they possess this information. One may infer from electronic communications between the Government and Defense that they do indeed hold current contact information of the potential witnesses. The language used is quoted from RMC 701(j).
[3] In rendering this decision, there has been no assertion that witnesses are under any protective regime for their personal safety by any police or political entity.

4