Saathoff M.D,                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

**Gregory B. Saathoff M.D.**
Diplomate, American Board of Psychiatry and Neurology
P.O Box 800657
Charlottesville, Virginia 22901



FILED WITH THE
COURT SECURITY OFFICER
CSO: _MPASSS_
DATE: _6/21/10_

### FORENSIC PSYCHIATRIC EVALUATION

June 20, 2010

Re: United States v. Ahmed Khalfan Ghailani, Criminal Case No. 1:98-cr-01023-LAK

### SUMMARY OF FORENSIC PSYCHIATRIC OPINION

Based upon my evaluation of documents and interviews that have been made available to me as of June 20, 2010 it is my professional judgment that Mr. Ghailani is competent to stand trial and does not suffer from any mental illness that would preclude him from assisting his attorneys. As a result of my observation and interviews with Mr. Ghailani, my review of documents and my interviews with personnel at the MCC who have had significant contact with him, it is my further judgment that he has been and continues to be competent to waive his right to attend court.

### INTRODUCTION

Ahmed Khalfan Ghailani is a 36 year-old male Tanzanian national charged with conspiring with Usama Bin Laden and others in the 1998 bombings of two American embassies in East Africa, resulting in the deaths of 224 people. Under the jurisdiction of the United States District Court, Southern District of New York, he has been held at the Metropolitan Correctional Center (MCC) since his arrival in June of 2009. As a matter of security policy, the Federal Bureau of Prisons requires full visual-only searches of inmates before and after court hearings and off-site medical evaluations. These searches, while visual in nature, require that inmates completely disrobe prior to physically demonstrating that they are not attempting to hide contraband. This full visual search includes that the mouth, ears, soles of feet, area behind the genitals and rectal area are free of contraband. In order to accomplish this, males must lift their genitals for inspection and also must turn around, bend over and spread their buttocks by hand in order to expose the rectal area.

On November 3, 2009, Mr. Ghailani objected to the full visual search that includes visual inspection of his rectal cavity. Following this search, he was expected to undergo another search by the court security personnel who were responsible for bringing him to the court. He also refused to undergo this second search, and as a consequence refused to attend the court hearing on that date. Since November 3, 2009, Mr. Ghailani has waived his right to attend hearings relating to his case. On April 2, 2010, Dr. Katherine Porterfield, retained by the defense, submitted a report that diagnosed Mr. Ghailani with Post Traumatic Stress Disorder (PTSD) on the basis of continued symptoms ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As a result the full visual search, Dr. Porterfield believes that he is reminded of those experiences and as a result, a severe anxious reaction is triggered. In her report, Dr. Porterfield indicated that Mr. Ghailani "may not be able to function in a courtroom if subjected to the procedure."

Since November 3, 2009, Mr. Ghailani has returned to court only once, on May 6, 2010, following the court's order compelling him to attend that hearing. He did not physically attempt to resist the order. According to MCC officials and Lt. Patrick Delaney, the officer who was present for his escort, he was required to undergo the full visual inspection as per policy. During that court hearing of May 6, 2010, Mr. Ghailani responded to a series of questions raised by Judge Kaplan. In his answers to the court's

1

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

questions and statements regarding his right to be present and the advantages of being present and the disadvantages of being absent, Mr. Ghailani expressed a full and complete understanding of the issues at hand, and specifically expressed an interest in waiving his right to be present at future hearings. On the basis of that discussion occurring on May 6, 2010, Judge Kaplan found that Mr. Ghailani "understands the nature and significance of his right to be present at criminal stages in this case." Judge Kaplan also found that Mr. Ghailani was "fully competent to exercise or waive that right."

On May 18, 2010, Dr. Katherine Porterfield testified regarding her forensic report of April 2, 2010 and interview findings conducted after the May 6, 2010 hearing. During her testimony, Dr. Porterfield opined that Mr. Ghailani's refusal to undergo the search relates to symptoms that arise from prior traumatic detention experiences that occurred following his 2004 capture in Pakistan. Furthermore, Dr. Porterfield has stated that if Mr. Ghailani undergoes rectal cavity exposure, his anxiety and distress is exacerbated to the point where he is "then unable to make a basically rational decision regarding attending court." Specifically, she stated that this procedure would serve as a trigger, serving as a reminder of past abuse, and due to hyperarousal he would be "unable to concentrate or focus." According to Dr. Porterfield, Mr. Ghailani's thinking would be "impaired", "disorganized" and "illogical." Dr. Porterfield further testified: "And what he is basically functioning at that point is a state of attempting to stop and block the sensations he is having, the memories and the fears. And so he is basically going to do what he can at that point to get out of the situation."

Although Dr. Porterfield had not been present in the May 6, 2010 court hearing with Judge Kaplan, she provided testimony about his mental state at the time, and based it upon her discussion with defense attorneys, her review of the May 6, 2010 transcript and her May 10 and 15, 2010 interviews with Mr. Ghailani. Dr. Porterfield opined that Mr. Ghailani's memory of the May 6 event would have been affected because of the traumatization of the earlier May 6 visual search and the resultant lack of "organized and clear thinking" that resulted both from the previous search but also the anticipation of a similar search following the hearing. Dr. Porterfield also opined "with a reasonable degree of medical certainty" that although Mr. Ghailani appeared outwardly calm when answering Judge Kaplan's questions, he was in fact not in "an internally calm state or a state of rational, functioning, intelligence and psychological functioning at that point." Dr. Porterfield attributed this to "the disorganization, the disregulation; the perceptual problems with safety and reality, the interpersonal problems with perceiving people in the courtroom as about to harm him..." She stated that this "would all affect his ability to clearly and rationally testify or be part of his defense."

Although Dr. Porterfield testified that she had not undertaken a full competency assessment for the court, she opined that due to the anticipation of psychological distress resulting from the full visual inspection, Mr. Ghailani is not competent to knowingly and voluntarily waive his right to attend court. In addition, it was her opinion that if Mr. Ghailani is required to undergo the full visual search, the resulting psychological distress will prevent him from assisting in his defense and from being able to "clearly and rationally testify." Dr. Porterfield agreed with Judge Kaplan's statement that her position placed the government in "the perfect catch-22. If they decline for good reason or bad to alter their security protocols to accommodate Mr. Ghailani, Mr. Ghailani can't knowingly and voluntarily avoid them by waiving his right to be present, because [he's] not competent to do that. And if he is brought in, whether he likes it or not, he's not competent to assist in his defense."

On May 20, 2010, United States District Judge Lewis A. Kaplan issued an order that I conduct a psychiatric examination of the defendant at MCC and file a report, pursuant to 18 U.S.C.4247 in order to determine the defendant's mental condition. In addition to addressing the question presented by the statute – i.e. whether the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, Judge Kaplan has also directed that the report shall address the question whether the defendant is competent to waive his right to be present at the trial of this matter and any right he may have to be present at other phases of the case.

2

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

In order to accomplish the evaluation, on May 28, 29 and 30, and June 19, 2010 I conducted four psychiatric interviews of Mr. Ghailani at the MCC in New York City, for a total of sixteen hours. In response to a defense motion, the court allowed defense counsel Steve Zissou to be present during the entire evaluation of Mr. Ghailani. My evaluation is based on examination interviews of Mr. Ghailani, information obtained from defense counsel Zissou, Assistant United States Attorney Chernoff, MCC Lt. Patrick Delaney, and MCC Unit Manager Kenneth Haas. In addition, I reviewed classified documents relating to the detention and interrogation of Mr. Ghailani outside of the United States following his 2004 capture in Pakistan but prior to his 2009 transfer to the MCC in New York. I also reviewed court documents relating to the case, as well as MCC log book, commissary, correspondence, medical and psychological documentation reflecting Mr. Ghailani's level of functioning during his current detention. These materials are referenced in Appendix I of this report.

## MATERIALS REVIEWED OR RELIED UPON

The most accurate examination for competency to stand trial benefits from multiple, independent, and objective sources of information. In this report, as in any forensic psychiatric evaluation of a detained individual, review of contemporaneous documents and interviews with relevant security and medical personnel are necessary to achieve an accurate picture of an individual's condition and will be referenced accordingly.

For this report, the sources of information relied upon are listed in Appendix I.

## QUALIFICATIONS

I am currently an Associate Professor of Research in Psychiatry and Neurobehavioral Sciences and Associate Professor of Emergency Medicine at the University of Virginia School of Medicine. I serve as the Executive Director of the University of Virginia Medical School's Critical Incident Analysis Group (CIAG). As an officer in the Medical Corps of the United States Army Reserves, I was deployed as a military psychiatrist overseas during the first Gulf War, where I assessed American soldiers with trauma-related symptoms. Since 1991, I have provided prisoner psychiatric care and teaching/training for medical students and residents of the University of Virginia's School of Medicine. This clinical teaching and training has occurred in medium and maximum security prisons for both men and women who suffer from major mental illness. I have given presentations at national and international meetings regarding psychiatric issues including psychiatric effects of trauma and prison psychiatry.

I have conducted on-site research interviews with Kuwaiti survivors of Iraqi torture as a result of the Iraqi occupation of Kuwait in 1990-1991 and later served as a Visiting Professor in Psychiatry at the King Faisal Specialist Hospital in Riyadh, Saudi Arabia. In 2003, I presented at a meeting with Iraqi and Kuwaiti psychiatrists in Kuwait City.

In a consultant capacity, I serve as the Conflict Resolution Specialist for the Critical Incident Response Group (CIRG) of the Federal Bureau of Investigation. In this role, I have consulted with the CIRG's Crisis Negotiation Unit and the National Center for the Analysis of Violent Crime since 1996. I am the author and editor of books relating to psychopharmacology and forensic psychiatry, and have published articles and chapters relating to a range of psychiatric issues including psychological trauma.

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

PERSONAL HISTORY OF DEFENDANT

### FAMILY HISTORY

Ahmed Khalfan Ghailani is a 36 year old male Tanzanian national who was born in Zanzibar in April of 1974. He speaks English and Swahili. Educated in Zanzibar with two years of technical school training, he reported to me that he then moved to Dar Es Salaam to live with a friend whose family ran a clothing store. Six months prior to his July 2004 capture, he was married to a woman who is 8 years his junior. He reports that they have a daughter.

On May 28, 2010, I interviewed Mr. Ghailani about his family background. He recalled his early childhood as follows:

> My mother's father and mother were separated. My grandfather was living in the village, from Malindi, six or seven miles from where I was living. During the time when the schools were closed, I would go and visit him. He worked – he was like a farmer, but a different type of farmer. If you are a farmer, it means that you are very poor. He was growing coconuts, cloves and other foods for the local market. He was nice to me, and easy to know. I didn't spend all the time with him. I would spend time playing with my uncles... My father divorced my mother, and my mother was visiting my grandmother. I visited them three times a week, so I spent a lot of time with my grandmother/great grandmother.

Although his 56 year old mother currently lives in Zanzibar, his father is now deceased. His father, Khalfan Ghailani, lived much of his life in Zanzibar, where he operated a restaurant. Because he didn't give his son money for the work that he did in the restaurant, the boy took money from his father, who confronted him about it at one point. Although he described a beating by his father after accidentally causing a fire in their house, Mr. Ghailani was close to his father, and they appear to have had a positive relationship. Mr. Ghailani reports that was fifteen years old when his father died of a chronic illness, and that this event plunged the family from a lower middle class existence to extreme poverty. Mr. Ghailani states that childhood friends and cousins used illegal drugs, and would sniff glue and gasoline, and use hashish. He stated to me on May 28, 2010 that he did not use drugs or alcohol and that he also did not chew khat, which was commonly used in the area.

In my 28 MAY 2010 interview, Mr. Ghailani told me about his family's relationship to Islam:

> My grandfather would take me to the mosque when I was a kid, my aunt and one of my cousins was strong in faith.
>
> Neither of my parents were strong in their faith, although my mom is strong in her faith now. When she came to see me, she told me that she went on Hajj... The death of my father helped me grow in my faith. He died in 1990 – he was about 40 years old and I was about 15. He had been sick, I think that it was cancer – possible TB. No one told me. He had been sick for months.

Mr. Ghailani's father's death had a profound impact upon him, and became quite tearful when he related that he was often hungry after his father died. "Even if I was hungry I would never beg. It is hard for me to ask for things."

4

Saathoff M.D.            CST EVALUATION: Ahmed K. Ghailani          20 JUNE 2010

## EDUCATIONAL HISTORY

Mr. Ghailani attended elementary school, high school and technical school in Zanzibar. He did not drive, and therefore either walked or rode his bicycle to school. He describes himself as a fairly good student, who was especially interested in mathematics, "I liked physics and mathematics. Computers were huge in Zanzibar. I was like a technician for computers."

## EMPLOYMENT HISTORY

Mr. Ghailani reported to me that he worked at his father's restaurant from a young age until his father's death when Mr. Ghailani was fifteen years old. After graduating from technical school in 1996, Mr. Ghailani stated that he lived with a friend in Dar Es Salam, whose family ran a clothing store. He related that this friend's family did not pay him for his work.

According to interviews that he provided to the U.S. government while after his 2004 capture in Pakistan, Mr. Ghailani worked for Al Qaeda starting in 1998. He reported that he served as Osama Bin Laden's bodyguard and cook. In addition, he forged documents for Al Qaeda. After the war in Afghanistan began, Mr. Ghailani reportedly went into hiding and lived with other members of an Al Qaeda group until his capture in July of 2004.

## MILITARY HISTORY

None

## FAMILY MEDICAL HISTORY

Mr. Ghailani reported to MCC medical department on first assessment that his 56 year old mother is hyperlipidemic and hypertensive. Mr. Ghailani's father suffered from cancer and tuberculosis and died of complications at age 40.

## MEDICAL HISTORY

1. Infectious
   Mr. Ghailani reports that he was treated for malaria as a child.
   Tuberculosis (+ PPD) – treated with INH for 9 months 2006-7

2. Significant Physical Injury:

   1. 1995: Mr. Ghailani reported to me that at the age of twenty-one, he was severely beaten by police after he approached a holding cell and spoke to his uncle, who had been detained. He was beaten about the head and neck, and his legs were kicked repeatedly by the officers, who wore steel-toed boots. These wounds are severe enough that he continues to have significant scarring on both lower legs. He does not report serious head injury or loss of consciousness as a result of that beating.

   2. 2004: Mr Ghailani reported to me that in the hours before his surrender on July 25, 2004, bullets rained down upon the back of his neck, and that he continues to have scars that he showed to me. In addition, he received a gunshot wound to the right hand during the gun battle leading to his capture. ██████████████████

## SUBSTANCE USE HISTORY

He denied any history of substance abuse, and this was corroborated by my review of documents.

Saathoff M.D.                          CST EVALUATION: Ahmed K. Ghailani                          20 JUNE 2010

## LEGAL HISTORY

Mr. Ghailani denied a legal history as a youth, but was held briefly without charges after he had approached and spoken to his uncle, who was jailed at the time.

## PRE-ARREST MENTAL HEALTH HISTORY

No prior mental health history exists, according to review of medical records and in-depth interviews with Mr. Ghailani.

## POST-ARREST MENTAL HEALTH HISTORY

Although Mr. Ghailani has received numerous mental health assessments, he has never been referred, diagnosed or treated for any type of mental illness, and adamantly states that he does not have a mental illness or psychological problem. As a consequence, he is not interested in receiving any treatment. Please see Mental Health Appraisal Section for further information

## FAMILY MENTAL HEALTH HISTORY

Review of all available documentation does not indicate any family history of mental illness for Mr. Ghailani, although he does report that several cousins engaged in significant substance abuse, including solvent abuse as teenagers.

## MENTAL HEALTH APPRAISALS

CIA Interrogation Site:

6

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

Guantanamo Bay:

Mr. Ghailani did not report to me that he experienced symptoms of mental illness while at Guantanamo Bay, nor was I able to find any record that he had been evaluated or treated for such symptoms while detained there. He did speak to me about the more relaxed atmosphere at Guantanamo, which he states was more pleasant than at MCC. While there, he was able to recreate with others, to access DVD's and in general felt that the atmosphere provided more freedom to detainees.

Metropolitan Correctional Center (MCC)

During my interviews with Mr. Ghailani, he consistently denied that he has any type of mental illness or psychological problem. He does report that he becomes upset when he undergoes full visual searches as per Bureau of Prison policy. He relates this to prior experiences that followed his 2004 capture in Pakistan. The most traumatic experience involved _____ He was unable to speak about that event other than to state that it was _____

In my interview with MCC Unit Manager Ken Haas, he informed me that MCC has a very low threshold for referral to the psychology department. "Anyone, even food service can refer to psychology. We will sometimes reach out to the assistant U.S. attorney suggesting that competency evaluation should be

7

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                20 JUNE 2010

done." When I asked Mr. Haas if he had ever heard from anyone that Mr. Ghailani had demonstrated any symptoms that could possible related to a mental illness, (as demonstrated by poor sleep, poor appetite, crying spells, lack of interest in other things, lack of energy, etc.) Mr. Haas said "no".

Despite the fact that no one on the staff of MCC has witnessed any behaviors suggestive of a mental condition, Mr. Ghailani is additionally afforded regular and continuing assessment by the psychology department at MCC. The following statement from Psychology Data System reflects the lack of signs and symptoms witnessed/reported at the time of his arrival at MCC and is consistent with monthly assessments completed on June 19, July 15, August 12, September 20, October 8, November 4, December 3, December 31 2009, and January 27, February 25, March 25, April 22 and May 20, 2010:

> After his arrival at MCC, Mr. Ghailani was placed in the special housing unit on 6-16-2009. In accordance with discipline and SHU policy, a psychological review was conducted. At the time of this review, Mr. Ghailani was housed in the special housing unit with a quarters assignment of administrative detention.
>
> Inmate Ghailani was interviewed. Other staff members and/or available records were consulted as necessary and appropriate. Current mental status, emotional expression and behavior do not suggest significant mental health problems. Current adjustment appears to be satisfactory, with low threat to self and others...inmate displayed no evidence of depression or suicidality and appeared to be adequately adjusting to SHU placement. This adjustment was determined by clinical presentation, his self report and the unit personnel statements.
>
> Assessment/plan: inmate is currently stable and in no need of mental health services. He has been instructed to contact psychology department staff for support should he request, or be in need of mental health services. Unit staff [members] are aware of the referral process. Inmate will be seen on an as needed basis or monthly for SHU reviews.

On May 28, 2010, in my interview with Mr. Ghailani, he spoke in strong terms about the fact that he does not suffer from a mental illness: "I don't have a mental illness. I don't have a need to see a psychiatrist. I don't have any problems. Psychology comes by on rounds once a week. I know myself I have no problems. I would say I am ok."

On June 19, 2010, in my interview with Mr. Ghailani, he again discussed his conviction that he does not suffer from a mental illness or psychological problems, and therefore does not require medication.

> I do not feel that I need medicine. I don't feel that I have a condition that could be helped by medicine. I don't think that medicine can help a psychological problem. But I don't have a psychological problem. When I was At Guantanamo Bay, I heard people that were on medicine. They were yelling and knocking on doors.
>
> I believe that medicine can help in a short time. For example, when you are in a bad mood, it can help you for a very short time. In my position, for example, because someone is in prison, medicine can't help him if the prison is the cause of the problems.

## HISTORY OF SELF-REPORTED PSYCHOLOGICAL TRAUMA

In his interviews with me, Mr. Ghailani related a number of episodes in his life dating from childhood that were psychologically traumatic. Because of the importance of his psychologically traumatic history as it relates to the current competency determination, and in order to be as accurate as possible, recollections relevant to trauma are provided verbatim from the notes of my interviews of May and June, 2010, rather than summarized.

8

Saathoff M.D.                   CST EVALUATION: Ahmed K. Ghailani              20 JUNE 2010

### 1977 Beating by Father: (age 3/4)

There was a stick. They took off the skin (insulation) from the wire. They would put the wire on the handle and would be beaten. This happened maybe once, maybe more. When I put fire on the curtain, my father beat me. My mother didn't protect me, my father beat me... When I was beaten for the curtain fire my sister watched. I saw my cousins beaten a lot. When they didn't go to school, they would be beaten.

### 1980-1994 -Beatings by Teachers: (high school)

At school, they would beat us. If the teacher didn't like the result of the test – people would be beaten. Male and female teachers beat us with sticks, and always in front of others. They would beat us with clothes on. It would give us pain. They would beat us so much that we would sometimes cry.

There were beatings in high school. If you didn't achieve the mark that the teacher wanted, the teacher would beat us. If the students talked, they would be beaten. It always happened in front of others. I was beaten in school [but] not often.

### 1991-Beating by Tanzanian Police (age 17-18)

Once I was treated unfairly by police. I don't remember exactly what my uncle did [but] my uncle was arrested. Me and my aunt went to the police to see my uncle. When we arrived there and my uncle was in a holding cell, my uncle saw me and he called me. I was 17 or 18. I went over to talk with him. When I was talking to him, one or two policemen kicked me with their iron toe boots. They took my belt, and everything in my pockets, and put me in a cell for a few hours and then released me. They held me by the collar. I have scars on my shins. They kicked me for one or two minutes. It wasn't just kicking me, they also slapped me. One of my eyes became reddish. [At this point, Mr. Ghailani showed me areas on shins with scarring.] My aunt was there and saw it. She saw it by herself. We did not discuss it. I may have spoken to my uncle about it, but have never told anyone else. I didn't go to a hospital or get seen by anyone.

This occurred in Zanzibar. The police are known to be unfair. I had heard stories of people being unfair, like getting bribes. I had no friends who were beaten by the police.

I don't remember how I felt after I was beaten. I was angry, I prayed against them. I never went to the police station again. It was 300 meters. I didn't remember seeing the policemen again. It was outside of the town. I had no nightmares or dreams about the incident. I never think about it, even when I see the scars. I never think about it. It is not a painful memory. If I am in a police station, if someone wants to talk to me, I will be very careful.

### 1994 Beating by Religion Teacher (age 20/21)

Once I remember I was beaten because the teacher who beat me could not control his anger. One day when he was writing on the board, many students were talking. He became angry and tore the pages of the books. He ripped the pages of my book and others. He was very angry. And then, after a few days, he swore that "I will not come again to this class."

Although some people bought books, I didn't. I didn't have money to buy another book. When he found that I didn't have another book, he beat me [on the buttocks] four or five times. This happened when I was 20 or 21, in my last year in high school, or one year before. That is the last time that I was beaten. I still didn't get a book. This

9

Saathoff M.D.          CST EVALUATION: Ahmed K. Ghailani          20 JUNE 2010

was religion class. In the final examination, I think that I got a B+, but I don't remember.

<u>1998 U.S. Missile Attack on Training Camp:</u> "thought that I would die" -(age 24)
Sometime in 1998, sometime in August or September... missiles came where I was. I was in a ditch, I saw missiles stop above and then come down and I covered my eyes. I thought that they would hit me.

Afterwards, I saw some people who were killed and some who were injured. I did not know any of them.

<u>2001 Motor Vehicle Accident:</u> "thought that he would die" -(age 26)
Once, I had a car accident. I will not tell you where. It happened in 2001. It was a minivan, I was not driving. I knew the driver, he was a good driver. It happened after 7 pm, it was dark. There was a small bridge. In the middle of the bridge, there was a broken truck. Maybe one or two meters before the bridge, there was the truck. There was a car coming, the lights blinded us. The driver was driving 80 km per hour, and saw the truck at the last minute. He veered away, clipped the side of the truck, then turned over and went off the bridge. It was an irrigation bridge over a small river. It was about up to mid-chest. I was awake at the time, watching the whole thing. After the car passed, the driver saw the truck, but it was too late. It turned over once or twice, then we hit the water. We were on our side and water came into the van. It was warm weather, and the windows were down. The water came into the van. No one was wearing a seat belt. No one screamed. Everyone was awake. The driver was talking to two passengers who sat up with him.

I had no injuries. I crawled out the window above. I was scared after what I saw. One of the guy who was removed from the van had no head. He may have been the one who was beside me. Three guys were killed. There were some people from beside the road who wanted to help. Two were killed immediately, one died after being taken to the hospital. The driver was my friend. I spoke with him afterwards. He explained to me that he didn't see the truck because of the truck. In Islam, if you kill someone accidentally, you have to fast for two months without stopping. He also paid the three families of the people who were killed.

I drove with him again. I don't think about the car often. I used to like to go fast, but now when we go fast I worry. When they took the guy out of the car without his head, I remember that guy. The second thing [that I remember]: The driver had documents and money in the car. After the accident he was very scared. I went to the car to find hiss passport. While I was walking inside, I touched something and thought it was a [dead] body. I was very scared. I grabbed it and pulled it. I laugh now myself, but can not ever forget it. I had dreams of the accident the first or second night.

<u>2001-U.S. Missile Attack-</u>"thought that I would die" (age 27)

I saw bombs in the fall of 2001, October or November for maybe 1-2 months. I knew people who died, I saw their bodies later. I saw pieces of children's bodies. I knew the children who died, but was not related to them.

In December of 2001, I saw missiles hit the houses. I felt that I was in danger. I couldn't see them, but I could hear them once they were fired. Afterwards, I saw some people who were killed, and I knew some of them. There is nothing that happens now that reminds me of that.

10

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani              20 JUNE 2010

<u>2004-Capture in Pakistan- barricade situation/gun battle-"thought that I would die"</u>
<u>(age 30)</u> -

"I wanted to jump off of the balcony. Because the house was very close to other
houses, I hoped to jump to another house. The door was locked, and I didn't have a
key. I ran downstairs again. At that time, a fire started, I think that it was from outside —
the police. There were two guns in the house. I went to take one gun. I thought, I could
find a way to jump out the window at night and run away. I thought that I could hold
back until night and then escape. At night, they put up spotlights. It was night, I
couldn't run away. At 10 in the morning, we surrendered, including my wife and
everybody in the house. There were 8 grownups and one teenager aged 12 and five
kids, aged 10 days to 5 years old.  I was up all night — we were up all night. There was
no way to sleep. There was tear gas thrown in the house. The tear gas affected us all- I
couldn't see, I couldn't breathe.   During the night they did this — it started from the
beginning. Several times they did it.

I received a shrapnel wound in my left hand, it happened early on. I took medicine for
pain, I don't know if it helped. Police shot from the outside to the inside, and we shot
from the inside out. No one was killed. I feared that I might die and that my wife might
die. The house is two story. At some point, I wanted to go downstairs. They saw me, I
think, the bullets were hitting above my head, the bullets dropped on my neck and they
were very hot. I thought I would die.  When I was shot in the hand, I saw blood and
didn't think anything about it. When the bullets were dropping on me, I thought maybe
that I would be killed.



## MEDICAL HISTORY AT MCC

Mr. Ghailani's exposure to medical staff at MMC has been minimal, with brief visits on approximately six occasions during the past year. When he was first assessed on June, 9 2009, he reported only minimal medical history – that he received INH due to a positive PPD that indicated a prior exposure to tuberculosis. It appears that no genital or rectal exam was done due to absence of a chaperone. At the time of initial assessment, he denied insomnia. His pulse was low at 62 bpm and his blood pressure was 124/82. Since that time, he has been assessed periodically for hypertension, high cholesterol and a skin rash. While he has accepted an anti-fungal cream for the skin rash and ibuprofen for tooth pain due to pulpitis, he has not accepted medication for his hypertension or hypercholesterolemia. He indicated to medical staff on February 23, 2010 that "I don't like medicine."

Following his initial assessment, he has not ever been noted to be anxious. Although he suffers from familial hypertension, which is untreated, his pulse has never been assessed to be greater than 78 bpm and is usually much lower than that, with an average of approximately 66 bpm when checked.

## REPORTED INTERACTIONS WITH MCC PERSONNEL

Because of the high level of security required for Mr. Ghailani, his movement is limited. In order to facilitate communication, he regularly interacts with the senior official on the unit, Ken Haas and Lt. Patrick Delaney. During my interviews with Mr. Ghailani, he was positive in his statements about these individuals, and MCC personnel in general. In my June 18, 2010 interview with Lt. Delaney, he described Mr. Ghailani in positive terms, and stated that he was pleasant and respectful: A "yes sir, no sir" type of inmate. Likewise, Mr. Ghailani described Lt. Delaney in positive terms, although he reported that he has the most contact with Unit Manager Ken Haas.

Mr. Haas described Mr. Ghailani in the following way: "He will laugh when I tell a joke" [I have] never seen him cry. [There is] very little fluctuation in mood. The happiest I have seen him has been during [a visit with his] family who had traveled from Africa, a few months after arrival at MCC." Mr. Haas stated that he has never observed symptoms of mental problems. When asked about his observation of Mr. Ghailani's ability to concentrate, he told me on May 27, 2010 that Mr. Ghailani is "just like everybody else up there [in that he is involved in participating, reading, his discovery, [and]

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani            20 JUNE 2010

meeting with his attorney." He may be the most steadfast reader... [He is] quiet, reserved, more in control. [He] doesn't really complain. Doesn't try to convince you he is right. Has never [tried] to convince me. You have to start every conversation. [I get only a] short answer only from him. He is well liked by officers."

Mr. Haas also recalled the conversation that they had on November 3, 2010 following his refusal to go to court: "[Mr. Ghailani has] never spoken about trauma, has attributed his reluctance [to undergo the search] to culture, religion and embarrassment. Words that he always used [to describe the visual search] were humiliating and embarrassing, not traumatic."

On October 4, 2009, Mr. Ghailani wrote a note to Mr. Haas, thanking him for making arrangements to meet with his family. The note includes the following:

> "I heartily appreciate all of the privilege you provided for me during those visits.
>
> I acknowledge where there are times because of some reasons I should not be able to meet with my family. But, because of your kindness and generosity you went beyond the regulation and enable me to meet with them. "Thanks a lot."
>
> I can not really come up with the right words to express my gratitude to you, but I will say thank you very much and may the God Bless you and reward your generosity. Most Sincerely, Ahmed

Mr. Ghailani further described Unit Manager Ken Haas in the following way:
> He is a very nice guy. I met him on the second day. For example, any time that I have some problem, like when I don't receive my books, I will ask him, he will call the people who are responsible at the same time. He visits us every Thursday. I feel comfortable talking to him about some topics.

## MENTAL STATUS EXAM

During my sixteen hours of interviews on May 28, 29, 30 and June 19 at the MCC, with Mr. Ghailani, he wore an orange jumpsuit. On each occasion, I met with him in a divided room in the presence of his attorney, Steve Zissou. Mr. Ghailani expressed an understanding of my role after his attorney, Mr. Zissou introduced me as a psychiatrist, appointed by Judge Kaplan, who has been asked to assess Mr. Ghailani's mental condition, competency to stand trial and competency to waive his right to be present in the courtroom.

Mr. Ghailani sat on the other side of a plexiglass and screen divider. Mr. Zissou shared my side of the divided visiting space and facilitated the initial interaction. At my request, Mr. Zissou did not face Mr. Ghailani during the time of our interviews.

Mr. Ghailani's hygiene and grooming appeared to be excellent. His hair was cut short, and he wore a faint beard and mustache. He did not report any physical discomfort during the interview sessions, although at times he paused and bowed his head when discussing a period of time ████████████████████████████████████████████████████████████████

This Tanzanian male was dressed in orange jumpsuit, mustache, beard, short hair. He showed good eye contact generally as well as impulse control. Generally smiling, he drank a soda and ate a snickers bar and nachos. He described his mood as "good", a 7 on a scale of 1-10. Affect was full. He was able to smile and laugh appropriately when speaking to Mr. Zissou. He became somewhat tearful, but appropriately so when discussing his father's death, his family and past painful experiences. His judgment

13

Saathoff M.D.                 CST EVALUATION: Ahmed K. Ghailani              20 JUNE 2010

also appeared to be intact. He was oriented to day, month, and year, as well as the name of this facility. At one point during our interview, he spent approximately five minutes praying at the scheduled prayer time.

Mr. Ghailani sat directly across from me, and showed a lack of spontaneity during periods when he discussed prior painful incidents including a beating at the hands of his father, a teacher, and the local police in Zanzibar. In addition, he showed poor eye contact during periods when speaking about his father's death and the poverty that resulted from that. He also appeared reluctant and uncomfortable, with frequent pauses when discussing his treatment ███████████████████ as well the experience of being searched at MCC.

Clearly, however, Mr. Ghailani was most distressed, and appeared unable to speak or show any eye contact when discussing a period when ██████████████████████████████████████████ ████████████████████████████████████████████ Although difficult tell through the plexiglass, he appeared to become genuinely tearful. At that point, while sitting in the chair, he bent down and remained motionless for two to three minutes. He stated that he could not go on, and that to share the story with me would be shameful for him, and could subject him to discomfort if others were to find out.

Mr. Ghailani was able to subtract serial 7's all the way to the number 2 and was able to recall three objects at five minutes. Regarding his memory, he stated: "If I put my mind on it, I have a good memory." I am able to keep in mind things that are important. Sometimes I will forget to ask them a question and then remember. Mr. Ghailani was able to name the current president and go backward to Kennedy. He did not name Ronald Reagan, Gerald Ford or Richard Nixon. His fund of knowledge is remarkably good. He spoke at some length about his interest in reading, particularly books by John Grisham relating to the legal system as well as mysteries.

Mr. Ghailani denied auditory or visual hallucinations, or perceptual disturbances during my interview, and did not report that he has experienced these at MCC. ████████████████████████████████ ████████████████████████████████████████████ Mr. Ghailani denies suicidality or homicidality. He stated to me that he sleeps well and has a good appetite.

## THE VISUAL SEARCH OF 3 NOV 2009

On May 29, 2010, Mr. Ghailani described for me the experience of undergoing a full visual search, and also specifically spoke about the search as it occurred on November 3, 2009. Notably, there can be as many as four full visual searches that an MCC inmate must undergo on a court day. This is because whether going to the courtroom or from the courtroom, MCC security who escort the inmate have a responsibility to do the search as well as the Receiving and Discharge security officers and the Marshal's Service. Whenever feasible, one search can be done on the trip to the court AND on the trip from the court if BOTH the Marshal's Service officers and the MCC escort officers are present at the same time and can be assured that the full search took place. In my June 18, 2010 interview with the Unit Manager, Ken Haas, he confirmed the situation and the option for one search in front of both security services:

> "One of our compromises was that we would have the escort officer there so he would only have to be searched once. What we have agreed to was that we would combine them, so if they escort officer saw them doing a proper search, then they wouldn't do it again. The escort officer must do the search because the escort officer is responsible.

While in general, the Marshal's Service and the MCC escort officers make this accommodation for the inmate, it does not always occur due to tight scheduling and the inability for both to be present at the same time. This is what occurred on November 3, 2009. According to Lt. Delaney in his June 18, 2010

14

Saathoff M.D.          CST EVALUATION: Ahmed K. Ghailani          20 JUNE 2010

interview with me, it was the need to be searched twice that may have further agitated Mr. Ghailani, because in the past he had been accustomed to one search with both services present. In his May 29, 2010 interview with me, Mr. Ghailani described not only a typical search, but also the search of November 3, 2009.

> You take all of your clothes, in front of officers here, men. The number is from 2-5. This takes place downstairs on the third floor. Temperature is alright. When you remove clothes, they search your body so that you don't bring a weapon. They don't touch me. They are one or two meters [away].

> They first have you raise your arms and then they have you squat, with knees down and bend over. That is what happened all of the times, except the last time, when they said bend over and spread yourself I don't know why they changed on the last time – I need to think about it. I can't, I don't know. PAUSE. I don't remember – it was months ago. October or November, probably November.

> When they asked me to spread myself (spread buttocks) I told the guy who asked me no, I will not do this. They said this is the way it is supposed to happen. There was one lieutenant, who was at a station. I said call the guy at the station. He didn't want to be involved. They said "you have to do it." The Lt. told them "if he doesn't want to comply, put him in the cell until the marshal comes. When the Marshal came, he told me to do the strip search; I told him that I was waiving my right to go to court.

> The unit manager [came to the holding cell and] explained everything to me. I told him that it did not happen that way before. He tried to explain that it is just not you.

> I was upset. I spoke with the unit manager. He listened to what I was saying, he didn't agree. I was upset about it for maybe two days. I don't remember how well I slept. I think that I was alright, I think that I slept alright and that I did not have any problem with my appetite. I did not cry, I was comfortable and confident with what I said. I did not get punished.

On May 27, 2010, I spoke with the Unit Manager, Ken Haas, about his recollections about the 3 NOV incident and he stated the following:

> Mr. Ghailani claimed that this was first time he was asked to spread his cheeks. When I saw him, he was dressed in orange. He was in a holding cell, he was angry, tense, direct and unyielding language: "No, I am not going to do that." He was visibly angry.

> I spoke to him for a while that day. I talked to him over the next weekend. It lasted about an hour. He was calm, rational, argued the points... I told him that he should go to court; he was calm and very rational, but stubborn on the issue.

> I told him that EVERYBODY has to go through the strip search. He said: "this is humiliating. This is embarrassing." He said "I know they are doing this because they have to. [But] when I see them afterwards, I want to punch them." He made the intellectual argument that "my culture is different." He said "nudity in America is not a big deal. It is harder for us because of our culture and religion." He never spoke of any trauma even thought we spoke for more than an hour.

> I have seen reluctance in others from his culture that object and complain. Some of those have been through the prison system so they are used to that. He came from Guantanamo

15

Saathoff M.D.                 CST EVALUATION: Ahmed K. Ghailani                 20 JUNE 2010

Bay, where that wasn't done. I told him that "this is best for you.' [to attend court and assist your attorneys.]

He is a very observant Muslim [Stating that he would refuse in the future, Mr. Ghailani said] "If I went through this and agreed to the strip search, I would be mad [angry]." His arguments were smart regarding cultural differences with us.

## THE VISUAL SEARCH OF 6 MAY 2010

Unlike the visual search of November 3, 2009, when he underwent one search from MCC security followed by the arrival and expectation of the Reception and Discharge (Marshal's Service) officers that the search would be repeated as per policy, the single visual search of May 6, 2010 prior to arrival at court occurred under the direction of Lt. Patrick Delaney, and included the presence of the Reception and Discharge officers, thereby eliminating the need for two sequential searches. In my May 27, 2010 interview with Mr. Haas, he recalled that on May 6, prior to the search, he noticed that Mr. Ghailani appeared to be somewhat distressed and "seemed to initially get tense [prior to the search]." I put my hand on his shoulder, said "calm down, you are getting yourself upset."

Lt. Patrick Delaney also recalled in our June 18 interview that Mr. Ghailani appeared to be clearly upset during the search, stating that when he was asked to lift his own genitals, Mr. Ghailani's eyes "welled up with tears." Lt. Delaney then stated that when Mr. Ghailani was requested to turn around and provide the security officers with a visual inspection of his rectum, Mr. Ghailani became noticeably tearful.

Notably, Mr. Ghailani responded fully to questions that Judge Kaplan asked during the proceeding, and expressed an understanding of the statements that were made by Judge Kaplan. According to those present in the courtroom, Mr. Ghailani appeared calm and answered Judge Kaplan's questions clearly. Six weeks later, Mr. Ghailani was able to relate to me the substance of the discussion, expressed appreciation for the way that Judge Kaplan addressed the issues, and felt that he had been treated fairly. He also stated to me that he has no regrets about the statements that he made, and would not change any of his statements. Furthermore, Mr. Ghailani felt that he was clearly competent to respond to Judge Kaplan.

## ANALYSIS

### Current Presence of Mental Illness or Defect

- Mr. Ghailani denies the existence of any mental illness or psychological problem and no prior history of mental illness is reported. Review of all available detention records supports his statements that he has no prior history of mental illness and no family history of mental illness. He is not noted to have sought mental health treatment during his life, either before detention or since his series of detentions following his arrest in Pakistan in 2004. ████████████████████

  Currently, Mr. Ghailani sees his current condition as being related to life in prison. In his interview with me on June 19, 2010, he stated that medicine can't help him if the prison is the cause of the problems.

- The MCC is a facility that is committed to providing mental health treatment for those detainees who require it. In order to insure that adequate assessment takes place, referral is made easy. In other words, there is a low threshold for identifying any inmates who are demonstrating any symptoms that might indicate the presence of a mental disorder. However, Mr. Ghailani, his family, his attorneys and/or the MCC staff have never requested that he be assessed by MCC mental health staff due to observed or reported psychiatric symptoms that he is experiencing. Weekly routine monitoring of Mr. Ghailani by MCC Mental Health staff have demonstrated that he has remained stable throughout the last year that he has been detained at the MCC.

16

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

- Review of medical records at MCC does not reveal the presence of hyperarousal symptoms that might suggest the presence of an anxiety disorder. For example, Mr. Ghailani's pulse has been low, rather than high. He has not complained to the medical staff about palpitations or shortness of breath. While he is diagnosed with hypertension, this appears to be familial in nature, and not related to anxiety but rather to exercise, diet, and Mr. Ghailani's reluctance to take antihypertensive medication at this point.

- Mr. Ghailani has appeared to demonstrate genuine discomfort when undergoing a full visual search, including flushing and tearfulness as described by Lt. Patrick Delaney who observed the procedure on May 6, 2010. His discomfort is also manifested by a halting and anxious demeanor when speaking about the visual search procedure and describing his experience ████████████████████████ ████████████████████████████████████████████████████████████

- Mr. Ghailani has experienced severe psychological trauma that he has experienced in his life ████ ██████ (several near death experiences where he thought that he would die including a gun battle with police that resulted in burn wounds to his neck and a shrapnel wound to his right hand, a severe beating by two Tanzanian policemen, a beating on his buttocks by a religion teacher in the presence of others when he was 20 years old, and most importantly a shameful experience that he can not describe ██████████ ███████████████████████████████, a diagnosis of Post Traumatic Stress Disorder, even if it were to be made, would not necessarily link current anxiety that he experiences during the full visual search to his experience ████████████████████████████████████ ████████████ Without a much more complete understanding of the trauma experienced ████████████████████████ it is not possible to appreciate the role, if any, that the

- Many of the features of Post Traumatic Stress Disorder are subjective, making independent assessment difficult if not impossible. In order to make the diagnosis of Post-Traumatic Stress Disorder, Dr. Porterfield cited persistent re-experiencing of traumatic events, and specifically cited ████████████████ as the time when the most intolerable memories occurred. ████████ In my interview with Mr. Ghailani, he indicated that the most intolerable experience occurred ████████████████████████ and that the event was so shameful that he could not even bear to discuss it. Although Dr. Porterfield describes ████████████ as the most traumatic for Mr. Ghailani, these are not the most significant painful memories that he related to me. In his interview with me, he stated that it was the prospect ████████ ████████████████████████ In fact, he has consented to searches at MCC that require nudity.

- Dr. Porterfield cited physiologic reactivity, and Mr. Ghailani's self report of shortness of breath and heart palpitations. This has not been seen on any of his medical assessments and is not possible to objectively determine when separated by Plexiglas. I did not witness Mr. Ghailani to be either short of breath or to demonstrate increased respirations during my sixteen hours of interviews with him. Physiologic reactivity can be measured, and we lack measurements that support that it is in fact occurring.

- Although Dr. Porterfield notes a restricted range of affect, Mr. Ghailani was able to demonstrate a rather full affect in the interviews that were conducted with me. He was able to smile and laugh when accepting snacks when we first met with him, in speaking to his attorney, when speaking of his family and when observed to be meeting with his family in September 2009 when they visited. ████████

17

Saathoff M.D.        CST EVALUATION: Ahmed K. Ghailani        20 JUNE 2010



Without access to friends and family, and in such a secure setting, it is understandable that Mr. Ghailani is less engaged than he would be in open society. His range of affect that I observed is not unlike the range of affect that I see in incarcerated individuals in a maximum security setting.

- Dr. Porterfield has indicated that Mr. Ghailani has difficulties with increased arousal, as demonstrated by insomnia. This has not been noted by the psychology department or by MCC personnel who monitor him closely. ████████████████████████████████████████████ he did not report to me that he has difficulty with sleep as it relates to reminders of prior incidents. Like physiologic reactivity, sleep disturbance is something that can be identified and quantified. Mr. Ghailani has not remarked to me or to the MCC psychology department that he has difficulty with sleep. The MCC Psychology Department did not note increased difficulties with sleep during the period that Mr. Ghailani was attending court hearings, and was required to undergo full visual searches. Without some type of objective documentation or even inmate reports, we lack the objective information needed to insure that sleep disturbance is actually occurring.

- Dr. Porterfield's contention that Mr. Ghailani has poor concentration as a result of reminders of maltreatment is not supported by my interviews with him. His Unit Manager has not noted that concentration is difficult for him, and stated that his level of concentration is on par with other inmates on the unit. Dr. Porterfield opined that as a result of triggered memories following the pre-hearing search of May 6, 2010, Mr. Ghailani was so impaired in concentration as to be incompetent to assist his attorneys or to testify. However, Mr. Ghailani was able to recall with specificity his understanding of his colloquy with Judge Kaplan, and stated that he in fact does remember what was said and would not change any of his statements to Judge Kaplan.

- The hypervigilance that Dr. Porterfield attributes to PTSD is not unlike the understandable wariness that I have seen among many high security inmates who do not have PTSD. As someone who is interested in following rules of the institution, Mr. Ghailani's vigilant approach to his surroundings is not necessarily a sign of pathology. The restrictive setting of a high-security jail, and particularly the security measures taken in the process of moving an inmate to court can result in an enhanced state of wariness and vigilance. In such a setting as MCC, this is not necessarily a marker of PTSD. Even while incarcerated in a secure setting, the recordings at Guantanamo do not reveal hypervigilance but rather a relaxed state in which Mr. Ghailani was quite candid with the other detainee.

## COMPETENCY ISSUES

### Understanding of his Charges and the Legal Process

On May 28, 2010, and with Mr. Zissou present, I interviewed Mr. Ghailani at length about his understanding of his charges and the legal process. What follows are his verbatim and unprompted statements to me:

> I am charged with bombings in east Africa, Dar Es Salaam. There are over 280 charges dealing with bombings – it deals with the number of people killed in the bombing. Most of [the charges] are similar

> I understand the charges, they make sense to me. There are different charges

18

Saathoff M.D,                    CST EVALUATION: Ahmed K. Ghailani           20 JUNE 2010

[At first], I had one attorney, he was army – his name was Michael Acuff, but we had some misunderstanding, and there was a substitute. I had him for six months or less. That was in 2008 (March to June/July). They gave me two attorneys. One was Jeff Callwell (military – a colonel, a marine) and the other person was Richard Reiter (USAF Major). I saw them once every three weeks. They remained on the case even after I got here and worked with civilian attorneys. They had to take the case and transfer it to attorneys here. They filed motions to stay on the case. The judge denied the motion and then they were out of the case. They left in December of 2009. [Visits from my attorneys] depend [upon] how busy they are. Sometimes they visit me. One is a paralegal – she visits me 2-3 times a week. My lawyers will visit between 1-4 times each month.

How many times have [I] been in court? Once at Gitmo and have been here four or five times. The rules in Gitmo allow certain kinds of evidence. The rules at Gitmo favor the government; here they are more fair. When I was at Gitmo, they were able to use hearsay evidence. Here, they have constitutional rights. Judges seemed the same. The judge here is alright. The judge's role is to make sure that everyone is following the law. If the government does something wrong, my lawyers file motions, and then it goes to the judge. The judge then will see which one is correct. If they say my side was wrong, then they say that the government was right, for example.

How many motions have my attorneys filed? They have done it more than five times. Some have been very important and they have to tell me. I think that he has granted the attorney's motions. I wanted the military lawyer to stay on the case. The judge did not grant that. The prosecutor did not have a big issue about that, but the government did not want them to be in the case. Military bosses did not want them to stay in the case.

When I go into the courtroom, I sit with my lawyers. There are about five chairs. Or six chairs. I sit on the fourth from left. The judge sits on the front. There is a row for prosecutors, one row in front of the defense. They have a table and chairs. – four or five. They don't talk to me. They have never talked to me. They talk to the judge.

They don't talk to my attorneys in the courtroom. But they talk at other times.

I feel good about my attorneys. They listen to me. It is difficult to compare [to] the Gitmo attorneys because it is a different system. If my attorney doesn't help me, then I will go to the judge. One of my attorneys was Mr. Cooper. I had a problem with him, and the judge removed him. I thought that [Mr. Cooper] wasn't listening to me. From the first time that I met him, I realized that we weren't getting along very well. When he came here, he came with the military attorneys. They convinced me to work with him. I tried to work with him. But I found some problem with him. Once the military was out of the case, it was easier for me to ask him off.

I told them 'I don't want him.' They tried to convince me – I told them 'I don't want him anymore.' I wrote a letter to the judge and my attorneys delivered it.

At that point, I stopped going to the court room. He told the MCC people to connect me to the judge by telephone. He asked me a few questions. I don't remember – it was a month or less – I don't remember exactly. That may have been in February.

I was able to assist in my defense, even though I wasn't in the courtroom. I was on the telephone. It was in the courtroom itself, in the judge's chamber. The judge explained to the prosecutor that I sent him a letter. He asked the prosecutor if they had any

19

opposition to that. They said no. He asked [Mr. Cooper] who explained himself. The judge listened to him, and then the judge asked me, have you changed your mind? I said to the judge, 'no I haven't changed my mind.'

These first steps are pre-trial. After this period, there will come a trial. There will be a jury who will listen to the crime itself. The jury will make the decision, guilty or not guilty. The case will go to trial in September.

The timing is set in a fair way. I feel that I will be ready by September.

I want to talk to my lawyers about the possibility of combining the charges. I know that the jury has not been selected yet.

[What is the] selection process? I think first, the people who will be selected are voters. There will be a time when there will be just 200 of them. My lawyers and the prosecutor will select the ones that they don't want to be there. Then they have to ask them questions, what do they call that, voir dire? There will be some replacements, but I don't know how many they have named. They come in case one of the jurors gets sick.

I learned this from Grisham's books. Brethren, Summons, Runaway Jury, Play for Pizza, The Street Lawyer, A time to Kill (I saw the movie), King of Torts.

[And what about] the trial itself? They start with the government with its witnesses and the evidence. Then they do direct, and then the defense does the cross examination and then the government does the redirect.

Then the defense presents its case. It is a reverse of the above. Then the defense rests.

Then the government will come again. They will do the same thing. I think so, I am not sure. Then after that, the closing statements from the government and then from the defense, although I not sure about that.

If there are motions that arise, the judge decides. After closing arguments, he will give instructions to the jury, that they should not read about the case, and that they should not discuss the case between themselves.

Then the jury goes to the chamber. Then they vote, they discuss the case and they deliberate. They can take as much time as they want until they can take a decision. They make a decision. If the decision is Not Guilty, the government will fight for appeal, I think. Appeal is [when] they don't agree with the decision. If they do agree, they may say that there are some decisions that they disagree with.

It will go to the Appeals Court, and may go up to another Appeals court.

If the jury says guilty, the defense will appeal. It depends what the Appeal Courts would say. It might go to the Supreme Court. The Supreme Court decides whether or not that they want it.

<u>Ability to Work with Attorneys</u>

In answer to my questions of June 20, 2010, Mr. Ghailani was consistent in his compliments about his attorneys and the work that they have been doing on his case. I witnessed the interaction between Mr.

Ghailani and his attorney Steve Zissou and found it to be one of trust and respect. Mr. Ghailani was able to appreciate humor, and often smiled and at times laughed appropriately in response to questions and comments of Mr. Zissou. The following statements are representative of Mr. Ghailani's view of his attorneys:

> I don't have any problem with my attorneys. I think that they are helping me. I trust them all the same. I understand that they are working together. Any advice that comes from one of them, I believe is from all of them, so I believe that it is from all of them. Some of the advice I agree with, some of the advice I don't agree with.

> They mean well. They know the law, I saw some of the motions that they filed, and I have seen transcripts of when they argue in the courtroom, and that makes me feel confident.

> I am impressed with my lawyers that they know what they are doing.

In my interview with Mr. Ghailani on May 30, 2010, he said the following: "I am competent to waive my rights. I have the constitutional right to be in the court room. If I don't want to be there, I can waive that right. I can make decisions with full understanding and I can continue to make decisions with full understanding."

While Mr. Ghailani has confidence in his attorneys, he is also prepared to resist them if he believes that they are not representing his wishes. On June 19, 2010, Mr. Ghailani spoke directly about the question of competence and his insistence that he does not suffer from any type of mental illness or psychological problem. As he stated many times over the course of the four interviews with Mr. Zissou in attendance, Mr. Ghailani strongly believes that he is competent to make decisions regarding his legal case, and is competent to waive his right to be present at the hearing if he chooses not to attend.

> If my lawyers told the judge that I was not competent, I would not agree with them.

> I went to court before, and I am willing to go to the court again. The only thing that stopped me is the way that they do the strip search. I think that if I go to the courtroom with the strip search, maybe at that point I will not be able to help them... When I have a search, my mind is not working very well

> [If asked] I would tell the judge that I am competent. What I believe is that their job is law, it is not health. That is because you are here, to tell them if they are right.

> I don't have any mental illness. I am not crazy. When I decide not to go to court, I think that I have that right.

> I don't like to go through strip search. If I have to go to the courtroom, I don't have any choice. They will do what they want.

## State of Mind While in the Courtroom

In my interviews with Mr. Ghailani, he displayed a good recollection of the discussion with Judge Kaplan, and stated that he would not change any of the statements that he made to the Judge. Although he states that he may feel somewhat nervous while in court, it does not impair his ability to understand the proceedings or to work with his attorneys. During his interview with me on May 30, 2010, he stated:

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

> Maybe I feel nervous. That is not a reason that would keep me from going to the court.
> Many things in the court make me nervous, but it doesn't stop me from going there.
> The problem is that when I am in the courtroom without chains, I think that people
> don't trust me. No one trusts me. There are two marshals on my back. If I make a
> move, they will try to stop me. That does not stop me from going into the court room. I
> am by myself and separate.

On June 19, I again asked Mr. Ghailani about his memory of the May 6, 2010 court interaction with
Judge Kaplan. He displayed an excellent memory of the colloquy between Judge Kaplan and himself,
even though it had occurred six weeks previously:

> In general, the judge asked me if I understood the process and if I understood the
> advantage and disadvantage of waiving my rights. I understood the judge, he is an
> understandable person. He gave me time to answer the questions. I would not change
> the answers.

Although Dr. Porterfield was not present at that hearing, she reviewed the testimony and met with Mr.
Ghailani four days later. Dr. Porterfield's assessment of the May 6 hearing was that his psychic distress
was significant enough that he perceived that court security officers were "about to harm him." In her
opinion, although Mr. Ghailani may have appeared outwardly calm, he was in fact so inwardly distressed
and disorganized that his memory would be impacted and that he would not be able to make reasoned
judgments. Dr. Porterfield's assessment that Mr. Ghailani was not competent to make rational decisions
related to his case is contradicted by Mr. Ghailani's own memory of the discussion, his confidence in the
statements that he made to Judge Kaplan and his apparent comfort with Judge Kaplan.

Ability to Reason



According to Unit Manager Ken Haas in our May 27, 2010 interview, Mr. Ghailani is impressive in his
intellectual abilities: "I think he is smart" "He speaks well, chooses words carefully, he can come up with
a strategy, he is logical, can negotiate. Mr. Haas indicated that Mr. Ghailani was upset that MCC is
stricter than Guantanamo Bay, which has a media room where detainees are allowed to watch movies. In
addition, food is allowed to be brought in to detainees, there is no strip search, there is group interaction
and group prayer allowed, as well as personal items. Referring to Mr. Ghailani's ability to argue
persuasively, Mr. Haas stated: "He didn't just know the procedure, but also the rationale. He will make
intellectual/emotional argument [and] knows that [when faced with a rule that seems unfair] he can't
confront it head-on."

Saathoff M.D.                    CST EVALUATION: Ahmed K. Ghailani                    20 JUNE 2010

## SUMMARY

At this time and based upon my review of all documents provided to me and interviews conducted, I am in agreement with Mr. Ghailani's statement to me that he does not suffer from a mental illness, does not require treatment, is competent to stand trial and is competent to waive his right to be present at his court proceedings.

Mr. Ghailani has reported multiple psychologically traumatic experiences dating from childhood, including episodes when he believed that he would die a traumatic death. Although Mr. Ghailani does demonstrate some anxiety-related symptoms that could be consistent with Post Traumatic Stress Disorder, I do not feel that Mr. Ghailani meets the criteria for a current diagnosis of Post-Traumatic Stress Disorder. Mr. Ghailani has reported past experiences of serious and life-threatening psychological trauma that pre-date ███████████████████████████ Based upon the relative candor of the history that he provided to me and his statements to me that he does not have a mental illness and does not require treatment or special privileges, I did not find him to be malingering during my assessment of him.

Mr. Ghailani does not presently suffer from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. In fact, based upon my interviews and reviews of relevant documents, there is not sufficient evidence to demonstrate that he suffers from any mental disease or defect.

Mr. Ghailani clearly is competent to waive his right to be present at the trial of this matter and any right he may have to be present at other phases of the case.

23

Saathoff M.D.                   CST EVALUATION: Ahmed K. Ghailani          20 JUNE 2010

**Appendix I**

1.  Psychology Monthly reports from 19 JUNE 2009 to 20 MAY 2010
2.  Sequential Log Book entries, from 26 MAR 2010 to 11 JUNE 2010
3.  Weekly Commissary Invoices, MCC, 8 SEP 2009 to 3 JUNE 2010
4.  Attorney Sign in sheets from 1 JAN 2010 to 7 JUNE 2010
5.  
6.  USDOJ, Memorandum for John A. Rizzo, 10 MAY 2005
7.  Affidavit by Katherine Newell, Esq., dated October 2, 2009
8.  
9.  FBI, Interview of Ahmed Khalfan Ghailani, 6 FEB 2008
10. U.S. v. Ahmed Khalfan Ghailani:Hearing of 26 APR 2010
11. U.S. v. Ahmed Khalfan Ghailani: Ghailani Affidavits (Tabs 4,5,6)
12. U.S. v. Ahmed Khalfan Ghailani: Memorandum of Law in support for Defendant's emergency Motion for a stay of the District Court's Order, 3 May 2010
13. U.S. v. Ahmed Khalfan Ghailani: hearing of 6 MAY 2010 (Ghailani)
14. U.S. v Ahmed Khalfan Ghailani: waiver to attend court, 13 MAY 2010
15. U.S. v. Ahmed Khalfan Ghailani: Memorandum Opinion of Judge Kaplan, 14 JUNE 2010
16. 
17. U.S. v. Ahmed Khalfan Ghailani: hearing of 18 MAY 2010(Porterfield)
18. U.S. v. Ahmed Khalfan Ghailani: teleconference with Judge Kaplan, 28 MAY 2010
19. Declaration of Dr. Katherine Porterfield, 2 APRIL 2010
20. Curriculum Vitae: Katherine A Porterfield, PhD
21. Interview Notes, Katherine A. Porterfield PhD, MAR- MAY, 2010
22. OMS Guidelines on Medical and Psychological Support to Detainee Renditions, Interrogation and Detention:
23. Four Ken Haas' emails of SEP 2009 relating to planning for family visit.
24. Clinical Encounter Health Records, MCC, for Ahmed Ghailani:
    9 JUNE 20209
    7 JULY 2009
    4 AUG 2009
    1 SEP 2009
    13 OCT 2009
    8 DEC 2009
    16 MAR 2010
25. Ahmed Ghailani handwritten note of thanks to Unit Manager Ken Haas thanking Mr. Haas for making special arrangements to visit with his family – dated 4 OCT 2009
    Ahmed Ghailani's handwritten name and ages of family members on 26 AUG 2009 in preparation for family visit.
26. Ahmed Ghailani's handwritten name and phone number of mother written 11 NOV 2009 in conjunction with request that he be allowed to call his mother on that date.
27. Interviews totaling 16 hours (with Defense Counsel Steve Zissou present) with Ahmed K. Ghailani 28, 29, 30 MAY and 19 JUN 2010
28. Interview with Ken Haas, MCC Unit Manager, 28 MAY 2010
29. Interview with Lt. Patrick Delaney, (MCC) 18, 20 JUNE 2010