UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       -against-

AHMED KHALFAN GHAILANI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FILED WITH COURT
SECURITY OFFICER
7/12/10

S10 98 Crim. 1023 (LAK)

## OPINION

Appearances:

> Michael E. Farbiarz
> Jesse M. Furman
> Harry A. Chernoff
> Nicholas Lewin
> Sean S. Buckley
> Assistant United States Attorneys
> PREET BHARARA
> UNITED STATES ATTORNEY

> Peter Enrique Quijano
> Michael K. Bachrach
> *Attorneys for Defendant*

> Andrew Weissman
> Howard J. Fisher
> Daniel B. Tehrani
> JENNER & BLOCK, LLP
> *Attorneys for* Amicus Curiae *The Center for Constitutional Rights*

> Kent S. Scheidegger
> *Attorney for* Amicus Curiae *Criminal Justice Legal Foundation*

> Stuart Wachs
> WACHS & ASSOCIATES

> Kristin L. Myles
> MUNGER, TOLLES & OLSEN, LLP

> *Attorneys for* Amicus Curiae *Center on the Administration of Criminal Law*

Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A.     Al Qaeda and the 1998 East African Embassy Bombings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B.     The Indictments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.     Ghailani's Years at Large (1998 - July 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    D.     Ghailani's Capture and Initial Detention ███████████████████ . . . . . . . . . . . . . 8
    E.     Ghailani's Detention in CIA Custody ████████████ . . . . . . . . . . . . . . . 9
    F.     Detention in Department of Defense Custody and Prosecution Before a Military Commission
          (September 2006 - June 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    G.     Civil Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    H.     Transfer to the Southern District of New York and Prosecution in this Court . . . . . . . . . . . . . . 16
    I.     This Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*I*       *The Right to a Speedy Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*II*     *The* Barker *Factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    A.     The Length of the Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    B.     Invocation of the Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    C.     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    D.     Reasons for the Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        1.    The CIA Period – █████████████ . . . . . . . . . . . . . . . 32
            (a)    The Abuse Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
            (b)    Alleged Dissipation of Intelligence Value . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.    The Guantanamo Period – September 2006 through June 2009 . . . . . . . . . . . . . . . . . 34
            (a)    The Enemy Combatant Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
            (b)    The CSRT Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            (c)    The Military Commission Investigation and Prosecution . . . . . . . . . . . . . . . 38

*III*    *Balancing the* Barker *Factors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

LEWIS A. KAPLAN, *District Judge.*

Ahmed Khalfan Ghailani, allegedly a member of the Al Qaeda terrorist organization, is charged with complicity in the 1998 bombings of two United States embassies in east Africa in which 224 people were killed and over a thousand injured. He and others were indicted for that offense in 1998. This Court issued arrest warrants. Several of Ghailani's co-defendants in fact were arrested years ago, tried, convicted and sentenced to lengthy prison terms.

Ghailani remained at large for years. In 2004, he was captured by a foreign nation and soon transferred to the exclusive custody of the Central Intelligence Agency ("CIA"), which interrogated him for roughly two years at one or more secret sites in an effort to obtain information for use in defending the United States and its interests. The CIA then turned Ghailani over to the Department of Defense ("DoD"), which detained him at the United States naval base at Guantanamo Bay for almost three more years.

In June 2009, following a change of policy, the executive branch transferred Ghailani to this district for trial on the 1998 indictment. Ghailani now moves to dismiss the indictment. He argues that the United States government, by detaining him for nearly five years in CIA and DoD custody before presenting him for trial, deprived him of his right under the Sixth Amendment to a speedy trial. Before proceeding to that contention, however, it is appropriate to consider the purpose served by this prosecution and the reason the speedy trial analysis cannot be avoided.

This case arises against the background of Ghailani's detention as an "enemy combatant" – a person who was part of or supported forces hostile to the United States or coalition partners abroad that engaged in armed conflict against the U.S. The Supreme Court has made clear that the executive branch, when authorized by Congress, has the power to detain even U.S. citizens

who are enemy combatants for the duration of those hostilities.[1]  Its power to do so is subject only to limited judicial review of the executive's process and basis for concluding that a particular individual in fact is an "enemy combatant."[2]  This is analogous to the internationally accepted right of any warring nation to detain captured enemy soldiers as prisoners of war for the duration of hostilities.  Ghailani therefore presumably will remain in U.S. custody as long as hostilities with Al Qaeda continue, regardless of the outcome of this case.  Why then is Ghailani being prosecuted for his alleged crimes?

Prisoners detained as enemy combatants may be held only for the purpose of preventing them from resuming hostilities.[3]  Such detention therefore has two salient characteristics. Detainees, like prisoners of war, may not be punished simply because they are in the control of their

---

[1]  *Hamdi v. Rumsfeld,* 542 U.S. 507, 518-19 (2004) ("We conclude that detention of individuals falling into the limited category we are considering, for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use."); *see also id.* at 516 (discussing definition and scope of term "enemy combatant").  While *Hamdi* recognized that this understanding "may unravel" should the "practical circumstances of a given conflict" prove "entirely unlike those . . . that informed the development of the laws of war," *id.* at 521, we are not now at that point, *see id.*

As will appear, a Combatant Status Review Tribunal ("CSRT") in March 2007 adjudged Ghailani to be an alien enemy combatant subject to executive detention.  *See* Farbiarz Filings Decl. [DI 917] Ex. A.

[2]  *Hamdi,* 542 U.S. at 533 ("We therefore hold that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker.").  *Hamdi*'s holding, by its terms, applies only to U.S. citizen–detainees, while Ghailani is not a U.S. citizen.  *Id.* at 516.  The Supreme Court has not determined whether aliens have the same rights.  *See Boumediene v. Bush,* 128 S. Ct. 2229, 2251-62 (2008) (holding that habeas corpus right applies to alien detainees at Guantanamo Bay, but leaving open the question whether alien detainees enjoy any other constitutional rights).

[3]  *Hamdi,* 542 U.S. at 518 ("The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again.").

3

adversaries.[4]   They must be released when hostilities end.[5]   They are, however, subject to prosecution in appropriate circumstances.[6]

The implication of these principles is clear.  Absent conviction by a court for a criminal offense or by a military commission for a violation of the law of war or other offense triable in such a forum,[7] the United States may not lawfully punish Ghailani for his alleged role in killing 224 people and injuring many more.  It could not lawfully give vent to the outrage felt both here and in Africa at these murderous attacks on innocent civilians.  It would be obliged to release him if hostilities with Al Qaeda were to end.  This prosecution therefore serves at least two purposes that our government could not lawfully achieve without an appropriate conviction – to pass a moral judgment on and to punish Ghailani if in fact he committed the alleged crimes.

That said, it remains to consider why an enemy combatant charged with a criminal offense in an American court enjoys the protection of the Speedy Trial Clause and why the speedy trial issue is not as simple as perhaps first appears.

The Court understands that there are those who object to alleged terrorists, especially non-citizens, being afforded rights that are enjoyed by U.S. citizens.  Their anger at wanton terrorist attacks is understandable.  Their conclusion, however, is unacceptable in a country that adheres to the rule of law.  Our nation decided over 200 years ago that the Speedy Trial Clause, like many

---

[4]      *Id.*; *see also Hamdan v. Rumsfeld,* 548 U.S. 557, 629-33 (2006).

[5]      *Hamdi,* 542 U.S. at 520.

[6]      *See Hamdan,* 548 U.S. at 631-33.

[7]      This Court expresses no view as to the constitutionality of military commissions, either generally or as they may be used in relation to Ghailani or other detainees.

4

provisions of the Constitution, applies to all, regardless of their citizenship or the crimes of which they are accused.[8]  Fidelity to our basic compact requires adherence to that principle.

The Court understands also that Ghailani is charged with crimes that took place twelve years ago, that he came into federal custody six years ago, and that he was held without being presented to answer those charges for just short of five of those years.  Some therefore may think that no trial commencing this long after Ghailani first came into federal custody possibly could be "speedy."  But it is not that simple.

The Sixth Amendment guarantees "a speedy . . . trial," but it nowhere defines "speedy."  The right "is a more vague concept than other procedural rights . . . [and i]t is . . . impossible to determine with precision when [it] has been denied."[9]  Delays as long and longer than five years have been held by the Supreme Court to be consistent with the Speedy Trial Clause.[10]  Under the controlling decisions of the Supreme Court, courts have no alternative to considering carefully and weighing the specific facts of each case in determining speedy trial claims.

This Court has considered and weighed those facts.  Among them are these.  Although the delay of this proceeding was long and entirely the product of decisions for which the executive branch of our government is responsible, the decisions that caused the delay were not made for the purpose of gaining any advantage over Ghailani in the prosecution of this indictment.

---

[8]

It provides that  "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ."  U.S. CONST. amend. VI.

[9]

*Barker v. Wingo,* 407 U.S. 514, 521 (1972).

[10]

*See United States v. Loud Hawk,* 474 U.S. 302, 315-17 (1985) (7.5 years); *Barker,* 407 U.S. at 533-34 ("well over five years"); *see also Rayborn v. Scully,* 858 F.2d 84, 89 (2d Cir. 1988) (over 7 years).

Two years of the delay served compelling interests of national security.  None of the entire five year delay of this prosecution subjected Ghailani to a single day of incarceration that he would not otherwise have suffered.  He would have been detained for that entire period as an enemy combatant regardless of the pendency of this indictment.  None of that delay prejudiced any interests protected by the Speedy Trial Clause in any significant degree.  In these specific circumstances, Ghailani's right to a speedy trial has not been infringed.

*Facts*

A.     *Al Qaeda and the 1998 East African Embassy Bombings*

Al Qaeda is a terrorist organization founded and led by Usama Bin Laden.  Under his leadership, the organization significantly expanded its network, its resources, and its mission in the 1990s, calling on followers to take increasingly radical steps against the west and, particularly, the United States.  Whereas Bin Laden's earlier *fatwas* had targeted U.S. military forces in the Middle East, he expanded the scope of his appeal in February 1998, calling for the deaths of any and all Americans – military or civilian – anywhere in the world.[11]

On August 7, 1998, the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, were destroyed by nearly simultaneous truck bombs.[12]  The Nairobi bombing killed 213 people, including twelve American citizens, and injured thousands.  The Dar es Salaam

---

[11]     Philip A. Swabsin Decl. [DI 914] [hereinafter "Swabsin Decl."] ¶ 12.

[12]     *Id.* ¶ 13.

6

bombing killed eleven people and injured hundreds.[13]  Al Qaeda claimed responsibility for both,[14] and the U.S. government quickly obtained an indictment in this Court against a number of alleged Al Qaeda conspirators.

B.      *The Indictments*

Ghailani first was indicted on December 16, 1998.  The indictment charged the existence of a broad conspiracy by Usama Bin Laden and others to wage a campaign of terror against the United States.[15]  Among the alleged means and methods of the conspiracy was the bombing of the embassies in Nairobi and Dar es Salaam.[16]  Ghailani was charged with participation in the conspiracy and with substantive offenses.  Four of Ghailani's co-defendants – Wadih el Hage, Mohamed Sadeek Odeh, Khalfan Khamis Mohamed, and Mohamed Rashed Daoud Al-Owhali – were captured and tried before this Court while Ghailani still was at large.[17]  That trial began on January 3, 2001 and concluded with guilty verdicts on May 29, 2001.[18]  Ghailani, however, was not then in U.S. custody.

---

[13]     *Id.*

[14]     *Id.*

[15]     Third superseding indictment [DI 31] ¶¶ 1-9.  There have been subsequent superseding indictments.

[16]     *Id.* ¶ 9.

[17]     Swabsin Decl. ¶ 7.

[18]     *Id.*

C.      *Ghailani's Years at Large (1998 - July 2004)*

While Ghailani was still at large, the government contends, he worked closely with high-level Al Qaeda members during the years following the bombings, first as a cook and bodyguard for Usama Bin Laden and later as a document forger.[19]  It argues also, on the basis of hearsay evidence, that he became aware at some point in that period that he was wanted by the United States.[20]

On September 11, 2001, Al Qaeda attacks on the World Trade Center and the Pentagon, and an additional thwarted attack, killed roughly 3,000 people.  The United States' approach to combating international terrorism changed significantly.  One week later, Congress authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 . . . in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."[21]  In accordance with that broad mandate, the executive branch expanded its counter-terrorism programs and shifted its resources towards intelligence-gathering focused on disrupting and preventing further terrorist

---

[19]     Gov't Br. [DI 850] 12-15.

He nevertheless is charged here only with offenses relating to the 1998 embassy bombings.

[20]     *See id.* ¶ 9 n.2.

[21]     Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001).

8

attacks.[22]   A covert CIA program (the "CIA Program"), explained in more detail below, was

established to detain and interrogate abroad certain individuals suspected of having particularly

valuable foreign intelligence.[23]   In addition, President Bush issued an executive order providing for

the detention of and trial by military tribunal of "alien enemy combatants."[24]   Congress subsequently

authorized and formalized the creation and use of military commissions for that purpose.[25]


D.      *Ghailani's Capture and Initial Detention*

          By the time Ghailani was captured abroad in July 2004,[26] the executive branch had

a reasonable belief, supported by fact, that Ghailani had critical intelligence information that could

not be acquired other than by placing him in the CIA Program.  Accordingly, once Ghailani was

transferred to U.S. custody,[27] he was put into the CIA Program.  As the successful pursuit of the CIA

Program was inconsistent with prosecuting Ghailani in this Court during the same period,[28] the arrest

---

[22]

    *See* Gov't Br. 8-10.

[23]

    Def. Br. [DI 841] Ex. B ¶¶ 6-12 [hereinafter "Newell Decl."] (describing purported public
knowledge of covert CIA detention and interrogation program).

[24]

    *See* Military Order, Detention, Treatment, and Trial of Certain Non-Citizens in the War
Against Terrorism, 66 Fed. Reg. 57833, 57834-35 (Nov. 16, 2001) § 4.

[25]

    Military Commissions Act of 2006, 10 U.S.C. §§ 948b *et seq.* (2006).

[26]

    Gov't Br. 15.

[27]

    The exact date of this transfer is classified.  The Court describes classified facts relevant to
the disposition of this motion in a supplement to this opinion (the "Supplement"), which is
likely to remain classified, at least in material respects.

[28]

    *See* Supplement.

9

warrant issued by this Court in 1998 was not executed and this prosecution did not proceed.  The

parties agree that this was a deliberate decision to further intelligence-gathering efforts at the

immediate expense of delaying the criminal prosecution.[29]

E.      *Ghailani's Detention in CIA Custody* ████████████████████

Ghailani was detained and interrogated by the CIA outside of the United States for

roughly two years.  Many details of the CIA Program and its application to specific individuals

remain classified.[30]   Nevertheless, it may be said that it sought to obtain critical, real-time

intelligence about terrorist networks and plots by using a combination of so-called "standard"[31] and

"enhanced"[32] interrogation techniques to question detainees thought to have particularly high-value

---

[29]
    *See, e.g.*, Def. Br. 30-31; Gov't Br. 11, 60.

[30]
    The relevant classified details of the CIA Program are described in the Supplement.

[31]
    The undated Draft OMS Guidelines on Medical and Psychological Support to Detainee
    Interrogations describe "standard measures" as including: shaving, stripping, diapering
    (generally for periods not greater than 72 hours), hooding, isolation, white noise or loud
    music, continuous light or darkness, uncomfortably cool environment, restricted diet,
    shackling in upright or horizontal position, and sleep deprivation up to 72 hours. *See*
    Bachrach Decl., May 6, 2010, Ex. 6 (Gov't Bates Number CP2009-00001562-73)
    [hereinafter "Draft OMS Guidelines"] at 1.

[32]
    The Draft OMS Guidelines identify the following as "enhanced measures": attention grasp,
    facial hold, insult (facial) slap, abdominal slap, prolonged diapering, sleep deprivation (over
    72 hours), stress positions, cramped confinement, and waterboarding. *Id.*

    For descriptions of many of these interrogation techniques, see Bachrach Decl., May 6, 2010,
    Ex. 17 (Steven G. Bradbury, Principal Deputy Assistant Attorney General, Memorandum
    for John A. Rizzo, Senior Deputy General Counsel, Central Intelligence Agency, dated May
    30, 2005), [hereinafter "Bradbury Mem."] at 12-15; *see also* Newell Decl. ¶¶ 50-74.

intelligence information.[33]  These techniques were "designed to psychologically 'dislocate' the

detainee, maximize his feeling of vulnerability and helplessness, and reduce or eliminate his will

to resist [the United States government's] efforts to obtain critical intelligence."[34]

An individualized interrogation program was developed and approved for each

detainee based on the unique personal, physical, and psychological characteristics of that

individual.[35]  Not all interrogation techniques were used on all detainees.  To the extent that they are

relevant to the disposition of this motion, the details of Ghailani's experience in the CIA Program

– in particular, the specific interrogation techniques applied to him – are described in the

Supplement.  Suffice it to say here that, on the record before the Court and as further explained in

the Supplement, the CIA Program was effective in obtaining useful intelligence from Ghailani

throughout his time in CIA custody.


F.    *Detention in Department of Defense Custody and Prosecution Before a Military Commission
      (September 2006 - June 2009)*

In September 2006, Ghailani was transferred to DoD custody at Guantanamo Bay.

It perhaps is useful to place that transfer and subsequent events in their historical context.

---

33

    Public versions of previously classified government documents describe the goals, methods, and philosophy of the CIA Program.  *See, e.g.*, Bradbury Mem.; Bachrach Decl., May 6, 2010, Ex. 10 ("Background Paper on CIA's Combined Use of Interrogation Techniques, undated but transmitted December 30, 2001) [hereinafter "CIA Background Paper"]; *see also* Newell Decl. (collecting public documents and information regarding CIA Program).

34

    Draft OMS Guidelines at 1; *see also* CIA Background Paper at 1 (describing goal of interrogation as creating a "state of learned helplessness and dependence conducive to the collection of intelligence in a predictable, reliable, and sustained manner").

35

    *See* Bradbury Mem., at 4-5, 7-8; Newell Decl. ¶ 18.

11

In the wake of the September 11, 2001, attacks, the executive branch determined that it would detain captured persons suspected of being unlawful combatants at Guantanamo. The first reportedly were taken there in January 2002[36] when Ghailani still was at large.

Litigation concerning the legality of that detention and the conditions of confinement began almost immediately.[37]  The prior administration took the position that the habeas corpus statute did not confer a right to judicial review of the legality of the detention of the Guantanamo detainees because Guantanamo was outside the United States. In June 2004, however, the Supreme Court held in *Rasul v. Bush*[38] and *Hamdi v. Rumsfeld,*[39] respectively, that (1) federal courts had jurisdiction "to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing,"[40] and (2) due process required that a United States citizen held as an enemy combatant be given notice of the factual basis for that classification and a meaningful opportunity to contest it.[41]

In response to *Rasul* and *Hamdi,* the DoD in July 2004 established Combatant Status Review Tribunals ("CSRTs") to afford persons detained at Guantanamo as enemy combatants the

---

[36]   U.S. Dept. of Defense, Joint Task Force Guantanamo, *Timeline, available at* http://www.jtfgtmo.southcom.mil/index/JTFGBrochurePg3.pdf) (last visited July 8, 2010); *see also Rasul v. Bush,* 542 U.S. 466, 471 (2004).

[37]   *See Rasul,* 542 U.S. at 471-72.

[38]   542 U.S. 466.

[39]   542 U.S. 507.

[40]   542 U.S. at 485.

[41]   542 U.S. at 533.

12

opportunity to contest that designation.[42]

  As the CSRT process applied only to Guantanamo detainees, it was not available to Ghailani while he was in CIA custody. In late 2005, however, reports of the hitherto secret CIA detention sites began to appear in the press[43] and generate controversy,[44] which continued for some time. Ultimately, President Bush, on September 6, 2006, acknowledged the CIA detentions and ordered that Ghailani and several other "high value detainees" be transferred to the U.S. naval base at Guantanamo Bay[45] where Ghailani subsequently was held in military custody for approximately thirty-three months.

  The transfer to Guantanamo made Ghailani eligible for review of his enemy combatant status in a hearing before a tribunal of three commissioned officers. The governing procedures entitled him to the assistance of a non-lawyer personal representative who was entitled to see the government's evidence and required to consult with Ghailani. The representative,

---

[42] Memorandum for the Secretary of the Navy, Order Establishing Combatant Status Review Tribunal (July 7, 2004), *available at* http://www.defense.gov/news/Jul2004/d20040707review.pdf (last visited July 8, 2010); U.S. Dept. of Defense, Combatant Status Review Tribunals, *available at* http://www.defense.gov/news/Jul2004/d20040707factsheet.pdf (last visited July 8, 2010).

[43] *E.g.,* Dana Priest, *CIA Holds Terror Suspects in Secret Prisons; Debate Is Growing Within Agency About Legality and Morality of Overseas System Set Up After 9/11*, WASH. POST, Nov. 2, 2005, at A01.

[44] *E.g.,* Ian Fisher, *Reports of Secret U.S. Prisons In Europe Draw Ire and Otherwise Red Faces*, N.Y. TIMES, Dec. 1, 2005, at A14.

[45] *See* Press Release, President Discusses Creation of Military Commissions to Try Suspected Terrorists (Sept. 6, 2006), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2006/09/20060906-3.html (last visited July 8, 2010).

however, was prohibited from informing Ghailani of the content of any classified material.[46]
Detainees including Ghailani were prohibited from being represented by attorneys, even military
attorneys.[47]  The tribunal was obliged to schedule the hearing within 30 days after the personal
representative reviewed the government's evidence and notified Ghailani of his opportunity to
contest his status.[48]

 Ghailani requested a status review, and his hearing took place on March 17, 2007.
It lasted for 44 minutes.[49]  While he was informed of the hearing by the personal representative
before it occurred, there is no evidence as to how long before March 17, 2007 that took place.  Nor
is there any evidence that Ghailani's presence at Guantanamo was needed to prepare for the hearing.
In any case, the CSRT sustained Ghailani's classification as an enemy combatant on the day of the
hearing.

 At about the same time – late February or early March 2007 – the Office of Military
Commissions began to investigate the question whether Ghailani could be prosecuted for violating

---

[46]

 Memorandum for Secretaries of the Military Departments, Chairman of the Joint Chiefs of
Staff, and Under Secretary of Defense for Policy, *Implementation of Combatant Status
Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base
Guantanamo Bay, Cuba* (July 14, 2006), Enclosure (1), at 2-4, *available at*
http://www.defense.gov/news/Aug2006/d20060809CSRTProcedures.pdf (last visited July
8, 2010).

[47]

 *Id.* at 2, 4.

[48]

 *Id.* at 5.

[49]

 Farbiarz Filings Decl. Ex. A, at 1, 19.

the laws of war in connection with his alleged role in the embassy bombings.[50]  In February 2008, the investigator completed a draft of a prosecution memorandum.[51]  More time was consumed in the preparation of a charge sheet and with further work on the prosecution memorandum.[52]  Finally, on March 28, 2008 – nearly a year and a half after his transfer to DoD custody – charges were sworn against Ghailani.[53]  Those charges, which potentially carried the death penalty, related to the Dar es Salaam bombing but not the bombing in Nairobi.[54]  On October 3, 2008, the convening authority referred these charges to be tried by military commission as non-capital offenses.[55]

Military counsel were appointed for Ghailani in connection with the military commission charges on April 24, 2008.[56]  He was arraigned on October 22, 2008.  A number of pretrial motions were filed and conferences held in subsequent months.[57]  As will appear, the military prosecution eventually would be suspended and then dismissed.

There is no evidence that Ghailani's presence in Guantanamo was required or even

---

[50]
See Felice John Viti Decl. [DI 915] [hereinafter "Viti Decl."] ¶ 3 (describing investigation).

[51]
Id. ¶ 5.

[52]
Id. ¶ 6.

[53]
Id. ¶ 8.

[54]
The charges related also to Ghailani's alleged material support to Al Qaeda in the years following the embassy bombings.  See id.

[55]
Id.; Farbiarz Filings Decl. Ex. B.

[56]
See Reply Br. 37; Farbiarz Filings Decl. Ex. F ¶ 2.

[57]
See, e.g., Farbiarz Filings Decl. Exs. L, M, N, O, P, Q, R, S; see also Viti Decl. ¶ 9.

convenient in connection with the military commission investigation and proceedings – or, for that

matter, that he even was informed that they were taking place – at least until charges were sworn

against him and perhaps even until military defense counsel were appointed.

## G. Civil Litigation

Over the following year – concurrent with the military commission prosecution –

Ghailani and his attorneys, both military and civilian, filed a number of habeas corpus petitions and

other prayers for relief in both the military commission and various federal courts.[58] The parties

disagree as to which, if any, of these filings invoked the right to a speedy trial.[59]

On May 29, 2008, Ghailani, through a civilian lawyer, filed a petition in the District

of Columbia Circuit challenging the result of his CSRT hearing.[60] On July 10, 2008, a different

civilian attorney filed a habeas corpus petition on his behalf in the District Court of the District of

Columbia.[61] Neither of these early filings even obliquely referred to the right to a speedy trial.

Ghailani first referred to this right in a clear manner in a *pro se* habeas corpus petition

filed in this Court on March 9, 2009, just weeks before he was transferred here for trial.[62] He did

---

[58]

*See* Farbiarz Filings Decl. Exs. E, G, T, U, V.

[59]

*See, e.g.*, Def. Br. 50-52; Gov't Br. 85-93.

[60]

Farbiarz Filings Decl. Ex. E.

[61]

*Id.* Ex. G.

[62]

*Id.* Ex. T at 3 ("In 2004, I was arrested pursuant to the warrant issued by this Court so that
I could answer the charges against me.  Eventhough [*sic*], I have been arrested for over four
years heretofore the Government has failed to bring me to the Court and never give me any
chance to answer the charges against me.").

so even more explicitly in a letter written by a civilian lawyer on his behalf dated May 9, 2009.[63]

In addition, he requested a speedy trial on the military commission charges on May 12, 2009, just

weeks before it was announced that he would be transferred to the Southern District of New York.[64]

H.    *Transfer to the Southern District of New York and Prosecution in this Court*

After taking office in January 2009, the President suspended the military

commissions.[65]  On May 21, 2009, the administration announced that Ghailani would be transferred

to this Court for prosecution on the 1998 indictment.   Eight days later, the convening authority

formally withdrew and dismissed without prejudice all charges pending against Ghailani before the

military commission.  He then was brought to the United States and arraigned in this Court on June

9, 2009.

I.    *This Motion*

On November 16, 2009, Ghailani moved to dismiss the indictment on the ground that

the nearly five-year delay between when he came into exclusive U.S. custody and his presentation

---

63

Id. Ex. V.  The government argues that this filing is "legally irrelevant" because it was filed
by a civilian attorney whose appearance in the case later was stricken.  Gov't Br. 91.  The
Colwell Declaration accompanying defendant's reply brief, however, makes clear that the
letter was filed with defendant's specific knowledge and consent, notwithstanding
subsequent developments regarding the attorney in question.

64

Farbiarz Filings Decl. Ex. U.

65

Exec. Order No. 13,492, 74 Fed. Reg. 4897, 4899 (Jan. 22, 2009) § 7.

in this Court for prosecution violated his constitutional right to a speedy trial.[66]

Ghailani acknowledges that the government had the authority to detain and question him in the interests of national security, notwithstanding the pending indictment in this case, but he argues that doing so foreclosed the possibility of later prosecuting him on the 1998 indictment. In other words, Ghailani contends that his arrest in 2004 presented the government with a choice: it either could have prosecuted him at that time on this indictment or it could have detained and questioned him in the interests of national security. But it could not do both. The necessary consequence of its decision to delay the criminal prosecution, according to Ghailani, is that the indictment against him now must be dismissed.

The government acknowledges that it intentionally delayed the defendant's prosecution because it concluded that he had valuable threat information that could be acquired only by placing him into the CIA Program and that it then delayed it further by the military commission prosecution and the other activities described above. It contends, however, that these decisions were justified in all the circumstances and that the delays did not violate Ghailani's right to a speedy trial.

---

[66] Ghailani invokes also FED. R. CRIM. P. 48(b). *See* Def. Br. 1, 3, 73. As Rule 48(b) is "coterminous" with the Speedy Trial Clause, *see, e.g., United States v. Rucker*, 586 F.2d 899, 907 (2d Cir. 1978), the rule need not be discussed separately.

The Center for Constitutional Rights, *amicus curiae,* contends that the Speedy Trial Act, 18 U.S.C. § 3164-74, and FED. R. CRIM. P. 5 and 9 afford additional bases for relief. It is mistaken. Rules 5 and 9 are triggered only by federal criminal arrest and the Speedy Trial Act, insofar as it is relevant here, by the defendant's first appearance before a federal judicial office,18 U.S.C. § 3161(c)(1), which in each case was June 9, 2009. *See* Gov't Br. 24; Def. Br. 3.

18

*Analysis*

I      *The Right to a Speedy Trial*

The roots of the Speedy Trial Clause reach extremely deep into our constitutional history. A right to speedy justice was recognized as far back as the Assize of Clarendon (1166) and the Magna Carta (1215).[67] Sir Edward Coke's translation of and commentary on the Magna Carta, first published in the seventeenth century, suggests a close relationship between this venerable right and the prevention of prolonged pretrial incarceration.[68] Concern over continued abusive delays led Parliament to pass the Habeas Corpus Act of 1679,[69] which required that prisoners held for "high treason or felony" and who petitioned for trial were to be indicted and tried or released.[70] Thus, the historical function of the speedy trial guarantee was to prevent prolonged pretrial incarceration in criminal prosecutions.[71]

---

[67]
    *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).

[68]
    1 EDWARD COKE, SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 42+ (Brooke ed. 1797) ("[T]herefore the justices . . . have not suffered the prisoner to be long detained, but at their next coming have given the prisoner full and speedy justice, by due trial, without detaining him long in prison.").

[69]
    31 Car. 2, c. 2.

[70]
    SOURCES OF OUR LIBERTIES: DOCUMENTARY ORIGINS OF INDIVIDUAL RIGHTS IN THE UNITED STATES CONSTITUTION AND BILL OF RIGHTS 196, 199 (Richard L. Perry & John C. Cooper eds., rev. ed. 1978).

[71]
    It is pertinent to note in this regard that high treason and most felonies were capital offenses under English law in the seventeenth century and before. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 92-93, 94-98 (1765, reprinted facsimile The Legal Classics Library, 1983). Bail therefore was not available. *See id.* at 294-95. Nor is there a federal constitutional right to bail in capital cases in this country. *See, e.g., United States v. Salerno,* 481 U.S. 739, 753 (1987). The number of offenses now punishable by death in our country, however, is dramatically smaller.

When this country broke away from England, it adopted this longstanding English right. We incorporated it into several of the earliest state constitutions and the Bill of Rights, giving it pride of place as the first criminal process right listed in the Sixth Amendment.[72] And we imbued it with a broader role. As the earliest Supreme Court case to identify the Speedy Trial Clause's animating principles described it, the Clause addresses more than pretrial detention. It is an "important safeguard [not only] to prevent undue and oppressive incarceration prior to trial, [but also] to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself."[73] These three concerns consistently have figured prominently in the subsequent case law, although different Supreme Court opinions have emphasized different interests as being of paramount importance, particularly focusing in recent years on prejudice to the accused's defense.[74]

---

[72]

See *Klopfer*, 386 U.S. at 225-26.

[73]

*United States v. Ewell*, 383 U.S. 116, 120 (1966).

[74]

In his dissent in *Doggett v. United States*, 505 U.S. 647, 662 (1992) (Thomas, J., dissenting), Justice Thomas identified two conflicting lines of authority regarding the individual interests protected by the speedy trial guarantee. One characterizes the right as concerned only with intrusions on a defendant's personal liberty. *See United States v. Loud Hawk*, 474 U.S. 302, 312 (1986) ("[T]he Speedy Trial Clause's core concern is impairment of liberty . . . ."); *United States v. MacDonald*, 456 U.S. 1, 8 (1982) ("The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by the passage of time . . . . [It] is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the . . . impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges."); *United States v. Marion*, 404 U.S. 307, 320 (1971) ("[T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense.").

The other line culminates in *Doggett* and recognizes trial prejudice as a concern within the purview of the right. *See Doggett*, 505 U.S. at 654 (identifying trial prejudice as the right's most serious concern); *Barker*, 407 U.S. at 532 (same); *Smith v. Hooey*, 393 U.S. 374, 377 (1969) (recognizing all three individual interests); *Ewell*, 386 U.S. at 120 (same).

While the objects of the Speedy Trial Clause are clear, its meaning is not. Everyone doubtless has his or her own idea of what constitutes "speedy," but the Sixth Amendment does not define the term.[75] Accordingly, as the Supreme Court has written, "any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."[76] The Court, however, has done "little more [to define that functional analysis] than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right."[77] The four that it enumerated in *Barker v. Wingo* are (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant.[78] It is important also to recognize both that these factors are not the exclusive criteria and that "[n]o one of the[m] . . . is 'either a necessary or sufficient condition to the finding of a deprivation of the right.'"[79] "[C]ourts . . . must engage in a sensitive balancing process whereby the conduct of *both* the prosecution and the defendant are weighed."[80]

---

[75]

It is entirely likely that James Madison, who drafted the Bill of Rights; the members of the First Congress, which passed it; and the members of the legislatures of the eleven states that ratified it would have been considerably less than unanimous in determining whether any given delay would have been inconsistent with the guarantee of a "speedy trial."

[76]

*Barker*, 407 U.S. at 522.

[77]

*Id.*

[78]

*Id.* at 530.

[79]

*Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988) (quoting *Barker*, 407 U.S. at 530).

[80]

*Id.* (emphasis in original).

21

*II      The* Barker *Factors*

The first of the enumerated *Barker* factors serves as a sort of "double enquiry"[81] in the sense that "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."[82] Once a court finds that the length of the delay presumptively has been prejudicial, its duration becomes only "one factor among several" in the subsequent analysis.[83]

Here, the government concedes that the delay in prosecuting Ghailani on this indictment was sufficiently long to trigger the *Barker* analysis.[84] The Court therefore moves to a full analysis under the *Barker* framework.

*A.      The Length of the Delay*

The constitutional right to a speedy trial attaches when a defendant is arrested or indicted, whichever comes first.[85] Ghailani was indicted on these charges on December 16, 1998. His speedy trial right therefore attached nearly ten and a half years before he was arraigned in this Court. Nevertheless, Ghailani properly concedes that the government cannot be faulted for the years

---

81
    *Doggett*, 505 U.S. at 651.

82
    *Barker*, 407 U.S. at 530.

83
    *Doggett*, 505 U.S. at 652.

84
    Gov't Br. 28 n.9; *see also Doggett*, 505 U.S. at 652 n.1 ("Depending on the nature of the charges, lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year.").

85
    *See United States v. Marion*, 404 U.S. 307, 320 (1971).

during which he was not in U.S. custody.  Accordingly, the period pertinent to this motion is the roughly five years from when Ghailani was taken into exclusive CIA custody ███████ until June 9, 2009, when he was arraigned in this Court.  That interval alone, however, is not dispositive here for two reasons.

First, even longer periods have been found not to violate defendants' speedy trial rights when they nonetheless were reasonable in light of other factors.[86]  As previously discussed, courts must consider all relevant circumstances in determining whether a particular delay has been unconstitutional.[87]

Second, different portions of the nearly five year delay occurred for different reasons. Depending upon the assessment of these reasons and other circumstances, the length of delay chargeable against the government for purposes of this motion may be less than the full five year period.

---

[86]

See supra note 10.

Likewise, shorter delays have been held "unreasonable" and violative of the speedy trial right in the context of all the relevant circumstances. See, e.g., United States v. New Buffalo Amusement Corp., 600 F.2d 368, 377-80 (2d Cir. 1979) (fifty-four month delay held unreasonable); United States v. Roberts, 515 F.2d 642 (2d Cir. 1975) (nine-month delay held to violate speedy trial right in all the circumstances).

[87]

Barker, 407 U.S. at 521-22 ("[It] is not a violation of the right to a speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. . . . [A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."); Ewell, 383 U.S. at 119 ("A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.").

B.      *Invocation of the Right*

In practice, a defendant's demand for or failure to demand a speedy trial tends not to influence the analysis strongly except at the extremes. That is, courts have tended to discount a defendant's belated demand for a speedy trial if convinced that it was opportunistic, "raising his speedy trial right when it suited his interests but not when . . . delay benefitted him."[88] On the other hand, early and frequent demands by a defendant for a speedy trial have proved significant if they have been ignored by the prosecution.[89]

The reason for the relative unimportance, except in unusual circumstances, of a defendant's failure to invoke the right to a speedy trial is readily apparent. "A defendant has no duty to bring himself to trial; the State has that duty . . . . [S]ociety has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest."[90] Hence, a defendant may prevail on a speedy trial claim despite invoking the right belatedly if other circumstances warrant. This approach allows "a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is

---

[88]
    *United States v. Abad*, 514 F.3d 271, 275 (2d Cir. 2008); *see also, e.g., Barker*, 407 U.S. at 534-35 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial. . . . [W]hile he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried. Counsel conceded as much at oral argument . . . .").

[89]
    *See, e.g., United States v. Vispi*, 545 F.2d 328, 334 (2d Cir. 1976) (dismissing indictment in part because "here the record, unlike that in most cases where denial of a speedy trial right is claimed, reveals that appellant repeatedly and energetically asserted his rights . . . but was ignored").

[90]
    *Barker*, 407 U.S. at 527.

24

appointed."[91]

The government here argues that Ghailani's invocation of his right to a speedy trial came late and was disingenuous. It contends that he knew of the indictment before he was in U.S. custody, made no effort before or for years after his capture to seek a trial on the federal charges, and invoked his right only belatedly. It even goes so far as to urge that Ghailani adopted this stance because, for most of his captivity, he thought it advantageous to be tried in a military commission rather than federal court.

The government's argument is unpersuasive. While Ghailani did not clearly invoke his right until recently,[92] there is no persuasive evidence that this failure reflected bad faith or opportunism.

First, while a declaration by an FBI agent assigned to the embassy bombings case indicates that Ghailani likely knew that he was wanted by the United States during at least part of the period in which he was at large,[93] this in itself is insufficient to hold Ghailani's failure to request a prompt trial during that period against him. It was the government's responsibility to apprehend him and bring him to trial. It would not have been his duty to turn himself in and demand prompt justice, even assuming that he knew that he would have had a right to a speedy trial.

Nor can Ghailani be taxed with a failure to demand a speedy trial while he was in CIA custody. The government concedes that Ghailani could not reasonably have been expected then

---

[91]

    *Id.* at 529.

[92]

    His *pro se* habeas letter to the Southern District of New York, dated March 9, 2009, seems to have been the first clear invocation of the right.

[93]

    Swabsin Decl. ¶ 9 n.2.

to have invoked the right "because he did not have a meaningful opportunity to" do so.[94]

The facts of course are somewhat different with respect to Ghailani's time in DoD custody. The indictment was mentioned in his presence at his CSRT hearing on March 17, 2007, so he became aware of it no later than that date.[95] But there is no evidence that he knew even then that he had a right to a speedy trial on the indictment, let alone the wherewithal to demand it. Moreover, while military counsel were appointed for him in April 2008 in connection with the military commission charges, their immediate concern and, for that matter, their mission was only the military commission.

In the last analysis, then, *Barker*'s demand factor does not cut one way or the other in this case. Ghailani cannot be faulted for having failed to invoke his right to a speedy trial earlier than he did. Nor can the government be criticized for ignoring demands for a trial.

C.    *Prejudice*

Within the *Barker* framework, prejudice refers to each individual defendant's personal interests in securing a speedy trial. It "should be assessed in the light of the interests of defendants that the speedy trial right was designed to protect[:] . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired" by the passage of time.[96] Moreover, as in so many other legal contexts, relief is appropriate only if there is a causal relationship between the claimed injury and

---

[94]    Gov't Br. 81 n.13.

[95]    Farbiarz Filings Decl. Ex. A at 4.

[96]    *Barker*, 407 U.S. at 532.

26

the conduct complained of – in this context, a causal connection between the particular alleged

prejudice and the delay in question.[97]   For example, a defendant who already is serving a long

sentence for a conviction on Charge A when he is charged with a different crime, Charge B, will not

be heard to complain, for speedy trial purposes, of the fact that he was in jail for a long time between

the indictment on Charge B and the trial on that charge.  The defendant would have been in jail on

Charge A anyway, so that incarceration would not implicate his right to a speedy trial on Charge B.[98]

Ghailani claims that he was prejudiced by delay in this prosecution in two respects:

"First, there is the physical and psychological harm that was inflicted upon Mr. Ghailani as a result of the Government's 'Enhanced Interrogation Techniques.' Second, there is the effect such 'dead time' had on the ability of Mr. Ghailani to investigate and prepare an effective defense."[99]

---

[97]

Similar causation requirements figure prominently in many areas of criminal procedure. *See, e.g., United States v. Crews*, 445 U.S. 463, 471 (1980) (requiring in the Fourth Amendment suppression context that "the challenged evidence [be] in some sense the product of illegal governmental activity"); *United States v. Ghailani*, — F. Supp. 2d —, No. S10 98 Crim. 1023 (LAK), 2010 WL 1839030, at *2-3 (S.D.N.Y. May 10, 2010) (finding in Fifth Amendment due process context that "[f]or a due process violation to result in consequences adverse to the government in a criminal case . . . there must be a causal connection between the violation and the deprivation of the defendant's life or liberty threatened by the prosecution").

[98]

*See, e.g., United States v. Lainez-Leiva*, 129 F.3d 89, 92 (2d Cir. 1997) ("Nor can Lainez-Leiva claim prejudice traceable to any oppressive pretrial incarceration, because he would have been serving his state sentence in any event.").

A defendant may satisfy this causal requirement by showing that the charges he seeks to dismiss aggravated the conditions of his otherwise unrelated detention. *See, e.g., United States v. Knight*, 562 F.3d 1314, 1324 (11th Cir. 2009) (finding no prejudice on the basis of exacerbated incarceration conditions where the defendant "would have been otherwise serving a state sentence of imprisonment and was housed in the [federal] maximum-security facility because of his earlier escape."); *United States v. Watford*, 468 F.3d 891, 907-08 (6th Cir. 2006) ("[B]ecause Watford was already incarcerated on state murder charges, he . . . suffered no oppressive pretrial incarceration at the hands of federal authorities."). Ghailani makes no such claim.

[99]

Def. Br. 52.

27

With respect to the former, Ghailani says that he was harmed physically and psychologically in the CIA Program, particularly by enhanced interrogation techniques to which he was subjected. He contends, among other things, that he "may be so damaged as a result of being subjected to the [CIA Program] that it might affect his ability to assist in his defense."[100]

The Court deals first with the claim of physical abuse. Ghailani is not alone in questioning the propriety of at least some of the techniques that the CIA was authorized to use on certain detainees. But this is not the time or the place to pass judgment on whether those techniques, in and of themselves, were appropriate or legal. In other words, the question on this prong of the *Barker* analysis is not whether the CIA's treatment of Ghailani prejudiced him in the sense that it was distasteful or worse. The question is whether that treatment, the precise nature of which is discussed in the Supplement, prejudiced values protected by the Speedy Trial Clause.

There is no sufficient basis for concluding that any physical mistreatment that may have occurred compromised these values. Its objective was to gather intelligence, not evidence for use in this criminal case.[101] The alleged physical mistreatment did not require pretrial incarceration that would not otherwise have occurred; Ghailani would have been held as an enemy combatant in any case. In consequence, the Court finds no prejudice to Ghailani's interests in a speedy trial that is traceable to any physical abuse that may have occurred.

Also unpersuasive is Ghailani's claim that he was so affected psychologically by the

---

[100]

Reply Br. 48.

[101]

Indeed, the government, with one possible exception, does not propose to use in this case any evidence that was procured as a result of Ghailani's interrogation. Ghailani's motion to preclude the government from calling a witness of whom it allegedly learned from Ghailani, the possible exception, is pending and, if warranted, will be granted. Thus, no evidence that was obtained by any mistreatment will be used against him.

alleged CIA mistreatment that his ability to assist in his defense has been impaired. To be sure, a clinical psychologist retained by Ghailani testified in another context[102] that she believes that Ghailani suffers from post-traumatic stress disorder as a result of his experiences in CIA custody and that, in her view, he becomes incapable of assisting in his defense when subjected to a particular Bureau of Prison security procedure associated with his attending proceedings in this Court because the procedure triggers that disorder.[103] While she did not offer any opinion as to his current competency to stand trial,[104] the Court, following her testimony, appointed a psychiatrist to examine Ghailani pursuant to chapter 33 of the Criminal Code.[105] On the basis of the psychiatrist's report and the entire record, including the evidence from the defense psychologist, the Court found that Ghailani suffers from no mental disease or defect, that he is capable of assisting in his defense, and that he is mentally competent.[106] The Court is not persuaded that his mental state has been affected in any material degree by anything that took place while he was in CIA custody.

Ghailani claims also that he was prejudiced by the delay of this prosecution in a more conventional way. He asserts that it has impaired his ability to investigate and prepare an effective

---

[102]

See generally United States v. Ghailani, __ F. Supp. 2d ___, No. 98 Crim. 1023 (LAK), 2010 WL 2426005 (S.D.N.Y. June 14, 2010).

[103]

See, e.g., May 18, 2010 Tr. at 8-12, 34; Dr. Katherine Porterfield Decl., Apr. 2, 2010, ¶¶ 20, 24.

[104]

Id. at 48-49.

[105]

18 U.S.C. §§ 4241 et seq.

[106]

DI 971.

defense because many potential witnesses now are unavailable or dead.[107] But he has not identified any particular witness who has become unavailable as a result of this delay. The only evidence on this issue is a declaration by Colonel Jeffrey P. Colwell,[108] one of the military attorneys assigned to represent Ghailani before the military commission, who said that Ghailani's military defense was able to locate only four of thirteen witnesses it sought in Tanzania. Colonel Colwell, however, did not attribute that inability to the passage of time from 2004 until the date of the defense efforts.[109]

There is one final consideration with respect to prejudice, albeit not one raised by Ghailani. The indictment in this case includes offenses punishable by death. While the government announced on October 2, 2009 that it would not seek the death penalty in this case,[110] it is reasonable to consider whether Ghailani may have felt apprehension on that score prior to the government's announcement and, if so, whether the period of such concern was caused or prolonged by delay chargeable to the government. Anxiety of that sort would constitute prejudice for speedy trial purposes. But it is important to be precise as to the duration, source and extent of any such concern.

It is not clear on the existing record when Ghailani became aware that a conviction in this case might have resulted in the death penalty, although it is reasonable to assume that he learned of this some time after military counsel were appointed in April 2008 to represent him

---

[107]

See Def. Br. 67-68.

[108]

DI 837.

[109]

See id. ¶ 24. The thrust of the Colwell declaration, moreover, was an allegation of improper prosecutorial and FBI interference with witnesses. See id. ¶¶ 16-23. Even if that troubling allegation were true, however, there would be no evidence that any such interference had anything to do with the delay of this prosecution.

[110]

Farbiarz Filings Decl. Ex. D.

before the military commission. At that point, however, the military commission charges against Ghailani also included offenses that could have been punished by death. There appeared to be very little chance that Ghailani ever would be prosecuted in this Court. Accordingly, until October 2008, when the convening authority decided not to seek capital punishment in the military commission, the far more immediate threat to his life was the military commission proceeding, not this case.

The situation change following the 2008 election. The President suspended the military commission prosecution in January 2009. That raised the prospect of prosecution in this Court, where a death sentence remained a technical possibility. It was, however, quite unlikely that the government would seek a death sentence here in light of the October 2008 decision not to seek death before the military commission. In the event, the government, not long after Ghailani was transferred here, said that it would not seek the death penalty in this case either. Accordingly, the period during which this case could have been the most likely source of any concern about a death sentence was brief. In any case, while the Court takes seriously any concern caused by any risk of a death sentence, the objective fact is that the risk of a death sentence in this case once the government abandoned any request for that penalty in the military commission proceeding was far more theoretical than real. This perhaps is reflected in Ghailani's failure to raise this point.

In sum, Ghailani has failed to establish any substantial prejudice to the interests protected by the Speedy Trial Clause.


D.      *Reasons for the Delay*

The reason for delay looms large in any speedy trial analysis and particularly so here. In *Barker*, the Supreme Court instructed as follows:

"[D]ifferent weights should be assigned to different reasons. A deliberate attempt

to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."[111]

It further emphasized bad faith as a factor in this consideration, stating that "it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over [defendants] or to harass them.'"[112] "[W]here there is a reasonable explanation for delay," however, "its negative implications will be vitiated."[113]

As an initial matter, there is no evidence that the government ever acted in bad faith to gain a tactical advantage over or to prejudice Ghailani with respect to his defense of this indictment. It argues, moreover, that the entire delay was justified because it was attributable to (1)

---

[111]

    *Barker*, 407 U.S. at 531.

[112]

    *Id.* at 531 n.32 (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971)).

[113]

    *Garcia Montalvo v. United States*, 862 F.2d 425, 426 (2d Cir. 1988).

    Courts have found valid a variety of reasons for delay including: "collect[ing] witnesses against the accused," *see, e.g., United States v. Doggett*, 505 U.S. 647, 656 (1992) ("[P]retrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down."); persuading a co-defendant to testify against the defendant, *see, e.g., United States v. Vassell*, 970 F.2d 1162, 1165 (2d Cir. 1992); determining how best to proceed with a case, *see, e.g., United States v. Abad*, 514 F.3d 271, 274 (2d Cir. 2008) ("[T]here were a number of valid reasons for delay, not least of which was the time needed for the Capital Case Unit to decide whether to seek the death penalty against Abad . . . ."); and allowing prosecution to proceed first in another jurisdiction., *see, e.g., Beavers v. Haubert*, 198 U.S. 77, 86 (1905); *United States v. Jones*, 91 F.3d 5, 8 (2d Cir. 1996) ("The government acted in good faith. It was reasonable to delay the prosecution of the Southern District case until the Eastern District proceedings had ended. Once the Eastern District proceedings had ended, [the defendant] was almost immediately transferred to the Southern District."); *Rayborn v. Scully*, 858 F.2d 84, 90 (2d Cir. 1988) (characterizing as "neutral" the time state prosecutors spent waiting for resolution of other state and federal criminal charges).

32

the protection of national security, first to gather intelligence from Ghailani while he was in CIA

custody and then to prevent him from resuming hostilities against the United States as an enemy

combatant by detaining him at Guantanamo, and (2) the pendency of other proceedings at

Guantanamo, specifically the CSRT process and the military commission prosecution.[114]  It is

necessary to consider these alleged justifications with respect to each time period involved.


*1.  The CIA Period* ███████████████████████

The government has offered credible evidence indicating that the decision to place

Ghailani in the CIA Program was made in the reasonable belief that he had valuable information

essential to combating Al Qaeda and protecting national security.[115]  The same evidence shows that

the government had reason to believe that this valuable intelligence could not have been obtained

except by putting Ghailani into that program and that it could not successfully have done so and

---

[114]

Gov't Br. 29, 38.

The government relies heavily on *United States v. Diacolios*, 837 F.2d 79 (2d Cir. 1988), for the proposition that the Speedy Trial Clause does not "stand in the way of that deference [to executive branch decisionmaking] by mandating that the Government seek to bring a defendant to trial despite other compelling interests." Gov't Br. 50-51.

While *Diacolios* contains broad language to that effect, the case dealt with a somewhat different issue than that presented here – namely, whether the government exercised due diligence in procuring the defendant from abroad in order to bring him to trial. *See Diacolios*, 837 F.2d at 84 ("Because the government's failure to obtain defendant's extradition was the result of a reliance upon United States policy not to seek extradition . . . we conclude that the government has satisfied its burden of demonstrating due diligence in seeking defendant's return for trial without unnecessary delay."). The opinion contained no discussion of the *Barker* factors. Accordingly, the Court takes *Diacolios* as pertinent but not binding on the issue of deference to executive decisionmaking in the context now before it. Even if it were binding, however, the result here would be the same.

[115]

*See* CIA Decl. [DI 918] ¶¶ 18-23.  The relevant details are described in the classified Supplement to this opinion.

prosecuted him in federal court at the same time.[116]

Ghailani essentially concedes the government's authority to detain him and to conduct an appropriate interrogation for intelligence purposes.[117]   He nevertheless challenges the validity of the intelligence-gathering justification on two bases.  First, he contends that the delay in this prosecution while he was in CIA custody was unjustified because the CIA tortured and mistreated him. In any case, he argues, his intelligence value quickly dissipated, and the subsequent delay therefore was unjustified.

### (a)      The Abuse Argument

The contention that the entire period of Ghailani's interrogation by the CIA was unjustified, for speedy trial purposes, because the CIA tortured and mistreated him is unpersuasive for two reasons.

First, Ghailani does not claim that he was mistreated throughout the entire two year period during which he was in CIA custody.  While details of what transpired are in the Supplement, it is appropriate to say here that the duration of the specific treatment to which Ghailani refers, i.e., the period during which he was subjected to enhanced interrogation techniques and other treatment that he has recounted in an affidavit that remains classified, was not of sufficient length to be material to this motion.[118]

---

[116]

*Id.* ¶¶ 23-28.

[117]

*See* Reply Br. at 16 ("As previously stated, the defendant, in this motion, does not question the Executive Branch's authority and prerogative to make these political decisions.").

[118]

*See* Supplement.

Even if that were not so, the Speedy Trial Clause, like other provisions of the Bill of Rights, requires a causal connection between the government conduct complained of and the alleged infringement of the values it protects.[119]  But Ghailani's interrogation furthered a valid objective. The delay of this prosecution while Ghailani was in CIA custody was attributable to the fact that he was interrogated at length for proper purposes, not to the particular manner in which he was treated during that interrogation.  There is no causal connection between the alleged physical mistreatment and the delay.

### (b)    Alleged Dissipation of Intelligence Value

Ghailani's second argument also is unavailing.  The government has offered evidence that Ghailani continued to be of intelligence value throughout his time in CIA custody.[120]  Ghailani's counsel have had access to extensive classified materials relating to his interrogation, yet they have pointed to no evidence to the contrary.  As discussed in the Supplement, the Court concludes that the government's evidence is persuasive.

### 2.    The Guantanamo Period – September 2006 through June 2009

The government seeks to justify the delay of this case during the Guantanamo period on somewhat different bases.  It argues that Ghailani was held at Guantanamo to prevent him from resuming hostilities against the United States as an enemy combatant, just as captured enemy soldiers are held during conventional warfare to prevent them from returning to the field of battle.

---

[119]    See supra note 97 (citing Fourth and Fifth Amendment cases).

[120]    See CIA Decl. ¶ 29.

35

In addition, it argues that the CSRT hearing, which took place on March 17, 2007, and the military commission investigation and prosecution of Ghailani were additional valid reasons for not prosecuting him here during significant parts of this thirty-three month period.

(a)     The Enemy Combatant Rationale

The fact that Ghailani was detained as an enemy combatant is the only justification offered for the executive branch's failure to present Ghailani for trial on this indictment from the date of his arrival in September 2006 until the CSRT hearing in March 2007.

No one denies that the United States has a valid interest in preventing Ghailani from engaging in hostilities against the United States.  But the government's contention that this important interest justified the delay of this prosecution during those months is unpersuasive.

Ghailani was produced in this Court a year ago to face these criminal charges.  Since then, he has been held at the Metropolitan Correctional Center, where many other accused terrorists – including others who have been convicted in this Court for involvement in the same embassy bombings with which Ghailani is charged – have been held securely for years.  He has been no more able to engage in hostilities against the United States while in the custody of the Bureau of Prisons pending trial on this indictment than he was at Guantanamo in the custody of the DoD.  He could have been brought to this Court in 2006 or any subsequent date to face this 1998 indictment and, at the same time, prevented from engaging in hostilities against this country.

Nor is the government obliged to detain an incarcerated defendant who is awaiting a criminal trial in the district or city in which the trial will take place. While a defendant who is in custody in anticipation of a criminal trial often is held adjacent to or near the courthouse in which the trial will take place, that usually is a matter of convenience and economy, rarely of necessity.

To be sure, a criminal defendant has a right to be present at the initial appearance, the initial arraignment, the plea and the trial.[121] But that right extends only to those particular events and to any other critical stages at which a defendant's "presence would contribute to the fairness of the procedure."[122] It does not generally apply to the conferences and motion arguments[123] that constitute substantially all of the pretrial proceedings in the overwhelming majority of criminal cases.  In consequence, most defendants who are detained pending trial could be held almost anywhere and brought to court only on the one or few occasions before trial when they have a right to be present as long as there were sufficient reason for them to await trial at a location remote from the courthouse.[124]

This case illustrates the point.  Ghailani's initial appearance, arraignment and plea all took place on a single day.  While it is customary for defendants to attend all or most other pretrial court proceedings,[125] it is doubtful that Ghailani has had a right to be physically present in this Court on more than one additional occasion thus far and the existence of such a right is

---

[121]

E.g., *Illinois v. Allen,* 397 U.S. 337, 338 (1970); FED. R. CRIM. P. 43(a).

[122]

E.g., *United States v. Tureseo,* 566 F.3d 77, 83 (2d Cir. 2009).

[123]

FED. R. CRIM. P. 43(b)(3).

[124]

See *United States v. Rivera,* 22 F.3d 430, 438-39 (2d Cir. 1994) (holding that defendant's presence was not required at conference during which court and counsel discussed jury instructions because conference involved purely legal matters). *But see Jones,* 91 F.3d at 8 (dictum) (suggesting, without citing any basis for it, that a defendant's presence is necessary during pretrial proceedings).

[125]

Ghailani in fact has declined to attend most.

debatable even as to that one.[126] He could have been held virtually anywhere in or out of the United States during the thirteen months of pretrial proceedings thus far save for one or perhaps two very brief appearances in New York.[127]

Barker teaches that even "neutral reason[s]" for delay such as "negligence or overcrowded courts should be weighted" against the government, albeit "less heavily" than "deliberate attempt[s] to hamper the defense," "since the ultimate responsibility for such circumstances must rest with the government rather than the defendant."[128] Thus, while the executive branch was entitled to decide where it would hold Ghailani to prevent him from resuming hostilities against the United States, the government is responsible for the delay caused by that decision.

> (b)     The CSRT Hearing

The government next argues that the CSRT proceeding justified part of the delay. This argument does not withstand analysis.

The CSRT hearing took place on March 17, 2007. There is no evidence that Ghailani's presence in Guantanamo was required, at least for any significant period, to prepare for

---

126

The Court refers to a brief court appearance that took place in consequence of a letter from Ghailani in which he expressed dissatisfaction with one of his attorneys and that resulted in that attorney being relieved.

127

Holding Ghailani at Guantanamo or some other remote place doubtless would have necessitated some travel by his attorneys to consult with him as well, perhaps, as the provision of appropriate electronic means of attorney-client communication. That would not have been an insurmountable problem in this era.

128

Barker, 407 U.S. at 531.

that hearing. As far as the record discloses, he spoke with his personal representative in advance of the hearing and then was brought into the hearing, attended for 44 minutes, and departed. The CSRT proceeding accounted for no material part in the delay of this prosecution. In any case, the government is responsible for any brief delay it caused.

### (c)    The Military Commission Investigation and Prosecution

The lead military commission prosecutor states that the investigation, which consisted in significant part of reviewing the trial and investigatory record from the previous embassy bombings trial in this Court, began in late February or early March 2007 and concluded with the swearing of charges a year later.[129] The military commission proceeding itself began in late March 2008 and was suspended in January 2009. The charges formally were dismissed roughly four months later.

The government argues that the delay during this entire period was justified by that investigation and prosecution. It relies on cases that have found that delays longer than the year-long investigation and preparation at issue here did not count against the government where they were attributable to the government's need to investigate and collect evidence.[130] It points also to other cases in which courts concluded that a delay of a prosecution in one jurisdiction to allow another criminal proceeding in a different state or federal court to proceed against the same

---

[129]

Viti Decl. ¶¶ 3-8.

[130]

See, e.g., United States v. Mejias, 552 F.2d 435, 443 (2d Cir. 1977) (finding twenty-one-month delay did not count strongly against government because "delay was engendered in order for the federal government to determine the need for, and scope of, charges to be brought, including, necessarily, an assessment of the [pending] state proceedings, to complete its investigation, and to obtain and compile evidence").

defendant was justified, or at least did not weigh against the prosecution for speedy trial purposes,[131]

regardless of which jurisdiction first charged the defendant[132] or whether the two prosecutions

related to the same or different conduct.[133]

The applicability of the authorities the government relies upon to the unique facts of

this case is questionable. The cases rely, in the main, upon (1) the principle of dual sovereignty,

which requires federal respect for state proceedings and *vice versa*,[134] or (2) the inherent need for

one of two cases involving different crimes, each subject to the Speedy Trial Clause, to proceed

---

[131]

> *United States v. Jones*, 91 F.3d 5, 8 (2d Cir. 1996), is a good example. There the defendant's
> trial in the Southern District of New York was delayed for just over two years in order to
> allow the completion of another prosecution in the Eastern District of New York, directly
> across the East River. The Second Circuit held that this delay did not count against the
> government despite the fact that the two courts in which the two cases were pending were
> just a mile or so apart. It concluded that the defendant's speedy trial right was not violated,
> largely because "[t]he government acted in good faith. It was reasonable to delay the
> prosecution in the Southern District [of New York] case until the Eastern District [of New
> York] proceedings had ended. Once the Eastern District proceedings were ended, [the
> defendant] was almost immediately transferred to the Southern District." 91 F.3d at 8.

> *But see United States v. Seltzer*, 595 F.3d 1170, 1177-79 (10th Cir. 2010) (finding that
> pending state proceedings are not always a valid reason for delaying a federal prosecution,
> and indicating that courts should consider (1) overlap between the state and federal charges,
> (2) the simplicity or complexity of the charges, and (3) whether concurrent proceedings in
> fact would be logistically cumbersome).

[132]

> *See, e.g., Beavers v. Haubert*, 198 U.S. 77, 86-87 (1905); *United States v. Stein*, 18 F.R.D.
> 17, 21-22 (S.D.N.Y. 1955) (denying speedy trial claim where federal proceedings in New
> York were delayed to allow prosecution on later-filed indictment in Northern District of
> California to go forward on the theory that the defendant "was entitled to a speedy trial on
> each indictment but obviously both trials could not proceed simultaneously. . . . The orderly
> administration of criminal justice leaves that choice [of which indictment should be tried
> first] with the prosecuting officials to be exercised in good faith").

[133]

> *See, e.g., Jones*, 91 F.3d at 8 (finding delay reasonable where it was necessary in order to
> complete prosecution in another federal jurisdiction with respect to different criminal
> conduct); *Mejias*, 552 F.2d at 443 (finding delay reasonable where government delayed
> federal prosecution to allow completion of state proceedings regarding same conduct).

[134]

> *E.g., Mejias*, 552 F.2d at 441-42.

first.[135]  Here, however, the military commission investigation and charges related to one of the two

embassy bombings at issue in this case,[136] not some entirely different matter.[137]  Both were brought

by the federal government.  Hence, the delay in the prosecution of this indictment that related to the

military commission investigation and prosecution was not attributable to the doctrine of dual

sovereignty or to any need for either one of two particular cases involving different conduct to

precede the other.  Nor does it appear to have been attributable to a competing imperative that

Ghailani be given a speedy trial on the military commission charges.[138]  It was attributable to the fact

that the government, once the CIA interrogation was completed, (1) decided to not to pursue this

indictment or, at least, to put it on a back burner from September 2006 until 2009, in favor of the

military commission route, and (2) later changed its mind and presented Ghailani for trial in this

Court.

Just as the executive branch was entitled immediately following conclusion of the

CIA interrogation to detain Ghailani at Guantanamo as an enemy combatant, it was entitled to make

the judgments it did as to the most appropriate forum in which to prosecute Ghailani.  By the same

---

[135]

*E.g., Jones,* 91 F.3d at 8.

[136]

They related solely to the bombing in Dar es Salaam, Tanzania.

[137]

The government charged Ghailani before the military commission with alleged offenses against the laws of war and conduct punishable under the Military Commissions Act of 2006.  Charge sheet, Ahmed Khalfan Ghailani (Mar. 28, 2008), *available at* http://www.defense.gov/news/commissionsGhailani.html (last visited July 7, 2010).  Those charges primarily related to Ghailani's alleged involvement in the Dar es Salaam bombing, but they included also a specification with respect to Ghailani's allegedly having provided material support to Al Qaeda between 1998 and 2004.  *See id.* at 11-13.

[138]

The Military Commissions Act of 2006, which applied at the time, made the speedy trial guarantee of the Uniform Code of Military Justice inapplicable to military commissions.  Pub. L. 109-366, § 3(a)(1).  The question whether the Speedy Trial Clause nevertheless would apply remains open.

41

reasoning, however, it is responsible for the delay that those judgments caused.

This, if anything, is even clearer with respect to the period from early 2007 until March 2008 when the military prosecutor conducted the investigation of possible military commission charges. There is no evidence that Ghailani's presence at Guantanamo was required or even convenient for the conduct of that investigation. Indeed, there is no evidence he even knew that it was taking place. For all the record discloses, the military prosecutor could have conducted exactly the same investigation regardless of where Ghailani physically was located. The prosecution in this Court could have proceeded in parallel with that investigation.

\* \* \*

In sum, the only reason for the delay of this prosecution during the period September 2006 through late February or early March 2007 was the fact that the executive branch decided to hold Ghailani at Guantanamo and not to proceed with this prosecution. The government's justification for the roughly one-year delay from February or March 2007 until March 28, 2008 is weak. The time during which the military commission proceedings were pending, March 28, 2008 until January 2009, also weighs against the government because the government and not the defendant was responsible for it. The same is true with respect to the interval from the suspension of the military commission prosecution in January 2009 until Ghailani eventually was produced in this Court.

*III*     *Balancing the* Barker *Factors*

The delay in this prosecution from the moment Ghailani came into U.S. custody until he was presented in this Court, almost five years, was long. As we have seen, however, that period was not an undifferentiated whole and its length in any case would not alone be dispositive.

42

The CIA interrogated Ghailani for the first two years in the reasonable belief that Ghailani had important intelligence information. While some of the methods it widely is thought to have used have been questioned and, to whatever extent they actually were used, might give rise to civil claims or even criminal charges,[139] no one denies that the agency's purpose was to protect the United States from attack.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."[140] While the Speedy Trial Clause conceivably might have been violated if a prosecution were delayed for the purpose of extended use of appalling or unlawful methods of interrogation even for important national security reasons, that is not this case. There was no prolonged delay here for any such purpose. The two year delay attributable to the CIA interrogation served a valid purpose.[141] The balance of considerations with respect to that period, especially in the light of the lack of substantial prejudice to Ghailani's Speedy Trial Clause-protected interests, tips very heavily in favor of the government.

The considerations affecting the remaining delay of almost three years present a somewhat closer case. None of that delay was attributable to a quest for tactical advantage.

---

[139]

But see Detainee Treatment Act of 2005, 42 U.S.C. § 2000dd-1(a) (establishing qualified defense for government personnel charged with offenses or liability in connection with officially authorized operational practices "that involve detention and interrogation of aliens who the President or his designees have determined are believed to be engaged in or associated with international terrorist activity that poses a serious, continuing threat to the United States").

[140]

Haig v. Agee, 453 U.S. 280, 307 (1981) (quoting Aptheker v. Sec'y of State, 378 U.S. 500, 509 (1964)).

[141]

Barker, 407 U.S. at 531 ("[A] valid reason . . . should serve to justify appropriate delay.").

Accordingly, in the *Barker* lexicon, the reason for each component of it was "more neutral"[142] than would have been delay resulting from a deliberate attempt to manipulate the system to the detriment of Ghailani's defense in this case. The "ultimate responsibility for" that delay, however, nevertheless "must rest with the government," as the government rather than Ghailani brought it about.[143] But that is only one component of the analysis.

*Barker* "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis."[144] It requires a balancing of all pertinent considerations, some of which are the length of and reasons for the delay, any prejudice to the accused, and the accused's invocation of the right. The objective is to determine whether the delay, given its effect on Ghailani and the reasons for it, "endanger[ed] the values the right [to a speedy trial] protects."[145]

In this case, Ghailani would have been detained as an enemy combatant throughout the period of the government's delay of this prosecution. The avoidance-of-prolonged-pretrial-incarceration objective of the Speedy Trial Clause therefore has no bearing here.

Ghailani has been aware since at least April 2008 and perhaps earlier that he has been subject to criminal charges. Moreover, it may be inferred, even in the absence of direct evidence, that this has caused some anxiety, particularly during the period in which there was some possibility that Ghailani faced the possibility of capital punishment in the event of a conviction in this Court. Nevertheless, the anxiety that ordinarily would be felt by one facing criminal charges must be

---

[142]

  *Id.*

[143]

  *See id.*

[144]

  *Barker*, 407 U.S. at 530 (emphasis in original).

[145]

  *Id.* at 522.

discounted to a material degree on the unusual facts of this case. Ghailani's status as an enemy combatant always has made it uncertain whether he ever will be freed, regardless of the outcome of the criminal case. The portion of the delay during which capital punishment in this case was a possibility was relatively brief and the risk considerably more theoretical than real. In consequence, the delay the government caused here did not subject Ghailani to any greatly added anxiety by prolonging his status as a defendant.

Nor does the trial prejudice aspect of the analysis help Ghailani. While a particularized showing of prejudice is not a prerequisite to finding for a defendant under *Barker*, evidence of actual prejudice is quite important unless the other factors weigh heavily against the government.[146] There is no persuasive evidence that the delay in this prosecution has impaired Ghailani's ability to defend himself in any respect or significantly prejudiced him in any other way pertinent to the speedy trial analysis.

Considering all of the circumstances, particularly the lack of significant prejudice of the sort that the Speedy Trial Clause was intended to prevent, the delay in this case did not materially infringe upon any interest protected by the right to a speedy trial. The Court therefore holds that Ghailani's Sixth Amendment right to a speedy trial has not been violated.[147]

---

[146]

Rayborn v. Scully, 858 F.2d 84, 94 (2d Cir. 1988) (citing *United States v. Mitchell*, 769 F.2d 1544, 1547 (11th Cir. 1985), for the proposition that a defendant must show actual prejudice unless the other three factors weigh heavily against the government).

[147]

For the sake of completeness, the Court notes that Ghailani's reply memorandum contains a conditional request for an evidentiary hearing. Def. Reply Br. 95 *et seq.* It sought a hearing with respect to any facts that might remain in dispute after the January 2010 oral argument and stated that these might be grouped into five categories: (1) Ghailani's "links to al-Qaeda; (2) the circumstances of his capture, detention and interrogation; (3) when and how he asserted his right to a Speedy Trial; (4) when he gained knowledge of his pending Indictment; and (5) whether the circumstances and length of the nearly five-year delay prejudiced his defense." The Court has carefully considered this contention. It is without

merit.

As an initial matter, Ghailani submitted no evidence with respect to his links to al Qaeda and when he learned of the pending indictment. In consequence, there would be no issue of fact as to those matters even assuming their materiality.

He did submit two brief affidavits relating to his treatment by the foreign nation that captured him and his subsequent treatment while in CIA custody, respectively. Both are classified. Suffice it to say here that the result on this motion would be the same even assuming the accuracy of everything set forth in those affidavits.

Ghalani submitted no affidavit or declaration of his own on any of the other subjects. Apart from uncontroverted documentary evidence, the only materials he put forward were (1) the Newell declaration, which purported to draw together publicly available materials with respect to the CIA Program, (2) the Colwell declaration, which went to the question of trial prejudice, and (3) the declaration and testimony of Ghailani's clinical psychologist, which was submitted on his motion to enjoin the Bureau of Prisons from subjecting him to a certain standard search procedure upon his departing for or returning from court and not in support of this motion. *See United States v. Ghailani,* __ F. Supp. 2d ___, No. 98 Crim. 1023 (LAK), 2010 WL 2426005 (S.D.N.Y. June 14, 2010).

The Newell and Colwell declarations raise no genuine issue of fact warranting a hearing. Neither conflicts with the government's evidence in any or, at least, any material respect.

Nor does the psychologist's evidence warrant a hearing. It prompted the Court to order a competency hearing and to appoint a psychiatrist to examine Ghailani and advise on that subject. The psychiatrist reported that Ghailani was fully competent and able to assist in his defense. Ghailani elected not to challenge that conclusion, declined to adduce further testimony from his psychologist, who in any case never contested his present competency, and waived an evidentiary hearing on competency and thus the opportunity to cross-examine and challenge the court-appointed psychiatrist. Tr., June 24, 2010, at 2.

*Conclusion*

For the foregoing reasons, the defendant's motion to dismiss the indictment due to the denial of his constitutional right to a speedy trial [DI 823] is denied. The government is entitled to attempt to hold Ghailani accountable in a court of law for his alleged complicity in the murder of 224 people and the injury of more than 1,000 others.

The Court expresses its thanks to counsel for *amici*, who were invited to supplement the efforts of counsel on both sides and thereby to assist the Court in resolving this unusual issue.

SO ORDERED.

Dated:      July 12, 2010

                                                    _____
                                                    Lewis A. Kaplan
                                                    United States District Judge