UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

      -against-

AHMED KHALFAN GHAILANI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S10 98 Crim. 1023 (LAK)

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 9/1/10

## ORDER

LEWIS A. KAPLAN, *District Judge.*

      The Memorandum Opinion, dated August 17, 2010, was filed with the Court Security Officer. The attached copy of that opinion, reviewed and redacted by the appropriate authorities in accordance with the Classified Information Procedures Act, now may be filed on the public record. Accordingly, the Clerk shall file the attached copy in place of the half sheet for DI 992.

      SO ORDERED.

Dated:      September 1, 2010

                            _____
                            Lewis A. Kaplan
                        United States District Judge

FILED WITH THE
COURT SECURITY OFFICER
CSO: _Macisso_
DATE: _8/14/10_

UNITED STATES DISTRICT COURT             FILED WITH COURT
SOUTHERN DISTRICT OF NEW YORK            SECURITY OFFICER
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

-against-                                S10 98 Crim. 1023 (LAK)

AHMED KHALFAN GHAILANI,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Michael Farbiarz
Jesse M. Furman
Harry A. Chernoff
Nicholas Lewin
Sean S. Buckley
Assistant United States Attorneys
PREET BHARARA
UNITED STATES ATTORNEY


Peter Enrique Quijano
Michael K. Bachrach
Steve Zissou
*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

Ahmed Khalfan Ghailani, an alleged member of Al Qaeda, was indicted in this Court in 1998 for, among other things, conspiring with Usama Bin Laden and others to kill Americans abroad by, among other means, bombing the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, bombings in which 224 people reportedly were killed and many more injured.

2



On March 26, 2010, Ghailani moved to suppress certain evidence and for other relief.

The principal issue that remains for resolution is whether the government should be precluded from

calling █████████ as a trial witness on the ground that the government identified and located

████ by use of coerced and uncounseled statements Ghailani made ██████████████████████

██████████████████

### Facts

Ghailani's alleged role in the embassy bombings was to obtain the explosives in

Arusha, Tanzania ████████ and to transport them to Dar es Salaam. ████ therefore may be a

significant witness for the government.

A.    *Earliest Government Knowledge of* ████

The FBI first learned of ████ alleged involvement in the 1998 embassy bombings

---

Def. Omnibus Mot. [DI 902].

The branch of Ghailani's motion that asked the Court to dismiss the indictment for
outrageous government conduct in violation of Ghailani's due process rights already has
been denied. *See United States v. Ghailani*, — F. Supp. 2d —, No. S10 98 Crim. 1023
(LAK), 2010 WL 1839030 (S.D.N.Y. May 10, 2010).

Ghailani asks also that the Court (1) commit in principle to the use of a jury questionnaire,
individual examination of prospective jurors, and allowing attorney *voir dire*, and (2) to
suppress statements Ghailani made ██████████████████ The Court already
has indicated that it will use a questionnaire, and the other jury selection-related issues are
premature. The government has stated that it would use the statements made while Ghailani
██████████████ only for purposes of cross-examination and rebuttal in the event
Ghailani testifies. *See* Gov't Br. [DI 927], at 7-9; Tr., May 12, 2010, at 4. The Court
therefore will not reach that issue unless and until Ghailani indicates that he intends to
testify at trial.

3





4

**B.**   *Ghailani's Custodial Statements* 

  **1.**

  **(a)**   *The Statements*

As detailed elsewhere,[5] Ghailani was apprehended by Pakistani forces in late July 2004.

---

[5]   *See, e.g., United States v. Ghailani,* — F. Supp. 2d —, No. S10 98 Crim. 1023 (LAK), 2010 WL 2756546 (S.D.N.Y. July 12, 2010)



Case 1:98-cr-01023-LAK   Document 1000   Filed 09/01/10   Page 6 of 37

5



**(b)    *Alleged Coercion***

Ghailani claims that all of the statements he made ████████████ were coerced



6

and, in addition, violated his Sixth Amendment right to counsel.[13]

[13] *See* Bachrach Decl., Apr. 30, 2010, Ex. B (Ghailani Aff., Apr. 27, 2010)

7

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

### 2.    *Statements in CIA Custody*

Ghailani was ████████████████████████████████████ placed

in the CIA's Rendition, Detention and Interrogation ("RDI") Program.  That program used a

combination of social influence approaches and extremely harsh interrogation methods to obtain

intelligence from a handful of detainees believed to possess particularly high-value information.[19]

Each was subjected to a unique interrogation program designed "to reduce [the detainee's] physical

ability and emotional desire to resist interrogation."[20]

---

[16]    Doran Decl. ¶ 3.

[17]    *Id.*

[18]    *Id.* ¶ 4.

[19]    Lander Decl. ¶¶ 8-9.

[20]    *Id.* ¶¶ 10-11; *see also* Bachrach Decl., May 6, 2010, Ex. 17 (Steven G. Bradbury, Principal
Deputy Assistant Attorney General, Memorandum for John A. Rizzo, Senior Deputy
General Counsel, CIA, May 30, 2005), at 1 (describing goal of interrogation as creating a
"state of learned helplessness and dependence conducive to the collection of intelligence in
a predictable, reliable, and sustained manner"); *id.* Ex. 6 (Draft OMS Guidelines on Medical
and Psychological Support to Detainee Interrogations, undated) (Gov't Bates Number

8



CP2009-00001562-73), at 1 (explaining how program was "designed to psychologically 'dislocate' the detainee, maximize his feeling of vulnerability and helplessness, and reduce or eliminate his will to resist [government] efforts to obtain critical intelligence").

9



**C.** ▮▮▮▮ *Identification, Location, and Cooperation*





10

Tanzanian authorities located and arrested ▮▮▮▮ in Arusha on August 13, 2006.[28] They immediately flew him to Zanzibar, Tanzania, where he was held and questioned by Tanzanian officials for about a week.[29] The FBI also questioned him during that period.[30] ▮▮▮▮ subsequently was released, and no charges were filed against him.

According to both the Assistant Commissioner of the Tanzanian Police Force and one of the FBI agents who interviewed ▮▮▮▮ in Zanzibar, ▮▮▮▮ has been cooperative from the moment he was taken into custody and consistently has told them in multiple voluntary interviews that he is willing to come to the United States to testify for the government in this case.[31] He has stated this willingness not only while in Tanzanian custody following his arrest in mid-August 2006,[32] but also in at least two non-custodial interviews with FBI agents since 2008, most recently in an interview at his home in February 2010.[33] Both law enforcement officials declare that neither they nor the other agents and officers who interviewed ▮▮▮▮ ever used threats or force to induce him to testify.[34]

██████████████████████████████████████████████████████

---

[28]
    Lewin Decl., Apr. 9, 2010, Ex. F (Mlowola Decl., Apr. 8, 2010) ¶ 3.

[29]
    *Id.*

[30]
    *Id.*

[31]
    Mlowola Decl. ¶¶ 3-4; ▮▮▮▮ Decl. ¶¶ 4, 10c.

[32]
    Mlowola Decl. ¶ 3; ▮▮▮▮ Decl. ¶ 10a-c.

[33]
    *See* ▮▮▮▮ Decl. ¶¶ 4-6, 10c & n.5.

[34]
    *Id.* ¶ 5; Mlowola Decl. ¶ 6.

11

██████████████████████████████████████████████████████

There is no treaty mechanism or other provision of law between the United States and

Tanzania that would allow either government to compel ████ to testify in this trial.[36]  Nor,

according to the Tanzanian police official, does ████ currently face any criminal exposure under

Tanzanian law.[37]


## Discussion

Ghailani claims that all of his custodial statements ████████ were coerced and

obtained in violation of his right to counsel.[38]  He argues that ████ should be precluded from

testifying at trial because that testimony would constitute "fruit of the poisonous tree" – evidence

derived from his illegally obtained statements.


## I

### A.    The Fruit of the Poisonous Tree

The fruit of the poisonous tree doctrine dates to *Silverthorne Lumber Co. v. United*

---

[35]       ████ Decl. ¶ 10d.

[36]       Mlowola Decl. ¶ 6.

[37]       *Id.* ¶ 5.

[38]       ████████████████████████████

12

*States*,[39] a case involving an illegal seizure of documents. Following the district court's direction that the prosecutor return the seized documents, the prosecutor caused the grand jury to subpoena the same evidence from the defendants. The defendants were held in contempt for refusing to produce them. The Supreme Court, however, reversed, holding that the Fourth Amendment precluded the use of the illegally seized evidence to formulate the grand jury subpoenas. It nevertheless declined to make the "facts . . . obtained [by the illegal seizure] sacred and inaccessible,"[40] noting that "[i]f knowledge of them is gained from an independent source they may be proved like any others . . . ."[41]

The Supreme Court next considered the problem of evidence derived from information gained by an illegal search in *Nardone v. United States*.[42] Federal officers there had obtained information through illegal wiretapping. While the wiretapped conversations themselves were not received in evidence, the defendant, following his conviction, sought to examine the prosecution on the uses to which it had put the information gained through the wiretapping. The lower courts rejected the effort, but the Supreme Court reversed, holding that "[t]o forbid the direct use of [unlawful] methods . . . but to put no curb on their full indirect use would only invite the very methods deemed inconsistent with ethical standards and destructive of personal liberty."[43]

---

[39]     251 U.S. 385 (1920).

[40]     *Id.* at 392.

[41]     *Id.*

[42]     308 U.S. 338 (1939).

[43]     *Id.* at 340 (internal quotation marks omitted).

Nevertheless, it made clear that a "but for" causal connection between law enforcement misconduct and trial evidence would not necessarily suffice to warrant exclusion of evidence. It endorsed *Silverthorne*'s statement that the facts obtained by an illegal search do not thereby become "sacred and inaccessible," but it recognized that "[i]n practice this generalized statement may conceal concrete complexities."[44] In language that came to bear heavily on the evolution of the fruit of the poisonous tree doctrine, it added that:

> "Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint."[45]

In sum, then, the fruit of the poisonous tree doctrine requires the exclusion of the fruits of illegally obtained evidence[46] unless, in the words used in *Wong Sun v. United States*,[47] "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at . . . instead by means sufficiently distinguishable to be purged of the primary taint."[48] This principle has resulted in considerable latitude in the application of the exclusionary rule in the

---

[44]     *Id.* at 341.

[45]     *Id.*

[46]

The government concedes that "[t]he doctrine applies not only to violations of the Fourth Amendment . . . , but also to coerced confessions in violation of the Fifth Amendment and to interrogations in violation of the Sixth Amendment right to counsel." Gov't Br. 22. Moreover, while the government notes that the Sixth Amendment right to counsel may not apply extraterritorially, it assumes "solely for purposes of this Motion, . . . that the Sixth Amendment right to counsel applied to any interrogations of the defendant following his capture." *Id.* 9 n.7.

[47]     371 U.S. 471 (1963).

[48]     *Id.* at 488 (internal quotation marks and citation omitted).

14

Fourth Amendment context. It allows the receipt in evidence, despite law enforcement misconduct, of evidence that the government inevitably would have discovered legally in any case as well as evidence that is only tenuously connected to illegal government action.

The government assumes, for purposes of this motion, that Ghailani's statements to the CIA were coerced and that his statement ████████████████ were uncounseled. It maintains, however, that the taint of the coercion of Ghailani's uncounseled statements has been dissipated because (1) the government inevitably would have obtained ████ as a witness by independent and lawful means, (2) the case falls outside of the "core application" of the fruit of the poisonous tree doctrine, and (3) the trial testimony would be sufficiently attenuated from the alleged illegality.

Like one ship passing another in the night, Ghailani essentially ignores the government's argument. He contends instead that ████ may not be called because the government has failed to establish that ████ testimony ultimately is traceable to a source entirely independent of Ghailani's statements. This disconnect reveals a fundamental difference between Ghailani and the government that the former has not even acknowledged.

B.     *Purging the Taint – The Applicable Standard*

Ghailani's position derives from *Kastigar v. United States*,[49] the case in which the Supreme Court upheld the constitutionality of the current witness immunity statute.[50] That statute provides that "no testimony or other information compelled under [an immunity] order (or any

---

[49]     406 U.S. 441 (1972).

[50]     18 U.S.C. §§ 6001-05.

15

information directly or indirectly derived from such testimony or other information) may be used

against the witness in any criminal case . . . ."[51]  Once a defendant shows that he has testified

pursuant to a grant of immunity with respect to matters pertinent to a federal prosecution, the

government bears the burden of proving "that the evidence it proposes to use is derived from a

legitimate source wholly independent of the compelled testimony."[52]  In upholding the statute, the

Court observed that its protection "is coextensive with the scope of the privilege" against self

incrimination.[53]  Accordingly, Ghailani argues, the government may not use ▮▮▮▮ as a witness

because it has failed to demonstrate that ▮▮▮▮ testimony will have been obtained by means

"wholly independent of" Ghailani's allegedly coerced statements.[54]  But the argument is not

persuasive.

　　　　　　As an initial matter, Ghailani's argument construes *Kastigar*'s observation that the

protection afforded by the immunity statute is coextensive with the privilege more broadly than the

decision warrants.  The issue to which that observation was directed was whether the grant of

derivative as well as direct use immunity was sufficient to overcome the flaw that had led the Court

---

[51]　　*Id.* § 6002.

[52]　　*Kastigar*, 406 U.S. at 460.

[53]　　*Id.* at 453.

[54]　　Cl. Tr., Apr. 19, 2010, at 22.

　　　The unstated premise of the argument is that the use of coerced statements and their fruits violates the privilege against self incrimination as distinguished from the Due Process Clause.  The government has not disputed that premise.  *See generally infra* Part II.B.

16

to invalidate a predecessor statute that had conferred only direct use immunity.[35]  As *Kastigar*

presented only a facial challenge to the statute, however, the Court there had no occasion to describe

the precise meaning of the statutory language – "any information directly or indirectly derived from

such testimony or other information" – or the exact scope of the privilege against self incrimination.

It sufficed to hold that the statutory language was at least as broad as the Fifth Amendment.  Nor was

the Court obliged to consider the relationship, if any, between its reference to "a legitimate source

wholly independent of the compelled testimony" and established doctrines that mitigate the severity

of the fruit of the poisonous tree doctrine in the Fourth Amendment context.  Hence, even if Ghailani

were right that *Kastigar* applies here, such a conclusion would not resolve the present motion.

Ghailani's attempt to import *Kastigar* into this case is not well founded, quite apart

from his overreading of the case.  To be sure, the Supreme Court has not fully defined the exact

scope of the exclusionary rule as applied to evidence derived from coerced confessions or Sixth

Amendment violations.[36]  Nonetheless, it has applied poisonous fruit doctrine and reasoning

developed in Fourth Amendment cases in the unlawfully obtained confession context,[37] and it has

---

[35]

406 U.S. at 448-59.

[36]

See 3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 9.5(a), at 467 (3d ed. 2007)
(hereinafter LAFAVE) ("Although the Supreme Court has never had occasion expressly to
adopt [the position that fruits analysis applies to evidence derived from coerced
confessions], it is unquestionably correct.").

[37]

See *Harrison v. United States*, 392 U.S. 219 (1968) (employing poisonous fruit analysis to
determine whether defendant's subsequent incriminating testimony, indirectly obtained from
earlier involuntary confession, was admissible against him); see also *Michigan v. Tucker*,
417 U.S. 433, 445-46 (1974) (assuming that *Wong Sun* would require suppression of
testimony of witness if the witness's identity had been ascertained from information coerced
from defendant).

17

indicated broadly that this generally is appropriate.[58] Lower courts[59] and commentators[60] consistently

have assumed that the poisonous fruit doctrine, with its qualifications, applies to coerced confessions

and Sixth Amendment violations. Moreover, there is good reason for treating evidence derived from

a coerced confession differently from evidence gained as a result of testimony compelled by a grant

of immunity.  Different policy concerns drive applications of exclusionary rules in each context.[61]

---

[58]

*Nix v. Williams*, 467 U.S. 431, 442 (1984) ("Although *Silverthorne* and *Wong Sun* involved
violations of the Fourth Amendment, the 'fruit of the poisonous tree' doctrine has not been
limited to cases in which there has been a Fourth Amendment violation. The Court has
applied the doctrine where the violations were of the Sixth Amendment, as well as of the
Fifth Amendment.").

[59]

*See, e.g., Subana v. Yarborough*, 130 Fed. Appx. 101, 103 (9th Cir. 2005) (denying habeas
petition challenging state court's holding that "the witness's initial recantation may have been
the fruit of Subana's involuntary confession, but her trial testimony occurred three years later,
and the passage of time attenuated the taint"); *Tretheway v. Farmon*, 39 Fed. Appx. 591, 594
(9th Cir. 2002) ("The fruit of the poisonous tree doctrine operates in the Fifth Amendment
context as follows: if the defendant's pre-*Miranda* statement was coerced in violation of the
Fifth Amendment, then the court must suppress the defendant's post-*Miranda* statement unless
the post-*Miranda* statement was sufficiently attenuated from the coercion to remove any
'taint.'") (citations omitted); *United States v. Kimball*, 884 F.2d 1274, 1279-80 (9th Cir. 1989)
(assuming poisonous fruit analysis, including concept of attenuation, applied to fruits of Sixth
Amendment violation); *United States ex rel. Hudson v. Cannon*, 529 F.2d 890 (7th Cir. 1976)
(assuming attenuation analysis applies in Sixth Amendment context); *Parker v. Estelle*, 498
F.2d 625, 629 (5th Cir. 1974) (applying attenuation analysis to evidence derived from coerced
confession); *United States ex. rel. Monks v. Warden*, 339 F. Supp. 30, 35 (D. N.J. 1972)
("Since the confessions are involuntary, the jacket is a poisoned fruit of the prior coercive
questioning which was not attenuated by intervening events.").

[60]

*See, e.g., 3 LAFAVE, § 9.5(a)*, at 467 (noting that excluding evidence derived from coerced
confessions "does not mean, of course, that an involuntary confession causes the 'rejection of
all evidence which follows it'; it merely requires application of the previously-discussed fruit-
of-the-poisonous-tree doctrine [including attenuation] to such confessions.") (citations
omitted); *id. § 9.5(d)*, at 483 (stating that attenuation analysis "will doubtless be applied" to the
testimony of witnesses identified from involuntary statements); 2A CHARLES ALLAN WRIGHT
ET AL., FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 408, at 56-57 (3d ed. 2000) ("The
exclusionary rule is best known in connection with the suppression of evidence secured by an
illegal search and seizure, but it applies also to . . . confessions obtained involuntarily . . . .").

[61]

*See, e.g., Kastigar*, 406 U.S. at 470-71 (Marshall, J., dissenting) (noting that "[a]n immunity
statute thus differs from an exclusionary rule of evidence in at least two critical respects":

18

As the Second Circuit explained:

> "[T]he Supreme Court has relied on Fourth Amendment cases in determining what evidence is excludable as the fruit of a coerced confession . . . . [A] coerced confession differs from immunized testimony. In the former situation, the likelihood of deterring police misconduct is, as in the Fourth Amendment context, a relevant consideration, while this is not so with regard to immunity, which is granted under prosecutorial and judicial supervision."[62]

It therefore is not surprising that Ghailani has identified no case that applied *Kastigar* to the fruit of coerced confessions or of statements made in violation of the right to counsel.

Accordingly, *Kastigar*'s requirement of proof of "a legitimate source wholly independent of" immunized testimony does not control this case. The principles governing the treatment of fruits of the poisonous tree in the Fourth Amendment context apply to the extent that their logic is consistent also with the underlying concerns of the Fifth and Sixth Amendments. The Court therefore turns to the government's contention that ▮▮▮▮ should be permitted to testify under three qualifications to the poisonous fruit doctrine, even on the assumption that it obtained ▮▮▮▮ as a witness by means of information that the CIA obtained from Ghailani under duress and in the absence of counsel.

---

first, higher standards are appropriate for immunity violations because unlike coerced confessions, immunity statutes grant constitutional approval to the act of compelling the testimony; and second, immunity statutes create a limiting framework in advance within which prosecutors can work, whereas exclusionary rules come into play after a violation has occurred and other societal interests are at stake); Kristine Strachan, *Self-Incrimination, Immunity, and Watergate*, 56 TEXAS L. REV. 791, 824-32 (1978) (noting that "[t]he policies behind precluding the use of coerced confessions are, for the most part, inappropriate to cases in which testimony is legally compelled," and identifying the most important as ensuring reliable evidence and deterring police misconduct); Note, *Standards for Exclusion in Immunity Cases After Kastigar and Zicarelli*, 82 YALE L.J. 171, 175-181 (1972) (explaining that stricter standard for admittance is necessary for compelled testimony under an immunity grant than for evidence derived from coerced confessions because the deterrence value is lower and the social cost of exclusion higher in the coerced confession context).

62  *United States v. Kurzer*, 534 F.2d 516 n.8 (2d Cir. 1976).

19

## II

### A.   *Inevitable Discovery*

The question whether the government would have identified, located, and gained the cooperation of ▮▮▮▮ without using Ghailani's statements depends upon each of several contingencies being resolved in the government's favor.



As the Second Circuit has made clear, the government cannot prevail on an "inevitable discovery" claim by showing that it is possible or even probable that it would have obtained the challenged evidence by untainted means:

> "We have previously indicated that the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation. *See United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995).

> \* \* \*

> "On the basis of *Cabassa*, district courts in our circuit have held that the inevitable discovery exception to the exclusionary rule is available only where a court has a 'high level of confidence' that 'each of the contingencies' needed to obtain the evidence legally would be resolved in the government's favor:

> "'The teaching of *Cabassa*, which is supported by principles of probability, thus is straightforward. It suggests that a trial court's task in [the] context [of inevitable discovery] is to deny the motion to suppress on the ground of inevitable discovery only if it has a *high level of confidence* that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis therefore requires a court to examine *each of the contingencies* that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having

21

occurred.' *United States v. Lavan*, 10 F. Supp. 2d 377, 389 (S.D.N.Y. 1998) (Kaplan, *J.*) (emphasis added); *see also United States v. Arms*, 2002 WL 32781, *5 (E.D.N.Y. 2002) (Block, *J.*) (finding that discovery of the evidence was inevitable when there is 'no question that a warrant would in fact have issued').

*  *  *

"To the extent that any confusion lingers in our circuit after *Cabassa*, we now expressly eschew the 'reasonable probability' framework that some of our sister circuits have used to analyze 'inevitable discovery' cases. In its place – and consonant with the 'teachings of *Cabassa*,' with the Tenth Circuit's methodology in *Cunningham*, and with the approach most recently taken by our district courts – we conclude that illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor."[66]

This Court cannot exclude the possibility that the government would have found ███████ on the basis of ██████ statements alone. But it would have been roughly comparable to finding a particular individual named John or Bill in a state with a population around the size of Maine or New Hampshire – or, at best, a city about the size of Buffalo – while knowing little more about him than that he was regarded as prominent in a significant industry in the state or city. To be sure, the government points also to information more recently provided by ███████ ████████████████████████████████████████████████████ -to buttress its inevitable discovery argument. The value of this additional evidence, however, depends upon whether the FBI █████████████████████████████████████████████ And even if it had done so and thereby found ██████ the

---

[66] *United States v. Heath*, 455 F.3d 52, 58-60 (2d Cir. 2006) (emphasis in original).

22

question whether ▮▮▮▮would have been cooperative in those circumstances would have remained uncertain.

Given these uncertainties, the Court does not have the requisite high level of confidence that the government inevitably would have obtained ▮▮▮▮testimony absent Ghailani's statements. Accordingly, the receipt of ▮▮▮▮testimony therefore would not be justified on this basis.[67]

### B.   The Core Application Doctrine

The core application doctrine grew out of the Supreme Court's view that the:

> "'exclusionary rule . . . operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect.' [*Arizona v. Evans*, 514 U.S. 1, 10 (1995).] 'As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. Where "the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted."' *Id.* at 11, 115 S. Ct. 1185 (quoting *United States v. Janis*, 428 U.S. 433, 454, 96 S. Ct. 3021, 49 L.Ed.2d 1046 (1976))."[68]

Accordingly, it holds in essence that:

> "[A]ny extension of the rule beyond its core application – normally, barring use of illegally seized items as affirmative evidence in the trial of the matter for which the search was conducted – must be justified by balancing the 'additional marginal deterrence' of the extension against the cost to the public interest of further impairing the pursuit of truth."[69]

---

[67]

In view of this conclusion the Court need not decide whether and to what extent the inevitable discovery rule applies to fruit of the poisonous tree analysis in the Fifth and Sixth Amendment contexts.

[68]

*United States v. Awadallah*, 349 F.3d 42, 72 (2d Cir. 2003).

[69]

*Id.* (quoting *Tirado v. Comm'r*, 689 F.2d 307, 310 (2d Cir. 1982) (citations omitted)).

23

In striking that balance, moreover:

> "'the key question is whether the particular challenged use of the evidence is one that the seizing officials were likely to have had an interest in at the time,' that is, 'whether it was within their predictable contemplation and, if so, whether it was likely to have motivated them.' [*Tirado*, 689 F.2d] at 311. '[I]f law enforcement officers are already deterred from Fourth Amendment violations by a prohibition against using illegally seized evidence to secure convictions for the offenses they are investigating, the further question is whether some significant incremental deterrence is achieved by prohibiting use of the evidence for additional purposes.' *Id.*"[70]

The government here contends that the CIA interrogated Ghailani for the purpose of obtaining intelligence thought directly relevant to national security objectives. Any violation by it of Ghailani's Fifth and Sixth Amendment rights therefore occurred in circumstances in which the CIA probably did not contemplate, and in any case was not likely motivated by, a possible criminal prosecution of Ghailani. Excluding evidence that is relevant to a criminal case and that was obtained as a collateral consequence of a national security investigation, it contends, would not serve the deterrent purpose of discouraging illegal law enforcement behavior. The government's argument, however, is not persuasive.

In the search and seizure cases that are the stuff of Fourth Amendment exclusionary rule decisions, the constitutional violation is the search or seizure itself. The exclusionary rule is not "a personal constitutional right."[71]  Its "purpose . . . is not to redress the injury to the privacy of the search victim: '[T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.'"[72]  Rather, it "is to deter future unlawful police conduct and thereby

---

[70]

    *Awadallah*, 349 F.3d at 72.

[71]

    *Calandra v. United States*, 414 U.S. 338, 348 (1974).

[72]

    *Id.* at 347 (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1965)).

24

effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."[73]

This case is different. Ghailani's position is that he was coerced into making statements ███████████ and that ████ testimony therefore cannot properly be used against him. In consequence, it is necessary to examine the constitutional treatment of coerced statements in order to determine whether the rationale of the core application doctrine applies here.

The rule limiting the admissibility of confessions and statements to those made voluntarily developed at common law but quickly found a constitutional foundation in the United States. In *Bram v. United States*,[74] a federal criminal prosecution, the Supreme Court said that the voluntariness rule "is controlled by that portion of the fifth amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'"[75] In the years prior to the application of the Fifth Amendment privilege of self incrimination to the states in *Malloy v. Hogan*,[76] the Court applied the Due Process Clause of the Fourteenth Amendment to reach the same rule with respect to coerced confessions introduced in state prosecutions.[77] Since *Malloy*, the Court has continued to rely in coerced and involuntary confession cases on both the Due Process and the

---

[73]    *Id.*

[74]    168 U.S. 532 (1897).

[75]    *Id.* at 542.

[76]    378 U.S. 1 (1964).

[77]    *E.g., Brown v. Mississippi*, 297 U.S. 278 (1936) (reversing, under the Due Process Clause, state criminal conviction based on confession obtained by physical coercion).

Aug. 18. 2010  4:51PM   15-DOJ                                        No. 7261   P. 26

25

Self Incrimination Clauses.[78]

The constitutional footings of the prohibition on the use of coerced confessions and statements are important here. The constitutional violation in a search and seizure case is complete when government officials make the unlawful search or seizure. A coerced confession case, in contrast, may involve more than one constitutional violation and, where it does, those violations may occur at different times and by different actions. Government torture or abuse may violate the Due Process Clause, which may "provide relief in appropriate circumstances" regardless of whether the abuse succeeds in obtaining evidence or, if it does, whether the evidence ever is used at trial.[79] But the Self Incrimination Clause is a specific trial right of criminal defendants that may be violated whenever a coerced confession or statement or the fruit of either is introduced at trial.[80]

The significance of this is plain. To the extent that Ghailani's complaint is the alleged

---

[78] *See, e.g., Chavez v. Martinez*, 538 U.S. 760, 733 (2003) (seeming to assume that both apply and stating that "[o]ur views on the proper scope of the Fifth Amendment's Self-Incrimination Clause do not mean that police torture or other abuse that results in a confession is constitutionally permissible so long as the statements are not used at trial; it simply means that the Fourteenth Amendment's Due Process Clause, rather than the Fifth Amendment's Self-Incrimination Clause, would govern the inquiry in those cases and provide relief in appropriate circumstances."); *Dickerson v. United States*, 530 U.S. 428, 432-440 (2000) (describing history of treatment of coerced and involuntary statements, recognizing that *Miranda* based protection on the Self Incrimination Clause, and declining to overrule *Miranda*); *Mincey v. Arizona*, 437 U.S. 385 (1978) (entirely ignoring Self-Incrimination Clause and holding that "[d]ue process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial."); *Miranda v. Arizona*, 384 U.S. 436 (1966) (Self Incrimination Clause). *See also* Mark A. Godsey, *Rethinking the Involuntary Confession Rule: Toward a Workable Test for Identifying Compelled Self-Incrimination*, 93 CAL. L. REV. 465 (2005) (describing evolution of constitutional status of involuntary and coerced confessions and statements).

[79] *Chavez*, 538 U.S. at 773.

[80] *See Kansas v. Ventris*, 129 S. Ct. 1841, 1845 (2009) (violation of privilege against self incrimination occurs at trial); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (same).

abuse and torture *vel non*, he asserts a due process claim based on outrageous government

misconduct. The considerations of deterrence that underlie the core application doctrine, in addition

to matters dealt with by this Court previously in another context,[41] are pertinent to that claim. But

deterrence is not the primary concern when the question is whether █████ testimony should be

excluded on the ground that it would be the fruit of Ghailani's coerced statements. The concern at

that point is whether introduction of testimony derived from compelling Ghailani to provide

evidence against himself would violate the Self Incrimination Clause. Hence, the exclusionary rule

with respect to fruits of coerced statements rests more heavily on the need to prevent a new and

separate constitutional violation – receipt of the product of the coerced statements – than on

considerations of deterrence of official misconduct. In consequence, the rationale of the core

application doctrine does not apply to this motion as it does in search and seizure cases.[42]

---

[41]    This Court previously has rejected Ghailani's motion to dismiss the indictment based on
the CIA's alleged abuse, but noted the possible availability of other relief in a different
proceeding. *United States v. Ghailani*, — F. Supp. 2d —, No. S10 98 Crim. 1023 (LAK),
2010 WL 1839030, at *3-5 (S.D.N.Y. May 10, 2010).

[42]    Even if the core application doctrine applied, it is far from clear that its requirements have
been satisfied. Typical core application cases have involved one of two situations.

In the first, the unlawful government conduct took place in an investigation of a particular
crime, the illegally obtained evidence was suppressed in the prosecution for the offense that
had been under investigation, and the government then sought to use the evidence or its
fruits in a different legal proceeding. *E.g.*, *United States v. Janis*, 428 U.S. 433, 448 (1976)
(holding that evidence obtained in violation of Fourth Amendment rights and suppressed in
state criminal case was admissible in federal civil tax proceeding); *Tirado*, 689 F.2d at 309
& n.1 (allowing evidence suppressed in state narcotics prosecution to be used in subsequent
federal civil tax proceeding). In such cases, the government already had been penalized by
suppression in the first case, and suppression in the second was thought to have little
incremental deterrent effect. *E.g.*, *Janis*, 428 U.S. at 448.

In the second, the challenged evidence was offered in the prosecution of a crime that was
committed after the unlawful law enforcement action already had taken place. *E.g.*,
*Awadallah*, 349 F.3d at 72 (perjury before grand jury committed after illegal search had

27

### C.    Attenuation

We have noted above that the Supreme Court, as early as *Nardone*, indicated that the connection between unlawful government conduct and evidence offered at trial "may . . . become so attenuated as to dissipate the taint" and thus permit receipt of that proof.[83] This is particularly so when the proof in question is the testimony of a witness.

In *United States v. Ceccolini*,[84] the Supreme Court reiterated that "verbal evidence which derives . . . immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."[85] At the same time, however, it held that the testimony of a live witness nevertheless is properly received in evidence where the connection between illegal government conduct and the testimony is sufficiently attenuated. Among the determinative factors are the willingness of the witness "to freely testify"[86] and the directness of the "link between the illegality and [the witness's] testimony,"[87]

occurred). Suppression in such cases has been denied on the theory that officers responsible for illegally obtaining the evidence in question would have been unlikely to have foreseen the defendant's subsequent offense and to have been deterred from their unlawful conduct by the prospect of suppression in an unforeseeable prosecution. *E.g., United States v. Varela*, 968 F.2d 259, 262 (2d Cir. 1992).

It is unlikely that any convincing comparable argument could be made here. In view of the Court's conclusion that the rationale of the core application doctrine does not apply here, however, it is unnecessary to resolve this issue.

[83]

*Nardone*, 308 U.S. at 341.

[84]

435 U.S. 268 (1978).

[85]

*Id.* at 275 (quoting *Wong Sun*, 371 U.S. at 485) (internal quotation marks omitted).

[86]

*Ceccolini*, 435 U.S. at 276.

[87]

*Id.* at 278.

a factor concerned chiefly with whether exclusion of the testimony would serve the exclusionary rule's purpose of deterring official misconduct.[88] In describing the significance of the willingness of the challenged witness to testify, the Court wrote:

> "The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness. Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness."[89]

Moreover, as "the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required" in order to exclude it.[90] "Where the cooperation of such a 'found' witness is truly the product of that individual's free will, unaffected by the [illegal government action], the purpose of the exclusionary rule would not be served by disallowing the testimony."[91]

In light of these considerations, the Second Circuit has directed courts to "assess the effect of the search [and analogous illegal government action] upon the exercise of the witness' free will, and where cooperation is not induced by the police misconduct, testimony will be received

---

[88] *See id.* at 279-80.

[89] *Id.* at 276-77 (footnote omitted).

[90] *Id.* at 278.

[91] *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980).

29

notwithstanding that the unreasonable intrusion was one step in the series of events which led to the witness' testifying."[92]  In particular, a court is obliged to consider (1) the "stated willingness of the witness to testify," (2) "the role played by the illegally seized evidence in gaining his cooperation," (3) "the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial," and (4) "the [motivation of the police] in conducting the search."[93]

Having thus described the essentials of the attenuation doctrine, the first question is whether and to what extent it applies here in light of the Fifth and Sixth Amendment roots of Ghailani's claim.  As the *Leonardi* factors make clear, attenuation analysis addresses two different concerns in determining whether to admit evidence derived from illegal government conduct.  The first three factors look to the closeness of the connection between the testimony of the witness and the coercion applied to the defendant.  This is consistent with self incrimination privilege interests because it seeks to determine whether the derivative testimony truly would be tainted by the coercion or whether, instead, the causal link is so tenuous that the testimony should not be treated as fruit of the defendant's coerced statements.  The fourth factor, the motive of the governmental actors, on the other hand goes to the different question whether exclusion would deter future governmental misconduct of the type at issue, a pertinent consideration, but one that is not the primary focus of the exclusionary rule in the self incrimination context.  Nevertheless, as all four factors are pertinent in varying degrees in coerced confession and statement cases, there is an appropriate role for

---

[92]  *Id.*; *see also id.* at 752-53 ("Even where one or more factors suggests a close relationship between the initial violation and the witness' testimony, suppression is unwarranted if the witness' testimony is 'truly the product of [the witness'] free will' or a 'product of detached reflection and a desire to be cooperative.").

[93]  *United States v. Reyes*, 157 F.3d 949, 954 (2d Cir. 1998) (quoting *Leonardi*, 623 F.2d at 752).

30

attenuation analysis in cases such as this. The fact that deterrence plays a much smaller role in the application of the exclusionary rule in such cases, however, means that the weight given to the first three factors should be greater than in a Fourth Amendment case. The Court therefore proceeds to the government's attenuation argument.

### 1. ██████ *Willingness to Testify*

The government claims that ██████ should he appear, would be doing so voluntarily. It relies on the facts, among others, that the FBI's most recent contact with him was in his home, that he has said that he is willing to appear, that he is not subject to compulsory process given the location of his residence. ████████████████████████████████ ████████████████████ In addition, two law enforcement agents involved in questioning ██████ after his arrest claim that he was cooperative immediately and that no threats were used to induce his cooperation.[94]

It is entirely possible that ██████ if he were to appear, would be a willing witness. But the burden of proof on the attenuation claim is on the government.[95] It has submitted no affidavit from ██████ Moreover, there is evidence that arguably undermines the government's claim. The circumstances of ██████ initial questioning, at least to the extent that the Court has been made aware of them, perhaps suggest that he is not simply a public spirited citizen who "has

---

[94]     Mlowola Decl. ¶¶ 3-4, 6 ██████ Decl. ¶¶ 4-5, 10(c) & n.5.

[95]     *See, e.g., United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) ("The government bears the burden of proving that the taint [of an illegal search] has been alleviated.").

31

come forward [to] offer evidence entirely of [his] own volition."[96] He was arrested by Tanzania,
flown to a distant location, held there for days, and questioned by Tanzanian police before the FBI
questioned him. Indeed, he told the Tanzanian authorities at the time of his arrest "that he knew this
day would come – that he had been waiting eight years for the authorities to locate him."[97] The
record discloses nothing about what happened while he was in Tanzanian custody, and it is sketchy
even about what took place after the FBI arrived. We know only that ███ was released after he
was questioned by the FBI and promised to appear as a witness in this case.

   2.   *The Role Played By the Illegally Seized Evidence in Gaining* ███
        *Cooperation*

   "Where cooperation is not induced by the alleged police misconduct, testimony will
be received notwithstanding that the unreasonable intrusion was one step in the series of events
which led to the witness' testifying."[98] The government therefore bears the burden of showing that
whatever may have resulted in ███ cooperation was not a consequence of a violation of
Ghailani's rights in order to prevail on this aspect of the attenuation analysis.[99]

   The government claims that Ghailani's custodial statements have played no role in
motivating ███ testimony. ████████████████████████████
████████████████████████████████████████
████████████████████████████████

---

[96]      *Ceccolini*, 435 U.S. at 276.

[97]      *Mlowola Decl.* ¶ 4.

[98]      *Leonardi*, 623 F.2d at 752.

[99]      *See Oguns*, 921 F.2d at 447.

32

Despite these uncontroverted assertions, there remains ambiguity on this point as well.

3.    **The Proximity Between Ghailani's Allegedly Coerced and Uncounseled Statements, ▮▮▮▮▮ Decision to Cooperate, and His Testimony at Trial**

The ambiguity ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ affects the Court's analysis of the third factor in the attenuation analysis as well.

33



If in fact ▮▮▮▮ testifies at Ghailani's trial, at least ▮▮▮▮▮ will have elapsed since the latest possible date ▮▮▮▮▮▮ of the alleged governmental misconduct leading to ▮▮▮ identification and cooperation.  Such a substantial period of time between the alleged illegality and the witness's testimony at trial, if in fact it is voluntary, would favor the government.

### 4.      *The Government Interrogators' Motives in Conducting the Interrogations*

The government argues that the fourth factor – the interrogators' motives – counts

34

in its favor because "questioning of the defendant by CIA officers . . . was not designed to elicit evidence that would be used in a subsequent trial but rather to obtain intelligence in connection with threats to national security."[106] This was the case with respect to the RDI Program in general,[107] and nothing in the record contradicts the government's assertion that national security motivated the CIA interrogations that elicited Ghailani's statements about ████████

████████████████████████████████████████████████

████████ That is not sufficient, however, to raise an issue of fact as to the CIA's motive in questioning Ghailani in the first place. The CIA had reason to believe that Ghailani was involved in bombing two American embassies. The identities and methods of others involved in those bombings, including the source of the explosives, were of critical importance to national security because the individuals involved and methods used might be applied against other targets in the future. The fact that the CIA several years later, having been aware of the FBI's interest in the bombings, ████████████████████████████████ does not undercut the CIA's contentions as to its motive in questioning Ghailani, at least where the significance of the subject of inquiry with Ghailani was so related to national security.

*   *   *

In the last analysis, the only attenuation factor that can be resolved on the present state of the record is the CIA's motive in questioning Ghailani ████████████████████ The remaining factors are subject to competing inferences. It is not clear that ████████ truly would be the

---

[106]    Gov't Br. 32.

[107]    *See* Lander Decl. ¶¶ 16-17, 23 n.10.

volunteer that the government claims, that unlawfully obtained evidence did not play a role in

securing ▮▮▮▮ cooperation, or that the interval between the alleged misconduct in obtaining from

Ghailani the information ▮▮▮▮▮▮ and ▮▮▮▮ agreement to cooperate was as long as the

government doubtless would have it. Accordingly, Ghailani is entitled to a hearing on these issues.

*Conclusion*

The Court will hold a hearing on the issues relating to attenuation that are described

above. It will take testimony from any FBI, CIA and Tanzanian witnesses the government elects to

call and from ▮▮▮▮ if the government wishes to produce him. It will hear the testimony of

witnesses other than ▮▮▮▮ starting at 10 a.m. on September 14, 2010. It will hear the testimony of

▮▮▮▮▮ and any Tanzanian witnesses at that time or, if the government prefers, at an *in limine*

hearing during the trial. The government is to notify the Court and defense counsel by August 28,

2010, as to the identities and affiliations of its intended FBI, CIA and Tanzanian witnesses and

whether it intends to call ▮▮▮▮ and any Tanzanian witnesses at the pretrial hearing.

This memorandum opinion contains classified information the public disclosure of

which would pose a serious danger to the national security. Accordingly, it shall be filed with the

Court Security Officer and remain in an appropriate secure facility in accordance with established



procedures until further ordered by this Court.

36

    SO ORDERED.

Dated:    . August 17, 2010

             _____
                Lewis A. Kaplan
             United States District Judge