UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                -against-

AHMED KHALFAN GHAILANI,

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S10 98 Crim. 1023 (LAK)

```
┌──────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: 10/14/10             │
└──────────────────────────────────┘
```

## ORDER

Lewis A. Kaplan, *District Judge.*

        The Opinion, dated October 6, 2010, was filed with the Court Security Officer. The attached copy of that opinion, reviewed and redacted by the appropriate authorities in accordance with the Classified Information Procedures Act, now may be filed on the public record. Accordingly, the Clerk shall file the attached copy in place of the half sheet for DI 1038.

        SO ORDERED.

Dated:      October 13, 2010

                                         Lewis A. Kaplan
                            United States District Judge

Oct. 7. 2010  9:44AM    15-DOJ                                    No. 7548   P. 3

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: 10/16/10

UNITED STATES DISTRICT COURT                    FILED WITH COURT
SOUTHERN DISTRICT OF NEW YORK                   SECURITY OFFICER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       -against-                            S10 98 Crim. 1023 (LAK)

AHMED KHALFAN GHAILANI,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

    Michael Farbiarz
    Jesse M. Furman
    Harry A. Chernoff
    Nicholas Lewin
    Sean S. Buckley
    Assistant United States Attorneys
    PREET BHARARA
    UNITED STATES ATTORNEY


    Peter Enrique Quijano
    Michael K. Bachrach
    Steve Zissou
    *Attorneys for Defendant*

Table of Contents

I.    Background ............................................................ 4
      A.    Hussein Abebe's Connection to the 1998 Embassy Bombings ............... 4
      B.    Identifying and Locating Hussein Abebe ............................... 6
            1.                          Statements ................................. 7
            2.    Ghailani's Initial Statements .................................. 8
            3.                                        ......................... 10
            4.                                        ......................... 11
      C.    Abebe's Arrest, Interrogation, and Cooperation ....................... 13
            1.    The Phone Call to Abebe in Late July or Early August ............ 13
            2.    Planning and Preparation for the Arrest ........................ 14
            3.    Senior Superintendent Mlowola of the TNP Is Briefed on August 12, 2006
                  ..................................................... 15
            4.    Abebe's Arrest ................................................ 16
            5.    The Tanzanian Interrogation – August 14-15, 2006 ............... 19
                  (a)     August 14, 2006 ...................................... 23
                  (b)     August 15, 2006 ...................................... 24
            6.    FBI Questioning on August 16 and 17, 2006 ..................... 27
            7.    Abebe's Release on Bond ...................................... 29
            8.    Subsequent Interactions with Law Enforcement and the Court........ 30

II.   The Earlier Ruling ................................................... 32

III.  Attenuation .......................................................... 34
      A.    Attenuation, Deterrence, and the Privilege Against Self-Incrimination ....... 34
      B.    The Ceccolini–Leonardi Factors ...................................... 39
            1.    The Proximity of the Coercion of Ghailani to Abebe's Proposed Testimony
                  ..................................................... 39
            2.    Abebe's Willingness to Testify ................................. 40
            3.    The Role of the Illegal Conduct in Securing Abebe's Cooperation and
                  Testimony .................................................... 46
            4.    Temporal Proximity and Deterrence ............................. 48
      C.    The Balance ...................................................... 51

IV.   Conclusion ........................................................... 59

LEWIS A. KAPLAN, *District Judge.*

The question presented by this motion is whether the government may use in this criminal trial the testimony of a witness whom the government obtained only through information it allegedly extracted by physical and psychological abuse of the defendant. The government has elected not to litigate the details of what was done to the defendant. Instead, it has asked the Court to assume for purposes of the motion that everything the defendant said was coerced in violation of the Fifth Amendment.[1] Accordingly, this decision, at the government's behest, proceeds on that premise.

Ahmed Khalfan Ghailani is charged with supplying the explosives that were used to bomb two United States embassies in 1998, one in Tanzania and the other in Kenya. Those attacks took the lives of 224 people and injured more than 4,000. Although Ghailani was not apprehended until years later, our government quickly learned of or suspected his alleged role.



Ghailani eventually was apprehended in 2004 and turned over to the CIA. The CIA

---

[1]  *See* Suppression Hearing Transcript ("Tr.") at 369 (Court asked, "[Y]ou are asking me to assume for the purposes of deciding the motion that everything Ghailani said from the minute he arrives in CIA custody till the minute he gets to Guantanamo at least is coerced. Am I correct?" The Assistant United States Attorney answered, "Yes, Judge, yes."); Gov't Resp. to Omnibus Mot. [DI 927], at 11 (not contesting or conceding the involuntariness of defendant's statements to the CIA and arguing that "[e]ven assuming *arguendo* the truth of the defendant's premise — namely, that use of the Custodial Statements would be prohibited under the Fifth and Sixth Amendments — there is no merit to his 'fruits' argument"). In view of the disposition of the Fifth Amendment argument, there is no need to deal with that based on the Sixth Amendment.

2

put him in a secret prison outside the United States and subjected him to so-called enhanced interrogation methods and other allegedly abusive treatment. It interrogated him in the secret prison for ▇▇▇▇▇ Over time, Ghailani gave the CIA the information that led the government directly to Hussein Abebe – ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The government now proposes to call Abebe as a witness against Ghailani. Ghailani moves to preclude the government from doing so. He argues that the government's identification of Abebe and his procurement as a witness flowed directly from statements that he made under duress and that the receipt of Abebe's testimony would violate the Constitution.

The Fifth Amendment states that "[n]o person shall be compelled in any criminal case to be a witness against himself." But it does more. "When an incriminating statement has been obtained through coercion, the Fifth Amendment prohibits use of the statement or its 'fruits'"[2] – that is to say, evidence derived from any statement coerced from the defendant – unless the evidence "has been come at . . . instead by means sufficiently distinguishable to be purged of the primary taint."[3] The government nevertheless argues that Abebe's testimony should be received because it is "attenuated" from the coercion to which Ghailani was subjected. It maintains that Abebe is willing to testify against Ghailani of his own free will, that Ghailani's coerced statements to the CIA played no part in securing Abebe's cooperation, and that the CIA was not motivated in its interrogation of Ghailani by any desire to obtain evidence for use against him in a criminal case. The Court finds that the government has not sustained its burden.

---

[2]    *Pillsbury Co. v. Conboy*, 459 U.S. 248, 278 (1983).

[3]    *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Case 1:98-cr-01023-LAK  Document 1040  Filed 10/14/10  Page 6 of 63

3

The temptation to allow our revulsion at these bombings, the human instinct for vengeance, and fear of terrorist attacks to overcome principles upon which our nation rests — principles that, although not always observed, are ideals to which we aspire — is powerful. If our nation is to continue as a bastion of liberty, however, we must remain true to our principles and overcome that temptation.

Among those principles is that which has been traced to Deuteronomy, that grew gradually through the long history of English law and in the American colonies, and that then was embodied in the Self Incrimination Clause in the Fifth Amendment.[4] While the connection between fruits of a coerced statement — that is to say, evidence derived from a statement coerced from a defendant — may be so remote, so attenuated, from the coerced statement that the use of that derivative evidence does not violate the Fifth Amendment,[5] the burden of proving attenuation is on the government.[6]

In this case, the link between the CIA's coercion of Ghailani and Abebe's testimony is direct and close. Based on an extensive record, the Court's assessment of the credibility of witnesses the government called at the suppression hearing, and the lack of credible evidence to support key aspects of the government's argument, the government has not carried its burden of

---

[4]    LEONARD W. LEVY, ORIGINS OF THE FIFTH AMENDMENT c.X-XIII & Appx. (1968).

[5]    *See United States v. Ghailani*, No. 98 Crim. 1023 (LAK), 2010 WL 3430514, at *2-3 (S.D.N.Y. Aug. 17, 2010) (hereinafter *"Ghailani Suppression"*).

[6]    *See, e.g., Brown v. Illinois*, 422 U.S. 590, 604 (1975) (government bears burden of proving attenuation); *United States v. Holmes*, 505 F.3d 1288, 1295 (D.C. Cir. 2007) (same); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990) (same); *United States v. Perez-Esparza*, 609 F.2d 1284, 1290 (9th Cir. 1980) (same); *see also Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (government bears burden of proving voluntariness of challenged confession).

4

proving that Abebe's testimony would be so attenuated from Ghailani's coerced statements to permit

its use.  The motion to preclude Abebe's testimony is granted.


### I.    Background

A.    Hussein Abebe's Connection to the 1998 Embassy Bombings

        Ghailani's alleged role in the embassy bombings included obtaining the explosives

in Arusha, Tanzania, from Abebe and transporting them to Dar es Salaam. According to Abebe, the

story is as follows.

        A man named Rashid called Abebe in 1997, about a year before the bombings, and

asked if Abebe could sell him explosives.[7] Abebe told Rashid that he could.  Rashid arranged for

a friend named "Ahmed" to travel to Arusha to purchase the explosives from Abebe and transport

them back to Dar es Salaam.  Over the course of the next six months, "Ahmed" – later identified as

Ghailani – made three to five trips to Arusha to purchase explosives and related materials from

Abebe.[8] Ghailani, Abebe claims, told Abebe that the explosives were for a pearl mining operation

off the coast of Somalia.  Abebe claims that he did not know that Rashid and Ghailani intended to

use the explosives to bomb the embassies.

        Soon after the August 7, 1998, embassy bombings, Abebe saw Ghailani's image on

---

[7]    This account of Abebe's sale of explosives to Ghailani is taken primarily from three FBI
reports of interviews with Abebe in 2006 and 2007.  See GX 3503-1 (dated August 22,
2006) ("August 2006 FBI Interview"), at 3-6; GX 3503-3 (dated December 5, 2006)
("November 2006 FBI Interview"), at 2-4; GX 3503-5 (dated June 12, 2007) ("June 2007
FBI Interview"), at 2-6.

[8]    The August 2006 and November 2006 FBI Interviews indicate three sales.  The June 2007
FBI Interview indicates five.

Case 1:98-cr-01023-LAK   Document 1040   Filed 10/14/10   Page 8 of 63

5

television in relation to the bombings and realized that the person to whom he had sold explosives, "Ahmed," was wanted in connection with the bombings.[9]  Abebe immediately realized that he, Abebe, probably was in trouble and became worried that the police would discover his involvement.[10]  He asked his father for advice.  His father told him that he should keep quiet and pray.[11]

Abebe took this advice.  He did not tell anyone else, not even his wife, about having sold explosives to "Ahmed."[12]  He certainly did not come forward and tell the police what he knew.[13]  When asked why not, he explained that he was afraid "the police over there [Tanzania] do not have

---

[9]   Agent Swabsin testified that Abebe told him in August 2006 that he had learned of Ghailani's involvement within days after the bombings. Tr. at 49; ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ *See also*, e.g., Tr. at 379-80.

[10]   Abebe told the FBI and ██████████████████ that, upon seeing Ghailani's picture on television, he immediately became "worried about being connected to the bombings." August 2006 FBI Interview, at 6; ████████████████████████████████████████████████ ████████████████████ Tr. at 50 (Abebe told the FBI that "he lived with that, with a fear, you know, a heavy conscience that one day, to quote him, one day this would come, that he would be – he would have a knock at the front door, . . . He advised us [at the August 2006 interview] that he was scared."); *see also* GX 3503-5 (FBI report dated June 12, 2007), at 6 (reporting that Abebe stated in a May 29, 2007 interview that "after he saw Ahmed's picture on television after the 1998 U.S. Embassy bombings, he began to worry about the possibility of getting arrested").

[11]   *See*, e.g., Tr. at 398; *see also* August 2006 FBI Interview, at 6.

[12]   Tr. at 398; *see also* August 2006 FBI Interview, at 6.

[13]   Tr. at 383-85.

6

the patience to understand whatever you want to report. They would come and take you by force."[14]

Moreover, when Abebe eventually was arrested in 2006 and questioned by Tanzanian and FBI

officials, he initially provided no information, but ultimately admitted that he had lived in fear of the

day the police would come for him ever since he first saw "Ahmed"'s picture on television in

connection with the bombings.[15]


B.    Identifying and Locating Hussein Abebe

Immediately after the bombings, ▮▮▮▮▮▮▮ law enforcement agencies, including

▮▮▮▮▮▮ the FBI, began trying to identify and apprehend the supplier of the explosives. The

FBI ▮▮▮▮▮ had distinct interests in doing so. The FBI was interested in prosecuting the

responsible individuals. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[14]  *Id.* at 384-85.

[15]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Abebe's testimony on this issue at the hearing was inconsistent. At times, he admitted to
having been afraid upon seeing Ghailani's picture on television. *See, e.g.*, Tr. at 382, 385.
At others, Abebe insisted that he "was not worried." *See, e.g., Id.* at 399. The Court finds
that Abebe in fact was extremely frightened from the outset, fearing that he would be held
responsible for the bombings if his role were discovered. It finds that his denials at the
hearing of any such concerns were prevarications.

[16]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7



1.





8



2.      *Ghailani's Initial Statements*

Ghailani was apprehended in Pakistan in late July 2004 and transferred to exclusive

CIA custody



20

21

22

23

·9

Ghailani was transferred to CIA custody in 2004. He was imprisoned at a secret site and subjected to extremely harsh interrogation methods as part of the CIA's Rendition, Detention and Interrogation Program.[24]  Ghailani here contends that his treatment constituted torture.  For present purposes, it suffices to say that the government does not dispute, for purposes of this motion, that all of the statements made by Ghailani while in CIA custody were coerced and obtained in violation of his Fifth and Sixth Amendment rights.



---

24

25

26



10



3.

27

28



29

30

11



4. _  



31

32

33

34

35

36

12



13

C.   *Abebe's Arrest, Interrogation, and Cooperation*

Having thus identified and located Ghailani's explosives supplier, ████████████

began moving together toward Abebe's arrest and questioning.[42] ███████████████

████████ FBI participate in the interrogation.[43]

1.   *The Phone Call to Abebe in Late July or Early August*

In late July or early August, roughly two weeks before his arrest, Abebe received a

phone call from a man who identified himself as Mr. Mazoa.  Mazoa told him that Abebe did not

know him, but that he was a well-known person who used to work at the police station in Arusha.[46]



42

43

44

45

46

*Id.* at 305-307.

14

He then instructed Abebe to travel to Dar es Salaam because "there are some people who would like to talk to you [there] on the 13th."[47] When Abebe asked who wanted to speak with him in Dar es Salaam, Mazoa said, "you'll know them when you come."[48] Abebe responded that he could not afford to travel to Arusha, at which point Mazoa suggested that he take out a loan to pay the travel costs and that Abebe later would be reimbursed. Abebe said "fine" and ended the call.[49]

Abebe's mother advised him not to take out a loan because he could not be sure about securing reimbursement; "if they need you, they will come for you."[50] In the event, Abebe took this advice and did not go to Dar es Salaam. Nor did he call Mazoa back or otherwise inform him that he was not planning to travel to Dar es Salaam as requested.[51]

It is not clear whether Abebe thought that Mazoa was connected with the Tanzanian police ████████. The fact that he ignored the call suggests that he did not.

2.    *Planning and Preparation for the Arrest*

████████████████████████████████████████████████

---

47    *Id.* at 304.

48    *Id.* at 304.

49    *Id.* at 305.

50    *Id.*

51    *Id.* at 306.

52    ████████████

15

In due course it was scheduled for August 13 through 16.[53] ████████████

████████████████████████████████████████████████████████████████████████

3.    *Senior Superintendent Mlowola of the TNP Is Briefed on August 12, 2006*

On August 12, 2006, Valentine Mlowola,[56] then a Senior Superintendent and now an

Assistant Commissioner of the TNP, was diverted from another assignment and directed to proceed

to Arusha. Upon his arrival, ████████████████████ informed him that they suspected

that Abebe had supplied the explosives used in the embassy bombings and that they planned to arrest

Abebe the following day.[57] ████████████████████████████████

████████████████████████████████████████████████████████████████████████

---



53

54

55

56

Commissioner Mlowola has received law enforcement training in Egypt, the United
Kingdom, and the United States. In particular, he studied for three months at the FBI
Academy in Quantico, and received a one-year counterterrorism fellowship at the National
Defense University in Washington D.C.  Tr. at 201-202.

57

*Id.* at 235.

█████████████████████████████████████████████████████████ 16

### 4.     Abebe's Arrest [59]

On the morning of August 13, 2006, two passengers — ████████████ — hired Abebe's taxi and asked him to drive to the regional government building.[60] A short time later, however, the men told him instead to go to the regional police station so that they could pick up a document.[61] Abebe did not speak with the men for the rest of the trip.[62]

When they arrived at the police station, the officers told Abebe to park his taxi "nicely" and lock it because they needed to talk with him inside the building.[63] The three men went inside and met then-Superintendent Mlowola, who introduced himself and asked Abebe whether he

---

[58] ████████████████████████████████████████████████████████████

[59] ████████████████████████████████████████████████████████████

Assistant Commissioner Mlowola's testimony as to the sequence of events differed from that of other witnesses and the contemporaneous documents. In light of both his and the government's recognition that Commissioner Mlowola does not clearly remember the sequence of events, *see id.* at 250-52, however, the Court relies primarily on the other sources.

[60]     *Id.* at 299-300.

[61]     *Id.* at 300-301.

[62]     *Id.* at 300.

[63]     *Id.* at 301.

"remember[ed that he] had received a phone call that [he was] wanted in Dar es Salaam."[54] Abebe said that he did remember, at which point Mlowola said: "So we came to take you now."[65] They allowed him to use the phone to call his family and to tell them that he would be in Dar es Salaam for a few days and that the family should come to the police station to pick up his taxi and some money the police provided to assist his wife and children while he was away.[66]

Molowola, Abebe, ███████████ then took a taxi to the Kilimanjaro Airport. Abebe claims that Mlowola did most of the talking along the way, trying to "remove [Abebe] from the worries."[67] He did not tell Abebe why he had been arrested or who wanted to question him, but he did tell Abebe that "Mr. Tibaigana [an important police officer in Dar es Salaam] knows about the taxi drivers, he knows what you guys know. So I'm advising you when you arrive there, try to speak or tell whatever you know to get done soon and come back soon."[68]

While the group waited at the airport,[69] Mlowola again encouraged Abebe to tell the

---

[64]   *Id.*

███████████████████████████████████

[65]   *Id.* at 302.

[66]   *Id.* at 206, 302-303.

[67]   *Id.* at 308.

[68]   *Id.* at 309.

[69]   Abebe claims that they spent roughly seven hours at the airport. *Id.* at 311.

18

as yet unidentified interviewers whatever he knew.[70]  Abebe testified that he then still believed that
he was being taken to Dar es Salaam. After boarding the airplane, however, Abebe was told that the
group first was going to Zanzibar to pick up another person "like you" and that it then would proceed
to Dar es Salaam.[71]

Abebe testified that he knew he was in trouble by the time he got to Zanzibar, but that
he had no idea why he had been arrested until he was asked about the 1998 bombings in Zanzibar
two days later.[72]  This is quite incredible.  Abebe had lived in fear of this arrest for years and
understood from the moment he arrived at the police office in Arusha that the arrest related to the
embassy bombings.  He was very frightened.  This would have been so in any case, but it was all the
more likely in view of the fact that Ghailani's 2004 apprehension and his detention had been reported
widely in Tanzania.[73]  In view of Abebe's concerns, it probably was well known to him.

After arriving in Zanzibar, Abebe was taken by car ████████████ where he

---

[70]   *Id.* at 310-11 ("Valentine continued to tell me that, 'Mr. Abebe, remember to, something that
you know, something that you can tell them, remember it, whatever you know, tell them.'").

[71]   *Id.* at 312-14.

[72]   *See, e.g., id.* at 322, 402-404.  To take one example, the Court asked Abebe: "From the time
the two men got into your taxi in Arusha, until the time you met Mr. Majid in Zanzibar [on
the morning of August 14], did you ever think for even a moment that [the fact that] you
were being arrested and flown to another city by all these men connected with the police,
just might possibly have something to do with your having sold the explosives to Ghailani?"
Abebe answered, "I did not remember at all."  The Court followed up, asking "you just
forgot about what you had been worrying about for eight years?"  Abebe responded, "Yes,
I did forget."

As discussed in greater detail *infra*, the Court does not credit Abebe's claim of forgetfulness
in this regard in light of the other testimony and documents attesting to his years of worry
and deliberate silence regarding his having sold explosives to Ghailani.  *See supra* note 15.

[73]   ████████

19

claims that he was "welcomed" and invited to eat. "[U]pon arrival . . . Abebe finally admitted to

███████████ that 'this must be serious.' Aside from that, however, he continued to be relatively

uncommunicative."[74]



5.    *The Tanzanian Interrogation – August 14-15, 2006*

On the morning of August 14, Mlowola introduced Abebe to a man named Sadek

Majid, whom Abebe knew from Arusha. As Mlowola had done the day before, Majid urged Abebe

---

74    *Id.*

After eating, he slept in a bedroom that he described as looking like a hotel. He said that he
was not locked in or otherwise restrained, although he understood himself to be under arrest
at that time. *Id.* at 314-15.

75

76

77



Case 1:98-cr-01023-LAK    Document 1040    Filed 10/14/10    Page 23 of 63

20

to tell whatever he knew so that he could go home.[78] Tanzanian officials then questioned Abebe on

August 14 and 15, 2006, with no Americans present.[79] Before proceeding to what is known about

the substance of those interrogations, the Court pauses on some threshold matters.

First, there is conflicting evidence as to the identity of the lead questioner, the extent

to which Mlowola actually was present, and even as to the number of days during which the

Tanzanians questioned Abebe without direct American participation. According to Mlowola, he was

the lead questioner and there was only one interrogation session involving Tanzanians alone.[80]

Abebe, on the other hand, said that he was questioned by the Tanzanians alone for two full days and

that Mlowola was not present during either of those sessions.[81]



These conflicts are readily resolved.



---

[78]

[79]

[80]    Tr. at 245 (Mlowola testifying that he led the questioning); *id.* at 247-48 (Mlowola
testifying that there was only one day of questioning by Tanzanian officers).

[81]    *Id.* at 316-18.

[82]    *Id.* at 160-61.

21

███████████████ Mlowola was drawn in only on August 12, primarily because

it was thought helpful to have the TNP involved in making the arrest.  Having considered all the

evidence, the Court finds that Abebe was interrogated by the Tanzanians alone through August 14

and 15, ██████████████████████████████ that Mlowola was present for at least part

of it, and that the testimony of both Mlowola and Abebe as to Mlowola's role and presence was

inaccurate in material respects.  Abebe was wrong in saying that Mlowola was not there at all and

falsely described Abebe's own state of mind and motives.  Mlowola was mistaken concerning his

role in the questioning and the number of sessions.

Second, the Court accepts that the questioning took place in comfortable surroundings

and that there is no evidence that Abebe was physically restrained or abused or that he was expressly

threatened with violence.  He had been told in advance of these sessions, however, to tell what he

knew so that he could go home, in itself an implicit threat, and he was aware also that the TNP

sometimes had been known to detain people without their families knowing where they had been

taken[84] and to "come and grab you and take you by force" upon receiving reports of information.[85]

Moreover, it perhaps bears mention that the Tanzanian arrest, detention and interrogation of Abebe

---

[83]

██████████████

[84]   *Id.* at 434 (Abebe testifying that police in Tanzania will hold people without their families
knowing where the people are "for about a week or ten days, until they're done with their
job and until when you follow it up, that's when they tell [the family] your person is at so-
and-so place").

[85]   *Id.* at 384.

22

appears to have violated several provisions of the Tanzanian Criminal Procedure Act of 1985.[86]

Third, it is important to recognize that the government introduced precious little evidence as to what actually transpired during the Tanzanian interrogation of Abebe. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the only Tanzanians who were there and who took the stand at the suppression hearing were Mlowola and Abebe. The government offered no explanation for its failure to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ offer in evidence contemporaneous notes that Mlowola said[88] had been taken by another TNP officer.[89]

---

[86] It appears that the arrest, detention and interrogation of Abebe likely violated the Tanzanian Criminal Procedure Act of 1985 ("TCPA") in multiple respects. The warrantless arrest appears to have been unlawful. *See* TCPA § 14. Abebe was not informed of the grounds for the arrest until he was in Zanzibar, many hours after he was taken into custody, in apparent violation of TCPA § 23(1). The failure to take Abebe before a court following his arrest and, in any case, the apparent failure to report his arrest to the nearest magistrate both also appear to have been unlawful. *Id.* §§ 30, 32, 33. The period during which a suspect in custody may be questioned by police is limited to four hours and may be extended for a period not exceeding eight hours, *id.* §§ 48(1), 50(1), 51(1), periods that were exceeded in Zanzibar. And the questioning was not recorded, in violation of TCPA § 57.

[87]

[88]

[89]



23

(a)     *August 14, 2006*

The first day of the Tanzanian interrogation was uneventful.





24



(b)    *August 15, 2006*

Questioning resumed on the following morning, again with no Americans present.



94

95

25



96

97



26



In any case, on the evening of August 15, after questioning had concluded for that

98

99

100

101



27

day, ████████████████████████████████ He sought to explain this

at the hearing by saying that he cried that night because he was angry that the people responsible for

the bombings had used him in this manner.[103]  The Court does not credit that testimony.  The tears

were products, at least primarily, of Abebe's fear of adverse consequences as a result of his admitted

involvement in the bombings.

6.    *FBI Questioning on August 16 and 17, 2006*

        FBI agents arrived in Zanzibar on the evening of August 15, 2006,[104] after the

Tanzanian interrogation ended ████████████████████████████████████  On

the morning of August 16, Majid informed Abebe that additional persons would participate in the

questioning that day and again urged Abebe to be candid: "I want to inform you that there are visitors

coming who are like me.  So don't be afraid.  Anything that you know, tell – tell it, like, nicely,

finish, and we go home."[105]

        Four FBI agents arrived at the house in mid-morning and were introduced to Abebe

by Mlowola. ████████████████████ served as translator throughout the FBI questioning, during

which the agents spoke English and Abebe spoke Swahili.  Agent Driscoll, through the translator,

thanked Abebe for the opportunity to meet with him and explained to Abebe that he did not have to

---

102   ████████████████████

103   Tr. at 349-50.

104   *Id.* at 4.

105   *Id.* at 331.



speak with the FBI and that it was his choice whether or not to do so.[106] The translator reviewed the

FBI advice-of-rights form with Abebe, and Abebe signed it.[107]

Over the course of the day, the FBI conducted three sessions totaling roughly six

hours, with a break between each session. Agent Swabsin testified that the tone was friendly and

conversational throughout.[108] The FBI agents did all of the questioning during these sessions, and

no one confronted Abebe with information or statements provided by Ghailani or referred to the fact

that Ghailani had made such statements.[109]

The first session lasted for two hours and dealt primarily with Abebe's background

information. The second was more focused and addressed Abebe's interactions with Ghailani.[110]

At the end of the third session, Swabsin asked Abebe if he would be willing to meet with the FBI

again in the future and if he would be willing to testify either in Tanzania or in the United States.

Abebe said that he would be willing to meet again and to testify in either location.[111] According to

Swabsin, Abebe told them that "this was something he wanted to get off his chest. . . . [It] weighed

on him, and now it was an opportunity for him to . . . clear his heart and his thoughts and his

---

[106]    *Id.* at 12.

[107]    GX 2. Abebe explained this decision as follows: "I saw that I was there, so I would talk to them." Tr. at 333. That explanation is not persuasive.

[108]    Tr. at 15.

[109]    *Id.* at 25.

[110]    *Id.* at 15.

[111]    *Id.* at 17; *see also* August 2006 FBI Interview, at 9 (describing Abebe's stated willingness to testify in future proceedings).

29

conscience."[112] While the Court accepts that Abebe made the statement related by Agent Swabsin, it does not credit the statement. He was no volunteer. He wanted to ensure his return home and to avoid prosecution and other feared adverse consequences.

The FBI held one more short interview session with Abebe on the morning of August 17, at the end of which Abebe again stated that he would be willing to testify in either Tanzania or the United States.[113]

7.   *Abebe's Release on Bond*

The FBI left Zanzibar on the afternoon of August 17,

████████████████████████████████████████████████████

████████████████████████████████████ Having satisfied themselves that Abebe's story was consistent, the Tanzanian authorities, on August 19, flew Abebe to Dar es Salaam where he was held in the Salender Bridge lockup for an additional five days.[115] Abebe finally was released on a police bond handwritten in Swahili by Mlowola on August 24, 2006. That bond, as translated by Mlowola, described Abebe as having been "accused of committing the offense of conspiring to murder and terrorist acts," and it required, *inter alia*, that he report to the

---

[112]     Tr. at 17.

[113]     *Id.* at 18-19.

[114]     ████████████

[115]     *Id.* at 166-67, 336.

30

regional crime office in Arusha every Monday morning.[116]

Abebe never was formally charged, but the bond's restrictions remained in effect for at least a year.[117] The bond was eliminated only after Abebe' brother in law, the chief judge of the Supreme Court of Tanzania, spoke to certain authorities on his behalf.[118] Notwithstanding the bond's release, Mlowola testified that Abebe still could be prosecuted in Tanzania today if there were sufficient evidence that Abebe knew that the explosives he sold would be used to bomb the embassies.[119]

8.     *Subsequent Interactions with Law Enforcement and the Court*

Since being released on bond, Abebe has had occasional interactions with Assistant Commissioner Mlowola and has been interviewed by FBI agents at least three different times.

Most notably, Abebe met on November 29, 2006, with FBI agents, Assistant

---

[116]    GX 6-T; *see also* Tr. at 214 (Mlowola testifying that he prepared the translation in addition to authoring the bond).

Mlowola testified that the Swahili word he translated as "accused" actually means either "suspected" or "accused" and that his use of the word "accused" in his translation of the bond was an error. The Court notes, however, that as both a lawyer and a person who has had extensive education in English speaking countries, Mlowola reasonably may be credited with having known the difference in English between these two terms. It finds that the English translation Mlowola prepared accurately reflects what was communicated to Abebe.

[117]    Abebe's testimony in two instances indicated that his reporting obligation came to an end one year after the bond was signed. *See* Tr. at 338, 430. In another instance, however, seemed to state that it ended only about one year ago. *See id.* at 425 (when asked "when was the bond eliminated," Abebe answered "It's almost like one year now. About a year.").

[118]    *Id.* at 339-41.

[119]    *Id.* at 289, 293.

31

Commissioner Mlowola, ███████████████████████ for a couple of hours at the local

police station in Arusha. He was not then in custody beyond the restrictions imposed by the police

bond. Nevertheless, the FBI again read him his rights and asked him to sign an advice-of-rights

form, which he did.[120]

     At some point during that interview, Abebe asked whether he would be compensated

for the information he had provided regarding Ghailani. Swabsin responded by "remind[ing] him

that . . . he should consider himself fortunate that he was a free man, that he was not under, facing

any criminal charges in the United States or here in Tanzania, that he had his life in order, living with

his family and working, having a meaningful existence in Arusha."[121] ████████████████



     Abebe met with FBI agents also (1) in May 2007 at the regional police headquarters

in Arusha, (2) in February 2010 at Abebe's home,[123] and (3) in Dar es Salaam in July 2010. He

---

[120]    *See* GX 3; Tr. at 22-23.

[121]    Tr. at 25.

[122]    ████████████████████████████████

[123]    Two Assistant United States Attorneys also were present at this meeting.

32

reiterated his willingness to testify on each occasion.[124]

On September 15 and 16, 2010, Abebe appeared before this Court and testified at the suppression hearing. He stated that he wants to testify because he is angry at Ghailani for having tricked him and that he wants to clear both his heart and his name.[125] He claims not to feel obliged to testify in order to remain free.[126] As will appear, the Court does not find that testimony credible.

## II.   The Earlier Ruling

The starting point for determining whether Abebe may be called as a witness against Ghailani is the Court's earlier opinion concluding that a hearing was necessary to decide the issue.[127]

To recapitulate briefly, illegally obtained evidence – including statements made by a defendant under government coercion – and the fruits of such evidence generally are not admissible against the defendant in a criminal trial.[128] Nevertheless, the fruits of illegally obtained evidence are admissible where, insofar as remains relevant here, the government proves that the connection between the illegal government action and the evidence offered at trial – here, Abebe's testimony – is "so

---

[124] See Tr. at 87-88.

[125] See, e.g., id. at 350 ("I want to take out the angerness that's inside my heart. . . . A lot of people in the world know that I'm involved by selling the explosives. So I'm coming to clean myself, that I'm a clean person, and that's why I have agreed to come and testify.").

[126] Id. at 352 ("It wasn't a must.").

[127] Ghailani Suppression, 2010 WL 3430514.

[128] See, e.g., Nardone v. United States, 308 U.S. 338, 340 (1939).

33

attenuated as to dissipate the taint."[129]  The ultimate question now before this Court therefore is

whether the government has established that the connection between Abebe's testimony and Ghailani's

unlawfully coerced statements is so remote as to permit Abebe to testify.

As the Supreme Court held in *Ceccolini*,[130] exclusion versus admissibility depends upon

a nuanced assessment of the length of the road from the government's improper conduct to the

witness's testimony, "the degree of free will exercised by the witness" in deciding to testify, the

usefulness of excluding the evidence in deterring government misconduct, and "considerations relating

to the exclusionary rule and the constitutional principles it is designed to protect."[131]  The Second

Circuit in *United States v. Leonardi*[132] briefly summarized *Ceccolini* as requiring consideration of "[1]

the stated willingness of the witness to testify, [2] the role played by the illegally seized [or other

illegally obtained] evidence in gaining his cooperation, [3] the proximity of the illegal behavior [to]

the decision to cooperate and the actual testimony at trial, and [4] the police motivation in conducting

the search" or engaging in other illegal activity.[133]  As its discussion of the facts makes clear, the

Circuit considered also the closeness of the connection between the illegal search there at issue and

how the government became aware of the existence, identity and potential value of the witness in

---

[129]
     *Ghailani Suppression*, 2010 WL 3430514, at *8 (quoting *Nardone*, 308 U.S. at 341
(internal quotation marks omitted)).

[130]
     *United States v. Ceccolini*, 435 U.S. 268, 274-75 (1978).

[131]
     *Id.* at 274-80.

[132]
     623 F.2d 746 (2d Cir. 1980).

[133]
     *Id.* at 752.

34

question.[134]  Nevertheless, in considering these factors, it must be borne in mind that the Supreme

Court in *Ceccolini* rejected any *per se* rule of admissibility, even where a witness who is the fruit of

illegal governmental action is willing to testify,[125] as Abebe now states is true of him.  Nor is there any

rigid formula for weighing the pertinent factors, each of which itself is a question of degree rather than

a binary function.

### III.    Attenuation

A.    *Attenuation, Deterrence, and the Privilege Against Self-Incrimination*

The government treats the factors articulated in *Ceccolini* and summarized in

*Leonardi* as a checklist. It takes essentially the view that the fruits of the coercive interrogation of

Ghailani are admissible if it has offered evidence that would permit the government to check at least

some of the items on the list, particularly whether exclusion of the fruits – here, Abebe's testimony

– would deter future misconduct of the sort that was inflicted upon Ghailani.  But that arguably is

too simple a summary even in the Fourth Amendment context.  It plainly is so in the Fifth

Amendment context in which this issue arises here.

It is true of course that the question whether exclusion would serve any deterrent

purpose is relevant in both Fourth and Fifth Amendment attenuation cases.  But it is not necessarily

the dispositive consideration, even in Fourth Amendment situations.  After all, the Supreme Court

in *Ceccolini* and the Circuit in *Leonardi* each listed the deterrent effect of exclusion as but one of

several factors to be considered in deciding whether the fruits of a violation of the Fourth

---

134      *Id.*

135         435 U.S. at 274-75.

35

Amendment are sufficiently attenuated to warrant their reception in evidence. If deterrence were decisive in every case, there would be little or no reason to consider, for example, the willingness of the challenged witness to testify, which may have little if anything to do with whether excluding a witness would have a meaningful effect in deterring official misconduct in the future. Nor were *Ceccolini* and *Leonardi* written on a blank slate. In order properly to understand the attenuation analysis, therefore, it is helpful to step back and examine its historical development.

The earliest fruit-of-tainted-evidence, or "poisonous fruit," cases dealt with physical evidence derived from illegal searches and seizures. The Supreme Court recognized that "[t]o forbid the direct use of [unlawful] methods . . . but to put no curb on their full indirect use would only invite the very methods deemed inconsistent with ethical standards and destructive of personal liberty."[136] It recognized also, however, that "this does not mean that the facts thus obtained become sacred and inaccessible"[137] – that is, a but-for causal connection between the official misconduct and the trial evidence is necessary but not sufficient to warrant exclusion of the derivative evidence. "Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint."[138] Thus in the words of *Wong Sun v. United States*, the fruits of illegally obtained evidence must be excluded unless "granting establishment of the primary illegality, the evidence to which instant objection is made has been

---

[136]    *Nardone*, 308 U.S. at 340.

[137]    *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

[138]    *Nardone*, 308 U.S. at 341.

36

come at . . . by means sufficiently distinguishable to be purged of the primary taint."[139]

In *Ceccolini*,[140] the Court found that the calculus is somewhat different where the derivative evidence at issue was a live witness's testimony. True, verbal evidence derived from an illegal search "is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."[141] Nonetheless, the Court concluded that live witnesses are different from physical evidence in a critical respect:

> "Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness."[142]

The Court noted two factors as being particularly indicative of the degree of attenuation where a live witness is concerned: the willingness of the witness "to freely testify" and the directness of the "link between the illegality and [the witness's] testimony."[143] "Where the cooperation of such a 'found' witness is truly the product of that individual's free will, unaffected by the [illegal government action], the purpose of the exclusionary rule would not be served by

---

[139]   371 U.S. at 488.

[140]   435 U.S. 268.

[141]   *Id.* at 276.

[142]   *Id.* at 276-77 (footnote omitted).

[143]   *Id.* at 278.

37

disallowing the testimony."[144]  The real point thus is that "willingness" refers, perhaps among other

things, to the connection between the challenged witness's testimony and the alleged constitutional

violation.  That is the relevance also of the role played by the defendant's coerced statements in

persuading the witness to testify and, in part, of the time interval between the unlawful government

conduct and the testimony.

All of this is merely to say that the *Ceccolini-Leonardi* factors that bear on the issue

of attenuation developed in service of a larger inquiry.  The question, assuming for a moment that

this were a Fourth Amendment case, would be whether the government has proved that Abebe's

proposed trial testimony in all the circumstances – including how he was identified and found, how

his cooperation was secured, and the reasons that he is "willing" to testify – would be so remote from

Ghailani's coerced statements that it should not be considered as having been tainted by that

coercion.  The *Ceccolini-Leonardi* factors would provide useful guidance on this question.

Deterrence would be a significant consideration.  But it would not always end the analysis.

This is even clearer in the Fifth Amendment context than in the Fourth.  In every

Fourth Amendment case, the violation of the defendant's constitutional rights was completed when

the illegal search or arrest that led, in one way or another, to the challenged witness took place.  It

cannot be undone.  The purpose of excluding the witness is to deter future violations of the rights

of others.  Thus, in Fourth Amendment cases, the strong public interest in making all relevant,

credible evidence available to the trier of fact[145] may outweigh the value of excluding the derivative

---

[144]     *Leonardi*, 623 F.2d at 752.

[145]     *See, e.g., Ceccolini*, 435 U.S. at 276-78 (considering the "enormous [public] cost" of
permanently disabling a witness's testimony, and concluding that "since the cost of
excluding live-witness testimony often will be greater, a closer, more direct link between

38.

evidence if the deterrent effect would be weak.

This consideration is relevant also in Fifth Amendment cases.[146] But it carries less weight in that context because the Self-Incrimination Clause places an additional and heavy weight on the stand. In a Fifth Amendment case -- that is, a case in which the proposed testimony is traceable to a statement obtained from the defendant in violation of his right to remain silent -- the receipt in evidence of the challenged testimony itself would violate the defendant's right not to be the unwilling source of evidence used to attempt to convict the defendant of a crime. As a plurality of the Supreme Court has written:

> "[T]he Self-Incrimination Clause contains its own exclusionary rule. It provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' Unlike the Fourth Amendment's bar on unreasonable searches, the Self-Incrimination Clause is self-executing. We have repeatedly explained 'that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial.'"[147]

Thus, the concern in the Fifth Amendment context is not only with whether exclusion would serve as a significant deterrent to future misconduct. It is also with whether the taint ordinarily attributable to the alleged derivation of the challenged testimony from the defendant's coerced statements is absent because the relationship between the defendant's statements and the challenged testimony is

---

the illegality and that kind of testimony is required. . . . The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve.").

[146]   *See Michigan v. Tucker,* 417 U.S. 433, 450-51 (1974) (noting in Fifth Amendment case that public interest in hearing relevant evidence may be outweighed by other interests protected by the exclusionary rule but that the public interests "must in any event be valued").

[147]   *United States v. Patane,* 542 U.S. 630, 640 (2004) (plurality opinion) (citations omitted) (emphasis in original) (quoting *Chavez v. Martinez,* 538 U.S. 760, 769 (2003) (plurality opinion)).

39

too remote. Unless that taint has been dissipated, the receipt in evidence of testimony that is the fruit of statements coerced from the defendant violates the self-executing exclusionary rule inherent in the Fifth Amendment.

That said, the Court considers the government's attenuation argument first in terms of the Fourth Amendment authorities, passing only then to the question whether the Fifth Amendment basis of the right asserted here requires any different result.

B.    *The* Ceccolini–Leonardi *Factors*

*1.    The Proximity of the Coercion of Ghailani to Abebe's Proposed Testimony*

The first of the considerations articulated by the *Ceccolini* Court as pertinent to the attenuation analysis is the closeness and proximity of the challenged testimony to the violation of the defendant's constitutional rights.[141] While it is the government's burden to prove the remoteness of the testimony from the violation, the evidence it has offered convincingly establishes the reverse. The Court finds that Abebe's testimony would be directly and closely related to the statements coerced from Ghailani.

As an initial matter, the government would not have identified or located Abebe absent Ghailani's coerced statements. 

---

[141]    *Ceccolini*, 435 U.S. at 274-75.

40

████████████████████████████████████████████████████

Abebe was arrested and interrogated solely as a result of statements coerced from Ghailani.

Nor is that all. As will appear below, ████████████████████████

████████████████████████████████████████████████████

### 2.    *Abebe's Willingness to Testify*

The government argues, drawing upon Abebe's testimony at the hearing, that Abebe is a "willing" witness in every sense of the word; he is an eager volunteer who has been cooperative from the moment he was found and who wants to testify against Ghailani because he wants to clear his heart and his name, not because he feels pressured to do so. Moreover, the government argues, Abebe's testimony would not be "unwilling" even if he had been pressured in various ways and at various times. Neither argument is convincing.

We begin with the chronology of Abebe's journey from uninvolved taxi driver to cooperating witness. Abebe knew very soon after the bombings that he had sold explosives to a man wanted in connection with those bombings. Notwithstanding the importance of that information, he chose not to come forward. He told almost no one what he knew and literally prayed that no one would find him. Eight years later, he was taken off the street in Arusha, flown to an unknown location in Zanzibar, held *incommunicado* and questioned for a week, and then looked up in Dar es Salaam for another five days. In the hours before the interrogation in Zanzibar, Tanzanian

41

authorities repeatedly told Abebe to tell what he knew so that he could go home. Even then, however, Abebe did not immediately confess his involvement.

The government has not established exactly what happened on the second day of Tanzanian interrogation, but something convinced Abebe finally to tell them that he had sold explosives to Ghailani. Seeing no other options available to him, he admitted his involvement ▮. ▮ He cried that night, despondent over what he had told the Tanzanian officials and fearful of what it would mean for his future. The next day, he repeated to the FBI what he already had told ▮ and agreed to testify wherever and whenever the Tanzanian or American officials wished.

This was not a free and unconstrained decision. Abebe is not at all comparable, for example, to the uninvolved police science student witness in *Ceccolini*. He quite plainly is no eager volunteer. He never would have come forward on his own. He is "willing" to testify now only because he fears that things will go badly for him if he does not. As Abebe understood would be the case from the moment he saw Ghailani's picture on television in 1998, the American and Tanzanian officials who interrogated him considered Abebe not only a potential witness, but also a prime suspect in the bombings. This was true when he first was arrested, and it remained true in his subsequent interactions with law enforcement officials. If the threat of prosecution previously had been only implicit, which it was not in view at least of Mlowola's statement, it became explicit in November 2006 when the FBI pointed out to Abebe in a subsequent interview that ▮

▮ In fact, Commissioner Mlowola testified that Abebe could

149 ▮

42

be prosecuted in Tanzania even today for his role in the bombings if the Tanzanian police had

sufficient evidence that Abebe knew the intended purpose of the explosives that he sold to Ghailani.

Abebe plainly was – and remains – acutely aware of his precarious position.  The most logical

inference from the evidence is that Abebe has agreed to cooperate and testify at least partly out of fear

of prosecution if he does not.  Moreover, Abebe evidenced concern at the hearing about the behavior

of the TNP in respects going beyond future prosecution.[150]  Moreover, as noted, the behavior of the

Tanzanian authorities with respect to Abebe may well have violated Tanzanian law,[151] a circumstance

that would give Abebe little comfort.

Abebe, to be sure, testified at the hearing that he has been under no pressure to testify

and that he wants to testify to "take out the angerness that's inside [his] heart" and to "clean

[him]self" by clearing his name in light of his belief that many people know that he was the

explosives supplier.[152]  None of this testimony, however, is credible.

To begin with, Abebe was not a credible witness on other matters.  He claimed that

---

[150]  See Tr. at 384 ("[T]he police over there do not have the patience to understand whatever
you want to report.  They would come and grab you and take you by force."); *id.* at 434
(describing how police will take people off the street and question them for days without
their families knowing their location).

The government on October 4, 2010 submitted a declaration stating in substance that
another Tanzanian witness in this case has changed his mind and refused to appear for trial
and that the witness has persisted in this position despite entreaties from the TNP and the
FBI.  Forsee Decl., Oct. 4, 2010.  The Court takes this to imply that Abebe would not be
testifying here out of fear of the Tanzanian authorities' reaction if he were to refuse.  It does
not, however, accept the argument.  Abebe's state of mind is the unique product of his own
experiences.  Moreover, there has been no showing that the circumstances of the suddenly
unwilling witness are at all comparable to Abebe's.

[151]  The Court need not place great weight on this latter point.  It would decide this matter in the
same way without regard to it.

[152]  Tr. at 350.

43

he had no idea why he had been arrested and that he was not at all worried when ▮▮▮▮▮▮

▮▮▮▮ Mlowola picked him up and flew him to Zanzibar. Indeed, he insisted at the hearing that it did

not cross his mind, even for a moment, that the arrest in Arusha and the trip to Kilimanjaro and then

on to ▮▮▮▮▮▮▮▮▮ Zanzibar might have had something to do with the embassy bombings.[153]

That testimony, the Court finds, was false. Anyone in Abebe's position would have been worried

for years that he would be found out and arrested, as Abebe on other occasions admitted was his state

of mind. Those worries doubtless would have been heightened when Ghailani's 2004 apprehension

became a matter of public knowledge in Tanzania. And Abebe's statements at the hearing are flatly

contradicted also by FBI ▮▮▮▮▮ accounts of Abebe's custodial interviews in 2006 and 2007. These

indicate that he told questioners on multiple occasions that he had been terrified for eight years, ever

since he first saw Ghailani's picture on the television after the bombings, that the police to come for

him.[154] The Court has no reason to doubt the accuracy of these accounts. Moreover, having

considered all the evidence and observed Abebe's demeanor at the hearing, it rejects entirely

Abebe's claims to the contrary.

Nor are Abebe's claimed motives for testifying any more credible. If indeed Abebe's

heart were moved by his having supplied the explosives that killed hundreds and wounded thousands

---

[153]   The Court asked: "From the time the two men got into your taxi in Arusha, until the time
you met Mr. Majid in Zanzibar [on the morning of August 14], did you ever think for even
a moment that you were being arrested and flown from another city by all these men connected
with the police, just might possibly have something to do with your having sold the
explosives to Ghailani?" Abebe answered, "I did not remember at all." The Court followed
up, asking "you just forgot about what you had been worrying about for eight years?"
Abebe responded, "Yes, I did forget." *Id.* at 402-404.

[154]   *See supra* note 10 (citing testimony and documents attesting to Abebe's years of worry and
deliberate silence regarding his having sold explosives to Ghailani).

44

of people, it would be very difficult to understand why he did not come forward on his own. The need for cleansing his heart and soul was at least as strong over the eight years before his arrest as it has been since. Likewise, the assertion that he has agreed to testify to clear his name cannot be squared with the facts. When Abebe agreed in 2006 to testify against Ghailani, Abebe's name was a secret known only within limited circles within ████ the FBI, ██████████████ Indeed, it remained classified throughout this prosecution until only a short time ago, long after Abebe committed to his present course. In all the circumstances, the Court rejects Abebe's claims as unpersuasive pretense. Abebe's motive in testifying is purely to avoid prosecution and other feared adverse consequences to himself. At a minimum, there is no convincing evidence of any other motive.

This of course is not to say that only eager volunteers and dutiful, uninvolved citizens may qualify as willing witnesses or that those who cooperate to improve their prospects in the criminal justice system may not be so regarded. Rather, the assessment always must include a consideration of the witness's motives and the extent to which the illegal search, coerced statements or other violation of law played a role in securing the witness's cooperation. So, for example, the fact that the challenged witness in *Leonardi* agreed to cooperate in order to reduce his exposure on a charge largely unrelated to the defendant's alleged crime did more to dissipate the taint of the illegal search than would have been the case if, for example, he had been involved in the same wrongdoing as the defendant and was persuaded to testify by use of the fruits of the violation of the defendant's rights.[155] Abebe, in contrast, was involved in the events for which Ghailani is being

---

[155]

See *Leonardi*, 623 F.2d at 753 ("Finally, and most importantly, Ax[, the witness,] had been caught in flagrante delicto committing another armed robbery. With a conviction certain to result from that escapade, Ax faced substantial jail time. It is likely that Ax decided to

45

prosecuted and fears prosecution himself in connection with those events. The government has not established that Ghailani's coerced statements did not play a role in obtaining his cooperation. The link between Ghailani's coerced statements and Abebe's testimony therefore is much closer than the link between the witness in *Leonardi* and his plea to an unrelated offense, on the one hand, and his agreement to cooperate against the defendant, on the other.

That said, it remains to consider the import for the attenuation analysis of Abebe's reason for testifying. On the government's view, Abebe is "willing" within the meaning of *Ceccolini* and *Leonardi* provided only that he has chosen, in some sense, to testify, as he obviously has, seemingly without regard to the reasons for his choice. But that argument, if accepted, would disregard the purpose of the "willingness" inquiry. *Ceccolini* makes clear that the primary purpose of inquiring as to "willingness" is to determine whether a challenged witness might have come forward even absent the violation of a defendant's rights. Accordingly, it matters a great deal whether the challenged witness is an "eager volunteer," a dutiful disinterested citizen, or one who had to be pressured into cooperating and on what basis. And if the witness is of the latter sort, it matters also whether and to what extent the violation of the defendant's constitutional rights played a role in persuading the challenged witness to become "willing." Given that Abebe certainly is nothing like an "eager volunteer," the Court turns now to the connection between Ghailani's coerced statements and Abebe's "willingness" to testify against him.

cooperate as a matter of self interest, and not due in any significant degree to the belief that the discovery of his driver's license (in the illegal search) had irreparably implicated him in the Westchester robberies (with which *Leonardi* was charged).").

46

### 3.    *The Role of the Illegal Conduct in Securing Abebe's Cooperation and Testimony*

The government contends that the only pertinent consideration in determining whether the illegal government coercion of a defendant's statements played a role in obtaining the testimony of a challenged witness is whether the witness was confronted with the defendant's coerced statements. That proposition appears to be incorrect. *Ceccolini* itself indicates that the use of the illegally obtained evidence in questioning the challenged witness is only part of the necessary inquiry, another aspect of which is whether the witness's cooperation was induced "as a result of" the evidence illegally obtained from the defendant.[156] And it is considerably more likely than not that that occurred here.

As an initial matter, the record makes clear that Abebe never would have been identified and located without the information contained in a series of coerced statements made by Ghailani



Not only were Ghailani's coerced statements the means by which Abebe was identified and found,

---

[156]    *See Ceccolini*, 435 U.S. at 279 (taint dissipated where "testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of [the police's illegal] discovery of the policy slips. Nor were the slips themselves used in questioning" the witness).

47

Mlowola admittedly told Abebe that he was suspected of having supplied the explosives to "Ahmed Khalfan Ghailani," thus strongly suggesting to Abebe that the TNP knew the full identity of the man previously known to him only as "Ahmed."

Moreover, while the Court recognizes that this evidence perhaps falls short of conclusive proof that Ghailani's statements were used to persuade Abebe to cooperate, that is not the test. The test is whether the government has proved that they were not so used. That it has not done.

At the most obvious level,

The contemporaneous notes taken by a TNP officer who apparently was present were not offered in evidence. And while both Abebe and Mlowola testified in general terms that Abebe was not told about Ghailani's statements, Abebe was not a credible witness, and Mlowola remembered little and was confused other key points. Moreover, their testimony on this point disregards the contemporaneous, if not complete or entirely satisfactory, evidence that is in the record —

In short, even if the government were correct in saying that this factor would cut in its favor if it proved only that Abebe was not confronted with the fact or substance of Ghailani's statements

48

in securing his cooperation, the government has not established that he was not so confronted. Indeed, as indicated above, the available evidence suggests the contrary.

Nor is the government's failure of proof entirely surprising. Whether by design or otherwise, there were no Americans whose presence could be compelled by an American court in the room. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Abebe's arrest and the ensuing events were scheduled in a manner that resulted in the arrival of the FBI only after Abebe had been interrogated by Tanzanians alone.

In all the circumstances, the Court finds that the government has not established that neither the fact nor the contents of any of Ghailani's coerced statements played a role in Abebe's decision to confess, cooperate and testify.[157] Although it is unnecessary to the result, the evidence suggests the contrary. And the Court would reach the same conclusion regardless of whether the lack of any Americans in the interrogation room was deliberate or serendipitous.

4. *Temporal Proximity and Deterrence*

The government argues that the interval between the last of Ghailani's coerced statements that led to Abebe, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and this trial has been about ▬▬▬▬▬▬▬ and that its length supports a conclusion that Abebe's testimony should not be suppressed.

Just as the absolute length of the period between Ghailani's apprehension and the

---

[157]         ▬▬▬▬▬▬ Mlowola, and Special Agents Swabsin and Forsee all testified that none of the officials who interviewed Abebe ever told him what Ghailani had said about him or that Ghailani was the source of their information. With the possible exception of Mlowola, none has personal knowledge of what happened and perforce is relying on what they were told by others. For reasons previously expressed, Commissioner Mlowola is not reliable as to what transpired.

49

government's decision to proceed with this prosecution was not alone dispositive of Ghailani's claim

that he was deprived of his right to a speedy trial, which the Court rejected as the government

sought,[158] the absolute length of the period between Ghailani's coerced statements and Abebe's

testimony is not alone dispositive of or, for that matter, especially significant on this motion. Indeed,

there may well be circumstances in which a prolonged interval may be a more serious exploitation

of a constitutional violation than a shorter one.[159] In each case, the time interval must be considered

in light of the policies of the constitutional provision relied upon.[160]

     Depending upon the circumstances, the passage of time may be persuasive on the

issue of attenuation in at least two ways. All other things being equal, the longer the time interval,

the less likely that the defendant's rights were violated in order to further the prosecution at issue

and, in consequence, the less likely that suppression of the challenged witness would deter future

violations.[161] Moreover, the length of time between the violation of a defendant's rights and the trial

---

[158]

    *United States v. Ghailani*, — F. Supp. 2d — No. S10 98 Crim. 1023 (LAK), 2010 WL
2756546 (S.D.N.Y. July 12, 2010) (hereinafter *Ghailani Speedy Trial*).

[159]

    *Barry v. New Jersey*, 454 U.S. 1017, 1020 (1981) ("[A] prolonged detention may well be
a more serious exploitation of an illegal arrest than a short one." (internal quotation marks
omitted) (quoting *Dunaway v. New York*, 442 U.S. 200, 220 (1979) (Stevens J.,
concurring))) (White, J., joined by Brennan and Marshall, JJ., dissenting from denial of
certiorari).

[160]

    *See Ghailani Speedy Trial*, 2010 WL 2756546, at *8, 16-17.

[161]

    *See, e.g., Brown v. Illinois*, 422 U.S. 590, 610 (1975) ("If an illegal arrest merely provides
the occasion of initial contact between the police and the accused, and because of time or
other intervening factors the accused's eventual statement is the product of his own
reflection and free will, application of the exclusionary rule can serve little purpose: the
police normally will not make an illegal arrest in the hope of eventually obtaining such a
truly volunteered statement.") (Powell, J., concurring in part); *see also* 1 WILLIAM E.
RINGEL, SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS § 3:11, at 3-50 (2d ed. 2005).

50

testimony of the challenged witness may indicate something significant about whether the witness is "willing" in a relevant sense to testify. For example, all other things being equal, the longer the interval, the greater the witness's opportunity for "detached reflection" and a considered decision.[162]

Regarding the significance of the passage of time with respect to Abebe's "willingness" to testify, Abebe for reasons discussed previously was no volunteer in the first place. Quite the contrary. He was induced to testify only out of fear of the consequences of not doing so, including possible prosecution and, conceivably, worse. While Tanzania has released him from the restrictions of the police bond, the risk of prosecution remains. As Commissioner Mlowola admitted, Abebe would be subject to prosecution in Tanzania even now if the authorities had evidence that he supplied the explosives with knowledge of their intended purpose. Ghailani might be willing to supply that evidence if conditions were right. Abebe's other concerns continue unabated.

It may be that the legal risks to Abebe now are somewhat less than he perceived them to have been when he initially agreed to testify. Nonetheless, the Court — particularly in light of Abebe's false testimony about his motives in testifying – is not persuaded that his fears of legal or other undesirable consequences should he decline to testify have been eliminated.

Turning to the question of the import of the passage of time with respect to the question of deterrence, the Court remains convinced that the CIA's predominant motives in coercing Ghailani to reveal what he knew about his explosives supplier were intelligence-oriented.

---

[162] *See Ceccolini,* 435 U.S. at 276.

Case 1:98-cr-01023-LAK   Document 1040   Filed 10/14/10   Page 54 of 63

51



### C.    The Balance

Having considered each of the factors pertinent to the attenuation analysis, it remains to strike the balance.

The starting point is the fact that the connection between Abebe's proposed testimony and statements coerced from Ghailani could not be closer.



----

163

164

52



Next, Abebe assuredly is not a volunteer witness. He sought to avoid discovery for years out of fears of being identified as the supplier of the explosives. He withstood his arrest, his transfer to ▮▮▮▮▮▮▮▮ Zanzibar, and a full day of Tanzanian interrogation without admitting his role, a reticence born of the fear of the consequences of a different course. In the last analysis, he has agreed to testify because he is afraid to do anything else.

What exactly produced this change of heart? Certainly not what Abebe claims produced it. The government has provided no convincing evidence of what accounted for it. As previously discussed, no one who was in the room at the time has been called to testify except Abebe and, if he was there, Mlowola. The contemporaneous notes that Mlowola said were taken were not offered and their absence was not accounted for. It is likely that Ghailani's coerced statements played at least some role, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In any case, the government certainly has not established that Ghailani's statements played no material role in Abebe's change of heart.

To be sure, the time interval between the violation of Ghailani's rights and any trial testimony by Abebe would be appreciable. But that would be of major significance only to the extent, if any, that it tended to show that the passage of time has made Abebe a more "willing" witness and that exclusion would serve no deterrent effect. While Abebe's legal risks may have

53

diminished somewhat, and even that is not certain, the Court finds that he is no more "willing" in any relevant sense to testify now than he was years ago. And the time interval has no bearing in this case on the question of deterrence. The lapse of time since the CIA questioned Ghailani at the relevant time was attributable entirely to U.S. government policy about the treatment of detainees. Indeed, weighing the time interval in favor of the government would reward it for the almost entirely unjustified delay from 2006 until mid-2009 in pursuing this case.[165]

The government's strongest argument remains that related to deterrence. It initially contended that the CIA was motivated entirely by intelligence objectives and that exclusion here consequently would serve no deterrent purpose.[166] Put another way, the suggestion was that the CIA would have done exactly the same thing irrespective of any law enforcement interest in prosecuting Ghailani.[167]

The Court accepts that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Whether that means that absolutely no deterrent purpose would be served by suppression of Abebe's testimony here, however, is another matter in light of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ And regardless of whether that is the case, deterrence is but one of the pertinent considerations.

In the last analysis, this Court concludes that exclusion of Abebe's testimony would

---

[165]   *See Ghailani Speedy Trial*, 2010 WL 2756546, at *13-16.

[166]   *See, e.g.*, Gov't Mem. [DI 927] at 39-41.

[167]   *Id.*

54

be required here even if the government had identified and found him in otherwise comparable circumstances as a result of an illegal search or seizure, this notwithstanding the relative lack of deterrence of exclusion in these circumstances.  If this were a search and seizure case, the relationship between the unlawful conduct and the identification and location would be just as close. Abebe's reluctance to testify and the fear of the authorities that nevertheless moves him to testify would be just as palpable.  The government's failure to prove that the illegally seized evidence played no role in securing his cooperation would be just as glaring as they are here.  These considerations would overcome the facts that the illegal search or seizure would have been a completed historical event and that the deterrent effect of exclusion, if any, would be considerably less than a certainty.  But, it bears emphasis, this is not a Fourth Amendment search and seizure case. Hence, two factors make the case for exclusion here much stronger than if it were.

        First, as this is a Fifth Amendment case, the receipt in evidence of Abebe's testimony itself would constitute a violation of the self-executing exclusionary rule inherent in the Constitution, not a matter of compliance with a purely utilitarian judge-made rule that was created in the twentieth century only to deter illegal searches and seizures.

        Second, the deterrence analysis, which for reasons previously explained is of less importance here than in a Fourth Amendment case, is somewhat different.  The CIA, acting upon the highest authority, used coercive methods to gain intelligence.  This Court has declined to this point to express an opinion on the constitutionality of such methods, considered in and of themselves.[168]  It declines to do so now because that issue is not before it.  What is before it,

---

[168]  *See Ghailani Speedy Trial*, 2010 WL 2756546, at *10; *United States v. Ghailani*, No. S10 98 Crim. 1023 (LAK), — F. Supp. 2d —, 2010 WL 1839039, at *2, 5 n.33 (S.D.N.Y. May 10, 2010).

55

however, is the question whether the Fifth Amendment – which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself" – is violated if a Court receives in a criminal trial evidence that is the fruit of statements coerced from the defendant, at least where the relationship between the coerced statements and the evidence is a close as it is here.

    *Ceccolini*,[169] *Leonardi*[170] and the other cases relied upon heavily by the government[171] do not suggest an answer to that question that would be favorable to the government. The cases, for one thing, for the most part are distinguishable, and in any case do not support the weight the government would have them bear. *Ceccolini, Leonardi* and *United States v. Reyes*[172] all were Fourth Amendment cases in which deterrence concerns played a greater role than would be appropriate here. Moreover, all were decided on facts that were decidedly weaker for the defendant.

    In *Ceccolini*, a perjury case, a police officer found policy slips in the defendant's shop while making an illegal search. This led to the questioning of the store clerk, who happened to be a police science student, by an FBI agent who was not even fully informed of the manner in which the police officer had obtained his information. The student immediately offered to help the police. Over a year later, the defendant testified before a grand jury, allegedly falsely. In the ensuing perjury trial, the issue arose whether the testimony of the student-store clerk should have been precluded on the theory that the police had questioned her only because of the illegal search that discovered the

---

169

    435 U.S. 268.

170

    623 F.2d 746.

171

    *United States v. Sweets*, 526 F.3d 122 (4th Cir. 2007); *United States v. Reyes*, 157 F.3d 949 (2d Cir. 1998).

172

    *Id.*

56

policy slips.[173] Thus, (a) the challenged witness's connection to the defendant was known before the illegal search took place, (b) the witness's uncoerced willingness to testify was entirely unrelated to the illegal search, (c) she was entirely uninvolved in the criminal conduct, and (d) the FBI agent who first questioned her was not fully informed of the circumstances that had piqued the police officer's interest in the first place. *Ceccolini* therefore bears no similarity to the facts here.

Similarly, the witness in question in *Leonardi* was known to the police prior to the illegal search,[174] and the evidence illegally discovered – his driver's license – did not in itself implicate the witness in any criminal wrongdoing. The witness, moreover, was facing substantial jail time on a different charge and so decided to cooperate for his own self-interested reasons, "not due in any significant degree to the belief that the discovery of his driver's license . . . had irreparably implicated him in the" robberies with which the defendant was charged.[175] That stands in stark contrast to Abebe's likely awareness that Ghailani had identified him as the explosives supplier.[176]

*Reyes* involved only the question whether the district court had committed plain error in receiving the testimony of a cooperating witness who had been located from a telephone number

---

173  *Ceccolini*, 435 U.S. at 271-73.

174  *Leonardi*, 623 F.2d at 752 ("First, Ax [the witness]'s existence, identity and potential value as a witness were established prior to the [illegal] seizure . . . Leonardi had already inculpated Ax by name and description, and the discovery of Ax's driver's license among the effects of his accomplice did little more than corroborate that information. The license was in no way used to locate or apprehend Ax; in short, he was not a 'found' witness whose existence became known to the authorities only as a consequence of the illicit search.").

175  *Id.* at 753.

176  It bears repeating that it is not Ghailani's burden to prove such awareness. It instead is the government's burden to prove that Ghailani's statements were not used to obtain Abebe's cooperation.

57

obtained in an illegal search. Relying heavily upon the facts that (1) the witness had decided to
cooperate as a result of a conversation in which a fellow prisoner explained to him the advantages
of doing so, and (2) "the relatively insignificant role played by the illegally seized evidence in
actually gaining his cooperation,"[177] the Court of Appeals found no plain error. Here, in contrast,
Abebe is a far less willing witness, and the government has failed to prove that Ghailani's coerced
statements played little or no role in his willingness to cooperate.[178]

 *Sweets*,[179] decided by a fractured panel that produced three opinions, differs from the
government's other cases in that it is a Fifth Amendment case. Nonetheless, neither its facts nor its
reasoning help the government as much as the government would have them.

 In *Sweets*, the police coerced the defendant to lead them physically to the location of
the witness, Long, who at that time was wanted for murder. Long subsequently cooperated and
testified against Sweets, and Sweets argued that this testimony should have been precluded as
poisonous fruit. Relying in part on the facts that (1) Long already had been identified by the police
and already was the subject of an outstanding arrest warrant for murder,[180] and (2) information

---

[177] *Reyes*, 157 F.3d at 954-55.

[178] The government relies also on *United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000). There, another judge of this Court declined to exclude the product of unlawful electronic surveillance conducted for intelligence purposes, noting that there had been no law enforcement participation, that the surveillance would have been conducted even if the government had known that the product would be inadmissible at a criminal trial, and that no deterrent purpose therefore would have been served by exclusion. *Id.* at 282-83. *Bin Laden* therefore is consistent with this Court's holding here, as the Fifth Amendment exclusionary rule was not implicated in that case.

[179] 526 F.3d 122.

[180] The government misconduct coerced the defendant into providing only Long's immediate location. *Id.* at 134.

Case 1:98-cr-01023-LAK   Document 1040   Filed 10/14/10   Page 61 of 63

58

coerced from Long was not used in questioning Sweet, the Fourth Circuit held that the witness's testimony at trial was attenuated sufficiently from the illegal conduct to purge the taint.[181] That is not the case here, █████████████████████████████████

██████████████████████████████████████████

███████████████████  Equally important, this Court does not agree with Sweets's view of the scope of the protection afforded by the Fifth Amendment right against self-incrimination. Sweets is not binding on this Court. To whatever extent that case might be regarded as inconsistent with the analysis and result reached here, this Court is unpersuaded by it.

In the last analysis, then, the government's cases do not lend significant support to its position here. Ceccolini, Leonardi and Reyes are not helpful both on the facts and, in any case, are not Fifth Amendment cases. Sweets too is unhelpful on the facts. And while it is a Fifth Amendment case, this Court does not find its Fifth Amendment analysis persuasive.

---

[181]   Id. at 129, 134, 135 (all three opinions concurring with respect to attenuation).

59

## IV.   Conclusion

In all the circumstances, this Court holds that the receipt in evidence of Abebe's testimony would violate the Fifth Amendment.[182] If the government is going to coerce a detainee to provide information to our intelligence agencies, it may not use that evidence – or fruits of that evidence that are tied as closely related to the coerced statements as Abebe's testimony would be here – to prosecute the detainee for a criminal offense. On these facts, the public interest in "making available to the trier of fact all concededly relevant and trustworthy evidence" is outweighed by the public and private interests protected by exclusion. The motion to preclude Abebe as a witness in this case is granted.

As the Court noted in its summary order dated October 5, 2010, it has not reached this conclusion lightly. It is acutely aware of the perilous world in which we live. But we must adhere to the basic principles that govern our nation not only when it is convenient to do so, but when perceived expediency tempts some to pursue a different course. The government may continue its prosecution of Ghailani without using this evidence. It probably may detain him as an enemy combatant as long as the present hostilities continue. What it cannot do is to use Abebe's testimony

---

[182]
It is very far from clear that Abebe's testimony would be admissible if Ghailani were being tried by military commission, even without regard to the question whether the Fifth Amendment would invalidate any more forgiving provisions of the rules of evidence otherwise applicable in such a proceeding.

Military commissions are governed by the Military Commissions Act, 10 U.S.C. §§ 948a *et seq.* (the "MCA"). Evidence in such proceedings is governed by the Military Commission Rules of Evidence ("MCRE"). U.S. DEP'T OF DEFENSE, MANUAL FOR MILITARY COMMISSIONS (2010 ed.).

MCA § 948r(a) and MCRE 304 preclude or restrict the use of "statements obtained by torture or cruel, inhuman, or degrading treatment," and evidence derived therefrom, and could require exclusion of Abebe's testimony. Even if they did not, the Constitution might do so, even in a military commission proceeding.

60

in its otherwise perfectly appropriate prosecution to convict him of the crimes with which he is

charged.

      The defendant's motion to preclude Hussein Abebe from testifying at trial is granted.

The foregoing as well as the Court's previous opinion on this motion are the Court's findings of fact

and conclusions of law.

      SO ORDERED.

Dated:    October 6, 2010

                                        Lewis A. Kaplan
                           United States District Judge