UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

      - v. -                  :    (S10) 98 Cr. 1023 (LAK)

AHMED KHALFAN GHAILANI,        :

           Defendant.    :

- - - - - - - - - - - - - - - x


GOVERNMENT'S UPWARD DEPARTURE APPLICATION


                              PREET BHARARA
                              United States Attorney
                              for the Southern District of
                              New York for the United States
                              of America


Michael Farbiarz
Harry A. Chernoff
Nicholas Lewin
Sean S. Buckley
    Assistant United States Attorneys
    - Of Counsel -

Table of Contents

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . 1

The Presentence Investigation Report . . . . . . . . . . . . . . 2

An Upward Departure is Warranted . . . . . . . . . . . . . . . . 7

Conclusion. . . . .    . . . . . . . . . . . . . . . . . . . . 12

i

Table of Authorities

CASES

Gall v. United States, 552 U.S. 38 (2007) . . . . . . . . . . . 8

United States v. Bermingham, 855 F.2d 925 (2d Cir. 1988) . . . 8

United States v. Hui, 83 F.3d 592 (2d Cir. 1996) . . . . . . . 8

United States v. Jose-Gonzalez,
    291 F.3d 697 (10th Cir. 2008). . . . . . . . . . . . . . 8, 9

United States v. Menzner, 29 F.3d 1233 (7th Cir. 1994) . . 8, 9

United States v. Rodriguez, 553 F.3d 380 (5th Cir. 2008) . 8, 9

United States v. Sanchez, 354 F.3d 70 (1st Cir. 2004) . . . . 10

United States v. Tropiano, 50 F.3d 157 (2d Cir. 1995) . . . . . 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :

    - v. -                         :          (S10) 98 Cr. 1023 (LAK)

AHMED KHALFAN GHAILANI,          :

        Defendant.           :

- - - - - - - - - - - - - - - - x

## GOVERNMENT'S UPWARD DEPARTURE APPLICATION

### PRELIMINARY STATEMENT

On November 17, 2010, following a trial of more than five weeks, a jury sitting in the Southern District of New York returned a verdict of guilty against Ahmed Khalfan Ghailani (the "defendant" or "Ghailani"), convicting him of conspiring to destroy United States buildings and property, in violation of Title 18, United States Code, Section 844(n), and finding that his conduct directly or proximately caused the death of a person other than a co-conspirator.

Following the defendant's conviction, a Presentence Investigation Report ("PSR") was prepared by the United States Probation Office ("Probation Office"). The Probation Office concluded that, as applied to this case, the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines") call for a sentence of life imprisonment. In addition, the Probation Office recommended that the Court impose a sentence of life imprisonment.

Pursuant to the Court's November 17, 2010 order, the instant memorandum sets forth the Government's objections to the PSR, as well as the Government's requests for departures from the sentencing recommendation set out in the PSR.[1]

The Government does not object to the factual findings or Guidelines analysis set forth in the PSR. However, a substantial upward departure is warranted here, in light of, among other things, the great number of people murdered as a result of the actions of the defendant and his co-conspirators.

### THE PRESENTENCE INVESTIGATION REPORT

The PSR was prepared based on a variety of sources of information, including the evidence adduced at trial; an interview with the defendant, see PSR ¶¶ 189-196; statements from numerous Embassy bombing victims as to the impact of the defendant's crime on them and their families, see PSR ¶¶ 160-167; and evidence with respect to the Embassy bombings plot that was not placed before the jury because it was not admissible at this trial, see, e.g., PSR ¶¶ 88, 89, 100, 95, 101, 104, 111, 113.

Based on all of this information, the PSR described in detail the defendant's role in the Embassy bombings plot. See PSR ¶¶ 64-67; 74-96; 100-117. Thus, for example, the PSR stated

---

[1] A fuller sentencing submission, that focuses on issues other than objections to the PSR and requests for departures, will be filed on January 18, 2010, in accordance with the Court's Individual Rules of Procedure for Sentencing Proceedings.

2

that the defendant procured essential bomb components, such as large quantities of fertilizer and over 100 explosive detonators, and then brought these items to the Tanzania bomb factory, along with the oxygen and acetylene tanks that he bought in Dar es Salaam. See, e.g., PSR ¶ 88 (indicating that Ghailani brought fifty-kilogram bags of fertilizer and gas tanks to the 213 Ilala bomb factory, in July of 1998); PSR ¶ 89 (noting that Ghailani obtained electric detonators, stored them in his residence, and brought over 100 such detonators to the 213 Ilala bomb factory).

In addition, in the period just prior to the Embassy bombings, the defendant worked closely with other Al Qaeda terrorists at the Tanzania bomb factory, loading TNT, fertilizer, batteries, and gas tanks into the Nissan truck that the defendant had bought in Dar es Salaam — the truck that would be used to carry the bomb that destroyed the United States Embassy in Tanzania. See PSR ¶ 100 (describing Ghailani's participation with four other Al Qaeda operatives in the loading of the Dar es Salaam bomb truck with boxes of TNT, gas tanks, detonators, and fertilizer — all during late July or early August 1998).

Finally, in the run-up to the Embassy bombings, the defendant repeatedly met with Al Qaeda operatives at various locations throughout East Africa. These operatives included an Al Qaeda explosives specialist, who had been dispatched to oversee the final preparation of the bombs; and a senior Al Qaeda

operative, who gave the defendant $500 so that, as he fled from Africa using his false passport, he could bribe local immigration officials as necessary. See PSR ¶¶ 95, 101, 104, 111, 113 (describing numerous meetings involving Ghailani and senior Al Qaeda operatives).

In short, the Probation Office's report concluded that the defendant operated at the very heart of the Al Qaeda terror cell that destroyed the United States Embassies in Kenya and Tanzania, and that he played a hands-on role in the final preparations for the mass killings of August 7, 1998.

In light of its factual findings, the Probation Office calculated the applicable Guidelines range. The Probation Office first determined that the Sentencing Guideline for a violation of 18 U.S.C. § 844(n) is found at U.S.S.G. § 2K1.4. See PSR ¶ 176. Section 2K1.4(a)(1) of the Guidelines implies a base offense level of 24. But Section 2K1.4(a)(1) notes that if "the offense was intended to cause death or serious bodily injury, [the Court should] apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above [in Section 2K1.4(a)]." U.S.S.G. § 2K1.4(c)(1).

Accordingly, the Probation Office analyzed Chapter Two, Part A (Offenses Against the Person) — and determined that "the guideline for First Degree Murder is the most analogous

4

guideline." PSR ¶ 176. The base offense level for first degree murder, 43, is higher than the base offense level of 24 that is set out in Section 2K1.4(a). See PSR ¶ 176 (citing U.S.S.G. § 2A1.1(a)). Therefore, the Probation Office concluded that 43 is the governing base offense level here. See PSR ¶ 176 (citing U.S.S.G. § 2A1.1(a)).

Because the victims of the defendant's bombing conspiracy included Government officers and employees, and the offense of conviction was motivated by this status, the Probation Office determined that there should be a three-level increase, from the base offense level of 43 to 46. See PSR ¶ 177 (citing U.S.S.G. § 3A1.2(a)).

Moreover, because the bombing conspiracy was a felony that involved and was intended to promote a federal crime of terrorism, see U.S.S.G. § 3A1.4(a), the Probation Office determined that the offense level of 46 was to be increased by a further twelve levels, to 58. See PSR ¶ 178 (citing U.S.S.G. § 3A1.4(a)).

As the defendant is not entitled to any downward adjustment for acceptance of responsibility, see PSR ¶ 182, the Probation Office concluded that the total offense level is 58. See PSR ¶ 185.

Given this offense level, and the defendant's Criminal History Category of VI, see PSR ¶ 188 (citing U.S.S.G.

§ 3A1.4(b)), the Probation Office concluded that the defendant's Sentencing Guidelines range is a term of imprisonment of life. See PSR at 48.[2]

In addition to calculating the applicable Guidelines range, the Probation Office recommended that the Court impose a term of life imprisonment. See PSR at 48. The Probation Office's rationale for this recommendation focused on the impact of the defendant's actions on thousands of victims; the need for deterrence, for incapacitation, and for just punishment; and the Probation Office's conclusion that the defendant showed by his actions a "blatant disregard for human life." PSR at 48-50.

In recommending a sentence of life imprisonment, the PSR also considered the defendant's requests, made by letter to the Probation Office dated December 13, 2010 ("Defendant's Letter"), for two downward departures. First, the defendant sought a downward departure because he was "mistreated" while in United States custody; and second, the defendant requested a downward departure for having provided information to the United States while in Central Intelligence Agency and then Department of Defense custody. See Defendant's Letter 2-3.

The Probation Office rejected these applications. In

---

[2] Under the Guidelines, 43 is the highest possible offense level and, in the final analysis, "an offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G., Chapter Five, Pt. A, app. note 2.

doing so, the Probation Office focused on the enormity of the defendant's crime; the painful impact the Embassy bombings continue to have on their victims; and "Ghailani's lack of compassion for human life." PSR at 50. In the Probation Office's view, these factors dwarfed all countervailing considerations proposed by the defendant: "[g]iven the nature of the offense, we do not believe that there are any mitigating factors that would warrant a departure from the . . . [G]uidelines range [of life imprisonment]." PSR at 50.

## AN UPWARD DEPARTURE IS WARRANTED

The bombing conspiracy of which the defendant was convicted was an appalling crime that culminated in 224 murders and thousands of injuries, many of them severe. See PSR ¶¶ 121, 124, 160-67. The scale of this killing and maiming was tragically vast. An upward departure is plainly warranted here, for each of the two reasons set forth below.[3]

---

[3] With reference to the Government's upward departure application, the Probation Office reasoned that "the number of deaths and injuries caused by the defendant's actions . . . are certainly factors that warrant consideration when determining Ghaliani's sentence." PSR at 50. But the Probation Office did not reach the question of whether an upward Guidelines departure would be appropriate here, because in the Probation Office's view doing so would merely amount to an academic exercise - even without any upward departures, the PSR notes, a life sentence should be imposed. See id. There is something to this point. Indeed, assuming a Guidelines offense level of 58 and a sentence within the Guidelines range, an upward departure would have practical consequences here only if the Court were to reject the Probation Office's conclusion that a downward departure is inappropriate - and then downwardly depart by an extraordinary 15

7

First, when "death result[s]" from an offense, an "appropriate factor" for the Court to consider in weighing a departure application is "whether multiple deaths result[ed]." U.S.S.G. § 5K2.1 Death (Policy Statement). Here, the "multiple deaths [that] result[ed]," id., number in the hundreds. This warrants an upward departure. See, e.g., United States v. Hui, 83 F.3d 592, 594 (2d Cir. 1996) (affirming imposition of an upward departure because, among other things, the defendant's conduct resulted in ten deaths) (citing U.S.S.G. § 5K2.1); United States v. Jose-Gonzalez, 291 F.3d 697, 700-03 (10th Cir. 2008) (same; three deaths) (citing U.S.S.G. § 5K2.1); United States v. Rodriguez, 553 F.3d 380, 396 (5th Cir. 2008) (same; 19 deaths) (citing U.S.S.G. § 5K2.1); United States v. Menzner, 29 F.3d 1233, 1235 (7th Cir. 1994) (same; two deaths) (citing U.S.S.G. § 5K2.1).

---

offense levels. But the upward departure issue should be considered. A Guidelines calculation is the first step in the sentencing analysis, and determining whether a departure is warranted is generally part of the Guidelines calculation. See Gall v. United States, 552 U.S. 38, 49 (2007) ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"); U.S.S.G. § 1B1.1(i) ("[i]nstructions" that govern Sentencing Guidelines analysis, directing the sentencing Court to refer to those portions of the Guidelines that concern departures). This said, there is no necessity to resolve the departure issue if, even were an upward departure not imposed, the Court would be inclined to conclude that the Sentencing Guidelines yield a sentence of life imprisonment. Cf. United States v. Bermingham, 855 F.2d 925, 932 (2d Cir. 1988) ("guideline disputes may be left unresolved where the same sentence would have been imposed under either of two overlapping guideline ranges").

Second, "[a] court may [upwardly] depart from the Sentencing Guidelines if it determines 'that there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.'" United States v. Tropiano, 50 F.3d 157, 162 (2d Cir. 1995) (quoting 18 U.S.C. § 3553(b)). That standard is met.

As an initial matter, the Guidelines applicable here, see supra, do not vary based on the number of people murdered. Accordingly, the Guidelines do not distinguish between a defendant who participated in a bombing conspiracy that killed one person and this defendant, who was a central player in a bombing conspiracy that killed hundreds of people. Hundreds of murders is plainly an "aggravating . . . circumstance," and one that the relevant Guidelines do not take into account in any way. Id. Accordingly, an upward departure is warranted. See Jose-Gonzalez, 291 F.3d at 700-03 (affirming imposition of an upward departure because the relevant Guideline accounted for the fact that the defendant's conduct caused death, but not for the fact that his conduct caused multiple deaths); Rodriguez, 553 F.3d at 396 (affirming imposition of an upward departure because the relevant Guideline "accounted for death, but not the number of deaths past one"); Menzner, 29 F.3d at 1235 (affirming imposition of an upward departure because, among other things, the relevant Guideline "failed to take into consideration multiple deaths,

9

<u>i.e.</u>, [the defendant] would have received a base level of thirty-three if only one child had died," but, in fact, two children died as a result of the defendant's conduct); <u>see also</u>, e.g., <u>United States</u> v. <u>Sanchez</u>, 354 F.3d 70, 79 (1st Cir. 2004)(affirming the imposition of an upward departure on other grounds, but noting that the defendant "would have received the same base offense level had the [crime of conviction] resulted in only one death, so it might well be said that the first degree murder cross-reference [U.S.S.G. § 2A1.1(a)] failed to take the second death [caused by the defendant's conduct] into account").

More generally, the relevant Guidelines do not adequately account for the defendant's conduct. <u>See generally</u> 18 U.S.C. § 3553(b) (a Court may upwardly depart when "there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."). The defendant was a central participant in an Al Qaeda terror cell that killed hundreds of people; caused thousands of injuries; harmed the well-being of numerous families by maiming or killing care-givers and breadwinners; disrupted the functioning of major United States Government facilities in Africa; endangered the public safety and national security of a number of countries; destroyed buildings; spread fear and terror; and, by virtue of its monumental scale and its indiscriminate mass murder, evinced extraordinary brutality, hatred, and evil —

10

well beyond the baseline of first-degree murder. None of this is reflected in the relevant Guidelines, and all of it lends further support to the conclusion that a substantial upward departure is required.[4] See, e.g., U.S.S.G. § 5K2.1 Physical Injury (Policy Statement) (indicating that an upward departure may be appropriate when "significant physical injury resulted"); U.S.S.G. § 5K2.5 Property Damage or Loss (Policy Statement) (indicating that an upward departure may be appropriate when "the offense caused property damage or loss not taken into account within the guidelines"); U.S.S.G. § 5K2.7 Disruption of Governmental Function (Policy Statement) (indicating that an upward departure may be appropriate "if the defendant's conduct resulted in a significant disruption of a governmental function"); U.S.S.G. § 5K2.8 Extreme Conduct (Policy Statement) (indicating that an upward departure may be appropriate when "the defendant's conduct was unusually heinous, cruel, [or] brutal"); U.S.S.G. § 5K2.14 Public Welfare (Policy Statement) (indicating that an upward departure may be appropriate "[i]f national

---

[4] The Government takes no position on the precise upward departure that is appropriate.

security, public health, or safety was significantly endangered").

## CONCLUSION

For the reasons stated above, a substantial upward departure should be imposed.

Dated:  New York, New York
        January 7, 2011

>     Respectfully submitted,
>
>     PREET BHARARA
>     United States Attorney
>
> By: *[signature]*
>     Michael Farbiarz
>     Harry A. Chernoff
>     Nicholas Lewin
>     Sean S. Buckley
>     Assistant United States Attorneys
>     (212) 637-1587/2481/2337/2261