UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

              -against-                         S10 98 Crim. 1023 (LAK)

AHMED KHALFAN GHAILANI,

                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDED MEMORANDUM OPINION**

Appearances:

> Michael E. Farbiarz
> Harry A. Chernoff
> Nicholas Lewin
> Sean S. Buckley
> Assistant United States Attorneys
> PREET BHARARA
> UNITED STATES ATTORNEY

> Peter Enrique Quijano
> Michael K. Bachrach
> *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Ahmed Khalfan Ghailani recently was convicted of one count of conspiracy in connection with in the 1998 bombings of the United States Embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya, in which over 200 people were killed and over 4,000 injured. The jury further found that his conduct directly or proximately caused death to a person other than a conspirator. He now awaits sentencing.

At trial, the government presented over 40 witnesses, many of whom were East African Swahili speakers who testified through an interpreter.  Naturally, the government produced prior statements of these witnesses under the Jencks Act.  The documents produced that are relevant here were FBI 302s that purported to summarize statements the witnesses had made prior to trial in interviews at which FBI agents were present.  During the cross-examination of a number of these witnesses, the defense sought unsuccessfully to elicit admissions that the witnesses previously had made statements in those interviews that were inconsistent with aspects of their trial testimony. These witnesses then were excused and returned to Africa.

As the government's case drew to a close, the defense notified the government that it wished to call a number of FBI agents to testify that six of the government's East African witnesses  had made statements in those interviews that were inconsistent with certain statements that they had made on direct examination during the government's case in chief.  The government objected, arguing chiefly that the defendant had not laid a proper foundation.  The Court sustained the government's objections with respect to three of the witnesses, and the disputes as to two others were resolved by agreement between the government and the defense.[1]  This memorandum opinion sets out the pertinent facts and the rationale for the Court's rulings.

*Facts*

All or most of the witnesses whose statements the defendant sought to impeach by calling FBI agents to testify to prior, allegedly inconsistent statements were interviewed during the

---

[1]   In one case, the defense withdrew its request.  A second request was resolved by stipulation between the parties.

3

investigation of the bombings.  FBI agents as well as Swahili-speaking East African police officers were present at each interview.  The local police officers translated, in one way or another, between the English-speaking FBI agents and the Swahili-speaking witnesses.  The FBI agents prepared 302s with respect to the interviews in accordance with standard FBI practice.  The 302s in some instances reported alleged statements by the witnesses that in one way or another were said to be inconsistent with their direct testimony.  The FBI agents, however, spoke no Swahili.  Their 302s therefore merely summarized what the East African police officers, who interacted with the witnesses in Swahili, told the FBI that the witnesses had said.  Hence, the FBI authors of the 302s had no personal knowledge of what the witnesses had said during these investigatory interviews.

As the government's case concluded, the defendant presented a list of six witnesses – all of whom by then had returned to Africa – whom they wished to impeach by calling FBI agents to testify to alleged prior inconsistent statements that appeared in the FBI 302s.[2]  In two instances, they proposed to impeach one statement by each witness; in two others they proposed to impeach two or more statements.  The Court explicitly sustained the government's objections with respect to three of the four witnesses.  The defense did not press its position with respect to the fourth.[3]

---

[2]

    Ct. Ex. I.

[3]

    As noted, the list initially included six such witnesses.  The defendant ultimately withdrew his proposal as to Mica Kamau Ngugi, *see* Tr. 1916, and the application as to Flenan Abel Shayo was resolved by stipulation, *see id.* 1943, 2030-31.

4

*Discussion*

A.      *General Principles*

Impeachment by extrinsic evidence of a prior inconsistent statement is governed by Federal Rules of Evidence 613(b)[4] and 403.[5]  A proffer of extrinsic evidence of a prior inconsistent statement therefore requires consideration of several factors.

First, the Court must determine whether the proffered statement in fact is inconsistent with the testimony sought to be impeached.[6]  The test is whether "there is '[a]ny variance between the statement and the testimony that has a reasonable bearing on credibility.'"[7]

Second, the party seeking to offer extrinsic evidence of a prior inconsistent statement must have laid a proper foundation for doing so by affording (a) the witness an opportunity to explain or deny the prior inconsistent statement and (b) the opposite party an opportunity to question

---

[4]      Rule 613(b) provides in relevant part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

[5]      Rule 403 provides in relevant part that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[6]      *United States v. Hale,* 422 U.S. 171, 180 n. 7 (1975) ("[T]he question whether evidence is sufficiently inconsistent to be sent to the jury on the issue of credibility is ordinarily in the discretion of the trial court."); *United States v. Trzaska,* 111 F.3d 1019, 1024-25 (2d Cir. 1997).

[7]      *Trzaska,* 111 F.3d at 1025 (quoting 28 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6203 (2010) (hereinafter WRIGHT & GOLD).

the witness about it.[8]

Third, the extrinsic evidence of the prior inconsistent statement must be competent and otherwise admissible.[9]

Fourth, the impeachment by prior inconsistent statement must relate to a material rather than a collateral matter.[10]

Finally, even if all of these requirements have been satisfied, the trial court

---

[8]      A trial court has discretion to require satisfaction of the latter requirement before the extrinsic evidence is offered or, alternatively, to permit it to be satisfied by recalling the witness after the extrinsic evidence is received. *See United States v. Surdow*, 121 Fed. Appx. 898, 899-90 (2d Cir. 2005) ("[A] trial court's broad discretion in controlling 'the mode and order of interrogating witnesses and presenting evidence,' FED. R. EVID. 611(a), permits it to exclude extrinsic impeachment evidence 'that was not revealed while the witness was on the stand,' or at least before the witness was permitted to leave the court." (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE § 613.05[2][a], at 613-19 (2nd ed. 2009)).

[9]      *See, e.g., United States v. Almonte,* 956 F.2d 27, 29-30 (2d Cir. 1992) (per curiam) (proponent of notes of alleged prior inconsistent statement must prove that the "notes reflect the witness's own words rather than the note-taker's characterization;" third party's characterization of witness's statement "does not constitute a prior statement of that witness unless the witness has subscribed to that characterization"); *United States v. Schoenborn,* 4 F.3d 1424, 1428 n.3 (7th Cir. 1993) (quoting *Almonte* and noting that "[o]ur finding that [the] report did not constitute a statement made by [the witness] precludes admission of the report pursuant to Rules 607 and 613(b)."); *United States v. Benson*, 961 F.2d 707, 709 (8th Cir. 1992) (reports of interviews of witness that were not adopted by witness were "inadmissible double hearsay" and not admissible to prove prior inconsistent statement); *United States v. Saget,* 991 F.2d 702, 710 (11th Cir.) ("[A] witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own."), *cert. denied*, --- U.S. --- (1993); *United States v. Leonardi,* 623 F.2d 746, 757 (2d Cir. 1980) (FBI notes offered to impeach not attributable to witness because "a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them"); 28 WRIGHT & GOLD § 6203 ("Rule 613 does not itself create any exception to the hearsay rule.").

[10]      *United States v. Rivera*, 273 Fed. Appx. 55, 58 (2d Cir. 2008) ("A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral . . . ." (internal quotation marks omitted) (quoting *United States v. Blackwood*, 456 F.2d 526, 531 (2d Cir. 1972))).

nevertheless may exclude the extrinsic evidence under Rule 403 on an appropriate finding.[11]

      With these principles in mind, I turn to the defendant's proffers.

B.    *All of the Proffered Impeaching Testimony Is Hearsay*

      With respect to each of the four witnesses at issue here, the defendant made the following proffer: (1) the witness said X on the stand, (2) an FBI 302 reported that the witness had said "not X" on a previous occasion, and (3) the defendant proposed to call an FBI agent who signed the 302 to testify that the witness had said "not X" during an interview at which the agent had been present.

      In each case, the FBI agents spoke English and not Swahili, and the witnesses spoke Swahili and not English.  In each case, therefore, a Kenyan or Tanzanian law enforcement official was used as an interpreter.[12]  As a result, the agents whom the defense proposed to call for

---

[11]

    *E.g., Surdow,* 121 Fed. Appx. at 899 (district court may exercise discretion to exclude extrinsic evidence of prior inconsistent statement under Rule 403 even though necessary foundation laid under Rule 613(b)); *United States v. Young,* 248 F.3d 260, 268 (4th Cir. 2001) ("[E]ven if all the foundational elements of Rule 613 are met, a district court is not unequivocally bound to admit any or all extrinsic evidence of a prior inconsistent statement. Rather, a district court may still exercise its discretion to exclude such evidence [pursuant to Rule 403]."), *cert. denied,* 533 U.S. 961 (2001); 28 WRIGHT & GOLD § 6203 ("Rule 403 still gives the trial court discretion to exclude that evidence in an appropriate case."); *Rush v. Illinois Cent. R. Co.,* 399 F.3d 705, 723 (6th Cir. 2005) (same); *United States v. Hudson,* 970 F.2d 948, 956 n.2 (1st Cir. 1992) (same); *see also United States v. King,* 560 F.2d 122, 128 n.2 (2d Cir. 1977) ("Rule 613 and Rule 403 fulfill separate functions.  Although admissible under 613 the papers could be excluded under 403.").

[12]

    All but two of the FBI documents relied upon here by the defendant explicitly stated that the relevant interview was conducted through an African law enforcement officer serving as an interpreter.  GX 35242-15, at 1; GX 35201-1, at 1; GX 35201-2, at 1; GX  35232-10, at 1; GX 35219-1, at 1; GX 35219-6, at 1.

    The FBI 302 dated Oct. 11, 1998, GX 35242-12, does not explicitly state that such an interpreter was used to interview Sleyyum Juma, but it indicates that at least three Tanzanian

impeachment purposes had no personal knowledge of what the East African policemen serving as interpreters asked the witnesses or of what the witnesses said to the interpreters.[13]   The interpreters' statements thus would have been offered, by means of the agents' testimony, to prove their truth – specifically, to prove the truth of the interpreters' assertions that the witnesses told the interpreters in Swahili what the interpreters then reported to the agents in English.

        To be sure, our Circuit in some cases has upheld the receipt in evidence, over hearsay objection, of testimony as to prior statements made in other languages,  usually by defendants.  The Court on occasion has used sweeping language to the effect that the interpreter "is no more than a language conduit."[14]   All of these cases, however, rested on one or more of the following circumstances:  (1) the interpreter had no motive to mislead and there was no reason to question the accuracy of the translation, (2) the interpreter was the declarant's agent or co-conspirator,[15] (3) the

---

National Police officers were present for the interview.  Moreover, the FBI 302 dated six weeks later, GX 35242-15, states that a Tanzanian police inspector was used as an interpreter to interview Juma on that later date, and Juma testified via interpreter at this trial that he does not read English, Tr. 369.  The logical inference, which the Court drew, is that an interpreter was used at the earlier Oct. 10, 1998 interview as well.

The handwritten notes dated October 2, 1998, GX 35219-7, appear to be notes from the FBI interview of Kasim Juma Abdulla documented in the FBI 302 dated October 3, 1998.  GX 35219-6.  That 302 explicitly states that an interpreter was used.

[13]

At least, there was no evidence that they understood any of it.

[14]

*E.g., United States v. Lopez,* 937 F.2d 716, 724 (2d Cir. 1991) (quoting *United States v. Koskerides,* 877 F.2d 1129, 1135 (2d Cir. 1989)).

[15]

Other circuits have identified several factors that may be relevant to assessing this relationship, "such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated."  *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991) (citing *United States v. Santana*, 503 F.2d 710, 717 (2d Cir.), *cert. denied*, 419 U.S. 1053 (1974)); *see also United States v. Vidacak*, 553 F.3d 344, 352 (4th Cir. 2009) (identifying four factors); *United*

defendant was bilingual, was present when the out-of-court statement was made, and failed to object to the translation at the time, and (4) the defendant's statement was not offered for its truth.[16]

None of these circumstances applied here. The statements all were offered for their truth. Ghailani was not present when the witnesses were questioned. He offered no persuasive evidence that the Kenyan and Tanzanian police officers who translated for the FBI were agents of the declarants. Moreover, in this case there was reason to question whether they even purported to serve as mere "language conduits" and the accuracy of the translations.

As an initial matter, these translators were law enforcement officers of other nations investigating crimes committed in their own jurisdictions. They were not functionaries of the FBI. In the absence of their testimony, there was no basis for concluding that they merely translated FBI

---

*States v. Martinez-Gayton*, 213 F.3d 890, 892-93 (5th Cir. 2000) (same).

[16]

*Lopez,* 937 F.2d at 724 (defendants, who spoke both English and Spanish, present when interpreter translated their English statements into Spanish for Spanish speaking witness; receipt of witness's testimony as to defendants' statements upheld); *Koskerides,* 877 F.2d at 1134-35 (receipt of agent's testimony as to statements made in Greek by defendant's father-in-law through an interpreter upheld where statements not offered to prove their truth); *United States v. Da Silva,* 725 F.2d 828, 831-32 (2d Cir. 1983) (receipt of DEA agent's testimony as to defendant's statements, translated from Spanish to English for agent, upheld where court found that defendant authorized the interpreter to speak on his behalf and, moreover, defendant repeated his statements to bilingual agent who also testified to their content); *Santana,* 503 F.2d at 717 (receipt of testimony as to statements by defendant that were translated to the witness upheld where translation was made by co-conspirator in furtherance of conspiracy, there was no reason to question reliability of translation, and actions that followed were consistent with content of statements as translated).

The New York rule is similar although perhaps not identical. Testimony as to an interpreter's account of declarant's statement in a language not understood by the witness is admissible over hearsay objection only if (1) the interpreter was selected "by common consent of the parties" and thus became the declarant's agent, or (2) "the interpreter had verified the correctness of his interpretation." *People v. Chin Sing,* 242 N.Y. 419, 421-23 (1926); *accord, People v. Perez,* 128 Misc. 2d 31, 33-34, 488 N.Y.S.2d 367, 369-70 (N.Y. Sup. Ct. 1985); 58 N.Y. JUR.2D, *Evidence* § 313 (2010); EDITH L. FISCH, FISCH ON NEW YORK EVIDENCE § 874 n.94 (2d ed. Supp. 2008); *see also Gaudino v. New York City Hous. Auth.,* 23 A.D.2d 838, 259 N.Y.S.2d 478 (1st Dept. 1965) (testimony as to what interpreter said that plaintiff had told the interpreter in a different language inadmissible hearsay).

questions from English to Swahili and the witnesses' responses from Swahili to English.  It is equally or perhaps more plausible that they at least in part conducted their own interrogations and informed the FBI as to what they perceived to have been the substance and import of the witnesses' statements.  Thus, the Court was not satisfied that they were purely mechanistic converters of Swahili into English and *vice versa.*[17]

At least equally important, there was substantial doubt as to the accuracy of their alleged translations.  There was no evidence about the language skills of these interpreters, and the interpreters did not testify at trial.[18]  As detailed below, each of the witnesses whom Ghailani proposed to impeach explicitly contested having made certain of the statements attributed to him in the FBI reports.  Neither the witness-declarants nor the FBI agents, however, were in a position to correct a mistranslation at the time of the interview because neither knew the others' language.[19]  Moreover, at least one arguably significant translation error was conceded at the suppression hearing

---

[17]
    *See United States v. Sanchez-Godinez*, 444 F.3d 957, 960-61 (8th Cir. 2006) ("[The interpreter] testified that he was acting as both a translator and a federal law enforcement officer. . . Because [the interpreter] was not merely acting as a 'language conduit,' but rather initiated at least some of the questions posed in the interview, his out-of-court statements raise hearsay concerns.").

[18]
    *See Martinez-Gayton*, 213 F.3d at 893 (clear error to treat translator as merely a language conduit "absent in-court testimony by [the translator] that will help the court assess his reliability as a translator and give Appellant an opportunity to attack the quality of the translation").

[19]
    *See id.* at 892 (finding accuracy of the translation to be less reliable than in other cases because the appellant did not speak the interviewer's language and could not correct any mistranslation, and because the appellant "asserted in court that what [the interviewing agent] claimed to have heard [from the translator] differed in some respects from what Appellant actually said"); *Lopez*, 937 F.2d at 724 ("Both defendants spoke English and were present when [a third party] translated their conversations to [the DEA criminal informant who testified to the contents of the conversation], and it stands to reason that if she had distorted their conversation, they would have noticed it and corrected her.").

by the police inspector in charge of the Tanzanian police investigation.[20]

In this context, the interpreters could not properly have been considered mere "language conduits."  No other circumstance that has grounded receipt over hearsay objection of statements allegedly made through interpreters was present.  Moreover, the FBI agents were competent to testify only to what they were told in English by the interpreters and not to what the witnesses said to the interpreters in Swahili.  Accordingly, the FBI agents' testimony as to the witnesses' statements would have been inadmissible even if all other requirements for impeachment by extrinsic evidence of prior inconsistent statement had been satisfied.[21]

This alone warranted exclusion of all of the FBI testimony the defense proposed to offer.  In any case, additional considerations specific to each government witness independently would have required that the proposed testimony be precluded.

C.    *Sleyyum Juma*

Juma worked as a vehicle broker in Dar es Salaam.  He testified on direct, through an interpreter, that he was approached shortly before the bombings by two individuals whom he spoke of as Ahmed the Taller and Ahmed the Shorter.  The parties stipulated that Juma previously had identified known photographs of Sheikh Swedan and of the defendant, Ghailani, as Ahmed the

---

[20]
*United States v. Ghailani*, — F. Supp. 2d —, No. S10 98 Crim. 1023 (LAK), 2010 WL 4058043, at *7 n.116 (S.D.N.Y. Oct. 6, 2010).

[21]
The hearsay problem was called to the attention of defense counsel at trial and no convincing response was offered.  Tr. 1904-06.  Even if the point had not been addressed at trial, the order excluding the evidence could be affirmed on this basis.  *See, e.g., Dandridge v. Williams,* 397 U.S. 471, 475 n.6 (1970) (prevailing party may raise on appeal "any ground in support of his judgment, whether or not that ground was relied on or even considered by the trial court"); *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582,* 305 F.3d 82, 88 (2002) (same).

Taller and Ahmed the Shorter, respectively.[22]  I refer to them as Swedan and Ghailani for ease of expression.

Juma testified that he brokered the sale of the Nissan Atlas truck that was shown by other proof to have been turned into a truck bomb and detonated at the U.S. Embassy from one Sultan to Ghailani, whom he had known previously, and Swedan.[23]  According to Juma, it was Ghailani who said that they wanted the truck, negotiated the price, and ultimately paid the money.[24] He testified also that Sultan, Sultan's brother, Ghailani, Swedan and Juma at one point all went to a garage in order to have the truck's alternator replaced, and that Ghailani paid for that to be done.[25] This brings us to the specific statements that the defense sought to impeach.

1.    *Page 367, lines 3-7*[26]

On cross-examination, Ghailani sought to elicit admissions that the transaction was primarily between Sultan and Swedan and that it was Swedan who had paid Juma the commission on the deal.  Juma, however, insisted that the deal was primarily with Ghailani and that Ghailani

---

[22]
    Tr. 341-42.

[23]
    *Id.* 333-37.

[24]
    *Id.* 343-55.

[25]
    *Id.* 347-50.

[26]
    The defendant identified in Court Ex. I, by transcript page and line numbers, the precise statements sought to be impeached by extrinsic evidence.

12

rather than Swedan had paid the commission.[27]

        Counsel then elicited a statement to the effect that Swedan had agreed to pay for the replacement of the truck's alternator before the sale would be completed, but a moment later Juma said that Swedan had agreed to buy the vehicle before the alternator was replaced.[28]

        This brings us to the specific testimony that the defense contended laid the foundation for the attempted impeachment:

> "Q    Do you remember in late November [1998] telling the FBI that Sheikh [Swedan], that tall Ahmed agreed to pay to replace the alternator even before the completion of the sale itself?  Do you remember telling the FBI that?   A   It's not true."[29]

        GX 35242-15, an FBI 302 dated November 30, 1998, is an FBI memorandum of an interview conducted at a Tanzanian National Police ("TNP") office in the presence of TNP and Tanzanian intelligence personnel and the FBI during which a TNP inspector acted as interpreter. The 302 contains the following:

> "SLEYYUM [Juma] advised that SWEDAN had agreed to replace the ATLAS' alternator prior to the actual sale of the ATLAS from SULTAN to SWEDAN. SWEDAN agreed to replace the ATLAS' alternator and if the ATLAS then worked SWEDAN would purchase the ATLAS.  If, after replacing the alternator, the ATLAS did not work, SWEDAN would not purchase the ATLAS.  SLEYYUM [Juma] stated that SLEYYUM would then 'sacrifice' the money paid for the replacement of the alternator."

        Defense counsel had the interpreter translate the foregoing lines for the witness and asked if it refreshed his recollection that, in late November 1998, Juma had told the FBI in substance

---

[27]    Tr. 358-59.

[28]    *Id.* 364.

[29]    *Id.* 367:3-7.

that Swedan had agreed to pay to replace the alternator prior to the sale and had agreed further that he would buy the truck if it worked after the alternator was replaced.[30]  Juma responded, "That's not true."[31]  Defense counsel then completed his cross-examination without adverting again to the alleged prior inconsistent statement.  He never asked that Juma remain available if needed, and Juma returned to Africa.

On the defendant's case, counsel proposed to call one of the FBI agents who had signed GX 35242-15 to impeach Juma's testimony – specifically, the testimony at page 367, lines 3-7 quoted above.  The Court sustained the objection.  It now states its reasons for doing so more fully than it did on the record at the time.

First, in addition to the dispositive hearsay problem previously described, there was no clear inconsistency between the witness's statement at Tr. 367:3-7, which is the statement sought to be impeached, and the proposed extrinsic evidence, viz. the FBI agent's testimony that Juma had said what was recorded in GX 35242-15.

In the passage upon which defendant relies, Juma was asked whether he remembered having made a particular statement to the FBI in November 1998.  He responded, "That's not true." It therefore was not clear whether the substance of his testimony was that it was not true that (1) he remembered making such a statement, (2) he remembered making such a statement in November 1998, as opposed to at some other time, (3) he remembered making such a statement in November 1998 to the FBI, as opposed perhaps from making it to the TNP with whom he actually spoke in Swahili, or (4) his interaction with Swedan had occurred as GX 35242-15 reported it, perhaps among

---

[30]    *Id.* 370.

[31]    *Id.*

other possibilities.  The ambiguities caused by the form of the question and the failure to pursue the answer left it unclear whether there was any variance between the direct testimony and the statement Ghailani sought to introduce, let alone any variance that would have had "a reasonable bearing on credibility."[32]

There would have been a similar problem even if one went beyond the specific statement the defendant identified as the testimony sought to be impeached.  The proposed extrinsic evidence would have been to the effect that Swedan had agreed to replace the alternator prior to the sale and that the sale was contingent on the truck working following the replacement.  On cross-examination, however, Juma admitted that Swedan "agreed to pay for the replacement of the alternator before the sale would be completed."[33]  Although he said also that Swedan had agreed to buy the vehicle before the alternator was replaced,[34] there would have been no significant inconsistency between his trial testimony on this point and the proffered FBI agent testimony to the account given in the 302, even without regard to the ambiguity introduced by the question and answer relied upon as the basis for impeachment.  The Court's decision, in the exercise of its discretion,[35] to exclude the proffered testimony for want of a sufficient inconsistency between the testimony and the proposed extrinsic evidence therefore was a second independent basis for the

---

[32]

*Trzaska,* 111 F.3d at 1025.

[33]

*Id.* 364.

[34]

*Id.*

[35]

*Hale,* 422 U.S. at 180 n. 7 ("[T]he question whether evidence is sufficiently inconsistent to be sent to the jury on the issue of credibility is ordinarily in the discretion of the trial court.").

ruling.  Moreover, given the ambiguity of the witness's testimony and the lack, or at least weakness, of any inconsistency, the Court would have reached the same result under Rule 403.  The probative value of any inconsistency, given its at best weak nature, would have been substantially outweighed by the risk of misleading the jury and confusing the issues.

There was a third entirely independent basis for excluding this evidence.  Even if the preceding points somehow could be put aside, the proposed impeachment all would have gone to the question whether Swedan agreed to pay for the alternator "even before the completion of the sale itself."  But the fundamental point of Juma's testimony was that Ghailani was involved in the purchase of the truck and that he was an active participant – indeed, so much so that he actually paid for the truck – as opposed to an innocent bystander or simply Swedan's companion.  The question whether Swedan, whom Juma agreed paid for the alternator, agreed to do so before the sale was agreed upon or at some later point was collateral.

Accordingly, the proposed extrinsic evidence was precluded.[36]   The defense thereupon agreed that the ruling as to this statement was dispositive as to four of the remaining five

---

[36]
It is doubtful also that Ghailani afforded Juma the requisite opportunity to explain or deny the alleged prior inconsistent statement and, in any case, afforded the government the necessary opportunity to question the witness about it.  *See* FED. R. EVID. 613(b).

As to the former, Ghailani did show Juma the relevant part of the 302 for the purpose of determining whether it refreshed his recollection.  But when Juma responded to those questions with the statement "That's not true," the subject was dropped.  This left it unclear whether Juma was saying that the 302 did not refresh his recollection, whether he was denying that he had made the statements attributed to him in the 302, or whether he was denying that the statements attributed to him were correct.

In any case, the defendant dropped the point on cross-examination and failed to notify the Court or the government that he would seek to impeach Juma on this point by extrinsic evidence.  This deprived the government of an opportunity to question Juma on the point before the jury, as was its right.  By the time the defense made its intentions clear, Juma had returned to Africa.  In this circumstance, it was well within the Court's discretion to reject the proffer of extrinsic impeaching evidence.  *See, e.g.*, *Surdow,* 121 Fed. Appx. at 900**.**

16

statements by Juma as to which it had sought to adduce alleged prior inconsistent statements.[37]

2.      *Page 393:1-10*

The background to the next issue is that Juma testified on direct that Ghailani, on the occasion on which he paid Sultan the money for the Nissan Atlas truck, told Juma not to tell one Rashid Saleh, who lived in the same house as did Ghailani, that Ghailani had bought the truck.[38] The defense sought to attack this assertion on cross-examination, evidently because it wished to portray Rashid as a principal actor in the plot to bomb the Dar es Salaam embassy and Ghailani as a dupe.

The testimony that the defense sought to impeach came on cross-examination and was as follows:

"Q      Well, we are in agreement that when you were discussing these things with the FBI it was not until the third meeting with them that you mentioned this thing about not telling Rashid about the truck sale, isn't that true?   A    That's not true.

"Q      Sleyyum, isn't it true that it's not until your meeting on October 10, 1998, which I believe is the fourth meeting with the FBI, that that's the first time you mentioned this thing about not telling Rashid about the purchase of the truck?    A I don't remember."[39]

Defense counsel showed Juma GX 35242-12, an FBI 302 dated October 11, 1998, and asked whether it refreshed his recollection.  The witness then said that he did not remember the date, but

---

[37]
          *Id.* 1900-01; Ct. Ex. I.

[38]
          Tr. 354.

[39]
          *Id.* 393.

that he thought that he had "told them that before this date."[40]

Although the point is not clear from Court Exhibit I, in which the defendant set forth his position, it became clear in argument that the defendant's position was that Juma's first mention to the FBI of Ghailani's request that Juma not tell Rashid that Ghailani had bought the truck came in the October 10, 1998 meeting, which was Juma's third or fourth encounter with the agents.[41]  The contention was that his silence on this point in earlier interviews was inconsistent with his trial testimony that Ghailani made such a request.

There is no quarrel with the proposition that a witness in some circumstances may be impeached by silence.  This was not such an instance.  The FBI 302 reports that, on October 10, 1998, Juma made a statement consistent with his trial testimony, i.e., he told the FBI at that time of Ghailani's request.  Even if he had not made such a statement before October 10, 1998, there is no evidence that could warrant the conclusion that any silence on this point in prior interviews was sufficiently unambiguous to make that prior silence inconsistent with his trial testimony.[42]

In addition to the lack of sufficient inconsistency, this impeachment effort suffered also from the same competency-hearsay problem discussed above.[43]  The FBI agents lacked any personal knowledge of what Juma was asked or said during any of the interviews because he spoke

---

[40]

     *Id.* 393-94.

[41]

     *Id.* 1901-03.

[42]

     *See United States v. Strother,* 49 F.3d 869, 874 (2d Cir. 1995) (prior silence may be "too ambiguous to have any probative force," as where "the belatedly recollected facts merely augment that which was originally described").

[43]

     *See supra* Part B (finding hearsay problem to be dispositive with respect to each of the proffers at issue here).

Swahili and the agents spoke English.  As previously explained, in all the circumstances the Tanzanian police interpreter could not properly be considered a mere language conduit or agent of the witness for hearsay purposes.  Any testimony by the FBI agents as to what the interpreter told the agents that he had asked Juma or that Juma had said to him would have been out-of-court statements offered for the truth of the matters asserted and thus inadmissible hearsay.  The most that any FBI witness could have said if called as a witness was that the 302s he or she signed accurately summarized everything that the Tanzanian interpreters told them had transpired between the interpreters and Juma in a language the agents did not understand.  Such testimony would not have contradicted Juma's statement.

For both of these independent reasons, the proffered extrinsic evidence was precluded.


D.   *Wilson Maganga*

The Azzan clothing store was located in Mombasa, Kenya, and was owned by the family of Fahad, one of the individuals allegedly involved in planning and carrying out the embassy bombings.  The government argued that the Azzan store was an important meeting place and staging ground for the conspirators in the period leading up to the bombings and that Ghailani's frequent presence at the store during that time reflected his involvement in the conspiracy.  In contrast, the defense characterized Ghailani as a mere employee of the Azzan store, one who was not privy to any illegal schemes being advanced by others who frequented the store.

Wilson Maganga, a mechanic who plied his trade outside the Azzan store, identified

19

a known photograph of Ghailani.  He testified, through an interpreter,[44] that Ghailani "was friends with the individual from the shop" – Fahad.[45]  He went on to say that the shop at some point before the bombings stopped selling clothing, but that Fahad, Ghailani, Swedan, and a number of other men continued to gather there and, from time to time, carried such items as boat engines and large vehicle batteries inside.[46]

1.      *Page 1060, lines 20-25, and Page 1061, lines 1-2*

On cross-examination, the defense sought to elicit from Maganga a characterization of Ghailani as an "employee who ran the shop."[47]  The trial testimony that forms the predicate for the attempted impeachment was this:

> "Q     *     *     *     And when you identified this photograph [of Ghailani] in September 1998, you told the FBI that you recognized him as the employee who ran the shop.  Do you remember saying that to the FBI when you identified this

---

[44]

*See* Tr. 1059.

[45]

*Id.* 1050.

[46]

*Id.* 1050-53.

Maganga's testimony did not indicate whether Ghailani was among the men Maganga saw carrying non-clothing items into the store or whether Ghailani was present on those occasions.  *Id.* 1052-53.

[47]

*Id.* 1060.

This would have fit into the defendant's view of the case in two respects.  Defense counsel sought to show that Ghailani could not have been in on the bombing plot because the shop was run by Fahad's mother, Fawzia, and that a radical Muslim man would not have worked for a woman.  Counsel sought also to minimize the significance of Ghailani's presence at the Azzan store by suggesting that he was an employee.

photograph?     A     I didn't tell them that."[48]

In GX 35201-1, an FBI 302 of an interview with Maganga on September 28, 1998, the agent wrote that Maganga identified a photograph of Ghailani "as the employee who ran the shop." On the defendant's case, counsel proposed to call the agent to impeach Maganga's testimony that he had not previously told the FBI that Ghailani had been an employee of the Azzan store.

The Court precluded this testimony for essentially the same reasons articulated above with respect to the defendant's proffers to impeach Sleyyum Juma. As previously discussed, the proffered testimony of the FBI agent would have been inadmissible hearsay because an interpreter was used to conduct the interview memorialized in GX 35201-1. The Kenyan police inspector who interpreted during the interview could not properly be considered a mere "language conduit" or agent of the witness, and the interviewing FBI agent lacked any personal knowledge of what Maganga was asked or said during the interview. Hence, the most that the agent could have said if called as a witness was that the 302 accurately summarized what the interpreter told him Maganga had said. Any testimony by the agent as to what Maganga said to the interpreter during that interview would have been hearsay.

In addition, the proposed impeaching testimony would have been collateral. As the Court explained at oral argument,[49] the full trial record contains extensive evidence both that Ghailani was a friend of Fahad's who spent time at the Azzan store and that Ghailani at times did some work there.[50] In this context, whether or not Maganga in 1998 characterized Ghailani as an

---

[48]     Id. 1600-01.

[49]     Id. 1914-15.

[50]     See id. 1913-14.

"employee" of the Azzan store – as opposed to merely a friend of Fahad's or someone who helped

out in the store – was of very little moment.

> 2.     *Page 1064, lines 11-20*

On direct, Maganga testified that the Azzan store stopped selling clothing at some

point prior to the bombings but that Fahad, Swedan, Ghailani, and others continued to gather there.[51]

On cross examination, defense counsel elicited the following testimony, which it later sought to

impeach with FBI testimony about alleged prior inconsistent statements:

> "Q     The shop was running and open until approximately two days before the bombing, is that right?    A    No.   It was closed for a long time.
>
> "Q     Did you tell the FBI in late September of 1998 that the store closed approximately two days prior to the embassy bombing?   Did you tell them that? A   I didn't tell them that.
>
> "Q     Did you ever tell them that?    A    I didn't tell them that."[52]

Defense counsel did not ask Maganga what he meant by "closed" or otherwise seek to clarify this

aspect of Maganga's testimony.

GX 35201-2 memorializes an interview with Maganga conducted via interpreter on

September 28, 1998.  According to that 302, Maganga "stated that the store closed approximately

two days prior to the Embassy bombing, and that it has not opened since that time."[53]  The defendant

proposed to call an FBI agent to impeach Maganga's testimony by adducing Maganga's alleged

---

[51]     *Id.* 1049-53.

[52]     *Id.* 1064: 11-20.

[53]     GX 35201-2, at 1.

prior inconsistent statement regarding when the shop "closed."  The Court rejected this proffer for the following reasons.

The hearsay-competency problem previously discussed – namely, that the agent was competent to testify only as to what the interpreter told him Maganga said, not what Maganga actually said – is dispositive.  In addition, it is not clear that the statement attributed to Maganga in GX 35201-2 in fact is inconsistent with Maganga's testimony.  Maganga testified that there came a time when the Azzan store stopped selling clothes but that Fahad, Swedan, Ghailani, and others continued to congregate at the store until a week or two before the bombings.[54]  Any apparent inconsistency between (1) Maganga's alleged statement in 1998 that the store "closed approximately two days prior to the Embassy bombing," and (2) his testimony that the shop had been "closed for a long time" when the bombings occurred stems from the ambiguity of the word "closed."  In answering defense counsel's question as to when the shop "closed," Maganga may have been referring to the time when the store stopped selling clothes, the later point when its doors finally were shut and locked prior to the bombing, or some other time entirely.  The defense did not clarify this aspect of Maganga's testimony.  As a result, the testimony was not clearly inconsistent with the alleged prior inconsistent statement.[55]

---

[54]    Tr. 1049-55.

[55]    In addition, in light of the fact that Maganga returned to Africa without being provided a meaningful opportunity to explain the alleged prior inconsistent statement – and without the government having been afforded an opportunity to question Maganga with respect to that prior statement – it would have been improper to allow the defendant to impeach Maganga's testimony with the proffered extrinsic evidence.  *See supra* note 8; FED. R. EVID. 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon . . . .").

In any case, even if the prior statement were inconsistent and were admissible over hearsay objection, the proffered testimony would have been collateral. On direct, separate from his later testimony on cross regarding when the Azzan store closed, Maganga testified that the store stopped selling clothes in the months leading up to the bombings. In this circumstance, the question of characterization – that is, whether on the stand Maganga characterized the store as "closed" during that time period when he previously had not done so – was collateral.

### E.      Felix John Lukulu

Lukulu is a welder in Dar es Salaam, Tanzania. He testified on direct that he sold a number of gas tanks to two men – one shorter and one taller – whom he later identified as Ghailani and Fahad, respectively, roughly a month before the bombings. Lukulu said that he sold a total of seven tanks to the two men over the course of three transactions[56] and that Ghailani did most of the talking for the buyers and paid for the tanks from a small pouch that he wore around his waist.[57]

On cross examination, defense counsel sought to elicit from Lukulu an acknowledgment that it had been Fahad and not Ghailani who wore the money pouch and paid for the tanks during the first transaction:

> "Q     [I]sn't it true that in November of 1998 you told the FBI that it was the taller of the two who had a belly-type pouch from which he took the money to pay you. Isn't that what you told the FBI in November of 1998?     A     It's not true."[58]

GX 35232-10 is an FBI account of interviews of Lukulu conducted via interpreter

---

[56]      Tr. 1317.

[57]      *Id.* 1319-20, 1324, 1326-28.

[58]      *Id.* 1335: 10-14.

on November 16 and 17, 1998.[59]   On page 6 of that FBI 302, the agent recorded that Lukulu "described Arab #1 as being taller than Arab #2 (Ghailani), that Arab #1 . . . had a belly-type pouch which he (Arab #1) took money from and was the individual that placed the cylinders into the Suzuki in the first transaction."   The more detailed descriptions of each separate transaction contained in earlier portions of the 302, however, state that Lukulu said that Fahad paid for the first transaction from a money pouch worn around his waist and that Ghailani paid for the second and third transactions from a similar pouch worn around his waist.[60]

The defendant proposed to impeach Lukulu's testimony by calling one or more of the FBI agents who signed the 302 to testify to the alleged inconsistent statement quoted above from page 6 of that document.  In addition to the dispositive hearsay-competency problem common to all of the proffers at issue here – that is, the fact that the agents know only what the interpreter, and not the witness, said at the interview – there were at least two other independent reasons to preclude the proposed testimony.

First, Lukulu's challenged testimony was ambiguous and not sufficiently inconsistent with the prior statements as reported in GX 35232-10.  Defense counsel asked Lukulu at trial if it was true that Lukulu told the FBI in November 1998 that it was the taller of the two men who had a money pouch from which he took money to pay Lukulu.  Lukulu answered, "[i]t's not true."  In this context, it is not clear if Lukulu meant that it was not true that (1) he had said that to the FBI, (2) he had said it in November 1998, or (3) he ever had said that.  In addition, it is unclear whether Lukulu was answering with respect only to the first transaction or to all those transactions.

---

[59]
       GX 35232-10, at 1, 5.

[60]
       *Id.* 2-3.

Defense counsel argued that the question and answer clearly were in the context of a discussion specific to the first transaction, but the Court found it at least equally plausible that the phrasing of the question caused Lukulu to answer with respect to the whole series of transactions. If that was Lukulu's meaning, then his answer arguably was consistent with the statements recorded in the 302 indicating that both Fahad and Ghailani paid for certain of the transactions from money pouches that each wore around his waist. But counsel did not clarify the significant ambiguity in Lukulu's answer. As a result, the defense failed to show that Lukulu's testimony was inconsistent with the statements contained in the FBI 302. Moreover, the defense allowed Lukulu to return to Africa without requesting that he remain available for further questioning or indicating its intention to impeach this aspect of his testimony. It therefore would have been inappropriate to allow the proffered impeachment in light of the fact that the witness no longer was available.

Second, any inconsistency as to whether it was Ghailani or Fahad who paid for the gas tanks in the first transaction was collateral in light of Lukulu's testimony, consistent with the 302, that Ghailani was present for all three transactions and that it was Ghailani who paid for the second and third transactions from a money-pouch worn around his waist. In this circumstance, whether Ghailani played the leading role in all three of the transactions in which he was involved, as opposed to only two of the three, was collateral and not a proper matter on which to impeach Lukulu by extrinsic evidence.

F.    *Kasim Juma Abdalla*

Kasim Juma Abdalla, also known as "Teacher," lived with Ghailani and Rashid in Dar es Salaam from 1996 until Ghailani's departure immediately prior to the embassy bombings. Teacher testified on direct that Ghailani came to him to say goodbye about six days before the

26

bombings and told Teacher that he was leaving the next day for Germany, by way of Nairobi, to look for work.[61]

On cross examination, defense counsel sought to show that Ghailani in fact had told Teacher that he was going to Yemen, as other witnesses testified Ghailani had told them, rather than to Germany:[62]

> "Q      Did you tell the FBI in October of 1998 that [Ghailani's] plans were to leave for Yemen or Germany and – did you tell the FBI that?     A    I don't remember telling them that.

> "Q      Did you tell the FBI also that he had booked a ticket for Yemen from Nairobi to leave?  Do you remember telling the FBI that?     A    I remember saying that he told me he had made a booking to leave from Nairobi to go to Germany, not Yemen."[63]

Court Exhibit I identifies GX 35219-1 and GX 35219-6 as FBI 302s said to contain prior statements by Teacher inconsistent with the above-quoted testimony.  At argument, counsel directed the Court also to GX 35219-7 – handwritten notes from an interview on October 2, 1998, seemingly the same interview memorialized in GX 35219-6 – as another example of a prior inconsistent statement by Teacher on this subject.

All three FBI documents report that Teacher said in September and October of 1998 that Ghailani had told Teacher in early August of that year that he was leaving for "Yemen or

---

[61]

Id. 1555-56.

[62]

Two other witnesses testified that Ghailani told them prior to the bombings that he was leaving Tanzania for Yemen.  *See, e.g.*, *id.* 505 (Salum Issa Mohammed); *id.* 1531 (Laddah Hussein).

[63]

Id. 1607: 7-14.

Germany."[64]  GX 35219-6 and the handwritten notes report also that Teacher saw Ghailani a couple of days after Ghailani informed Teacher of his impending departure and that Ghailani told Teacher on that second occasion that he had booked a flight from Nairobi to Yemen on August 6, 1998.[65] Ghailani proposed to call one or more of the agents who prepared these FBI documents to impeach Teacher's testimony, quoted above, by testifying to these alleged prior inconsistent statements.

The Court did not rule on this proffer at argument but expressed the hope that the parties might resolve the matter by stipulation.[66]  The parties subsequently did not inform the Court that any such stipulation had been reached.  In any case, however, Ghailani did not renew his proffer with respect to impeaching Teacher's testimony before resting the defense case.  The proffer therefore was abandoned.

Even had it not been abandoned, the Court would have sustained the government's objection with respect to this proffer because the proposed impeaching testimony would have been both inadmissible hearsay and collateral.  As previously discussed, the agents Ghailani proposed to call would have been competent to testify only as to what the interpreter told them Teacher said during the interviews, not what Teacher actually said.  Moreover, in light of (1) two other witnesses' testimony that Ghailani told them he was going to Yemen, (2) substantial evidence that Ghailani in fact went to Pakistan, and (3) the lack of any evidence that he went either to Yemen or to Germany, the question of which specific lie Ghailani told Teacher – that is, which specific false destination Ghailani gave Teacher – was collateral.  Accordingly, even if the defendant's proffer had not been

---

[64]
        GX 35219-1, at 5; GX 35219-6, at 2; GX 35219-7, at 1.

[65]
        GX 35219-6, at 2; GX 35219-7, at 3.

[66]
        Tr. 1949.

28

abandoned, the Court would have precluded the proffered extrinsic evidence of the alleged prior inconsistent statements by Teacher.

<em>Conclusion</em>

For the reasons described above, the defendant was precluded from introducing the proffered extrinsic evidence to impeach the four government witnesses discussed above.

SO ORDERED.

Dated:          December 21, 2010

Amended:      January 14, 2011

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)