UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                  -against-                                          S10 98 Crim. 1023 (LAK)

AHMED KHALFAN GHAILANI,

                             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Michael E. Farbiarz
Harry A. Chernoff
Nicholas Lewin
Sean S. Buckley
Assistant United States Attorneys
PREET BHARARA
UNITED STATES ATTORNEY

Peter Enrique Quijano
Michael K. Bachrach
*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Ahmed Khalfan Ghailani was indicted in 1998 for his alleged complicity in the 1998 bombings of two United States embassies in east Africa in which 224 people were killed and over a thousand injured. He was apprehended in Pakistan in 2004 and then transferred to exclusive CIA custody. On June 9, 2009, Ghailani was brought to the Southern District of New York. Following a lengthy trial, the jury found Ghailani guilty of Count 5 – conspiracy to destroy buildings and

property of the United States – and not guilty of the other 284 counts with which he was charged. It further found, in response to an interrogatory, that Ghailani's conduct in Count 5 was a direct or proximate cause of the death of a person other than a conspirator. Ghailani now moves for a judgment of acquittal or, in the alternative, a new trial on Count 5.

*Facts*

I.      *The Evidence*

A.      *The Rule 29 Standard*

Rule 29 provides, in relevant part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[1] It places a heavy burden on the defendant.[2] A district court may enter a judgment of acquittal on this basis only if "after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."[3] That is, the "evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that

---

[1]      FED. R. CRIM. P. 29(a).

[2]      *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008).

[3]      *United States v. Reyes,* 302 F.3d 48, 52 (2d Cir.2002); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *Bullock*, 550 F.3d at 251; *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003).

no reasonable jury could find guilt beyond a reasonable doubt" in order for a court to acquit.[4]  In making this determination, moreover, a court must not usurp the role of the jury – a court may not "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."[5]  "Where a defendant challenges the sufficiency of the evidence in a conspiracy, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision.'"[6]

In this case, viewing the evidence in the light most favorable to the prosecution and drawing all permissible inferences in the government's favor, the jury was entitled to find at least the following:

B.    *Al Qaeda During the 1990s*

L'Hussaine Kherchtou, a cooperating witness who was a member of Al Qaeda from roughly 1991 through 1996, testified with respect to Al Qaeda's history, structure, goals, and membership during that time period.[7]

Kherchtou first described his experience at Al Qaeda training camps in Afghanistan

---

[4]

*United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) (internal quotation marks and citation omitted).

[5]

*Id.* (internal quotation marks and citation omitted).

[6]

*United States v. Ortiz*, 2010 WL 3736627, at *1 (2d Cir. 2010) (quoting *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)).

[7]

*See* Tr. 678-974.

4

during the early 1990s.  He explained also that Al Qaeda in 1992 relocated to Sudan and focused

on combating American influence in Africa and the Arabian peninsula.[8]  It established two training

camps in Somalia that trained members and affiliates to fight in the Somali civil war, with a

particular emphasis on targeting American soldiers and property.[9]  In early 1996, however, Al Qaeda

returned to Afghanistan.[10]  Its message became increasingly militant.  Whereas in the early 1990s

Al Qaeda had focused on targeting the American military presence in the Middle East,[11] by early

1998 public *fatwas* and interviews by Usama Bin Laden expanded its stated goals to include killing

Americans, military and civilian, anywhere in the world.[12]  Al Qaeda considered United States

embassies and other facilities abroad to be particularly attractive targets.[13]

   According to Kherchtou, Al Qaeda was committed to secrecy.  Its operatives often

used aliases, even with one another, and they frequently had at least one set of travel documents in

a false name.[14]  Its operations were compartmentalized, including four distinct phases, each

---

[8]

  *Id.* 769.

[9]

  *Id.* 779-81, 785-90.

[10]

  *Id.* 784, 815-817.

[11]

  *Id.* 767-68, 788-91; *see also* GX 1600-T (*fatwa* issued by Usama Bin Laden on Aug. 23, 1996).

[12]

  Tr. 829-34.

  *See, e.g.*, GX 93-T (*fatwa* issued by Usama Bin Laden on Feb. 23, 1998); GX 81-D (ABC interview with Usama Bin Laden, broadcast on June 10, 1998).

[13]

  Tr.  751, 795-96.

[14]

  *Id.* 714, 819, 871, 937.

involving a different set of operatives.[15]  First, the management or leadership team – high-ranking Al Qaeda members – decided on a target.  A surveillance team then gathered information about that target.  Months or even years later, a logistics team, selected by the management team, made arrangements such as acquiring raw materials, renting locations at which to work with those materials, building bombs or other devices, and coordinating with individuals who would execute the operation.  Because the logistics phase of an operation involved significant interaction with local populations and a greater risk of being identified, Kherchtou testified that it was preferable to use trustworthy individuals who were or appeared to be local and who were willing to leave the area when their jobs were done.[16]  Once the logistics phase was complete, the execution team, often suicide bombers or assassins, struck the target.

Kherchtou identified a number of Ghailani's alleged co-conspirators as Al Qaeda operatives and described their positions within the organization.  He identified Abu Mohammed Al Masri ("Al Masri"),[17] Harun Fazul,[18] Abdul Rahman Al Masri ("Abdul Rahman"),[19] and Wadih El

---

[15]

   *Id*. 919-25.

[16]

   *Id*. 922-23.

[17]

   Kherchtou identified the man depicted in GX 119 as Abu Mohammed Al Masri.  Tr. 712, 740-41.  Al Masri was the leader of Al Qaeda's Al Farouq training camp in Afghanistan in the early 1990s and he became a trainer in Africa after Al Qaeda relocated.  He served also on Al Qaeda's Military and Religious Committees.  *Id*. 713-15.  His rank in Al Qaeda was sufficiently high that he might serve on the management team for an operation, selecting targets and personnel for the surveillance, logistics, and execution teams.  *Id*. 920-21.

[18]

   Kherchtou identified the man depicted in GX 110 as Harun Fazul.  *Id*. 715.  Fazul trained at the Al Farouq camp, served as a trainer in Al Qaeda's Somali camps, and was a member of Al Qaeda's Media Committee in 1991-1992.  *Id*. 716, 724-26.

[19]

   Kherchtou identified the man depicted in GX 134 as Abdul Rahman Al Masri, also known as Abdul Rahman Al Muhajir.  *Id*. 732-34.  Abdul Rahman was an explosives trainer at the

Hage[20] as senior Al Qaeda trainers and leaders with whom he had worked while he was an Al Qaeda member.  Mohammed Sadek Odeh and Mustafa Fadhil, he said, were Al Qaeda members who served as trainers in the Somali camps and had families in Mombasa.[21]

Kherchtou left Al Qaeda in early 1996 when the organization relocated to Afghanistan.[22]  Probably for that reason, he did not recognize pictures of Ghailani or four of Ghailani's alleged co-conspirators: Sheikh Swedan, Khalfan Khamis Mohamed ("K.K. Mohamed"), Mohamed Rashed Daoud al-'Owhali, and Fahid Mohamed Msalam ("Fahad").[23]  Despite his

---

Al Farouq Camp.  He later was a trainer in the Somali camps as well.  *Id.* 733-34.

[20]

Kherchtou identified the man depicted in GX 131 as Wadih El Hage.  *Id.* 806.  El Hage rented a large house in Nairobi that he shared for a time with Kherchtou and at which other Al Qaeda members, including Harun Fazul, sometimes stayed when they passed through Nairobi.  *Id.* 808-10.  The house included an office and had a phone number frequently used for Al Qaeda business, most often by El Hage and Fazul.  *Id.* 809-10.  This house was searched by the FBI and Kenyan police on August 21, 1997, at which time certain items were recovered including a "security report" described below.  *Id.* 890-92; GX S-29.

[21]

Kherchtou identified the man in GX 130 as Mohammed Sadek Odeh.  *Id.* 728-29.  He identified the man in GX 132 as Mustafa Fadhil.  *Id.* 730.

Kherchtou first met Odeh and Fadhil at Al Qaeda's Al Farouq training camp in Afghanistan.  *Id.* 729-31.  Odeh and Fadhil later served as Al Qaeda trainers in Somalia, and Kherchtou saw them occasionally in Nairobi when they travelled to and from the Somali camps.  *Id.* 729, 731, 784.

[22]

*Id.* 817-20.

[23]

*Id.* 850-51.

GX S-43 between the parties establishes that GX 125, GX 141, and GX 140, are known photographs of Ghailani, Khalfan Khamis Mohamed, and Mohamed Rashed Daoud al-'Owhali, respectively.  Khalitum Omar identified the man depicted in GX 124 as her nephew, Fahad Mohamed Ali Msalam.  *Id.* 1017.  She identified the man in GX 123 as Sheikh Swedan, her neighbor in Mombasa.  *Id.* 1018.

departure, however, Kherchtou kept in contact with some active Al Qaeda members[24] who continued to provide him with information about Al Qaeda activity in East Africa.  Most notably, Harun Fazul stayed with Kherchtou in Sudan for a few weeks some time after August 1997 and then told Kherchtou that (1) the FBI had searched El Hage's office in Nairobi in August 1997,[25] and (2) Al Qaeda had new recruits in Mombasa.[26]  The latter statement was corroborated by a "security report" found by the FBI in El Hage's office in August 1997,[27] which Kherchtou testified probably had been written by Harun Fazul to Al Qaeda leaders.[28]  The report, dated August 14, 1997,[29] expressed great concern about the secrecy and security of Al Qaeda's "East Africa crew." It specifically mentioned "ansars" – partisans or local supporters[30] – who were working for Al Qaeda in Mombasa.[31]

---

[24]

    *Id.* 835.

[25]

    *Id.* 836.

[26]

    *Id.* 837.

[27]

    *See* GX 300A-T, at 6.  The parties have stipulated that GX 300A-T is an accurate translation of a computer file contained on the computer seized during the August 21, 1997 search of El Hage's home and office.  *See* GX S-28, GX S-29; Tr. 890-92.

[28]

    Tr. 869-72, 918.

[29]

    GX 300A-T, at 3.

[30]

    Tr. 872, 885-86.

[31]

    GX 300A-T, at 4 ("On the same day we heard the news the partisans (Ansar) called us from Mombasa and asked them never to call me at that number again.  They told me that Khalid wanted to talk to me urgently but I told them I will get in touch with them but never to call me at [El Hage's] number again.  After two days they called me back at the same number so I forced them to burn that number and immediately informed Khalid that I had prohibited them from calling me here as I am 100% sure that the telephone is tapped . . . .").

8

C.      *New Recruits in Mombasa: 1996 through Early-1998*

Other witnesses picked up the story where Kherchtou left off.  Testimony detailed

below permitted the jury to find that the new recruits included at least Sheikh Swedan, Fahad

Msalam, K.K. Mohamed, and Ghailani and that the group used the Azzan clothing store in

Mombasa, in addition to other locations, as a safe haven and staging ground for the plot to blow up

the American embassies.

Several witnesses testified that Fahad's parents owned the Azzan store, which in the

1990s was run primarily by Fahad's mother.[32]  Around 1996, Fahad left Mombasa for a number of

months, ostensibly to study in Pakistan, but he took an increasingly active part in running the

business after he returned.[33]  According to Wilson Maganga and Mica Kamau Ngugi, who worked

very near the Azzan store,[34] Fahad began to manage the store in 1997 after his father's death.[35]

Ghailani, who lived in Dar es Salaam in 1997 and 1998,[36] was seen at the Azzan store on a regular

basis beginning in 1996-1997, as a friend of Fahad's and perhaps also helping out with the store.[37]

---

[32]     Kherchtou testified that "Khalid" was another name for Mustafa Fadhil.  Tr. 730, 886.

[33]     *See* Tr. 1027-28 (Khalitum Omar); *id.* 1078-80 (Ngugi).

[34]     *Id.* 1028 (Khalitum Omar);

[35]     *Id.* 1047 (they worked "just five steps" away).

[36]     *Id.* 1048 (Maganga); *id.* 1079-80, 1084 (Ngugi).

[37]     He lived first on Narungombe Street and later at 15 Amani Street.  *See, e.g.*, *id.* 492-93.

        *Id.* 1029-30 (Khalitum Omar); *id.* 1050-51 (Maganga); *id.* 1084-86 (Ngugi).  All three
witnesses stated that Ghailani was Fahad's friend.  Their accounts differed as to whether he
worked in the store.  *Id.* 1029-30 (Khalitum Omar stated "I didn't know if he worked there.
I knew him as Fahad's friend."); *id.* 1060-61, 1065 (Maganga insisted that Ghailani did not

The Azzan store changed significantly in early 1998.  Ngugi testified that a new group of men who were not customers began frequenting the store about seven months before the bombings, roughly in January 1998.[38]  Ngugi identified Swedan, K.K. Mohamed, Mustafa Fadhil, and Sadek Odeh as regular visitors to the store during that time.[39]  Unlike native Mombasans, the Swahili spoken by the new visitors was not very good.  They wore conservative Muslim dress, visited the nearby mosque frequently, and slept at the store.[40]  In addition, Maganga testified that the Azzan store stopped selling clothes about the time the new group of people started visiting.[41]  Both Ngugi and Maganga testified that Ghailani continued to frequent the store after these changes occurred – that is, he went inside the store with Fahad, Swedan, and other new visitors, and the door was shut.[42]

---

work at the store); *id.* 1085-86 (Ngugi testified that Ghailani sometimes helped run the store when Fahad was away).  The parties stipulated that, on September 28, 1998, Ngugi identified a picture of Ghailani as "the person who worked in the Azzan store in 1997-98." *Id.* 1086.

In addition, Ghailani's fingerprint was found on a Fanta bottle seized by the FBI when it searched the Azzan store in September 1998. *See* GX S-19; GX S-45, ¶ 1(b); GX 1704; GX 1462A-1; Tr. 1101, 1106-07.

[38]

Tr. 1087-88.

[39]

The parties so stipulated. *See id.* 1084 (with respect to Odeh), 1089 (with respect to Swedan, K.K. Mohamed, and Fadhil).

Maganga testified also that Sheikh Swedan was Fahad's friend and frequently was seen at the store. *Id.* 1050.

[40]

*Id.* 1088-89.

[41]

*Id.* 1049-52.  Maganga was not specific as to when this change occurred.  He asserted that the store in essence "closed" long before the bombings. *Id.* 1064.

[42]

*Id.* 1049-52 (Maganga); *id.*1088 (Ngugi).

D.      *Securing Travel Documents and Bomb-making Sites: April through early-June 1998*

In April, May, and early June, the conspirators took additional steps to effectuate the embassy bombings plot.

1.      *Nairobi*

In a quiet Nairobi neighborhood, a man named Mohamed Sikander took a six-month lease on 43 Runda Estates, a villa at which the Nairobi truck bomb was assembled.[43]  He did so on behalf of Harun Fazul,[44] who was identified by Kherchtou as a senior Al Qaeda trainer.

The Runda Estates residence is surrounded on all sides by a high fence and is situated slightly below street level so that a person standing on the street would have a restricted view of the interior.[45]  Fazul told the lessor that he was relocating to Nairobi temporarily for business and that a number of business associates – gold traders – would be visiting the house.[46]  When the lessor stopped by the house a month later, however, she noticed that Fazul's family had joined him but that

---

[43]

The lease is dated April 24, 1998.  GX 568-P.

[44]

Fazul was involved from the very beginning in choosing the location and negotiating the rental.  Tr. 1636, 1647-49.

John Simdi Simeon, a gardener at nearby 53 Runda Estates, identified a picture of Harun Fazul as the person who resided at 43 Runda Estates during the summer of 1998.  *Id.* 1670. Simeon testified also that four people were with Fazul when Fazul first approached Simeon about whether houses in Runda Estates were for rent.  *Id.* 1668.

[45]

*Id.* 1637-42.

[46]

*Id.* 1639-41, 1657-58.

the house remained unfurnished.[47]  John Simdi Simeon, a gardener who did occasional work for

Fazul at 43 Runda Estates, testified that the gate that opened onto the front street was kept locked

and that he one day saw a man, later identified as Fahad, standing outside and trying to get in.[48]

Fahad was not the only conspirator who visited Nairobi during this time.  The guest

register for the Hilltop Hotel in Nairobi, frequented by members of the bombing conspiracy,[49] shows

that a "Mohammed Kai" with a Yemini passport, number 0621074, stayed there on May 31, 1998.[50]

This was an alias, supported by a passport in a false name, for Abdul Rahman, whom Kherchtou

identified as another senior Al Qaeda leader and trainer.[51]

On June 2, 1998, Rahman applied for and obtained a visa from the Tanzanian consul

in Nairobi using a passport in the name of Mohamed K.A. al-Namer.[52]  The visa application listed

43 Runda Estates as al-Namer's address.  It was reasonable to infer both that Abdul Rahman was

---

[47]
    *Id.* 1652-53.

[48]
    *Id.* 1672-73.

[49]
    The hotel registry indicates that various conspirators stayed there during the summer of 1998.  *See* Tr. 1039-45; GX 518; *see also infra* notes 142 - 143 and accompanying text.  A phone index recovered from El Hage's office in August 1997 contains an entry for "HILTOP" with phone number 250601.  GX 304, at 10; *see* GX S-29 (stipulating phone book's recovery during search); GX S-22, ¶ 5 (stipulating that Hilltop Hotel's phone number is 02250601).  The government did not offer any explanation as to why the first two numbers in the phone number as stipulated were missing from the number as listed in El Hage's phone book.

[50]
    GX 518, at 30; *see* Tr. 1042.

[51]
    This is evidenced by the fact that a Tanzanian visa application for "Mohamed K.A. al-Namer," Yemen passport number 0621074, includes a picture of Abdul Rahman Al Masri.  GX 1460A.

[52]
    *Id.*

12

attending to Al Qaeda business at 43 Runda Estates and that he made plans to visit conspirators in Tanzania.

2.      *Dar es Salaam*

Meanwhile, in Dar es Salaam, Ghailani and K.K. Mohamed made their own initial travel preparations.  Although Ghailani already had one Tanzanian passport under a false name,[53] he applied for a second under a different false name in early April 1998.

GX 1460-T is a translation of a Tanzanian passport application in the name of "Abubakar Khalfan Ahmed."[54]  It includes a picture of Ghailani as the applicant and indicated that "Abubakar" needed the passport to conduct business in Zimbabwe and Botswana.[55]  The application included a supporting letter, dated April 3, 1998, ostensibly written by Rashid Saleh.  Kassim Juma ("Teacher"), a friend and housemate of Ghailani's, however, testified that the letter actually is in Ghailani's handwriting.[56]  The application was approved on June 18, 1998.[57]

K.K. Mohamed also applied for a passport under a false name at about the same time. After the bombings, a partially completed Tanzanian passport application in the name of "Zahran

---

[53]

Another Tanzanian passport bearing Ghailani's photograph and a different fake name – "Shariff Omar Mohamed" – was issued on May 20, 1994.  GX 1460D; *see also* GX S-12, ¶ 1.

[54]

*Id.* 979.

[55]

GX 1460, 1460-T.

[56]

Tr. 1618-19;

[57]

GC 1460, at 1.

Nassor Maulid" was discovered in the 15 Amani Street residence that Ghailani shared with others and found to contain K.K. Mohamed's fingerprints.[58]  K.K. Mohamed had the Maulid passport itself when he was arrested in South Africa on October 5, 1999.[59]  That passport, in the name of Zahran Nassor Maulid, bears K.K. Mohamed's picture and was approved on May 4, 1998.[60]

Soon thereafter, Mustafa Fadhil, the Al Qaeda member and trainer known to Teacher as "Hussein," came to stay at 15 Amani Street in Dar es Salaam.[61]  He remained there in May and June 1998, usually sleeping in Ghailani's room.[62]  Ghailani told Teacher that Fadhil had come to Dar es Salaam to open a cinder block business.[63]  While Fadhil was there, a number of different people came to 15 Amani Street to visit, including Fahad and K.K. Mohamed.[64]

During this time, the conspirators in Dar es Salaam scouted for a residential

---

[58]

*See* Tr. 1788; GX 1307; GX 1461; GX S-19.

A copy of the passport application for Zahran Nassor Maulid that actually was submitted and approved bears K.K. Mohamed's picture and appears to have been submitted April 16, 1998.  GX 1452; *see also* GX S-12, at 3.

[59]

*See* Tr. 1789-91; GX 1018; GX S-18.

The passport was found to be covered with TNT residue.  *See* GX 1462, at 8.

[60]

GX 1018, at 3-4.

[61]

Tr. 1560.

[62]

*Id.* 1561-62.

[63]

*Id.* 1561.

[64]

*Id.* 1597.

14

compound in which to assemble the Tanzanian bomb truck.[65]  The parties stipulated that a real estate broker, if called, would have testified that K.K. Mohamed said in June 1998 that he was looking for "a residence with high exterior walls, a wide driveway, and a gate for a vehicle"[66] and that the witness brokered the rental of 213 Ilala Street to K.K. Mohamed and Fadhil.[67]  When Fadhil subsequently left 15 Amani Street, Ghailani told Teacher that Fadhil ("Hussein") had rented a house with K.K. Mohamed in a different neighborhood in Dar es Salaam, thus evidencing at least some awareness of Mohamed's activities.[68]

K.K. Mohamed made an additional purchase just a few days prior to the 213 Ilala rental.  On June 9, 1998, he bought a white 1989 Suzuki Samurai pickup truck[69] in a transaction attended and witnessed by Fahad.[70]  A number of conspirators were seen using a white Suzuki Samurai, as detailed below, in the following months.  When the same Suzuki Samurai was searched outside of 15 Amani Street after the bombings, the interior was found to contain TNT residue.[71]

---

[65]

*Id.* 1823-36; GX S-42.

[66]

GX S-42, ¶ 2(b).

[67]

*Id.* ¶ 2(c).

Both Fadhil and K.K. Mohamed signed the lease on June 15, 1998.  *Id* ¶ 3; GX 1353 (signed lease).  Fadhil signed the lease using the name "Hassan Ali."  *Id.* ¶ 2(d).

[68]

*Id.* 1562-65.

[69]

GX S-23, ¶ 2; *see also* GX 1420.  The Suzuki had Tanzanian license plate number TZG 7575.

[70]

GX S-23, ¶ 3.

[71]

GX 1462, at 2; Tr. 560-61.

E.     *Acquiring Trucks and Bomb Materials: Mid-June through late-July 1998*

Once the bomb-making locations had been secured, the conspirators set about acquiring the necessary vehicles and materials for the truck bombs. These preparations proceeded primarily in Mombasa, Kenya, and in Dar es Salaam, Tanzania, and it appears that at least one high-level Al Qaeda member traveled to Tanzania during this time period to supervise.[72]

1.     *Mombasa*

In Mombasa, Swedan bought the Toyota Dyna truck later used to bomb the Nairobi embassy[73] and then took it to Ali Mahfudh Salim's garage for modifications.[74] The welder who did

---

[72]

Tanzanian border patrol records indicate that Abdul Rahman crossed into Tanzania on July 22, 1998, using his fake "Mohamed al-Namer" passport. *See* GX 1460C (Arrivals, July 22, 1998, page 2) (showing "al-Namer," with Yemeni passport number 0621074); GX S-12; *see also* Tr. 2220-21.

[73]

GX S-15, ¶ 11 ("The vehicle that contained the explosives that were detonated at the United States Embassy located in Nairobi, Kenya on August 7, 1998 was a Toyota Dyna truck, model MDGT. Physical evidence recovered from the vicinity of the United States Embassy in Nairobi, Kenya consists of fragments of the Toyota Dyna truck that was used to carry the explosives used in the bombing . . . . Among other things, included in those fragments was the chassis of the Toyota Dyna truck, which bore the unique identifying number 'BU61-0001636.'"); *see also* GX 815 (fragment bearing indicated chassis number).

Said Salim Omar testified that he sold Swedan a Toyota Dyna with the same unique chassis number found on one of the fragments of the truck used in the Nairobi bombing a month or so before the bombings. Tr. 1203-05, 1209-10, 1216-17; GX 583A (sales agreement, dated May 18, 1998, for Toyota Dyna bought by Said Omar, including chassis number BU61-0001636). Said Omar's brother, Omar Salim Omar, previously had worked for Swedan and also testified to this transaction. Tr. 1230-32.

[74]

*Id.* 1262-63.

Mahfudh testified that his garage worked on the Toyota Dyna roughly two month before the bombings. *Id.* 1260. Kazungu said he did the work between one and four weeks before the bombings. *Id.* 1277.

the work testified that he (1) enclosed the open back of the truck with an unusually low steel-plate covering,[75] (2) built a separator inside the truck bed to create two chambers,[76] and (3) made clamps to fasten three large car batteries to the floor, all at Swedan's request.[77]  Once the modifications were completed and the batteries had been clamped to the truck bed, Swedan brought in an electrician who did some wiring under the truck.[78]

The conspirators used the Azzan store throughout the summer of 1998 as a place to meet and store the materials they were acquiring for the bombings.  Maganga, a welder who worked near the store, saw many of the conspirators, including Swedan and Fahad, bringing boat engines and large vehicle batteries into the store in the week or two before the bombings.[79]  Ghailani was

---

[75]

*Id*. 1278-80.

Both Mahfudh and Kazungu testified that the enclosure Swedan asked them to build was much lower than normal for a truck of this type.  *Id*. 1272 (Mahfudh); *id*. 1280-81 (Kazungu).  Swedan told Mahfudh that he needed it to be low so that the truck would fit through the gate at his poultry farm.  *Id*. 1272.  He told Kazungu something similar.  *Id*. 1280-81.

[76]

*Id.* 1281-82.

[77]

*Id*. 1282-83.

Mahfudh and Kazungu testified that this request too was unusual.  *Id*. 1273 (Mahfudh); *id*. 1278-79 (Kazungu).  Moreover, Swedan gave Mahfudh and Kazungu different reasons for needing to transport the batteries.  He told Mahfudh that he was taking them to a friend in Nairobi, *id*. 1264-66, but he told Kazungu that he needed the batteries to run the generators at his farm, *id*. 1282-83.

[78]

*Id.* 1267-68, 1283.

[79]

*Id.* 1052-54.

Specifically, Maganga saw Swedan and Fahad carry three large batteries into the store. Each battery was too large for one man to carry.  *Id.* 1054.

seen there regularly during this time, even though the store by then had stopped selling clothes.[80]

### 2. Dar es Salaam

Ghailani was involved heavily in the preparations in Dar es Salaam during the same time period. Most importantly, he bought a number of acetylene and oxygen gas cylinders a month or two before the bombings. Felix John Lukulu, a welder in Dar es Salaam, sold seven gas tanks to two men, whom he later identified as Ghailani and Fahad,[81] in three transactions about a month before the bombings.[82] Both Lukulu and Flenan Abel Shayo, an acquaintance of Ghailani who brokered these deals, testified that Ghailani, not Fahad, did most of the talking and paid for the gas tanks.[83] In addition, Shayo stated that Ghailani first approached him on foot without Fahad about wanting to buy a number of gas tanks.[84] At that time, Ghailani told Shayo he needed the tanks because they had gotten a job cutting scrap metal in the Tanga region a few hours away.[85] It was

---

[80]

See supra notes 38 - 42 and accompanying text (discussing testimony regarding Azzan store).

[81]

Lukulu identified the shorter man as Ghailani and the taller man as Fahad. Tr. 1380. Shayo similarly identified Fahad as the person who was with Ghailani when he purchased the gas tanks. Id. 1377.

[82]

Id. 1317-18, 1330-31.

[83]

Id. 1319-20, 1324, 1326-28 (Lukulu); id. 1376-79 (Shayo).

[84]

Id. 1373.

[85]

Id. 1374.

When Shayo asked if he could go with them to work there also, Ghailani said no, it would be too expensive to bring him along. Id. 1374-75. Shayo, who had known Ghailani for a number of years, testified that he never knew Ghailani to do any welding or scrap metal

only when Ghailani returned later, after Shayo had located two tanks through Lukulu, that Fahad also came.[86]  On that occasion, Ghailani and Fahad arrived in a white Suzuki Samurai, driven by Fahad, into which they loaded the first two tanks that Ghailani purchased.[87]

Over 200 fragments from at least 19 different oxygen and acetylene tanks were collected in the immediate vicinity of the United States embassy in Dar es Salaam after the bombings.[88]  The tanks enhanced the explosive power and fragmentation of the truck bomb.[89]  While Ghailani purchased only seven from Lukulu, Shayo testified that about six other workers in the area asked him for gas tanks soon after the Ghailani-Lukulu deals.[90]  This was highly unusual – it was rare to have even one person in a year come asking for gas tanks, and on those rare occasions people usually sought only a single tank for work.[91]  In all the circumstances, the jury was entitled to infer that this unusual demand was stimulated by Ghailani's search for more gas cylinders.

Ghailani participated also in the conspirators' purchase of the Dar es Salaam bomb truck in late July, this despite the fact that Ghailani does not drive.  The vehicle used to bomb the

---

[86]  work.  *Id.* 1375.

[87]  *Id.* 1373, 1376.

*Id.* 1322-23 (Lukulu); *id.* 1379-80 (Shayo).

For the two subsequent transactions Ghailani hired a cart to carry the gas tanks away.  *Id.* 1325-29, 1380-81.

[88]  GX S-24, ¶¶ 9-10; Tr. 1354-56.

[89]  *Id.*

[90]  *Id.* 1382, 1388.

[91]  *Id.* 1388-89.

Dar es Salaam embassy was a 1987 Nissan Atlas refrigerated truck.[92]  Sleyyum Suleiman Salim

Juma testified that he brokered the sale of this truck[93] to "Ahmed Mrefro" and "Ahmed Mfupi," later

identified as Swedan[94] and Ghailani, respectively, one or two weeks before the bombings.[95]  He

stated that Ghailani did most of the talking when Ghailani and Swedan first approached him about

buying the truck.[96]  Swedan, Ghailani, Sleyyum, the truck owner Sultan, and Sultan's brother went

to a room on the second floor of the Al Noor Hotel to complete the sale.[97]  Sleyyum stood out on the

---

[92]

 The truck used in the Dar es Salaam bombing had vehicle identification number ("VIN") MH40-060500.  *See* GX S-24, ¶¶ 12-13; GX 1116 (fragment recovered from Dar es Salaam bomb site containing VIN MH40-060500).

[93]

 This was the same white Nissan Atlas refrigeration truck used in the bombings.  Juma Kasinya Amani owned the company, Jaba Trading Inc., that imported the Nissan Atlas with chassis number MH40-060500.  *See* GX S-26; GX 1177; GX 1177-T, at 7.  Amani testified that he had trouble selling that vehicle until a broker named Mohamed Sultan arranged its sale in June 1998.  Tr. 313-317.

 The chassis number listed on the sales agreement between Amani and Sultan, dated June 17, 1998, is missing the final zero.  GX 1176; GX 1176-T; Tr. 315-16.  Amani testified, however, that this was due to the fact that he copied it from a registration card that similarly recorded the chassis number incorrectly.  Tr. 315-16.

[94]

 The Al-Noor Hotel's guest registry shows that a "Sheha Ahmed" from "MSA" stayed in room 24 from July 24-30.  *See* GX 1457; GX S-33.  The parties have stipulated that "Sheha" is translated as "Sheikh."  Tr. 325.  "MSA" is a common business abbreviation for Mombasa.  *Id.* 298.

[95]

 *See* Tr. 333-35 (describing truck and sale); *id.* 342 (stipulation that on October 9, 1998, Sleyyum identified known pictures of Swedan and Ghailani as the taller man and the shorter man, respectively, to whom he had sold the truck).

 During testimony, Sleyyum referred to Swedan as Ahmed Mrefro ("the taller") and Ghailani as Ahmed Mfupi ("the shorter").  *Id.* 335.

[96]

 *Id.* 343, 346.

[97]

 *Id.* 351-52.

balcony while the others spoke inside, but observed that Ghailani did most of the talking.[98]  He

testified also that Sultan and Ghailani paid Sleyyum his commission after the sale.[99]

Once Ghailani and Swedan had purchased the truck, Swedan took it to a local welder

for modifications.[100]  The welder testified that, at Swedan's request, he (1) made a stand for two

large vehicle batteries,[101] (2) built a lockable metal compartment to surround the stand,[102] (3) added

metal bars along the floor and sides of the back of the truck,[103] and (4) drilled many small holes in

the floor of the enclosed truck bed.[104]  He testified also that when he questioned Swedan as to the

wisdom of drilling those holes – the holes would destroy the seal on the refrigerated compartment

– Swedan told him to drill them anyway.[105]  Swedan assured the welder that he had done this before

---

Half of the purchase money was paid at that time, but the balance was to be paid at a later date.  *Id.* 383.

[98]

*Id.* 352.

[99]

*Id.* 359.

[100]

On October 9, 1998, Temo identified a known photograph of Swedan as the man for whom he performed welding work on a Nissan Atlas refrigeration truck in the summer of 1998.  *Id.* 447.

[101]

*Id.* 448.

Temo testified that Swedan took him to a store called Chloride to measure the batteries for which he was building the stand.  *Id.* 448.

[102]

*Id.* 449-50.

[103]

*Id.* 456-64.

[104]

*Id.* 464-66.

[105]

*Id.* 466-67, 472.

with other trucks, that he needed the holes to build separators inside the truck for his fish-selling business, and that he would caulk the holes to make the refrigerated cabin air tight again.[106]  The welder added that the back of the Nissan Atlas had a specific place for a refrigeration unit, but that the refrigeration unit itself had been removed by the time he made modifications to the truck.[107]

On July 30, 2010, Swedan went to Chloride Exide Tanzania Ltd. in Dar es Salaam, asked for two of the largest batteries the shop sold, and bought two large truck batteries after having a welder measure them for him.[108]

In the same time period, Teacher, one of Ghailani's housemates, and Ghailani shared an armoire located in Teacher's room, Teacher keeping his belongings in the left half and Ghailani his in the right.[109]  The two halves were separated completely from one another, and each man had a separate lock and key for his own half.[110]  Typically, Teacher could see the contents of Ghailani's half when Ghailani opened it.[111]   Beginning around the end of July or in early August 1998, however, the manner in which Ghailani opened his half of the armoire changed.  Ghailani when opening his half of the armoire began positioning his body in a manner that blocked the contents of

---

[106]

Id.

[107]

Id. 473.

[108]

Id. 419-24 (describing transaction and identifying GX 1199 as sales receipt for that transaction); GX 1199 (sales receipt, dated July 30, 1998, for two N150 batteries sold to "Ahmed Ally," signed by Temba).

[109]

Id. 1570-72.

[110]

Id.

[111]

Id. 1572-73.

his half from Teacher's view.[112]  It was reasonable to infer that Ghailani was hiding something in the armoire.

What Ghailani was hiding became clear when the FBI searched Ghailani's half of the armoire after the bombings and discovered a blasting cap and wiring wedged behind the top shelf.[113]  Clothing removed from Ghailani's side of the armoire was found to be covered in PETN residue, a residue given off by the specific type of blasting cap recovered there.[114]  FBI explosives examiner Leo West testified, moreover, that a single blasting cap would have been unlikely to leave residue on nearby items.  Such residue would have been much more likely if a person had handled a large number of detonators still in their packaging.[115]  The jury therefor was entitled to conclude that Ghailani began storing a large quantity of blasting caps in his armoire in July or early August 1998.

In addition, the conspirators used a mobile phone registered in Ghailani's name throughout the summer of 1998 to keep in touch with one another as preparations proceeded simultaneously in Nairobi, Mombasa, and Dar es Salaam.  When the FBI searched Ghailani's half of the locked armoire at 15 Amani Street after the bombings, they found also Mobitel phone records

---

[112]

   *Id.* 1574-75.

[113]

   *Id.* 1734-36; GX 1305.

[114]

   Tr. 1738 (Bamel testifying that clothing was recovered from armoire and sent to FBI for testing); *id.* 640 (West testifying that base charge in this blasting cap was PETN); GX 1462, at 1 (summary of lab results indicating PETN residue on clothing recovered from 15 Amani).

[115]

   Tr. 632-33.

in the name of "Ahmed Khalfan."[116]   Those phone records were found to have Ghailani's fingerprints on them.[117]   The billing records[118] indicated that numerous brief calls were made to Fahad,[119] 43 Runda Estates,[120] the Hilltop Hotel,[121] and a call box located directly outside of the Hilltop Hotel in June, July, and the first week of August 1998.[122]

F.      *Building the Truck Bombs and Making Final Travel Arrangements: Late July through August 6, 1998*

Once the truck bomb materials had been acquired, the conspirators built the truck bombs at 213 Ilala Street in Dar es Salaam and 43 Runda Estates in Nairobi and made final preparations for their coordinated flight.

Evidence from a number of sources showed that 213 Ilala and 43 Runda Estates

---

[116]

GX 1308-P; Tr. 1729-30; *see also* GX S-45, ¶ 1(b).

[117]

GX 1462A-1 (summary showing that all three fingerprints found on the records were identified as Ghailani's).

[118]

GX 1459; GX S-22, ¶ 2.

[119]

Fahad's phone number at that time was "493121." *See* GX 1303, 1303A-1 (address book with "Ahmed Khalfan" inscribed on the front page, found in Ghailani's locked armoire at 15 Amani Street, contains an entry for "Fahad Moh'd, MSA Kenya" listing that number); *see also* Tr. 729-30 (describing discovery of address book during search); *id.* 1984-86.

[120]

The phone number for 43 Runda Estates from May 1998 through August 1998 was "02512430." GX S-22, ¶ 4.

[121]

The number for the Hilltop Hotel in Nairobi from May 1, 1998 through August 1998 was "02250601." GX S-22, ¶ 5.

[122]

A call box located directly outside the Hilltop Hotel from May through August 1998 was assigned number "02229393." GX S-22, ¶ 6.

served as the bomb-making sites in Dar es Salaam and Nairobi, respectively.  Exactly the same type of blasting cap discovered in Ghailani's half of the armoire at 15 Amani Street was found also at 213 Ilala after the bombings.[123]  Moreover, when the FBI searched the 213 Ilala compound after the bombing, it found TNT and PETN residue in nearly every room.[124]  A neighbor of the 213 Ilala residence testified that she saw two vehicles coming and going from 213 for the two months prior to the bombings:  a white Suzuki, and a large white cargo truck with a covered back.[125]  She identified a picture of Harun Fazul as one of the tenants at 213 Ilala and said that Fazul once had come to her door and told her not to worry if she heard any loud noises coming from 213 because they were fixing their gate.[126]

A few days before the bombings, Ghailani attempted to dispose of the refrigeration unit that had been removed from the Nissan Atlas.  He brought a large vehicular refrigeration unit to Sera Auto Parts and asked Salum Issa to tell Rashid, one of Ghailani's housemates and the owner

---

[123]
    *Id.* 1429-31, 1458-59 (identifying GX 1355 as the blasting cap found on windowsill at 213 Ilala); *id.* 637-41 (Agent West describing all of the similarities between GX 1355, blasting cap found at 213 Ilala, and GX 1305, blasting cap found in Ghailani's armoire at 15 Amani, and testifying that he "could find no differences").

[124]
    GX 1462, at 3-6; *see also* GX S-6.

[125]
    Tr. 1496-99.

[126]
    *Id.* 1499-1501.  The evidence is slightly confusing as to who spoke to Mamboshi that day. The government read into the record a stipulation between the parties that "On October 22, 1998, . . . Mamboshi identified a known photograph of 'Harun Fadl' as the man who came to the door of her house to discuss the noises."  The government went on, however, to identify GX 110 (a known photo of Harun Fazul) as the photograph that Mamboshi had identified in 1998.  It seems most likely that the full name in the stipulation simply was mis-recorded or misread at trial and that Mamboshi in 1998 identified the picture of Harun Fazul as the man she had seen.  In any case, she identified one of the conspirators – either Harun Fazul or Mustafa Fadhil – as the 213 Ilala tenant who spoke to her that day.

of Sera Auto, that he could sell it.[127]   Other testimony demonstrated that the refrigeration unit provided to Issa that day was the same one that had been installed in the Nissan Atlas used in the bombings.[128]

Meanwhile, similar preparations proceeded at 43 Runda Estates in Nairobi, where Harun Fazul and others were transforming the Toyota Dyna into a truck bomb.  Simeon, the gardener who did occasional work at 43 Runda that summer, testified that two men on one occasion came out of the area known as the servant's quarters, next to the garage, and darted back out of view when they saw him.[129]  He added that the garage was locked from the inside whenever he visited the house.[130]  When the FBI searched 43 Runda after the bombings, it found TNT and PETN residue on numerous surfaces throughout the house and garage.[131]  It found also large amounts of aluminum powder, which can be used to enhance the detonation velocity of explosives.[132]  The layer of aluminum powder in the garage was so thick that it was visible to the naked eye on all of the

---

[127]

Tr. 506-09.

[128]

Issa testified that he became frightened after the bombings and wanted to get rid of the unit so he gave it to a man named Feisal Ali.  *Id.* 508-09.  Khalfan Jumma Kombo testified that in 1998 a man named Feisal Ali brought a refrigeration unit to him to sell but that the police confiscated the unit before he could sell it.  *Id.* 562-64.  Kombo identified GX 1194 as the unit that Feisal Ali brought to him at that time, and the parties stipulated that the serial number on GX 1194 matches the serial number of the unit that had been installed in the Nissan Atlas prior to the bombing.  *Id.* 565-66; GX S-26, ¶ 2.

[129]

*Id.* 1671-72.

[130]

*Id.* 1675.

[131]

*Id.* 1977-78; GX 788 (summary of FBI examinations of swabbings from 43 Runda Estates); GX S-19.

[132]

Tr. 1975.

26

horizontal surfaces.[133]

While the truck bombs were being built, the conspirators made final travel arrangements and said goodbye to friends and family.  Ghailani's plane ticket – in the name of "Abubakar Khalfan Ahmed" – for a flight from Nairobi, Kenya, to Karachi, Pakistan, on August 6, 2010, was purchased on July 30, 1998, from a store-front travel agency in Mombasa.[134]  Two days later, Abu Mohamed Al Masri's ticket for the same flight on the same day was purchased from the same travel agency in the name of "Abdullah Ahmed Abdullah."[135]  On August 3, 2010, Fahad's and Sadek Odeh's tickets for a different flight from Nairobi to Karachi on August 6 were purchased from the same travel agency.[136]

Swedan was the first to leave.  In late July 1998, long after he had purchased plane tickets to Pakistan, Swedan told his brother that he was relocating his family to Yemen for work,[137]

---

[133]

*Id.*

[134]

*Id.* 979-82; GX 519C (copy of the "agent copy" of the airline ticket issued to "Abubakar"); GX S-27, ¶ 1 (stipulating that an agent copy of an airline ticket is a carbon copy of a validly issued airline ticket and is a business record of the Eagle Travel agency); *see also supra* note 54 and accompanying text (describing evidence related to Ghailani's passport application in the name of "Abubakar Khalfan Ahmed").

[135]

Tr. 987-92; GX 519B (copy of the "agent copy" of the ticket issued to "Abdulla Abdulla" and invoice indicating Abdulla's Yemen passport number 0325191); GX 523, 523-T (official Yemeni government document referencing passport number 325191 issued to "Abdullah Ahmed Abdullah" on September 23, 1993); *see also supra* note 17 and accompanying text (Kherchtou's identification and description of Abu Mohamed Al Masri).

[136]

*See* GX 520A (ticket for "Abdullbast Awadah," purchased August 3, 1998, from Eagle Travel); GX 520B (ticket for "Fahid Msalam," purchased August 3, 1998, from Eagle travel); GX S-27, ¶ 4.

[137]

Tr. 1137-38.

Salim Swedan testified also that to his knowledge his brother Sheikh never had been

this despite the fact that he already had a trucking business in Mombasa.[138]  On August 2, 1998, Swedan and his wife and children flew from Nairobi to Karachi.[139]

The conspirators appear to have coordinated the false story about going to Yemen. Before they flew to Pakistan, Fahad[140] and Ghailani[141] also told friends and family that they were going to Yemen.   In fact, however, they, along with most of the rest of their co-conspirators, went first to Nairobi and then flew to Pakistan, not Yemen.   The guest registry for the Hilltop Hotel in Nairobi shows that Ghailani stayed there under the alias, "Abubakar Khalfan Ahmed" on August 1, 1998,[142] and that Sadek Odeh stayed there under the name "Abdull Basit" on August 4, 1998.[143]

---

[138]

involved in a farming or fishing business.  *Id.* 1136.

[139]

*Id.* 1137.

[140]

Swedan and his family's tickets were purchased on July 1, 1998, from Senator Travel.  *See* Tr. 1503-10; GX 540, at 3-4 (Senator Travel ticket register books indicating July 1, 1998 purchase date for four tickets for Swedan, his wife, and two children); GX 541A-P (copy of Sheikh Swedan's ticket indicating his name, the carrier, flight number, route, date, ticket price, etc.).

[141]

Khalitum Omar testified that her nephew, Fahad, came to say goodbye and told her that he was going to Yemen because he had gotten work there.  *Id*. 1019.

[142]

Two witnesses testified that Ghailani told them that he was leaving for Yemen.  *Id.* 1531(Laddah Hussein, Ghailani's cousin); *id.* 504-05 (Salum Issa Mohamed).  In addition, Teacher testified that Ghailani told him he was leaving for Germany.  *Id.* 1555.

[143]

GX 518, at 4-5 (listing P.O. Box 15577D as "Abubakar"'s address); *see also* GX 1460, at 4 (listing P.O. Box 15577 as "Abubakar"'s address on passport application).

GX 518, at 2 (registering "Abdul Basit," Yemeni passport number 0011061, on August 4, 1998).  *See* GX S-21, ¶ 1 (Sadek Odeh was detained at the Karachi airport on or about August 7, 1998, because he presented to Pakistani customs a Yemeni passport number 0011061 that bore the name "Abdullbast Awadah M.A." and a photograph of someone else).

Sadek Odeh's fingerprint was lifted from room 107 of the Hilltop Hotel after the bombings.

On August 6, 1998 – the day before the bombings – Ghailani, Odeh, and at least three other central figures in the bombing plot flew from Nairobi to Karachi[144] – Ghailani,[145] Abu Muhamed Al Masri,[146] and Abdul Rahman Al Masri[147] on one flight and Fahad[148] and Odeh[149] on a second.   All except Fahad traveled under false names.   Odeh was detained upon his arrival by Pakistani customs.[150]   His bag contained clothing that tested positive for PETN and TNT residue.[151]

---

[144]   *See* GX 696, 697; GX S-19.

[145]   *See* GX S-27, ¶¶ 3-4 (stipulating that GX 522A-1, 520A, and 520B are copies of flight coupons used on KQ310 and PK 746 and that coupons marked as "utilized" or "honoured" for those airlines, respectively, indicate they were used to board the plane); *see also* Tr. 974-1011 (extensive testimony linking various travel documents to the five conspirators).

[146]   GX 519C ("agent copy" of ticket); GX 522A1-OA-P (ticket marked "utilized"); GX 521E (Pakistani disembarkation card); GX 1460 (passport application for "Abubakar"); *see also supra* note 54 and accompanying text.

Ghailani ultimately was apprehended in Pakistan in July 2004.  GX S-36.

[147]   GX 519B ("agent copy" of ticket); GX 522A1-OB-P (ticket marked "utilized"); GX 521C (Pakistani disembarkation card); GX 523-T (Yemeni passport application for "Abdullah Ahmed Abdullah"); *see also supra* note 17.

[148]   GX 522A1-OC-P (ticket marked "utilized"); GX 521D (Pakistani disembarkation card); GX 1460A (visa application for "Mohamed K.A. al Namer") *see also supra* note 19.

[149]   GX 519A ("agent copy" of ticket); GX 520B (ticket marked "honoured"); GX 521A (Pakistani disembarkation card).

[150]   GX 519A ("agent copy" of ticket); GX 520A (ticket marked "honoured"); GX 521B (Pakistani disembarkation card); 526A-P ("Abdullbast Awadah" passport that Odeh tried to use at the Karachi airport); GX S-21, ¶ 1 (stipulating to Odeh's attempted use of passport and detention).

[151]   *See* GX S-21, ¶ 1 (Sadek Odeh was detained at the Karachi airport on or about August 7, 1998, because he presented the fake Abdullbasit passport).

GX 538 (summary of exhibit analysis); GX S-21, ¶ 2 (stipulating contents of bag).

G.      The Bombings

By August 7, 1998 – the day of the embassy bombings – only a handful of conspirators remained to execute the plan.

Around 6:00 a.m., Amina Bakary saw a large refrigerated truck backing out of the 213 Ilala compound.[152]  The truck got very close before the driver braked, causing the rear doors to swing open in front of her.[153]  Bakary saw a large box and two metal cylinders – gas tanks – in the back of the truck before the driver jumped out and closed the doors.[154]  She testified also that the driver appeared to be an Arab and that he got back into the truck and drove off in the direction of town.[155]

At 6:53 and 6:56 a.m., two faxes were sent to Al Qaeda's media office in London claiming responsibility for the bombings, which had not yet occurred.[156]  The fax claiming

---

[152]    Tr. 576-77.

[153]    *Id.*

[154]    *Id.* 577-81.

[155]    *Id.* 581.

[156]    *See* GX 1557E-P, 1557E-T (fax claiming responsibility for Nairobi bombings, received in London at 4:53 a.m. London time on August 7, 1998); GX 1557D-P, 1557D-T (fax claiming responsibility for Tanzanian bombings, received in London at 4:56 a.m. London time on August 7, 1998); GX S-38; Tr. 893-95.

Copies of these faxes were recovered from Al Qaeda's London media office at 1A Beethoven Street during a search on September 23, 1998.  *See* GX S-32, ¶¶ 1-3 (stipulating search's date and location and the items recovered); Tr. 1828-45 (describing search and items seized linking Khalid al-Fawwaz to 1A Beethoven St.); *id.* 726-28, 767-68, 803-05, 882-83 (Kherchtou describing how al-Fawwaz went to London to establish an Al Qaeda media office).

responsibility for the bombing in Dar es Salaam stated that "[t]he operation was carried out by a man from the land of Kinana (Egypt)."[157]  Ghailani's cell phone had been used to call Egypt three times in the 24 hours prior to the bombing,[158] which permitted the inference that the suicide bomber used it to take leave of his family.

The United States embassies in Dar es Salaam and Nairobi were bombed almost simultaneously around 10:30 a.m. on August 7, 1998.[159]  Moses Oyoo, who worked in a building near the U.S. embassy in Nairobi, testified that he saw the bomb truck that morning as it approached the embassy.  He described it as a light brown, half-ton pickup truck with the back area covered by metal.[160]  When the truck reached the final barrier between it and the embassy, a passenger – later identified as Mohamed Rashed Daoud al-'Owhali – jumped out, threw three small explosive charges or grenades toward the embassy, and fled.  The driver then backed the truck up to the embassy gate and detonated the bomb.[161]

These bombings killed over two hundred people, injured and maimed thousands, and

---

[157]

GX 1557D-T, at 1.

[158]

GX 1459, at 19.

[159]

The embassy in Nairobi was bombed at approximately 10:30 a.m. on August 7, 1998.  GX S-15, ¶ 1. The embassy in Dar es Salaam was bombed approximately ten minutes later.  GX S-24, ¶ 1.

[160]

Tr. 227.

[161]

*Id*. 218-27, 1854-63, 1865-66; *see also* GX S-9 (stipulating with respect to al-Owhail's arrest on August 12, 1998).

did tremendous damage to the embassies themselves.[162]  Two hundred and thirteen individuals

perished in Nairobi.[163]  Eleven died in Dar es Salaam.[164]  Approximately 4,000 people were injured

by the bombing in Nairobi, while 85 were injured in Dar es Salaam.[165]

      Later that same day, Harun Fazul – one of the few conspirators who had not yet fled

– made final arrangements to vacate 43 Runda Estates.  He went to the lessor's house and attempted

to return the keys, saying that he needed to terminate the lease early because his father-in-law had

taken sick.[166]  She told him that she needed to inspect the house before she could accept the keys,

and they made plans to meet at 43 Runda a couple of days later.  The day of the bombings, Fazul

called also the gardener Simeon and asked him to come to 43 Runda to help him clean the residence

because Fazul was leaving Nairobi.[167]  Simeon testified that there was nothing left in the house at

that time but that he found bedding and clothes in the servants' quarters, next to the garage.[168]  When

---

[162]

      *See, e.g.*, GX 83A (video footage of the U.S. embassy and surrounding areas in Nairobi in aftermath of the bombing); GX 84 (video footage of the U.S. embassy and surrounding areas in Dar es Salaam in the aftermath of the bombing); *see also* GX S-15 (regarding physical damage in Nairobi), GX S-16 (regarding injuries and deaths in Nairobi); GX S-24 (regarding physical damage in Dar es Salaam); GX S-25 (regarding injuries and deaths in Dar es Salaam).

[163]

      GX S-16, ¶¶ 2-6.

[164]

      GX S-25, ¶¶ 2-4.

[165]

      GX S-16, ¶ 7; GX S-25, ¶ 5.

[166]

      Tr. 1653-54.

[167]

      *Id.* 1675-77.

[168]

      *Id.* 1678.

Simeon asked Fazul why he was leaving, Fazul told him that it was because his work "with the mosque" was finished.[169]  Fazul asked Simeon if he had heard about the bombings, and together they watched some of the news coverage on Fazul's television.  Simeon testified that Fazul "was very nervous and moving in and out of different rooms very nervously."[170]  Simeon and the lessor each saw Fazul one more time, a couple of days later in conjunction with his returning the keys, after which they did not see him again.  It appears that he, like his co-conspirators, fled to Karachi a few days later.[171]

### H.    Ghailani's Knowledge and Intent

The evidence of Ghailani's culpable mental state and intent was plentiful.  His active participation in critical aspects of the conspiracy – the purchase of the Dar es Salaam bomb truck, the purchase of the gas cylinders used in the bomb, the storage and concealment of detonators in his locked armoire, his sheltering of Fadhil, an Al Qaeda operative, and his connection to the cell phone

---

[169]    *Id.* 1677.

[170]    *Id.*

[171]    *See* GX 541N (copy of a ticket purchased August 7, 1998 at Senator Travel in Nairobi in the name of "Abdallah Fazul" for Emirates Air flight 739 flying from Nairobi to Moroni, the Comoros, and for further travel to Karachi via Dubai; GX 540, at 8 (Senator Travel ticket register recording sale); GX S-10, ¶ 2 (stating that "Fazul Abdullah Mohammed" is also known as "Harun Fazul"); GX 903-P, 903-T (passport for "Abdullah Mohamed," containing a photograph of Harun Fazul); GX S-27, ¶ 8 (stipulation regarding GX 541N); Tr. 519-24 (linking relevant government exhibits to GX 541N).

The parties have stipulated that the ticket was for departure Aug. 14, 1998, *see* GX S-27, ¶ 8, but the ticket itself seems to indicate a departure date of Sept. 18.

used in the plot – all support an inference of knowing and willing participation in the conspiracy.[172] His procurement in advance of the bombings of a false passport ultimately used to flee on their eve suggests culpable participation also, particularly given the fact that Ghailani already possessed a different passport and gave false information to others about his intended destination.   This suggestion is rendered all the more compelling by the clear evidence that Ghailani's departure from Tanzania was coordinated with the flight of senior Al Qaeda operatives.[173]   And this is not all.

Al Qaeda is committed to operational secrecy.[174]   Its East Africa cell was especially security conscious at the time relevant here.[175]   The jury was entitled to conclude that it was quite unlikely to involve anyone but a committed operative in activities such as those in which Ghailani participated because anyone else might have revealed Al Qaeda's operation and personnel to authorities either before or, in light of the carnage they wrought, after the bombings.

Finally, the jury was entitled to consider Ghailani's relationships with such key Al Qaeda operatives as Odeh, Swedan, K.K. Mohamed, Fahid Msalam, and Fadhil in assessing his knowledge and intent.   It was well within its province to conclude that Ghailani's associates confided their knowledge of the plot to him.[176]

---

[172]

See, e.g., In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 113 (2d Cir. 2008).

[173]

See, e.g., GX B (summary chart setting forth relevant passengers, including Ghailani, who flew from Nairobi to Karachi on August 6, 1998); see also Tr. 975-87, 992-1009.

[174]

GX 177; Tr. 918-925, 945-56.

[175]

See GX 300A-T.

[176]

See United States v. Ruble, No. S1 05 Crim. 0888 (LAK), 2009 WL 911035, at *3 (S.D.N.Y. Apr. 22, 2009) (jury entitled to infer from close relationship between them that associate told

## II.     The Trial

Ghailani conceded many aspects of the government's case from the outset.  He did not dispute, *inter alia*, the existence of Al Qaeda, that Al Qaeda bombed the embassies in Nairobi and Dar es Salaam, that those bombings resulted in many deaths and injuries, or even that he performed many of the specific actions attributed to him by the government.[177]  His focus from the very beginning was the contention that he was an innocent dupe – that is, that he innocently performed benign acts which, with the benefit of hindsight, turned out to have furthered plans of others to bomb the embassies.[178]

This defense permeated the entire trial.  On cross-examinations, the defendant frequently attempted to show that government witnesses and other innocent people similarly were duped into furthering the conspiracy by performing necessary tasks with no awareness of the conspiracy or its objects.[179]  The defense summation framed the case in exactly these terms.  It began with the declaration that "Ahmed did not know.  Ahmed did nothing with the knowledge that

---

defendant, an alleged conspirator, fact critical to defendant's *mens rea*), *aff'd sub nom. United States v. Pfaff,* Nos. 09-1702-cr(L), 09-1707-cr(CON), 09-1790-cr(CON), 2010 WL 4188245, at *2 (2d Cir. Oct. 26, 2010) (same).

[177]
    For example, Ghailani did not dispute that he bought gas cylinders, spent time at the Azzan store, associated with Swedan and Fahad, and was present when the Nissan Atlas was purchased.

[178]
    *See, e.g.*, Tr. 46-47 ("[W]hat the evidence is going to show is that Ahmed Ghailani had friends and he lived in Dar es Salaam and these friends, better, worse or for whatever reasons, at some point in their lives traveled and became part of al-Qaeda. . . . [T]his case is going to come down to one very simple question:  Did he know?  Did Ahmed Ghailani know?  Did he know what his friends were planning?  Did he know what al-Qaeda was planning?  Did he know what was going to happen? . . . [Y]ou are going to conclude that the answer to that question is no.").

[179]
    *See, e.g.*, *id.* 476-78 (Temo Kisingo); *id.* 1272-74 (Ali Mahfudh Salim); *id.* 1287-88 (Christopher Kazungu Karisa).

his actions would help carry out the bombings of two United States embassies and lead to the murder of hundreds of innocent lives.  Ahmed did not know."  It used the word "dupe" more than twenty times.[180]   The case, the defendant asserted, came down to this:

> "One question.  I'll make this as easy for you today as possible because there is one question for you to decide.  Did he know?  After four weeks of trial, dozens of witnesses, hundreds of exhibits, 200-some charges, I tell you, ladies and gentlemen, there is one question:  Did he know and did he know beyond a reasonable doubt?  And based on the facts and the law, the answer to that one question simply is no.  Ahmed did not know."[181]

## III.    *Jury Deliberations and the Verdict*

The jury was charged on November 9 and 10, 2010.  After about two days of deliberation, the Court received a note from one of the jurors indicating that she disagreed with the other jurors about the appropriate verdict and asking that she be replaced by an alternate.[182]  In response, the Court re-read to the jury that portion of the charge explaining their obligations to

---

180

> *See, e.g.*, *id.* 2258 ("[Ghailani] was used as a dupe by his friends, used as a dupe the way al-Qaeda used the parade of dupes who testified before you as government witnesses."); *id.* 2267 ("Ahmed didn't know the objective of the conspiracy when he engaged in this conduct. He believed Sheik, Fahad, and Rashid when they lied and they got dupes to unwittingly help them carry out this conspiracy."); *id.* 2291 ("Ahmed's role is a dupe, is the Kariakoo kid, the guide for these Mombasa guys, Fahad and Sheikh, into this warren, this maze that is Kariakoo.").

181

> *Id.* 2258.

182

> Ct. Ex. X ("Your Honor Judge Kaplan at this point am secure and I have come to my conclusion But it doesn't agreed with the rest of the juror.  My conclusion it not going to change I feel am been attack for my conclusion.  Therefore am asking you if there is any way I can be excuse or exchange for an alternate juror.  Sign 12 and 82.") (as in original); *see also* Tr. 2567.

deliberate together and to come to a unanimous verdict.[183]  The Court heard nothing further from the jury until mid-afternoon the following day, when a new note asked the Court for additional guidance with respect to conscious avoidance.[184]  After consulting with the parties,[185] the Court gave a supplemental charge on this issue the following morning.[186]  Roughly seven hours later, the jury returned a unanimous verdict,[187] finding Ghailani guilty on Count 5, answering "Yes" to the special interrogatory Question 5b, and finding the defendant not guilty on all other counts.[188]

## Discussion

I.    *The Rule 29 Motion*

    A.    *Sufficiency of the Evidence Generally*

        Conviction on Count 5 required the jury to find that the evidence satisfied each of

---

[183]
    Tr. 2573.

[184]
    Ct. Ex. AC.

[185]
    The defendant argued again that the necessary factual predicate for giving a conscious avoidance charge was lacking, Tr. 2611-12, but he conceded that the supplemental charge correctly stated the law on conscious avoidance, *id.* 2634, 2636, 2638-39; Def. Br. [DI 1071], at 16-17.

[186]
    Tr. 2641-43.

[187]
    No *Allen* charge ever was given to the jury.

[188]
    *Id.* 2646-48.  As per its instructions, the jury did not consider Counts 284 through 286 in light of its verdict on the earlier counts.  *Id.* 2648.

two elements beyond a reasonable doubt:[189]  (1) the existence of the alleged conspiracy – that is, that an unlawful agreement was made between or among two or more conspirators to achieve at least one of the objects alleged in Count 5 – and (2) Ghailani unlawfully, knowingly, and willfully joined that conspiracy with a criminal intent and that he agreed to take part in the conspiracy to further at least one of its unlawful objects.[190]

"Both the existence of a conspiracy and a . . . defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."[191] Here, the evidence clearly was sufficient to satisfy each of the requisite elements beyond a reasonable doubt.

---

[189]

The offense of conviction – violation of 18 U.S.C. § 844(n) – does not require proof of an overt act.  *See* 18 U.S.C. § 844(f), (n).  Ghailani did not object to the Court's instruction that proof of an overt act was not required to convict on Count 5.  *See* Tr. 2054-66 (charge conference); 2463-65, 2543 (charge as given).

[190]

Tr. 2454, 2456, 2466.

In addition, the jury had to find (1) by a preponderance of the evidence that venue was proper, and (2) beyond a reasonable doubt that the conspiracy alleged in Count 5 existed at some point after April 24, 1996, when 18 U.S.C. § 844(n) was enacted, and before December 16, 1998, when the indictment was filed, and that Ghailani joined it within that same time frame.

Ghailani has not challenged the sufficiency of the evidence with respect to either of these aspects of his conviction.  Moreover, the parties stipulated to facts sufficient to establish venue by a preponderance of the evidence – namely, that three of Ghailani's charged co-conspirators first were brought to the Southern District of New York following their arrests outside of the United States.  GX S-37, ¶¶ 1-3; *see also* 18 U.S.C. § 3238.  With respect to the temporal requirement, nearly all, if not all, of the evidence presented to the jury concerning Ghailani's participation in the alleged conspiracy related to alleged conduct by him during the requisite time period.  The evidence therefore was sufficient to satisfy this temporal requirement.

[191]

*Ortiz*, 2010 WL 3736627, at *1 (quoting *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007) (quotation marks omitted)).

Count 5 of the indictment alleged three objects of the conspiracy:

"[to] (i) bomb American facilities anywhere in the world, including the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania; (ii) attack employees of the American Government stationed at those facilities, including the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania; [and] (iii) attack military installations and members of the American military stationed at such military installations in Saudi Arabia, Yemen, Somalia and elsewhere with bombs."

The jury saw and heard abundant evidence of the existence of a conspiracy to bomb the American embassies in Nairobi and Dar es Salaam and thereby to kill employees working there.  A juror could have concluded beyond a reasonable doubt that two or more of Swedan, Fazul, Fahad, Odeh, Abu Mohamed Al Masri, Abdul Rahman, Fadhil, and K.K. Mohamed worked in concert to achieve this purpose.  Indeed, Kherchtou identified several of these individuals as having been Al Qaeda leaders and trainers who previously had been involved in Al Qaeda operations targeting American interests in Africa.   They obtained and modified the trucks used in the bombings, acquired the explosives and other raw materials, rented the buildings and compounds in which the truck bombs were built, and resided at and regularly visited those locations in the relevant period.  Most of them then fled Kenya and Tanzania together the day before the bombings.

The evidence was sufficient also with respect to Ghailani's membership in the charged conspiracy.  The jury heard testimony from several sources that Ghailani was close to key figures in this conspiracy and frequently was seen at locations where actions in furtherance of the conspiracy were taken.  Though he did not drive, he played an active role in purchasing the Nissan Atlas truck used to bomb the embassy in Dar es Salaam.  Though he had no other use for them, he personally sought out and paid for gas cylinders of the type used in the truck bomb.  After the bombings, Ghailani's locked half of the armoire at 15 Amani was found to contain (1) clothes bearing residue of the explosive PETN, a component used in the bombs, (2) Mobitel records for a

cellular phone listed in Ghailani's name from which numerous calls to other individuals and locations associated with the conspiracy were made during the summer of 1998, and (3) an explosives detonator of the exact type found at 213 Ilala Street, where the Dar es Salaam truck bomb was built.  The explosive residue left on his clothing showed that the armoire had contained a large quantity of blasting caps.  In addition, Ghailani lied to his cousin and friends about why he was leaving Tanzania and where he was going – the same lies told by his co-conspirators to their families and friends – and then left the country on a false passport just before the bombings with four of the co-conspirators, two of whom were high-ranking Al Qaeda leaders.  This evidence alone was sufficient to support the finding of membership in the conspiracy alleged in Count 5.  There is other evidence, but there is no need to refer to it in greater detail.

The jury's finding that Ghailani's conduct in Count 5 directly or proximately caused the death of at least one person other than a co-conspirator also is supported by abundant evidence. The parties stipulated that 224 people were killed by injuries resulting from the bombings in Nairobi and Dar es Salaam, 213 in the former and eleven in the latter.[192]  At the very least, the jury was entitled to find that Ghailani's actions in purchasing the gas cylinders that likely were incorporated into the truck bomb in Dar es Salaam proximately caused the deaths that occurred in Dar es Salaam.

B.    *The Alleged Inconsistency in the Verdict*

Ghailani's argument that he is entitled to judgment of acquittal on Count 5 in light of acquittals on other counts begins with a statement by the Second Circuit in *United States v.*

---

[192] GX S-16 (Nairobi); GX S-25 (Dar es Salaam).

*Palmieri,*[193] repeated in *United States v. Chen*[194] and on a handful of other occasions, that "acquittal on a substantive charge does not prevent a conviction for a conspiracy to commit [that offense] *unless the necessary proof on the substantive charge is identical with that required to convict on the conspiracy count.*"[195]  It then postulates that the proof required for conviction on at least some of the charges on which Ghailani was acquitted was identical to that required for conviction on Count 5.  It concludes by contending that the acquittals on the other counts therefore require acquittal on Count 5.  But the argument is deeply flawed.

### 1.    *Ghailani's Premise*

The defense would have the Court infer from the sentence fragment quoted above that the conviction for conspiracy to commit a substantive offense cannot stand if (a) the defendant is acquitted of committing the substantive offense, and (b) the proof necessary to convict on the substantive charge is identical to that required to convict of conspiracy.  In fact, however, neither *Palmieri* – the case from which it is drawn – nor its handful of progeny stands for that proposition in any context relevant here.  Indeed, the quotation is taken quite out of context.

In *Palmieri,* our Circuit *rejected* very much the same argument Ghailani makes here – a contention that a conviction for conspiracy to engage in loan sharking could not stand because the defendant had been acquitted by the same jury in the same trial of the substantive loan sharking offense.  In the course of reconciling the conspiracy and substantive offense verdicts as a factual and

---

[193]    456 F.2d 9 (2d Cir. 1972).

[194]    378 F.3d 151 (2d Cir. 2004).

[195]    *Chen,* 378 F.3d at 164 (quoting *Palmieri,* 456 F.2d at 12) (emphasis added).

legal matter, the Court of Appeals did no more than observe in passing that the acquittal on the substantive charge would not have prevented a conviction for conspiracy unless the "necessary" proof for both was identical.[196]  It cited for that proposition only *United States v. Fassoulis*[197] and *Pereira v. United States.*[198]  As *Fassoulis* did little more relevant to this point than cite *Pereira, Pereira* ultimately underlies Ghailani's argument.

The defendants in *Pereira* were convicted of mail fraud, interstate transportation of stolen property, and conspiracy to commit those offenses.  They argued that the convictions on both the substantive offenses and the conspiracy count violated the Double Jeopardy Clause.  The Supreme Court, however, rejected the argument.  It first stated that:

> "It is settled law . . . that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both.  Only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy."[199]

It concluded that there was no double jeopardy violation because "the charge of conspiracy requires proof not essential to the convictions on the substantive offenses – proof of an agreement to commit an offense against the United States . . . ."[200]  In consequence, *Pereira* did not deal with the subject

---

[196]

The necessary proof of course could not have been identical.  The conspiracy count required proof of an agreement to engage in loan sharking but did not require proof that anyone in fact extended an extortionate loan.  The substantive count required proof of an extortionate extension of credit but not proof of any agreement to do so.  *Palmieri*'s observation therefore was entirely unnecessary to the result – a classic *dictum*.

[197]

445 F.2d 13, 18 (2d Cir.), *cert. denied,* 404 U.S. 858 (1971).

[198]

347 U.S. 1 (1954).

[199]

*Id.* at 11 (internal citations omitted).

[200]

*Id.* at 11-12.

of allegedly inconsistent verdicts at all.  The law on that subject is found elsewhere, has been clear for over a century, and is squarely against Ghailani.

The governing rule, which has its origins in English common law, was stated by Mr. Justice Holmes in *Dunn v. United States*[201] almost eighty years ago:

> "Consistency in the verdict is not necessary.  Each count in an indictment is regarded as if it was a separate indictment.  *Latham v. The Queen,* 5 Best & Smith 635, 642, 643[, 122 Eng. Rep. 968, 971, 972 (1864)] . . . .  As was said in *Steckler v. United States,* 7 F. (2d) 59, 60:
>
>> "'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.  We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'"[202]

This principle has been restated repeatedly by the Supreme Court and our Circuit, both before and after *Pereira*.  Indeed, the Supreme Court ringingly and unanimously reaffirmed it in *United States v. Powell*,[203] where it stated that a court's review of the sufficiency of the evidence on one count "should be independent of the jury's determination that evidence on another count was insufficient"[204] and added that returning an inconsistent verdict:

> "is, as the *Dunn* Court recognized, an 'assumption of a power which [the jury] has no right to exercise,' but the illegality alone does not mean that such a collective judgment should be subject to review.  The fact that the inconsistency may be the

---

[201]

284 U.S. 390 (1932).

[202]

*Id.* at 393.

[203]

469 U.S. 57 (1984).

[204]

*Id.* at 67; *see also United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) ("The review of the legal sufficiency of the evidence with respect to one count should be independent of the jury's determination that the evidence on another count was insufficient to meet the government's burden of persuasion.").

result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable."[205]

As our own Circuit has said, "the convicted defendant's protection against an irrational verdict is his ability to have the courts review the sufficiency of the evidence to support his conviction."[206] Thus, while a handful of cases have referred to the *Fassoulis* "necessary proof" paraphrase of *Pereira* in rejecting challenges to allegedly inconsistent convictions,[207] those cases are neither binding nor persuasive because they have taken that language out of context, done so only in *dicta*, and are inconsistent with binding authority. *Dunn*, *Powell*, *Acosta*, and *Chang An-Lo* control this case. The *Dunn - Powell* line of cases thus would require the rejection of Ghailani's argument even if the proof required to convict on the substantive counts had been identical to that essential to conviction on Count 5.[208] In any case, however, the proof necessary to convict on Count 5 and other

---

[205]

> *Powell*, 469 U.S. at 64-66 (quoting *United States v. Dunn*, 284 U.S. 390, 393 (1932)); *see also United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009) (listing cases in different circuits holding that inconsistent criminal verdicts should not be disturbed); *United States v. Chang An-Lo*, 851 F.2d 547, 559 -60 (2d Cir. 1988) (recognizing as binding *Dunn*'s and *Powell*'s rule allowing inconsistent criminal verdicts); *United States v. Palmieri*, 456 F.2d 9, 12 (2d Cir. 1972) ("Although the jury could have convicted Travisano on the substantive count as an aider and abettor, it chose to convict him only on the conspiracy count. Absolute consistency in the verdict is in any event not required." (citations omitted)).

[206]

> *Acosta*, 17 F.3d at 545.

[207]

> *See United States v. Maracle*, 282 Fed. Appx. 891, 893-94 (2d Cir. 2008) (quoting *Chen* for "necessary proof" language, but finding such proof not to be identical for the conspiracy and substantive counts); *Chen*, 378 F.3d at 164 (quoting *Palmieri* for "necessary proof" language, but finding that such proof was not identical for the conspiracy and substantive counts); *Palmieri*, 456 F.2d at 12 (quoting *Fassoulis*, and citing *Pereira*, for "necessary proof" language, but finding that such required was not identical for the conspiracy and substantive counts); *United States v. Fassoulis*, 445 F.2d 13 (2d Cir. 1971), *cert. denied*, 404 U.S. 858 (1971) (originating the "necessary proof" language but upholding appellant's conviction in the face of double jeopardy challenge).

[208]

> Nor would double jeopardy be a bar in that circumstance because double jeopardy is offended only when a defendant is convicted on two counts charging the same offense. *See,*

counts was not identical.

### 2.     *The Alleged Identity of Necessary Proof*

In order to convict on Count 5, the jury was obliged to find only that (1) the alleged conspiracy existed and (2) Ghailani joined it knowing, or consciously avoiding knowledge, of its unlawful object or objects.  Ghailani points to no substantive count on which the proof necessary to convict was identical.  None of the substantive counts required proof of the existence of the alleged conspiracy or of Ghailani's knowing joinder in it.  Each of the substantive counts required proof of elements that were not necessary to the conspiracy conviction.  Comparison of Count 5 with Count 8, the latter of which charged Ghailani with the bombing of the U.S. embassy in Dar es Salaam, illustrates the point.

Count 8 required proof that (1) Ghailani used an explosive to damage or destroy, or attempt to damage or destroy, a building or other property, (2) the federal nature of the building or other property which was damaged or destroyed, and (3) Ghailani acted unlawfully, willfully, knowingly, and maliciously.[209]  The Court charged further[210] that a conviction on Count 8 could rest on any of three theories:  that Ghailani himself committed the substantive offense, that he aided and

---

*e.g.*, *United States v. Irving*, 54 F.3d 64, 76 (2d Cir. 2009) ("While it is permissible to prosecute a defendant simultaneously on two or more counts charging offenses that are the same for double jeopardy purposes, the Double Jeopardy Clause protects him against multiple punishments for the same offense.  When the jury returns verdicts of guilty on more than one such count, the district court should enter judgment on only one.").

[209]      Tr. 2495-2501.

[210]      *Id.* 2488-94.

abetted another in doing so, or on a *Pinkerton* theory.[211]   In each case, the jury's focus necessarily was on Ghailani's specific actions, knowledge and intent, as the fact that the embassy was federal property was not disputed.

First, conviction on Count 8 on the theory that Ghailani personally committed the offense would have required proof that Ghailani participated in the actual bombing of the embassy. Conviction on the conspiracy count, however, required proof only of the charged conspiracy and of Ghailani's joinder in it with the requisite state of mind.   The proof necessary to the direct commission theory of the substantive offense and to the conspiracy count therefore was different.

Nor does the *Pinkerton* theory require a finding of inconsistency.   While *Pinkerton permits* a jury to find a defendant guilty of a substantive offense committed by a co-conspirator in furtherance of a conspiracy of which he is a member, even where the defendant "did not personally participate in the acts constituting that crime and even if he did not have actual knowledge of it,"[212] it does not *require* that a jury convict on that basis. Thus, the acquittal on Count 8 may have reflected nothing more than the jury's permissible election not to hold Ghailani responsible for a substantive crime committed by co-conspirators notwithstanding Ghailani's participation in the conspiracy.   There was no necessary inconsistency.

Finally, in order to prevail on Count 8 on an aiding and abetting theory, the government was obliged to prove that (1) someone other than Ghailani committed the offense, viz.

---

[211]

    The *Pinkerton* theory allows a jury to find a defendant guilty of any substantive offense committed by a co-conspirator in furtherance of a conspiracy of which the defendant is a member, regardless of whether the defendant was aware of or participated in that substantive offense.  *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946).

[212]

    Tr. 2492-94; *see also, e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 n.10 (2d Cir. 2009); *United States v. Bruno*, 383 F.3d 65, 89-90 (2d Cir. 2004); *United States v. Gallerani*, 68 F.3d 611, 620 (2d Cir. 1995).

the bombing of the embassy, (2) Ghailani "willfully and knowingly . . . associated himself in some way with that crime, and [(3) . . . Ghailani . . . ] participated by doing some act . . . to help make the crime succeed."[213]   Thus, in order to convict on Count 8 on an aiding and abetting theory, the government had to prove among other things, that Ghailani knew that the embassy was a target and that he acted to further that goal.   As the embassy concededly was bombed, the acquittal – if it necessarily meant anything at all beyond the fact that the jury acquitted on Count 8 – necessarily meant only that the jury was not persuaded that Ghailani (1) knew the target and (2) knew it when he took any actions that ultimately proved to have furthered the bombing.

      Count 5 was different in at least two important respects.

      First, there was no requirement that Ghailani himself have taken any actions, either in furtherance of the conspiracy or otherwise, in order to convict on Count 5.   Second, the knowledge requirement on Count 5 was different.   To be sure, conviction on Count 5 required proof that Ghailani, "with knowledge of at least one of its unlawful purposes and with an intent to aid in the accomplishment of its illegal objectives," joined the conspiracy.[214]   But the government sought, and the Court gave, a conscious avoidance charge on the conspiracy counts but not the substantive counts.[215]   Accordingly, the requirement of proof of knowledge of the unlawful purposes of the conspiracy would have been satisfied by proof that Ghailani "was aware of a high probability that an objective of the conspiracy was to commit the crime or crimes charged as the object of the conspiracy and nevertheless participated in the conspiracy."   Such wilful blindness, however, would

---

[213]      Tr. 2489-90.

[214]      *Id.* 2459-60.

[215]      *See id.* 2460-62.

not have sufficed to convict on Count 8, at least on the charge in this case.  Thus, even if the acquittal on Count 8 necessarily implied a finding that the government had failed to prove actual knowledge that the embassy was a target, and it does not, that acquittal would have been consistent with a finding that Ghailani possessed the requisite mental state for conviction on the conspiracy count.

Nor was there any identity of necessary proof on Count 5 and any of the conspiracy counts on which Ghailani was acquitted, Counts 1, 3, 4 and 6.  The objects of the five alleged conspiracies differed despite some overlap.[216]  Moreover, conviction on Counts 1, 3 and 6, unlike Counts 4 and 5, would have required proof of overt acts in furtherance of the alleged conspiracies.[217]

Finally, Ghailani argues also that the jury's special finding that his conduct directly or proximately caused deaths must be set aside.  He contends that the jury's failure to convict on Counts 7 and 8, which charged him with bombing the Nairobi and Dar es Salaam embassies, was inconsistent with the finding that his actions caused death.  As previously discussed, however, there is no requirement of consistency of verdicts.  Moreover, there in any case was no necessary inconsistency between the special finding and any of the acquittals.

---

[216]

The conspiratorial objects alleged in Counts 1 and 2 involved killing Americans and American officials or employees, respectively.  Count 6 alleged an objective to destroy "national defense material."

The relevant object alleged in Count 4 was "[to] bomb the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, *and* employees of the American Government stationed at those embassies."  Tr. 2477 (emphasis added).  In Count 5, however, the objects "to bomb American facilities anywhere in the world, including the American embassies in Nairobi and Dar es Salaam" and "to attack employees of the American government stationed at those facilities" were identified as separate objects such that the jury was required to find a conspiracy with respect to only one or the other objective, not both.

[217]

*See* Tr. 2463-64.

## II.   The New Trial Motion

### A.   The Standard

Rule 33 states that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[218]  The standards governing Rule 29 and Rule 33 motions are similar but not identical.  "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"[219]  Courts must "strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury."[220]  "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."[221]  The Second Circuit has articulated the standard as follows:

> "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  There must be a real concern that an innocent person

---

[218]

FED. R. CRIM. P. 33(a).

[219]

*United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)); *see also United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958) ("It is well settled that motions for new trials are not favored and should be granted only with great caution.").

[220]

*Ferguson*, 246 F.3d at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)).

[221]

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *see also Ferguson*, 246 F.3d at 134 ("An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." (quoting *Sanchez*, 969 F.2d at 1414)).

may have been convicted."[222]

Ghailani has identified three bases on which, he claims, the Court should grant a new trial pursuant to Rule 33. He contends that the interests of justice require it because (1) the verdict on Count 5 cannot be reconciled with the jury's findings on the other counts, (2) instructing the jury on conscious avoidance was prejudicial error, and (3) the government's summation was improper in part. Each of these contentions is without merit.

B. *Alleged Inconsistency in the Verdict*

Ghailani rests his new trial motion in part on the premise that the conviction on Count 5 is inconsistent with the acquittals on the other counts. As previously discussed, this Court sees no necessary inconsistency. Even if there were an inconsistency, however, Ghailani's assumption that it would cut in his favor would be gravely mistaken.

In reaffirming the *Dunn* rule in *United States v. Powell*,[223] the Supreme Court addressed precisely this point:

> "As the *Dunn* Court noted, where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction, the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.' The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts – even verdicts that acquit on a predicate offense while convicting on the compound offense – should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

---

[222] *Ferguson*, 246 F.3d at 134 (internal quotation marks and citations omitted).

[223] 469 U.S. 57.

> But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

> "Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored.  Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course."[224]

In other words, even if the verdict in this case were inconsistent, it would be entirely possible that the "victim" of the jury's "error" was the government, not Ghailani.  The government may have suffered unwarranted acquittals in the face of persuasive evidence of guilt, in which case a new trial would be an undeserved windfall for Ghailani in consequence of a jury compromise, jury leniency or some other reason that favored him at the government's expense.   Since the government is foreclosed from appealing or challenging the acquittals, we consider only the question whether the conviction on Count 5 rested on a legally sufficient basis and is consistent with the weight of the evidence.

As our Circuit has made clear, the ultimate question is whether the conviction on Count 5 was a manifest injustice.  This Court is persuaded that it was not.  The jury, in the Court's view, rightly found Ghailani guilty of the charge asserted in Count 5.  Moreover, the undersigned is satisfied that Ghailani was guilty, at least on a *Pinkerton* theory, of at least the substantive offenses of bombing the two embassies charged in Counts 7 and 8 and of the 224 murders charged in Counts 11 through 234.  Thus, if there was any injustice in the jury's verdict, the victims were the United States and those killed, injured and otherwise devastated by these barbaric acts of terror, not Ghailani.

---

[224] *Id.* at 64-65 (quoting *Dunn,* 284 U.S. at 393).

C.     *The Conscious Avoidance Charge*

The theory of Ghailani's defense was that he was an innocent dupe.  This contention permeated his defense.  Nonetheless, Ghailani argues that the evidence did not justify the giving of a conscious avoidance charge and that he therefore is entitled to a new trial.

In our Circuit,

"A conscious avoidance instruction is properly given (i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."[225]

The first condition clearly was satisfied here because (1) knowledge of one or more of the objects of the conspiracy alleged in Count 5 was required in order to convict Ghailani on that count, and (2) Ghailani argued to the jury that he "didn't know the objective of the conspiracy."[226]

The second condition was satisfied also.  For the same reasons that a jury was entitled to infer Ghailani's actual knowledge of at least one object of the conspiracy,[227] a reasonable jury could have found also that Ghailani, assuming he lacked actual knowledge, was aware of a high probability that the object of the conspiracy was to bomb the embassies and that he consciously avoided confirming that fact.

---

[225]

*United States v. Ramirez*, 320 Fed. Appx. 7, 10-11 (2d Cir. 2009) (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003) (internal quotation marks and citations omitted)).

[226]

Tr. 2267; *see also, e.g.*, *id.* 46, 47, 2306, 2325, 2328, 2336.

[227]

*See supra* Discussion, Part I.A.

Ghailani and his associates bought a truck that he could not drive and gas cylinders for which neither he nor they had any known use save as bomb components.  He possessed a large quantity of detonators or blasting caps of the sort used in making the truck bombs.  That a plot was afoot to bomb something was obvious, and the jury was entitled to find that Ghailani knew at least that much.  In addition, there was ample evidence that Al Qaeda effectively had declared war on the United States and Americans generally, civilian as well as military.  It regarded U.S. embassies as attractive targets.  Ghailani was well acquainted and associated closely with Al Qaeda members and operatives whom the jury reasonably could have found to have known of these objectives and shared them with Ghailani.  In these circumstances, the evidence was more than sufficient to warrant a rational jury in concluding that Ghailani, even if ignorant of the specific bombing targets, was aware of a high probability that they included U.S. embassies and consciously avoided learning that fact.

The conscious avoidance charge was proper.

D. *The Government's Allegedly Improper Summation*

As previously discussed, Ghailani's defense was built on the argument that he was an innocent dupe.  The defense summation began with the phrase "Ahmed did not know" and argued that assertion throughout.  The government's rebuttal summation responded to this defense, in part, as follows:

> "There are hundreds and hundreds of names in this indictment.  Hundreds.  And the thing to know about killing on this scale is that killing on this scale is horribly [*sic*], it's planned and it's precise, and it's terribly sophisticated.  And in the course of an operation like that that cost us many lives, there is no room for some dupe just to get led into the heart of it.  No room for a dupe because he might get cold feet.  And there's no room for a dupe because he might talk to his friends.  And there's no room for a dupe because he might call the cops.  And the other thing about killing on this scale is there's no room for a dupe because when it's done the costs are so high and so gruesome and so apocalyptic that anyone with a conscience, *no dupe stays silent*

*in the face of being involved in this kind of thing*.  That's why there are no dupes in this."[228]

Ghailani concedes that much of the government's rebuttal was fair argument, including many parts that responded to his "dupe" defense.  He asserts, however, that a new trial is warranted because the italicized comment quoted above was improper in two respects: (1) Ghailani's defense was not based on withdrawal from the conspiracy, and the comment improperly placed on him the burden of showing why he did not immediately report to the police, and (2) "the Government was well aware that there were in fact many similar dupes that . . . did not [] immediately report to the police."[229]  Ghailani argues that these improprieties were "akin to a *Napue* violation" and amounted to a denial of Ghailani's due process in the specific context of this case.[230]

The first problem with Ghailani's argument is that he did not object to the prosecutor's comment at the time it was made.  Indeed, he waited until the filing of his memorandum in support of the present motion weeks after the trial ended.  Accordingly, the comment, even if it had been inappropriate, would warrant relief  "only where [it] amounted to a "flagrant abuse.""[231]

---

[228]

Tr. 2419 (emphasis added in Def. Br. 27).

[229]

Def. Br. 29-30.

In particular, Ghailani asserts that "[B]ased upon the Government's pretrial claim that [Hussein] Abebe was, essentially, a dupe, coupled with its knowledge that Abebe willfully and intentionally avoided reporting information to the police for approximately eight years, the Government should not have been permitted to argue at trial that 'no dupe stays silent in the face of being involved in this kind of thing.'" *Id.* 31.

[230]

*Id.* 29.

[231]

*United States v. Farmer,* 583 F.3d 131, 147 (2d Cir. 2009) (quoting *United States v. Coriaty,* 300 F.3d 244, 255 (2d Cir. 2002) (quotation marks and brackets omitted)).

Ghailani's contention that the comment at issue improperly shifted the burden of proof to him is unpersuasive.  The prosecutor's meaning was not that Ghailani had failed to demonstrate his innocence.  Rather, it was a response to Ghailani's repeated contention that he was a naif, duped into unwittingly assisting others in their preparations to bomb the embassies.  The point was that Al Qaeda would not have allowed a dupe to operate at the heart of the embassy bombings plot because a dupe could not be counted upon to refrain from revealing to authorities what he had learned and seen, particularly after the bombs had wrought their carnage.[232]  There was no shifting of the burden of proof.  In any case, the prosecutor's fleeting remark here certainly did not amount to a flagrant abuse, either in isolation or in the overall context – an overall context in which Ghailani's "dupe" defense clearly invited the comment and in which a lengthy charge repeatedly made clear that the burden of proof always was borne by the government and never shifts to the defendant.

Ghailani's second argument concerning this comment rests on the premise that others who in one way or another provided the conspirators with something that wound up being useful in the bombing plot did so without having been aware of the conspirators' intentions and nevertheless did not rush to the police in the wake of the bombings.  Accordingly, he argues, the prosecutor's comment that Ghailani's failure to do so, which Ghailani construes to have been a suggestion of Ghailani's guilt, was analogous to the knowing presentation of false evidence in violation of *Napue v. Illinois.*[233]

This argument too is unconvincing.  Here as well, the prosecutor's statement was a

---

[232]

Tr. 2378-84.

[233]

360 U.S. 264, 269 (1959).

fair response to Ghailani's "dupe" defense.  In any case,  "[p]rosecutorial misconduct is a ground for reversal only if it causes the defendant 'substantial prejudice' by 'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.  Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'"[234]  The Second Circuit applies "a three-factor test in determining the existence of 'substantial prejudice' where a prosecutor's summation is challenged: 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'"[235]

In the context of the full trial record – the opening statements and summations, the evidence, and the thorough instructions provided to the jury – the comment identified above by Ghailani was not "egregious misconduct."[236]  First, it is doubtful that it was improper in any respect.  Moreover, any improper prejudicial effect was minimal.[237]  The jury instructions and both parties' summations clearly and repeatedly instructed the jury that the burden of proof belonged only to the

---

[234]

United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal citations omitted); see also United States v. Young, 470 U.S. 1, 11-12 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify . . . [reversing] a criminal conviction in an otherwise fair proceeding.  Instead . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error.").

[235]

Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir.) (per curiam), cert. denied, 456 U.S. 989 (1982)); see also United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2003); Shareef, 190 F.3d at 78; United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995).

[236]

See Elias, 285 F.3d at 190 ("[T]his Court has repeatedly stated that the severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding.").

[237]

With respect to the second factor, no corrective actions were taken by the Court because no misconduct was brought to its attention.  Defense counsel did not object to any aspect of the government's summation rebuttal when it was delivered.

56

government.  In addition, as was described at length above, Ghailani's conviction was supported by sufficient evidence.  The Court is convinced that Ghailani would have been convicted even absent the comment in question.  There certainly was no manifest injustice requiring a new trial.

*Conclusion*

The defendant's motion for a judgment of acquittal or, in the alternative, for a new trial [DI 1061] is denied.

SO ORDERED.

Dated:          January 21, 2011

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)